UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SCOTT A. BRIGHT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>KALSHIEX LLC, a Delaware limited liability company; and KALSHI INC., a Delaware corporation,<br><br>Defendants. | Case No. 2:26-cv-04091<br><br>DECLARATION OF JESSICA E. LA LONDE IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS |

I, Jessica E. La Londe, declare as follows:

1. I am an attorney with Duane Morris LLP, counsel of record for Defendants KalshiEX LLC and Kalshi Inc. in the above-captioned action. I am admitted to practice law in the State of Washington and before this Court. I submit this declaration in support of Defendants' Motion to Stay Proceedings. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto.

2. Attached hereto as **Exhibit A** is a true and correct copy of the Complaint for Injunctive and Other Relief filed in *State of Washington v. KalshiEX LLC*, No. 26-2-10264-3 SEA (Wash. Super. Ct. King Cnty. Mar. 27, 2026).

3. Attached hereto as **Exhibit B** is a true and correct copy of the Amended and Updated Order Granting Plaintiff State of Washington's Amended Motion for Preliminary



Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127

Injunction entered in *State of Washington v. KalshiEX LLC*, No. 26-2-10264-3 SEA (Wash. Super. Ct. King Cnty. Aug. 12, 2026).

4. Attached hereto as **Exhibit C** is a true and correct copy of the Petition for a Writ of Certiorari filed in *Flaherty v. KalshiEX LLC*, No. 26-299 (U.S. Sept. 2, 2026).

5. Attached hereto as **Exhibit D** is a true and correct copy of the Brief of Amicus Curiae Commodity Futures Trading Commission filed in *North American Derivatives Exchange, Inc. v. Nevada*, No. 25-7187, Dkt. # 37.2 (9th Cir. Feb. 17, 2026).

6. Attached hereto as **Exhibit E** is a true and correct copy of the Opinion and Order entered in *Ho-Chunk Nation v. Kalshi Inc.*, No. 25-cv-698-wmc, Dkt. # 114 (W.D. Wis. Sept. 11, 2026).

7. Attached hereto as **Exhibit F** is a true and correct copy of an excerpt of the docket in *Georgia Gambling Recovery LLC v. Kalshi Inc.*, No. 4:25-cv-310 (M.D. Ga.), reflecting the text-only order entered at Dkt. # 73 on May 18, 2026.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30th day of October, 2026, at San Francisco, California.

*/s/ Jessica E. La Londe*

Jessica E. La Londe (WSBA# 56399)
Spear Tower, One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
P: 415.957.3225
F: 415.520.9395
jelalonde@duanemorris.com

*Declarant*

# EXHIBIT A

FILED
2026 MAR 27 09:00 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-10264-3 SEA

**STATE OF WASHINGTON**
**KING COUNTY SUPERIOR COURT**

| | |
|---|---|
| STATE OF WASHINGTON,<br>Plaintiff,<br>v.<br>KALSHIEX, LLC,<br>Defendant. | NO.<br>COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF |

## I. INTRODUCTION

1.1 KalshiEx, LLC ("Kalshi") claims to have "cracked the code on legal betting in all 50 states" through its online betting platform. Kalshi offers and advertises a continuous and captivating stream of opportunities to bet money online on thousands of topics ranging from sports and elections to the total number of "measles cases this year," "what will the witnesses say during the Child Trafficking hearing," and whether Ali Khamenei will be "out as Supreme Leader" of Iran, all while Kalshi takes a cut of the action. Under longstanding, well-established, and unambiguous Washington state law, Kalshi's gambling operation is illegal.

1.2 Washington has some of the most restrictive gambling laws in the United States. The Washington Constitution of 1889 explicitly prohibited all gambling activities on state lands, and Washington continues to tightly regulate gambling to this day. In 2006, the Washington State Legislature expressly banned online gambling, finding that "with the advent of the internet and other technologies . . . it is appropriate for this legislature to reaffirm the policy prohibiting gambling that exploits such new technologies." Laws of 2006, ch. 290, § 1. That prohibition



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

remains in effect, with the sole exception of sports wagers placed and accepted on tribal lands. RCW 9.46.240.

1.3 In direct violation of this prohibition and public policy, Kalshi operates its online betting market nationwide, including in Washington and other states that prohibit online gambling. In its advertising and marketing, Kalshi specifically promotes illegal online sports gambling in Washington state.




1.4 Kalshi's platform extends well beyond sports gambling, however, to include betting on politics, news, entertainment and cultural topics, so-called 'mention markets' that urge bettors to wager on what will be said during public broadcasts, and thousands upon thousands of niche issues—all available online 24/7. Indeed, Kalshi boasts that it has made it possible to "bet on anything" by restructuring and rebranding traditional gambling models as "predictive markets." In so doing, Kalshi is driving an explosion of online gambling activity, while openly violating Washington law, and turning a profit in the process.

1.5 Kalshi's gambling operations violate numerous provisions of Washington's Gambling Act, as well as the Consumer Protection Act and the Recovery of Money Lost at



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Gambling Act. The Attorney General accordingly brings this enforcement action in the name of the State and as *parens patriae* on behalf of persons residing in Washington to prevent and remedy Kalshi's unlawful, unfair, and deceptive business practices and to vindicate the public interest.

## II. JURISDICTION AND VENUE

2.1 The Attorney General files this Complaint to enforce Washington's Consumer Protection Act, RCW 19.86 (CPA), Gambling Act, RCW 9.46, and Recovery of Money Lost at Gambling Act, RCW 4.24.070 (RMLGA). This Court has jurisdiction under these statutes, as well as RCW 2.08.010 and RCW 7.24.010.

2.2 Kalshi has engaged in the conduct set forth in this Complaint in King County and elsewhere in the State of Washington.

2.3 Venue is proper in King County pursuant to RCW 4.12.020 and RCW 4.12.025, and Civil Rule 82 because Kalshi transacts business in King County by offering, operating, conducting, marketing, promoting, and/or distributing unlicensed and illegal gambling activities, including, without limitation, illegal gambling games, bookmaking, sports wagering, professional gambling and/or gambling devices (hereinafter, collectively, "Illegal Gambling Activities"), to consumers in King County.

## III. PARTIES

3.1 The Plaintiff is the Washington State Attorney General's Office, Consumer Protection Division.

3.2 The Attorney General is authorized to commence this action pursuant to RCW 19.86.080, RCW 19.86.140, and RCW 43.10.030 to address practices that violate the CPA, the Gambling Act, and the RMLGA, and to vindicate the rights of the public because Illegal Gambling Activities are matters of public concern. RCW 9.46.010, .0213, .0269, .038, .0368, .903.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

3.3 Defendant Kalshi is a Delaware limited liability company with its principal place of business located at 594 Broadway, Suite 407, New York, New York 10012. Kalshi is a wholly owned subsidiary of Kalshi, Inc. Kalshi is not licensed by the Washington State Gambling Commission to conduct online gambling.

3.4 Kalshi conducts business throughout King County and throughout Washington State by offering, operating, conducting, marketing, promoting, and/or distributing unlicensed and Illegal Gambling Activities to Washington consumers. Kalshi offers, operates, and advertises in Washington State, and it collects fees from bets made within Washington State.

## IV. FACTS

### A. The Evolution of Kalshi's Unlawful Gambling Activity

4.1 Tarek Mansour and Luana Lopes Lara founded Kalshi in 2018. "Kalshi" means "everything" in Arabic, reflecting the founders' vision of allowing people to "bet on everything."[1] Indeed, Kalshi advertises that it has "cracked the code on legal betting in all 50 states" for "sports markets" and "everything else."




[1] Oliver Roeder, *This 29-year-old is worth $15b and wants you to bet on everything*, Australian Financial Review (Feb. 10. 2026), https://www.afr.com/companies/games-and-wagering/this-29-year-old-is-worth-15b-and-wants-you-to-bet-on-everything-20260210-p5o0x0 (last accessed March 26, 2026).



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

4.2 Kalshi's platform became publicly available in 2021, initially offering a limited selection of topics. Over time, Kalshi rapidly expanded both the scope of its offerings and the reach of its platforms. By 2024, Kalshi began allowing bets on politics, advertising that "[y]ou can't bet on sports," but "[f]or the first time in 100 years, you can now bet on the election!"




4.3 Kalshi's political betting offerings include primary and general election outcomes, voter turnout, party control of Congress, and results in swing states. For example, bettors could wager on the outcome of the 2025 King County Executive race and can currently wager on the various 2026 House primaries in Washington congressional districts, the 2028 Washington gubernatorial race, which party will control the Washington State Senate in 2028, and the outcome of the 2028 U.S. presidential election. Kalshi also offers Washingtonians opportunities to bet on numerous political issues and elections outside the United States including, as one of many examples, who will become the next mayor of Lyon, France.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

4.4 In 2025, Kalshi launched "mention markets," which encourage betting on whether specific words or phrases will be used by public speakers—including politicians, sports announcers, and actors—during speeches, television shows, or broadcasts. For example, Kalshi permitted bettors to wager on whether Survivor host Jeff Probst would say the words "alliance," "immunity idol," or "tribe has spoken."




4.5 In early 2025, Kalshi announced its entry into the sports betting market just ahead of the Super Bowl and today sports betting constitutes a substantial percentage of Kalshi's platform.

4.6 In August and September 2025, Kalshi expanded its sports betting options by offering spread bets (a bet on the difference in score between two competing sports teams), over/under wagers (a bet on how many total points will be scored in a sports game), and proposition bets (bets on specific things that may occur within a sports game, such as the number of touchdowns a football player might score during the game).



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

4.7 For example, Kalshi offered bets on whether the Gonzaga University Bulldogs would beat the Seattle University Redhawks by more than 11.5 points, or whether the teams would combine to score more than 149.5 points total, during a midseason college basketball game.







4.8 In recent months, Kalshi began offering "combo" bets, known to sports bettors as a "parlay." These bets link the outcomes of multiple wagers, where each wager must win to get a payout. To place a "combo" bet, a Kalshi user links together multiple wagers and submits a Request for Quote (RFQ). RFQs are reviewed by designated entities who have access to Kalshi's Application Programming Interface (API) and act like a traditional casino "house," calculating odds and prices for each combo bet.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

4.9 Over time, the scope of Kalshi's offerings has expanded to a nearly limitless array of political, popular culture, and other issues to bet on, including, for example, the total number of "measles cases this year" and "what will witnesses say" during a child trafficking hearing.







4.10 Kalshi also allowed bets on when Ali Khamenei would be "out as Supreme Leader" of Iran.




4.11 Kalshi's bet-on-anything model is designed to provide a constant stream of wagering opportunities, generating ever-greater volumes of betting activity, and driving up Kalshi's profits.

**B. Kalshi's Betting Platform**

4.12 Kalshi operates its online betting platform on its website at https://kalshi.com and through its mobile applications for Android and Apple iOS devices. The platform is readily accessible to Washington residents and does not restrict access based on location. Any



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Washingtonian over 18 years old can create an account, deposit funds, and place bets from anywhere in the state.

4.13 Kalshi collects transaction fees, which vary depending on the expected earnings, of each bet. Kalshi also charges bettors fees for certain types of deposits and withdrawals from their accounts.

4.14 The price of an individual bet on Kalshi fluctuates between $0.01 and $0.99 per bet, exclusive of any transaction fees. The individual bet price is determined by the volume of "yes" and "no" bets on an underlying question. As more "yes" bets get placed compared to "no" bets for a question, the price of a "yes" bet goes up and the price of a "no" bet goes down.

4.15 If the price of a bet changes before the underlying question resolves, bettors can "sell" their bets at the updated price. Once the question is resolved, winning bettors receive $1 and losing bettors receive $0.

4.16 Kalshi's platform matches bettors on opposite sides of a particular wager. For example, if Kalshi offers a bet asking, "Will the Seattle Mariners win their game on Friday?" a user might want to bet "yes" at 0.65 cents, expecting the Mariners to win. To complete the wager, another Kalshi user must take the opposite side of this bet. If the Mariners win, the first user receives the full $1.00 payout, and the second user receives nothing. Regardless of the outcome, Kalshi takes its transaction fees from both users.

4.17 In order to ensure a sufficient volume of betting activity on both sides of a bet, Kalshi uses so-called "market makers," including its own affiliated entity, Kalshi Trading LLC ("Kalshi Trading"), to place bets. Individual Kalshi users never know whether they are betting against other bettors or against a market maker like Kalshi Trading. In this way, Kalshi plays a role similar to that of the house in a traditional gambling model.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

## C. Kalshi's Illegal Gambling Activity Violates Washington's Strict Gambling Laws and Public Policy

4.18 Under Washington law, every core feature of Kalshi's Illegal Gambling Activities—its wagers, fees, and online transmission of gambling information—constitutes illegal online gambling.

4.19 Since Washington's founding in 1889, gambling has been tightly regulated in the state. This long-standing public policy protects the health, welfare, and safety of Washingtonians.

4.20 Over time, the Legislature has reaffirmed the need to regulate gambling in light of advancing technologies. In 2006, the Washington Legislature passed Substitute Senate Bill 6613 (SSB 6613), reaffirming that all forms of internet and electronic gambling remain prohibited, unless explicitly authorized.[2] Section 1 of SSB 6613 states:

> It is the policy of this state to prohibit all forms and means of gambling, except where carefully and specifically authorized and regulated. With the advent of the internet and other technologies . . . it is appropriate for this legislature to reaffirm the policy prohibiting gambling that exploits such new technologies.[3]

4.21 SSB 6613, codified at RCW 9.46.240, effectively banned all online gambling in Washington. *See Rousso v. State*, 170 Wn.2d 70, 74-75, 239 P.3d 1084 (2010) (RCW 9.46.240 "criminalizes the knowing transmission and reception of gambling information by various means, including use of the Internet. Since sending and receiving gambling information is illegal, Internet gambling in the state of Washington is effectively banned.").

4.22 Kalshi's Illegal Gambling Activities meet every element of the definition of gambling under state law. Washington's Gambling Act defines "gambling" broadly to include "staking or risking something of value upon the outcome of a contest of chance or a future

---

[2] SSB 6613, 59th Leg., Reg. Sess., Laws of 2006, ch. 290 ("reaffirming and clarifying the prohibition against internet and certain other interactive electronic or mechanical devices to engage in gambling[.]").

[3] *Id.*, § 1.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome." RCW 9.46.0237.

4.23 A "contest of chance" means "any contest, game, gaming scheme, or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." RCW 9.46.0225.

4.24 A "thing of value" means "any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge." RCW 9.46.0285.

4.25 On Kalshi, bettors wager on issues ranging from sports scores, political elections, popular culture to you-name-it. Each bet risks money, relies in part on chance, and promises a payout to winners. Kalshi's Illegal Gambling Activities therefore constitute gambling under Washington law.

4.26 Kalshi's Illegal Gambling Activities also constitute "professional gambling," which is illegal in Washington. RCW 9.46.220-.222. "Professional gambling" occurs when an entity "knowingly accepts or receives money or other property pursuant to an agreement or understanding with any other person whereby he or she participates or is to participate in the proceeds of gambling activity." RCW 9.46.0269. Kalshi charges fees for every bet and ensures liquidity through its affiliated entity, Kalshi Trading. By facilitating wagers, absorbing unmatched bets, and collecting fees, Kalshi profits from professional gambling at every stage.

4.27 Kalshi also engages in illegal "bookmaking" under state law by accepting bets as a business and charging a fee to place bets on its platform. Washington considers "bookmaking"—accepting bets for a fee—to constitute illegal "professional gambling." RCW 9.46.0213; RCW 9.46.0269(d); RCW 9.46.220-.222; *see Internet Cmty. & Ent. Corp. v.*



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

*Washington State Gambling Comm'n*, 169 Wn.2d 687, 694-95, 238 P.3d 1163 (2010) (finding "bookmaking" includes "either accepting bets as a business or charging a fee for the opportunity to place a bet" and is "therefore professional gambling under RCW 9.46.0269").

4.28 Kalshi also transmits gambling information on the internet and maintains equipment to do so, in violation of Washington law. RCW 9.46.240. "Gambling information" means "any wager made in the course of and any information intended to be used for professional gambling. . . . [I]nformation as to *wagers, betting odds and changes in betting odds shall be presumed to be intended for use in professional gambling*." RCW 9.46.0245 (emphasis added); *see Internet Cmty.*, 169 Wn.2d at 695-96 (finding that "information on wagers and odds [online betting platform] received from its users must be presumed, under the plain terms of the statutes, as intended for use in professional gambling"). Kalshi's website and mobile applications, which provide real-time odds and match users for wagers, clearly fall within this prohibition.

4.29 Kalshi likewise violates Washington's prohibition of internet gambling, which "introduces new ways to exacerbate the[] same threats to health, welfare, safety, and morals" as traditional gambling, including "gambling addiction" and "other societal ills." *See Rousso*, 170 Wn.2d at 82. Online sports wagers are illegal in Washington unless "placed and accepted at a tribe's gaming facility [and] only while the customer placing the wager is physically present on the premises of that tribe's gaming facility." RCW 9.46.0368. Kalshi violates Washington law by allowing Washingtonians to place online bets from anywhere in the state.

4.30 Finally, Kalshi also violates Washington's prohibition on gambling records and unlicensed gambling devices. "Gambling records" include "any record, receipt, ticket, certificate, token, slip or notation given, made, used or intended to be used in connection with professional gambling." RCW 9.46.0253; RCW 9.46.217; *see Internet Cmty.*, 169 Wn.2d at 696 ("Because we hold that [online betting platform] was engaged in professional gambling, it necessarily follows that it used 'gambling records' as part of its business."). "Gambling devices" include "any device . . . or installation designed primarily for use in connection with professional



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

gambling" such as "electronic games of chance." RCW 9.46.0241. Kalshi's website and mobile apps constitute "gambling devices" and all of Kalshi's records in connection with its professional gambling platform constitute illegal "gambling records" under Washington law.

4.31 Every aspect of Kalshi's Illegal Gambling Activities, from engaging in unlicensed gambling in violation of RCW 9.46.160 to illegal bookmaking and transmitting gambling information through online gambling devices, constitutes illegal gambling in Washington. Kalshi profits from each of these unlawful activities, in direct violation of the explicit prohibitions in state law and Washington's longstanding public policy of tightly regulating gambling to protect the health, welfare, and safety of its residents.

**D. Kashi Provides and Promotes Addictive Gambling Activities**

4.32 Gambling addiction is a public health crisis throughout the country, including in Washington. Approximately 2.5 million adults in the U.S. engage in compulsive gambling and suffer from gambling disorder, a clinically recognized behavioral addiction. An additional five to eight million adults experience problems due to their gambling behavior, with often devastating consequences to the individuals involved, their families, and communities.[4]

4.33 According to the 2021 Washington State Adult Problem Gambling Prevalence Study, among Washington adults who gambled, 3.5% would likely be diagnosed with gambling disorder (1.5% of all adults), and 17% were at an increased risk for problem gambling (7.5% of all adults).[5]

4.34 The Washington State Adult Problem Gambling Prevalence Study further found that the prevalence of moderate-to-severe problem gambling was substantially higher among "online gamblers" (10.3%) compared to all gamblers (3.5%). Additionally, "online gamblers"

[4] Nat'l Council on Problem Gambling, Problem Gambling Fact Sheet, www.ncpgambling.org/wp-content/uploads/2025/01/PGAM-2025-Problem-Gambling-Fact-Sheet.pdf (last accessed March 26, 2026).

[5] Washington State Health Care Authority, 2021 Washington State Adult Problem Gambling Prevalence Study Results: Report to the Legislature (June 30, 2022), at iv, www.evergreencpg.org/wp-content/uploads/2022/12/wa-state-adult-problem-gambling-prevalence-study-final-2021.pdf (last accessed March 26, 2026).



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

were almost four times as likely to experience problem gambling compared to gamblers who only gambled at brick-and-mortar venues such as Washington's tribal casinos where sports gambling is legal in Washington (10.3% as compared to 2.6%).[6]

4.35 The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) categorizes gambling disorder as an "addictive disorder," making it the only defined behavioral addiction recognized in the DSM-5. The symptoms of gambling disorder include an increased tolerance for gambling (i.e. wagering more money over time), repeated unsuccessful efforts to control, reduce, or stop gambling behavior, and lying or concealing the extent of gambling involvement from others.[7]

4.36 Gambling stimulates the brain's dopamine center and reward system and leads gamblers to participate in risky behavior and risk their money in the hopes of gaining the "high" of a winning wager. Over time, this continuing chase for the "gambler's high" often leads to addiction.

4.37 Gambling addiction can destroy the lives of the gamblers, but the destructive effects of compulsive gambling are not limited to the gamblers themselves. Gambling disorders also negatively affect spouses, partners, children, and others. Studies show for example that gambling disorders are associated with higher rates of domestic and intimate partner violence.[8]

4.38 Kalshi's advertising targets young adults, particularly young men, to place bets on its platform. Young men are at a disproportionally higher risk of developing problem

---

[6] *Id.* at vii.

[7] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).

[8] Nerilee Hing et al., *An integrative review of research on gambling and domestic and family violence: Fresh perspectives to guide future research*, 13 Frontiers Psych., Oct. 2022 [https://doi.org/10.3389/fpsyg.2022.987379]; *see also*, American Gaming Association, "Engaging in Responsible Play," https://www.americangaming.org/responsibility/ (last accessed March 26, 2026).



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

gambling behaviors.[9] Yet, Kalshi is expanding its reach among college students by leveraging social media campaigns and student influencers, amplifying exposure to this high-risk group.[10]

4.39 The risks and harms associated with online gambling are also greater than with in-person gambling (such as that permitted at Washington's tribal casinos) because mobile devices are a necessity of life and people carry them everywhere. From their mobile phones and other devices, users can gamble on Kalshi anywhere and at any time—at home, at work, at lunch, at their children's soccer games, on vacation, or anywhere else that receives a signal.

4.40 Kalshi's online betting platform is addictive and can lead to gambling disorder in the same way as any other form of gambling. Kalshi has admitted as much itself by advertising on Instagram that Kalshi, in its own words, is "kind of addicting."[11]

4.41 Kalshi encourages gambling and potential addiction by including features on its apps that are designed to encourage continued engagement, attention, and betting. These include behavioral design mechanisms meant to encourage impulsive engagement, push notifications to users' phones, and advertisements through sponsored influencers.

4.42 Kalshi encourages high-risk gambling behavior by emphasizing reward while minimizing risk. When placing a bet, Kalshi highlights potential payouts in bright green font, a color synonymous with safety. In contrast to the bright green payout information, information associated with risk and negative consequences, like betting costs and odds, is left in standard black text.

---

[9] Vincent O. Mancini et al., *Predicting Problem Gambling in Young Men: The Impact of Sports Gambling Frequency and Internalizing Symptoms*, 41 J. Gambling Stud. 1119 (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12361320/ [https://doi.org/10.1007/s10899-025-10403-0].

[10] Katherine Long et al., *'Is This Insider Information?' The Prediction Market Bets Driving a Campus Frenzy*, Wall St. J. (Mar. 5, 2026), https://www.wsj.com/business/media/prediction-markets-campus-e57cd19f?reflink=desktopwebshare_permalink.

[11] Dustin Gouker, "Kalshi Says It's 'Kind of Addicting' in Instagram Post," Event Horizon (Oct. 21, 2025), https://nexteventhorizon.substack.com/p/kalshi-says-its-kind-of-addicting (last accessed March 26, 2026).



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

4.43 Kalshi promotes competition between bettors on its platform to increase impulsive gambling and transaction volume. For instance, Kalshi encourages bettors to create "Ideas" profiles that include nicknames and profile photos so they can interact with other bettors on the platform. These social profiles can publicly display detailed betting histories, including potential payouts and total number of bets. Bettors use their "Ideas" profiles to like, bookmark, and reply to others' posts.

4.44 Kalshi also encourages bettors to join its "leaderboard," where they can "track" their performance and become part of Kalshi's "competitive environment." Bettors navigate to the "leaderboard" page by clicking a gold trophy symbol, which then ranks bettors by daily, weekly, monthly, and all-time profits, and by trading volumes.

4.45 Kalshi further encourages continued engagement and more bets on its platform by showing users what "people are also buying" and displays what "people also bought" after a user makes a bet.

4.46 Kalshi markets to individuals who already engage in gambling. For example, Covers.com, a gambling publication and Kalshi sponsor, offers a $10 bonus for joining the Kalshi platform. Covers.com describes itself as a sports betting information outlet "[w]here people who love the risk and rush of competition come together," and as being part of a "world-class team in sports betting and gaming" that reaches "millions of players each year."

4.47 Kalshi also attempts to hook and take advantage of bettors by intentionally conflating its gambling scheme with traditional investments, representing that Kalshi's "events contracts" are financial products, rather than simply an opportunity to wager money.

4.48 For example, Kalshi's marketing slogans, such as "everyone is an expert at something" and "trade what you know" create the deceptive impression that placing online wagers on Kalshi is not gambling, but making use of a skill-based financial tool.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

4.49 Kalshi's design features exploit psychological triggers, enticing frequent and continuing transactions, and driving disordered consumption and addictive behavior, while Kalshi reaps ever increasing profits.

4.50 Kalshi is now fueling a public health crisis in Washington by promoting and providing illegal online betting in the state under the guise of "events trading" in a financial "prediction market."

## V. FIRST CAUSE OF ACTION
## (Unfair and/or Deceptive Conduct in Violation of the Consumer Protection Act, RCW 19.86)

5.1 Plaintiff incorporates each of the foregoing paragraphs herein as if set forth in their entirety.

5.2 The Attorney General may obtain injunctive relief, as well as monetary relief, including restitution, disgorgement, civil penalties, and recovery of costs and fees for violations of the Consumer Protection Act. RCW 19.86.080, .140.

5.3 The Consumer Protection Act prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020.

5.4 Kalshi's provision, marketing, and advertising of Illegal Gambling Activities constitute unfair and/or deceptive acts or practices in trade or commerce under RCW 19.86.020.

5.5 Kalshi's provision, marketing, and advertising of Illegal Gambling Activities occurred and are occurring in trade or commerce under RCW 19.86.010, as constituting the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington.

5.6 Kalshi's provision, marketing, and advertising of Illegal Gambling Activities demonstrate a pattern of conduct committed in the course of its business and of which there is a real and substantial potential for repetition, impacting the public interest.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

## VI. SECOND CAUSE OF ACTION
## (Recovery of Money Lost at Gambling Act, RCW 4.24.070)

6.1 Plaintiff incorporates each of the foregoing paragraphs herein as if set forth in their entirety.

6.2 The Recovery of Money Lost at Gambling Act provides that "[a]ll persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost." RCW 4.24.070.

6.3 Pursuant to RCW 43.10.030(1), the Attorney General has discretionary authority to act in any court in matters of public concern provided there is a cognizable common law or statutory cause of action, such as RCW 4.24.070. *State v. City of Sunnyside*, 3 Wn.3d 279, 304, 550 P.3d 31 (2024); *see, e.g.*, *State v. Gattavara*, 182 Wn. 325, 329, 47 P.2d 18 (1935) (the Attorney General may "in the absence of express legislative restriction to the contrary, exercise all such power and authority as the public interest may, from time to time, require."); *City of Seattle v. McKenna*, 172 Wn.2d 551, 562, 259 P.3d 1087 (2011); *State v. Taylor*, 58 Wn.2d 252, 257, 362 P.2d 247 (1961); *Reiter v. Wallgren*, 28 Wn.2d 872, 880, 184 P.2d 571 (1947) ("It has always been a paramount duty of the attorney general to protect the interests of the people of the state.").

6.4 Illegal gambling and the recovery of money lost at gambling is a matter of public concern. RCW 9.46.010; *Rousso*, 170 Wn.2d at 82; *see also O'Neil v. Crampton*, 18 Wn.2d 579, 583-84, 140 P.2d 308 (1943) (holding basis for RMLGA is not only protection of the individual but "also a protection to the public, which is even more important").

6.5 Defendant Kalshi operates, develops, manages, finances, and/or profits from Illegal Gambling Activities in Washington, and continues to engage in these activities, including, among other things, unlicensed online sports wagering.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

6.6 Kalshi engaged and continues to engage in professional gambling, including by engaging in bookmaking, in violation of Washington law. RCW 9.46.220-.222; RCW 9.46.0269(d).

6.7 Kalshi has engaged and continues to engage in online gambling activity in violation of Washington law. RCW 9.46.240.

6.8 Kalshi has engaged and continues to engage in unlicensed online sports wagering in violation of Washington law. RCW 9.46.240; RCW 9.46.0368.

6.9 Kalshi has used and continues to use gambling records as part of its business in violation of Washington law. RCW 9.46.217; RCW 9.46.0253.

6.10 Kalshi owns, develops, and operates a website and apps that are unlicensed gambling devices in violation of Washington law, and continues to do so. RCW 9.46.215; RCW 9.46.0241(3), (4).

6.11 Kalshi has conducted, managed, directed, and/or profited from unlicensed gambling activities in violation of Washington law, and continues to do so. RCW 9.46.180; RCW 9.46.228.

6.12 Defendant Kalshi has offered and continues to offer gambling on its platform in violation of Washington's gambling laws and/or regulations.

6.13 The Attorney General is entitled to recover all money Washingtonians have lost through Defendant Kalshi's illegal gambling operation.

## VII. REQUEST FOR RELIEF

Wherefore, the Plaintiff requests the following relief:

7.1 That the Court adjudge and decree that the Defendant has engaged in the conduct complained of herein.

7.2 That the Court adjudge and decree that Defendant's operation of gambling activities, as described above, violates Washington's Gambling Act, RCW 9.46.

7.3 That the Court adjudge and decree that Defendant's conduct complained of herein constitutes unfair or deceptive acts or practices and is unlawful in violation of the Consumer Protection Act (CPA), RCW 19.86.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

7.4 That the Court issue a permanent injunction pursuant to the CPA, RCW 19.86.080, enjoining and restraining Defendant and its representatives, successors, assigns, offices, agents, servants, employees, and all other persons acting or claiming to act for, on behalf of, or in concert or participation with Defendant, from continuing or resuming the unlawful conduct complained of herein.

7.5 That the Court make such other orders pursuant to RCW 19.86.080 as it deems appropriate to provide for restitution to consumers of money or property unlawfully acquired by Defendant as a result of the conduct complained of herein.

7.6 That the Court, as an equitable remedy, disgorge Defendant of money or property acquired by Defendant as a result of the conduct and violations complained of herein.

7.7 That the Court assess civil penalties, pursuant to RCW 19.86.140, against Defendant for each and every violation of the CPA.

7.8 That the Court order Defendant to provide an accounting of the names and contact information of each Washington consumer from whom Defendant collected monies, and to whom Defendant remitted monies, and the amount of monies received from and remitted to each such consumer.

7.9 That the Court make such orders as necessary to recover all money Washingtonians have lost at illegal gambling and/or activities through Defendant pursuant to Washington's Recovery of Money Lost at Gambling Act, RCW 4.24.070.

7.10 That the Court make such orders pursuant to RCW 19.86.080 to provide that the Plaintiff, State of Washington, have and recover from Defendant the costs of this action, including reasonable attorneys' fees.

7.11 That the Court award pre- and post-judgment interest, at the maximum allowable rate provided by law.

7.12 For such other relief as the Court may deem just and proper.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

DATED this 27th day of March, 2026.

NICHOLAS W. BROWN
Attorney General

*s/Andrea Alegrett*
ANDREA ALEGRETT, WSBA No. 50236
JULIA K. DOYLE, WSBA No. 43993
BEN J. BRYSACZ, WSBA No. 54683
MATTHEW GEYMAN, WSBA No. 17544
SEANN COLGAN, WSBA No. 38769
Assistant Attorneys General
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
andrea.alegrett@atg.wa.gov
julie.doyle@atg.wa.gov
ben.brysacz@atg.wa.gov
matt.geyman@atg.wa.gov
seann.colgan@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

# EXHIBIT B

FILED
2026 AUG 12 03:47 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-10264-3 SEA

**STATE OF WASHINGTON**
**KING COUNTY SUPERIOR COURT**

STATE OF WASHINGTON,

Plaintiff,

v.

KALSHIEX, LLC,

Defendant.

NO. 26-2-10264-3 SEA

AMENDED AND UPDATED ORDER GRANTING PLAINTIFF STATE OF WASHINGTON'S AMENDED MOTION FOR PRELIMINARY INJUNCTION

THIS MATTER, was before the Court on Plaintiff State of Washington's Amended Motion for Preliminary Injunction against Defendant KalshiEX, LLC (Kalshi). The Court reviewed the following materials directly related to the matter at issue:

1. The State of Washington's Amended Motion for Preliminary Injunction;
2. The Declaration of Ben Brysacz and attached exhibits;
3. The Declaration of Eric Peters and attached exhibits;
4. Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction;
5. The Declaration of Matthew J. Laroche and attached exhibits;
6. The State of Washington's Reply in Support of the Amended Motion for Preliminary Injunction;
7. The Declaration of Ben Bryacz in Support of the Reply with supportive exhibits;
8. A Notice of Supplemental Authority from the Defendant submitted after oral argument held on July 10, 2026;

9. Defendant's Motion to Stay Preliminary Injunction Pending Appeal;
10. Defendant's Notice of Supplemental Authority in Support of Defendant's Motion to Stay;
11. The state of Washington's Opposition to Defendant's Motion to Stay
12. The Declaration of Julia Doyle in Support of the State of Washington's Opposition to Defendant's Motion to Stay;
13. The Parties' Joint Submission Re: Order Granting Plaintiff State of Washington's Motion for Preliminary Injunction;
14. Defendant's Reply in Support of its Motion to Stay Preliminary Injunction Pending Appeal;
15. The State of Washington's Notice of Supplemental Authorities; and
16. The State of Washington's Notice of Supplemental Authority Re: Commissioner's Ruling Denying Motion to Stay.

The Court familiar with the records and files herein, and being otherwise fully advised after well-presented oral argument, hereby enters the following Findings of Fact, Conclusions of Law, and Order.

## I. FINDINGS OF FACT

1. Plaintiff is the State of Washington (State), by and through the Consumer Protection Division of the Washington State Attorney General's Office.

2. Defendant Kalshi operates an online platform where users can place bets on the outcome of various events, categorized under multiple different topics including Elections, Politics, Sports, Culture, Crypto, Commodities, Climate, Economics, Mentions, Finance, and Tech & Science. Kalshi makes its betting platform available nationwide, and it specifically targets Washington consumers in its advertising and marketing.

3. Kalshi is a Delaware limited liability company with its principal place of business located at 594 Broadway, Suite 407, New York, NY 10012. Kalshi is a wholly owned subsidiary of Kalshi, Inc. Kalshi is not licensed by the Washington State Gambling Commission to conduct online gambling. Kalshi is not registered to conduct business in Washington.

4. The State's Attorney General is authorized to commence this action pursuant to RCW 19.86.080, RCW 19.86.140, and RCW 43.10.030 to address practices that violate Washington's Consumer Protection Act (CPA), Gambling Act, and the Recovery of Money Lost at Gambling Act (RMLGA), and to vindicate the rights of the public. RCW 9.46.010, .0213, .0269, .038, .0368, .903.

5. This Court has personal jurisdiction over Kalshi. Kalshi has purposefully availed itself of the privileges and benefits of conducting business in King County and elsewhere in the State of Washington by engaging in the conduct set forth in the Complaint, including but not limited to offering online gambling activities—which Kalshi refers to as a "prediction market"—in King County.

6. This Court has subject matter jurisdiction over this action pursuant to RCW 19.86.080 and RCW 19.86.140.

7. Venue is proper in King County pursuant to RCW 4.12.020 and RCW 4.12.025, and Court Rule 82 because the causes of action arose, in part, in King County and Kalshi transacted business in King County.

8. Washington has tightly regulated gambling since its founding in 1889. Washington's Legislature has consistently recognized a public policy interest in protecting the health, welfare, and safety of Washington residents by restricting gambling activity. In 2006, the Legislature effectively banned all online gambling in Washington. In 2020, the Legislature authorized a limited exception for sports wagering that takes place on tribal lands pursuant to a tribal gaming compact.

9. Kalshi operates an online betting platform that it advertises as a “prediction market” and that allows consumers to bet on thousands of topics ranging from sports, political elections, entertainment, popular culture, and whether public figures will utter specific words or phrases (“mentions”). Kalshi’s website and mobile application (app), which is available to both Android and iOS users, are available in Washington.

10. On Kalshi, consumers place bets on the outcome of various issues by purchasing a “yes” or “no” bet. If the consumer wagers correctly, they receive a payout. If the consumer wagers incorrectly, they forfeit the money they wagered. Kalshi earns a transaction fee on each bet placed. Each bet risks money, relies in part on chance, and promises a payout to winners.

11. Kalshi’s offerings also include so-called “mention markets” that allow users to bet on whether public figures will say certain words during public appearances.

12. Kalshi knowingly accepts and receives money from Washington consumers through its online betting platform. By facilitating wagers and collecting fees, Kalshi profits from its betting platform.

13. Kashi’s website and app provide information about wagers, real-time odds, and match users for wagers. Kalshi transmits gambling information on the internet and maintains the equipment to do so.

14. Kalshi’s advertisements that it offers “legal betting” in Washington state are likely to mislead a reasonable consumer that such gambling activities are legal under state law.

15. Kalshi continues to offer illegal gambling, sports wagering, and bookmaking, and continues to advertise to Washington consumers.

16. On December 9, 2025, the Washington Gambling Commission issued a notice that "[o]ffering events-based contracts or participating in these markets is not authorized in Washington State."

17. Kalshi has not ceased offering events-based contracts in Washington. At the same time, Kalshi has also opposed state regulation and oversight in other states, and is subject to a preliminary injunction in Nevada.

18. As the Washington Legislature has found, "some individuals in this state are negatively impacted by problem gambling and gambling disorder." RCW 9.46.071. Similarly, the Washington Supreme Court has observed that "[g]ambling addicts and underage gamblers have greater accessibility to on-line gambling—able to gamble from their homes immediately and on demand, at any time, on any day, unhindered by in-person regulatory measures." *Rousso v. State*, 170 Wn.2d 70, 82, 239 P.3d 1084 (2010).

19. Gambling addiction is a recognized public health problem. According to the 2021 Washington State Adult Problem Gambling Prevalence Study, among Washington adults who gambled, 3.5% would likely be diagnosed with gambling disorder (1.5% of all adults), and 17% were at an increased risk for problem gambling (7.5% of all adults). The Washington State Adult Problem Gambling Prevalence Study further found that the prevalence of moderate-to-severe problem gambling was substantially higher among "online gamblers" (10.3%) compared to all gamblers (3.5%). Additionally, "online gamblers" were almost four times as likely to experience problem gambling compared to gamblers who only gambled at brick-and-mortar venues such as Washington's tribal casinos where sports gambling is legal in Washington (10.3% as compared to 2.6%). *See* Washington State Health Care Authority, 2021 Washington State Adult Problem Gambling Prevalence Study Results: Report to the Legislature

(June 30, 2022), at iv-vii, www.evergreencpg.org/wp-content/uploads/2022/12/wa-state-adult-problem-gambling-prevalence-study-final-2021.pdf.

20. Gambling disorders also negatively affect spouses, partners, children, and others besides the person experiencing the disorder. Studies show for example that gambling disorders are associated with higher rates of domestic and intimate partner violence. *See* Nerilee Hing et al., An integrative review of research on gambling and domestic and family violence: Fresh perspectives to guide future research, 13 Frontiers Psych., Oct. 2022, https://doi.org/10.3389/fpsyg.2022.987379.

21. Some researchers have noted that prediction markets share "structural and functional similarities" with online gambling, and "pose harms beyond traditional gambling" because they "operate under limited regulation while carrying social and commercial legitimacy." Nizan Geslevich Packin and Sharon Rabinovitz, Prediction markets as a public health threat, 392 Nature 6795, Apr. 2026, ttps://www.science.org/doi/10.1126/science.aee3932.

## II. CONCLUSIONS OF LAW

1. Kalshi transacts business in King County by offering, operating, conducting, marketing, promoting, and/or distributing unlicensed and illegal gambling activities, including, without limitation, illegal gambling games, bookmaking, and professional gambling with respect to betting on sports, elections, politics, entertainment, culture, and mentions markets (collectively, Illegal Gambling Activities).

2. The Supremacy Clause sets out a "fundamental principle of the Constitution" that "Congress has the power to preempt state law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000); U.S. Const. art. VI, cl. 2. Express preemption "exists when Congress expresses a clear intent to pre-empt state law in the language of the statute." Bibbo v. Dean Witter Reynolds, Inc., 151 F.3d 559, 562 (6th

Cir. 1998); see City of Seattle v. Burlington N. R.R. Co., 105 Wn. App. 832, 835-836, 22 P.3d 260 (2001). F

3. The Commodity Exchange Act (CEA) does not preempt Washington State gambling law. While 7 U.S.C. § 2(a)(1)(A) grants the Commodities Futures Trading Commission (CFTC) "exclusive jurisdiction" over certain transactions on designated contract markets (DCMs). This grant or exclusive jurisdiction was not added to exclude state regulation, but to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies" and "consolidate federal regulation of commodity futures trading in" one agency. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386-87 (1982); see also *KalshiEx, LLC v. Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026).

4. 7 U.S.C. § 2(a)(1)(A) does not contain express preemption language. Kalshi's cited authorities are not to the contrary. *Mississippi v. Louisiana*, 506 U.S. 73 (1992), concerned the statutory grant of exclusive jurisdiction over controversies between states to the Supreme Court; *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016), concerned the Federal Power Act and held that the Federal Energy Regulatory Commission had exclusive jurisdiction over the sale of electric energy at wholesale in interstate commerce; and *Bache Halsey Stuart Shields, Inc. v. Erdos*, 35 Wn. App. 225, 232 (1983), concerned "the CEA's preemption of federal and state security laws"—consistent with *Curran* (emphasis added).

5. The "exclusive jurisdiction" provision within 7 U.S.C. § 2(a)(1)(A) contains savings clauses for state "regulatory authorities" and state court jurisdiction. These clauses provide at relevant parts as follows:

> *Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State…*

> *Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.*

The language referenced above indicates that Congress did not intend to supersede or limit States in regulating gambling or in superseding or limiting the jurisdiction of any court of any State in addressing such regulation.

6. As to field preemption, while the CEA preempts the field of regulating on DCMs, it does not preempt the State of Washington's enforcement of gambling law under RCW 9.46.

7. Conflict preemption occurs (1) when it is impossible to comply with both federal and state regulation, or (2) where the state law stands as an obstacle to the purposes and objectives of Congress. *Inlandboatmen's Union of the Pacific v. Dept. of Transportation*, 119 Wn.2d 697, 707 (1992).

8. Regulation of gambling and regulation of futures markets are different fields of regulation. Allowing for continued State regulation of activities that fit within the legal framework of gambling in the State of Washington under RCW 9.46 does not subvert the purpose of the CEA to uniformly regulate actual futures trading. Regulation sought by the State of Washington is solely as to enforcement of gambling laws under RCW 9.46 and as to application of Washington's Consumer Protection Act (CPA), RCW 19.86, and the Recovery of Money Lost at Gambling Act (RMLGA), RCW 4.24. Complying with Washington law would not prevent Kalshi from complying with applicable Federal law.

9. Federal law requires DCMs like Kalshi to provide "impartial access" to its markets per 17 C.F.R. § 38.151(b). 17 C.F.R. § 38.151(b) provides in relevant part as follows:

**§ 38.151 Access requirements.**

(a) ***Jurisdiction.*** Prior to granting any member or market participant access to its markets, a designated contract market must require that the member or market participant consent to its jurisdiction.

(b) ***Impartial access by members, persons with trading privileges and independent software vendors.*** A designated contract market must provide its members, persons with trading privileges, and independent software vendors with impartial access to its markets and services, including:

(1) Access criteria that are impartial, transparent, and applied in a non-discriminatory manner; and

(2) Comparable fee structures for members, persons with trading privileges and independent software vendors receiving equal access to, or services from, the designated contract market.

The operative language of this regulation means providing its members, persons with trading privileges, and independent software vendors with impartial access to its markets and services. An anticipated inability to match Washington traders with other traders nationwide is not discrimination in providing access on the part of Kalshi. Moreover, 7 U.S.C. § 7a-2(c)(5)(C)(i)(I), the Special Rule for review and approval of event contracts and swaps contracts within the CEA suggests that certain contracts may be listed in some state markets but not others. This is evident in the language below referencing activity that is "unlawful under any Federal or State law."

7 U.S.C. § 7a-2(c)(5)(C)(i)(I) provides as follows:

a. **C) Special rule for review and approval of event contracts and swaps contracts**

b. **(i) Event contracts**

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) [2] of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve-

> (I) activity that is unlawful under any Federal or State law;
> (II) terrorism;
> (III) assassination;
> (IV) war;
> (V) gaming; or
> (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

While one may argue that the "Special Rule" supports the contention that Federal preemption occurs because it allows the CFTC to determine that certain agreements, contracts or transactions, including those involving gaming, are contrary to the public interest, this provision of authority is not enough to expressly direct Federal preemption. The language referencing "activity that is unlawful under State law" demonstrates that State's retain the authority to determine what is unlawful under applicable State law. The CFTC may then determine whether such unlawful activity may be contrary to the public interest. Regardless of a contrary to public interest determination, certain types of contracts and transactions may be allowed in some states and not in others.[1] Required compliance with the law of the State of Washington as to gambling is not unlawful denial of access.

10. The impartial access rule does not require Kalshi to violate state law.

---

[1] This determination is further supported by the language of 17 C.F.R. § 40.11(a)(1) which also references activities determined to be unlawful under any State or Federal law. 17 C.F.R. § 40.11(a)(1) at relevant part is set forth below:

> **§ 40.11 Review of event contracts based upon certain excluded commodities.**
>
> (a) *Prohibition.* A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:
>
> (1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or
>
> (2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

Rather the rule requires DCMs to use "access criteria that are impartial, transparent, and . . . non-discriminatory" and "comparable fee structures" for members. 7 C.F.R. § 38.151(b)(1) (2) is a non-discrimination provision.

11. Kalshi's conduct in the State of Washington does not constitute participation in "bona fide business transactions valid under the law of contracts for the purchase or sale at a future date of securities or commodities" such that Kalshi is excluded from compliance with the Washington State Gambling Act under Chapter 9.46 of the Revised Code of Washington.

12. Kalshi's provision, marketing, and advertising of illegal gambling activities constitute unfair and/or deceptive acts or practices in trade or commerce under RCW 19.86.020.

13. Kalshi is engaged in trade or commerce within the meaning of RCW 19.86.020 because it offers illegal gambling activities to Washington consumers and solicits bets from Washington consumers on its platform. For example, Kalshi specifically solicited online gambling bets from Washington consumers by advertising that they could "bet on the NFL even though [they] live in Washington."

14. Kalshi's conduct affects the public interest within the meaning of RCW 19.86.020 because Kalshi solicits its services to and solicits bets from all Washington consumers over the age of eighteen.

15. Illegal gambling and the recovery of money lost at gambling is a matter of public concern. RCW 9.46.010; *Rousso v. State*, 170 Wn.2d 70, 82, 239 P.3d 1084 (2010); *see also O'Neil v. Crampton*, 18 Wn.2d 579, 583-84, 140 P.2d 308 (1943) (holding basis for RMLGA is not only protection of the individual but "also a protection to the public, which is even more important").

16. The State has shown a likelihood of success on the merits of its claims that Kalshi's conduct constitutes (1) unfair and/or deceptive acts or practices, (2) in

trade or commerce, (3) affecting the public interest, in violation of the CPA. *State v. Kaiser*, 161 Wn. App. 705, 719, 254 P.3d 850 (2011).

17. The State has shown a likelihood of success on the merits of its claims that Kalshi's conduct violates the RMLGA, RCW 4.24.070.

18. The State has shown a likelihood that Kalshi's conduct violates multiple provisions of the Washington Gambling Act, including that Kalshi:

a. Operates, develops, manages, finances, and/or profits from Illegal Gambling Activities in Washington, and continues to engage in these activities, including, among other things, unlicensed online sports wagering.

b. Engaged and continues to engage in professional gambling, including by engaging in bookmaking, in violation of Washington law. RCW 9.46.220-.222; RCW 9.46.0269(d).

c. Engaged and continues to engage in online gambling activity in violation of Washington law. RCW 9.46.240.

d. Offered and continues to offer gambling on its platform in violation of Washington's gambling laws and/or regulations.

19. Based on the declarations and exhibits presented, the State has demonstrated a well-grounded fear of immediate invasion of consumers' legal rights. *See Rabon v. City of Seattle*, 135 Wn.2d 278, 284, 957 P.2d 621 (1998). Kalshi has willfully ignored a Washington State Gambling Commission notice stating that offering event-based contracts is not authorized in Washington state.

20. The State has also shown a likelihood of actual and substantial injury to Washington consumers from illegal gambling activities should an injunction not issue.

21. The Court took referenced significant compliance costs and lost profits for Kalshi into consideration in reaching its decision. The public interests at stake and

potential harm to consumers in the continued operation of Kalshi's online gambling activities in the State of Washington outweigh harm to Kalshi.

22. Pursuant to CR 65(c) and RCW 4.92.080, no security or other bond shall be required of the State prior to the issuance of the preliminary injunction.

## III. ORDER

It is therefore ORDERED that the State of Washington's Motion for Preliminary Injunction is GRANTED.

IT IS FURTHER ORDERED that:

(1) Defendant shall preserve all records reasonably related to Washington consumers and any event contracts or other contacts, instruments, or products on Defendant's platform accessible in Washington, including logs, communications, geolocation/location determinations, and marketing/targeting data, until further order of the Court.

(2) By no later than August 19, 2026 Kalshi will implement IP address and residency based geofencing, and by no later than September 2, 2026, Kalshi will implement a multi-source geofencing solution provided through GeoComply, designed to prevent anyone located within the geographic boundaries of the State of Washington from purchasing any event contract, or other contract, instrument or product in violation of the preliminary injunction. Kalshi will not prohibit users from exiting positions they already hold. The State reserves, and does not waive, the right to seek recovery for fees and losses incurred by Washington consumers on or after September 2, 2026.

In the event Kalshi fails to complete implementation with GeoComply of the geofencing solution by September 2, 2026, Kalshi will either (i) pay to the State $120,000.00 each day thereafter until the implementation is complete, or (ii) submit to the Court a sworn affidavit of a Kalshi and/or GeoComply representative explaining

why implementation of the geofencing solution remains incomplete, whereupon, if (after the State of Washington is afforded an opportunity to be heard) the Court determines that Kalshi failed to show that it acted with sufficient diligence in implementing the GeoComply solution, Kalshi may be subject to penalties in an amount to be determined by the Court.

Kalshi will provide the State of Washington with the same information and updates regarding its implementation of the GeoComply geofencing solution as it provides to the State of Michigan and the State of Nevada and will permit the State of Washington to discuss, together with counsel for Kalshi, the solution with GeoComply.

(3) Kalshi shall cease marketing, advertising, promoting, conducting, operating, facilitating, distributing, offering, or accepting event contracts, or other contracts, instruments, or products in Washington, related to sports, elections, politics, entertainment, culture, tech and science, or mentions, including but not limited to those listed in the “Sports,” “Elections,” “Politics,” “Culture,” “Tech and Science,” and “Mentions” tabs on Defendant’s platform. This does not include bets in the following categories, “Commodities,” “Climate,” Economics,” and “Finance.”

The prohibition on marketing and advertising set forth above applies to Kalshi locally advertising and marketing that is targeted to Washington or Washington residents. In addition, Kalshi shall make good faith efforts to exclude Washington from nationwide advertising or marketing campaigns to the extent it is technologically feasible to do so.

(4) Kalshi shall maintain the status quo with respect to funds that it obtained from consumers who identified or self-reported as Washingtonians, as a result of transaction fees for activity prohibited by this Order. Nothing in the Order shall prohibit Kalshi from allowing Washington, identified or self-reported consumers to close or deactivate their Kalshi accounts and withdraw funds.

DATED this ____ day of ______ 2026.

_______________________________
JUDGE JOHN F. MCHALE
KING COUNTY SUPERIOR COURT

**King County Superior Court**
**Judicial Electronic Signature Page**

| | |
|---|---|
| Case Number: | 26-2-10264-3 SEA |
| Case Title: | STATE OF WASHINGTON VS KALSHIEX LLC |
| Document Title: | Order |
| Date Signed: | 08/12/2026 |

Judge: John McHale

| | |
|---|---|
| Key/ID Number: | *402609605* |
| Page Count: | This document contains 15 page(s) plus this signature page. |

# EXHIBIT C

No. 26-___

IN THE

# Supreme Court of the United States

MARY JO FLAHERTY AND JENNIFER DAVENPORT,

*Petitioners,*

v.

KALSHIEX, LLC,

*Respondent.*

**On Petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit**

## PETITION FOR WRIT OF CERTIORARI

JENNIFER DAVENPORT
*Attorney General of New Jersey*
JEREMY M. FEIGENBAUM*
*Solicitor General*
STEPHEN EHRLICH
*Deputy Solicitor General*
LIZA B. FLEMING
EMILY M. BISNAUTH
PATRICK JHOO
VIVEK N. MEHTA
*Deputy Attorneys General*
OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY
25 Market Street, Box 080
Trenton, NJ 08625
(862) 350-5800
jeremy.feigenbaum@njoag.gov

**Counsel of Record*

WILSON-EPES PRINTING CO., INC. – (202) 789-0096 – WASHINGTON, D.C. 20002

## QUESTION PRESENTED

Whether the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act preempted States from regulating sports bets that occur within their jurisdictions if those bets are offered on markets registered with the Commodity Futures Trading Commission.

## PARTIES TO THE PROCEEDING

Petitioners Mary Jo Flaherty, in her official capacity as Interim Director of the New Jersey Division of Gaming Enforcement, and Jennifer Davenport, in her official capacity as Attorney General of New Jersey, were defendants-appellants.

Respondent KalshiEX, LLC was plaintiff-appellee.

## CORPORATE DISCLOSURE STATEMENT

Petitioner Mary Jo Flaherty and Jennifer Davenport are government officials.

## STATEMENT OF RELATED PROCEEDINGS

The following proceedings are directly related to this case within the meaning of Rule 14.1(b)(iii):

- *KalshiEX, LLC v. Flaherty*, No. 25-1922 (CA3 Apr. 6, 2026).
- *KalshiEX, LLC v. Flaherty*, No. 25-2152 (D.N.J. Apr. 28, 2025).

# TABLE OF CONTENTS


| | Page |
|---|---|
| QUESTION PRESENTED | i |
| PARTIES TO THE PROCEEDING | ii |
| CORPORATE DISCLOSURE STATEMENT | ii |
| STATEMENT OF RELATED PROCEEDINGS | ii |
| TABLE OF AUTHORITIES | iv |
| OPINIONS BELOW | 4 |
| JURISDICTION | 4 |
| CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED | 5 |
| STATEMENT OF THE CASE | 5 |
| A. Legal & Historical Background | 5 |
| 1. State Gambling Laws | 5 |
| 2. Federal Commodities Regulation | 7 |
| B. Factual & Procedural History | 11 |
| REASONS FOR GRANTING THE PETITION | 14 |
| I. The Question Presented Has Generated A Direct And Acknowledged Split | 15 |
| II. The Question Presented Is Exceptionally Important | 20 |
| III. The Decision Below Is Wrong | 24 |
| CONCLUSION | 33 |
| APPENDIX | |

TABLE OF AUTHORITIES

CASES Page(s)

*Ah v. Wittman*,
198 U.S. 500 (1905) .................................. 20, 21

*Bond v. United States*,
572 U.S. 844 (2014) .................................. 31

*Cipollone v. Liggett Grp.*,
505 U.S. 504 (1992) .................................. 30

*Coinbase v. Nessel*,
No. 25-14092, 2026 WL 2295184
(E.D. Mich. Aug. 7, 2026) .......................... 15, 19

*Coinbase v. Raoul*,
No. 25-15406 (N.D. Ill.) ............................ 15

*Coinbase v. Tong*,
No. 25-02121, 2026 WL 2294602
(D. Conn. Aug. 10, 2026) .......................... 15, 19

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .................................. 30

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
527 U.S. 173 (1999) .................................. 31

*Kalshi v. Assad*,
__ F.4th __, 2026 WL 2543846
(CA9 Aug. 28, 2026) ... 2, 12, 16-18, 21-23, 26-28

*Kalshi v. Bird*,
No. 26-109 (S.D. Iowa) ............................. 15

*Kalshi v. Cafferelli*,
No. 25-2016, 2026 WL 2294589
(D. Conn. Aug. 10, 2026) ..................... 15, 19, 22

TABLE OF AUTHORITIES—Continued

Page(s)

*Kalshi v. Cox*,
No. 26-151, 2026 WL 2241564
(D. Utah Aug. 4, 2026) .............................. 15, 19

*Kalshi v. Flaherty*,
No. 25-2152 (D.N.J.) ................................ 15

*Kalshi v. Furcolo*,
No. 26-327 (D.R.I.) .................................. 15

*Kalshi v. Hendrick*,
No. 25-00575, 2025 WL 1073495
(D. Nev. Apr. 9, 2025) .............................. 13, 15

*Kalshi v. Hendrick*,
817 F.Supp.3d 1014 (D. Nev. 2025).......... 13, 19

*Kalshi v. Johnson*,
No. 26-01715 , 2026 WL 1223373
(D. Ariz. May 5, 2026).............................. 15, 19

*Kalshi v. Knudsen*,
No. 26-28 (D. Mont.) ................................ 15

*Kalshi v. Martin*,
No. 25-1283, 793 F.Supp.3d 667
(D. Md. 2025)............................................ 15, 19

*Kalshi v. Orgel*,
No. 3:26-CV-00034, 2026 WL 474869
(M.D. Tenn. Feb. 19, 2026) ....................... 15, 19

*Kalshi v. Raoul*,
No. 26-7363 (N.D. Ill.).............................. 15

*Kalshi v. Schuler*,
No. 25-1165 , 2026 WL 657004
(S.D. Ohio Mar. 9, 2026) .......................... 15, 19

TABLE OF AUTHORITIES—Continued

Page(s)

*Kalshi v. Schuler*,
No. 26-3196, 2026 WL 1295806
(CA6 Apr. 24, 2026) .................................. 19, 24

*Kalshi v. Williams,*
No. 25-8846 , 2026 WL 1961872
(S.D.N.Y. July 7, 2026) ............................. 15, 19

*Kansas v. Garcia*,
589 U.S. 191 (2020)................................... 29, 30

*Kentucky. v. Kalshi*,
No. 26-48 (E.D. Ky.)................................. 15

*Kentucky. v. Kalshi*,
No. 26-689 (Ky. Circuit Ct.)...................... 15

*Kentucky v. Polymarket*,
No. 26-47 (E.D. Ky.)................................. 15

*Kentucky v. Polymarket*,
No. 26-696 (Ky. Circuit Ct.)...................... 15

*King v. Burwell*,
576 U.S. 473 (2015).................................. 21

*Knight v. City of Margate*,
431 A.2d 833 (N.J. 1981) .......................... 5

*Kurns v. R.R. Friction Prods. Corp.*,
565 U.S. 625 (2012).................................. 29

*Learning Res. v. Trump*,
607 U.S. 229 (2026).................................. 31

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024).................................. 28

*Ludlow Exch. v. Torrez*,
No. 26-2576 (D.N.M.)................................ 15

TABLE OF AUTHORITIES—Continued

Page(s)

*Massachusetts v. Kalshi*,
No. 2584CV02525, 2026 WL 188019
(Mass. Super. Jan. 20, 2026); .................. 15, 19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .................................. 29

*Murphy v. NCAA*,
584 U.S. 453 (2018) ....... 1, 3-6, 14, 21, 25, 29-31

*NADEX v. Nevada*,
815 F.Supp.3d 1169 (D. Nev. 2025) .......... 19

*NADEX v. Nevada*,
No. 25-978 (D. Nev.) ................................. 15

*New Mexico v. Kalshi*,
No. 26-1857 (D.N.M.) ............................... 15

*New Mexico v. Kalshi*,
No. D-101-CV-2026-1567
(1st Jud. Dist. Ct. N.M.) ........................... 15

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995) .................................. 26

*QCX v. Nessel*,
No. 26-710, 2026 WL 1895958
(W.D. Mich. June 17, 2026) ...................... 15, 19

*QCX v. Torrez*,
No. 26-2100 (D.N.M.) ............................... 15

*Rhode Island. v. Kalshi*,
No. PC-2026-2753 (R.I. Super. Ct.) .......... 15

TABLE OF AUTHORITIES—Continued

Page(s)

*Robinhood v. Dreitzer*,
No. 25-1541, 2025 WL 3283308
(D. Nev. Nov. 25, 2025) ............................ 15, 19

*Robinhood v. Nessel*,
No. 26-730 (W.D. Mich. June 17, 2026) ... 15, 19

*State v. Coinbase*,
No. 260C000301B (Nev. Dist. Ct.
Mar. 26, 2026) .......................................... 15, 19

*State v. Kalshi*,
No. 260C000501B (Nev. Dist. Ct.
Apr. 28, 2026) ........................................... 15, 19

*State v. Polymarket*,
No. 260C000121B (Nev. Dist. Ct.
June 3, 2026) ............................................ 15, 19

*United States v. Illinois*,
No. 26-3659 (N.D. Ill.) .............................. 15

*United States v. Kentucky*,
No. 26-49 (E.D. Ky.) ................................. 15

*United States v. Minnesota*,
No. 26-2661, 2026 WL 2150211
(D. Minn. July 27, 2026) ........................... 15, 19

*United States v. New Mexico*,
No. 26-1912 (D.N.M.) ............................... 15

*United States v. Phillips*,
155 F.4th 102 (CA2 2025) ......................... 25

*United States v. Wisconsin*,
No. 26-C-749 (E.D. Wisc. July 29, 2026).. 15, 19

TABLE OF AUTHORITIES—Continued

Page(s)

*Washington v. Kalshi*,
No. 26-2-10264-3 (Wash. Super. Ct.
Aug. 12, 2026) .......... 15, 19

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 31

*Wis. Pub. Intervenor v. Mortier*,
501 U.S. 597 (1991) .......... 30

*Wyeth v. Levine*,
555 U.S. 555 (2009) .......... 29

CONSTITUTION

U.S. Const. art. VI, cl. 2 .......... 5

N.J. Const. 1844, art. IV, § 7, ¶2 .......... 5

N.J. Const. art. IV, § 7, ¶2(D) .......... 5, 6

STATUTES AND REGULATIONS

7 U.S.C. §§1—27f.......... 7-8

§1a(47)(A)(i).......... 27

§1a(47)(A)(ii) .......... 9, 17, 22, 26

§1a(47)(A)(iii) .......... 27

§2(a)(1).......... 9

§2(a)(1)(A).......... 10, 28, 29

§2(e) .......... 10, 22, 28

§5(a) .......... 8

§5(b) .......... 8

§7a-2(c) .......... 11

TABLE OF AUTHORITIES—Continued

Page(s)

§7a 2(c)(1) .......... 11
§7a 2(c)(2) .......... 11
§7a-2(c)(5)(C) .......... 10
§7a-2(c)(5)(C)(i) .......... 10, 31, 32
§7a-2(c)(5)(C)(ii) .......... 10
§7a-2(c)(5)(C)(iv) .......... 11
§16(e)(2) .......... 30
§16(h) .......... 30
15 U.S.C. §3001(a) .......... 5
15 U.S.C. §3001(a)(1) .......... 25, 29
15U.S.C. §8302(d)(1) .......... 27-28
18 U.S.C. §1084(a) .......... 23
18 U.S.C. §1955(b)(1)(i) .......... 23
25 U.S.C. §2701(5) .......... 23
28 U.S.C. § 1254(l) .......... 4
CFTC Act of 1974, Pub. L. 93-463, 88 Stat. 1389 .......... 8
§101(a)(3), 88 Stat. 1389 .......... 8
§201(b), 88 Stat. 1395 .......... 8, 9
Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936) .......... 7

TABLE OF AUTHORITIES—Continued

Page(s)

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010) ........................ 9, 25

§722, 124 Stat. 1672 ................................ 9

§745, 124 Stat. 1736-37 ............................ 10

N.J. Stat. Ann. §§5:12-1—233 ....................... 6

§5:12-55 .................................................. 6

§5:12-76 .................................................. 7

§5:12-76(a)............................................... 6

§5:12-92 .................................................. 7

§5:12-104(a)(12) ...................................... 6-7

§5:12-104(a)(13) ...................................... 6-7

N.J. Stat. Ann. §§5:12A-10—19.................... 6

§5:12A-10................................................. 6, 7

§5:12A-11(a) ............................................ 6

§5:12A-11(c)............................................. 7, 30

§5:12A-11(e) ............................................ 7

§5:12A-11(f)(1).......................................... 7

§5:12A-11(f)(3).......................................... 7

§5:12A-13(a) ............................................ 7

§5:12A-13(a)(11)....................................... 7

§5:12A-16................................................. 7

17 C.F.R. § 40.11(a)(1).................................. 10

TABLE OF AUTHORITIES—Continued

COURT FILINGS Page(s)

Amicus Br. of CFTC, *NADEX v. Nev.*, No. 25-7187 (CA9, Feb, 17, 2026) .................. 24

Amicus Br. of Indian Gaming Ass'n, et al., *Kalshi v. Schuler*, No. 26-3196 (CA6, June 11, 2026)......................................... 24

Amicus Br. of Nevada, et al., *Kalshi v. Schuler*, No. 26-3196 (CA6, June 11, 2026)........................................................ 24

Appellee's Br., *Kalshi v. CFTC*, No. 24-5205, 2024 WL 4802698 (CADC Nov. 15, 2024)....................................................... 27

OTHER AUTHORITIES

44 States, *Comment Ltr. on Proposed Rule Regarding Prediction Mkts.* (July 27, 2026), https://tinyurl.com/2v4uauxb ........ 24

80 Cong. Rec. 6162 (Apr. 27, 1936)............. 8

89 Fed. Reg. 48,968 (Jun. 10, 2024)............ 21

120 Cong. Rec. 10,625 (Apr. 10, 1974)......... 8

120 Cong. Rec. 35,000 (Oct. 10, 1974) ......... 9

Am. Gaming Ass'n, *State of the States 2025* (May 13, 2025), https://tinyurl.com/bdh vcvf9 ....................................................... 21

Associate, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ....................... 26

David Purdum, *How Kalshi and Predictions Markets Are Disrupting Sports Betting*, ESPN (June 2, 2025), https://tinyurl.com/28yxea y9.................. 12

TABLE OF AUTHORITIES—Continued

Page(s)

Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (Apr. 3, 2025), https://tinyurl.com/tb6yvp79 .......................................... 12

*Hrg. to Rev. Legis. Amending the CEA*, 110th Cong. (2008).................................. 9

*Kalshi volume passes $17B in first two weeks of World Cup, fees top $10M daily*, PredictionNews (June 25, 2026), https://tinyurl.com/489nd4yk ............................. 22

Sports Props, Kalshi, https://tinyurl.com/4efc68k3 (last visited Sept. 2, 2026)........ 11

*State of the States 2026*, Am. Gaming Ass'n (May 12, 2026), https://tinyurl.com/mptz3m32 ........................................................ 21, 22

Terry Oldreal, *5 of the strangest 'Big Game' markets on Kalshi*, KalshiNews (Feb. 7, 2026), https://tinyurl.com/3pcmnmt3....... 11-12

**PETITION FOR WRIT OF CERTIORARI**

For more than a century, the States have been the primary regulators of gambling in this country. Just eight years ago, this Court reiterated that "each State is free to act on its own" in regulating sports betting. *Murphy v. NCAA*, 584 U.S. 453, 486 (2018). But Kalshi has a different view. Kalshi bills itself as "the first app for legal sports betting in all 50 states" and believes it can offer that "legal sports betting" without following the sports-gambling laws of *any* of those 50 States. Kalshi and the other so-called "prediction markets" have built an entire business model on the claim that Congress silently displaced the States' authority over sports wagering 16 years ago when it directed the Commodity Futures Trading Commission to regulate swaps in the wake of the 2008 financial crisis. So long as a company offers its sports bets on a CFTC-registered market, they claim, state sports-gambling laws all fall away. Given the unprecedented nature of their claim, these companies' actions have already dragged at least 20 States into litigation. That litigation has generated a direct, acknowledged, and irreconcilable split between the Third and Ninth Circuits. That split has tremendous importance, as it will determine whether a multi-billion-dollar gaming industry can suddenly operate free from state sports-gaming laws. And given the deep errors made by the Third Circuit below, certiorari is urgently needed.

This case arose in 2025 when Kalshi sued New Jersey in an effort to offer sports bets in the State without following New Jersey gambling laws. Eight years ago, *Murphy* recognized that States may regulate sports wagering within their borders—invalidating a federal law, the Professional and Amateur Sports Protection Act, that had prevented

most States from doing so. In the wake of that decision, New Jersey swiftly enacted its Sports Wagering Act to permit sports gambling—with careful limits to prevent, *inter alia*, insider trading, gambling by minors, and compulsive gambling. Other States passed distinct sports-gambling laws too, reflecting their independent sovereign choices on the major and contested issue of sports wagering. Rather than follow those state laws, Kalshi insisted that it could ignore state gambling laws—in New Jersey and across the country—because the company offers its bets via an exchange the company registered with the CFTC. The Third Circuit affirmed an injunction against the enforcement of New Jersey's sports-gambling laws by a 2-1 vote.

The Third Circuit's decision is the subject of a circuit split that easily justifies certiorari. The expansion of these prediction markets, which purport to have recently discovered a major sports-gambling loophole in the 2010 Dodd-Frank Act, led to an explosion of litigation in the last year: Kalshi, other companies, and the CFTC have either initiated or forced litigation with 20 States. And that explosion of litigation has produced a split between the Third and Ninth Circuits, as well as considerable disagreement across other federal and state courts too. Indeed, the Third Circuit majority, in the decision below, held that Kalshi can offer sports bets without complying with state law. The Ninth Circuit disagreed, holding that the 2010 Dodd-Frank Act does not preempt States' gaming laws, explicitly disputing both the Third Circuit's methodology and its conclusion. See *Kalshi v. Assad*, __ F.4th __, 2026 WL 2543846 (CA9 Aug. 28, 2026).

Resolution of that conflict is profoundly important. At issue is whether Congress federalized a multi-

billion-dollar sports-betting industry via a single word and its definition—"swap"—in Dodd-Frank. After all, if Kalshi is right that it can offer sports bets on federal exchanges irrespective of state law, companies can disregard all state sports-gambling statutes with ease, so long as they register with the CFTC. Nor do the consequences stop there. Dodd-Frank also prohibits companies from offering swaps off of CFTC-registered markets. So if Kalshi is correct that Dodd-Frank federalized regulation of sports wagering, then state-licensed sportsbooks that everyone has understood to be legal since *Murphy*—including at brick-and-mortar casinos—have apparently been violating Dodd-Frank all along. It is thus no surprise that Kalshi's view has already drawn opposition from 44 States, hundreds of Tribes, casinos, public officials, and more.

The Third Circuit's profoundly important decision is also profoundly wrong. Kalshi argues that in granting the CFTC "exclusive jurisdiction" over "swaps" on CFTC-registered markets, Congress in 2010 actually preempted sports-wagering laws applied to these bets. But as the Ninth Circuit has since explained, these sports bets are not "swaps" as the statutory text and structure uses that term. And it strains credulity to hold that Congress in resolving the 2008 financial crisis took steps to federalize regulation of sports gambling that was otherwise explicitly addressed across other federal statutes spanning decades. At the very least, Dodd-Frank is not nearly clear enough to transfer authority over a multi-billion-dollar sports-gaming industry to a federal regulatory agency with no gambling expertise (let alone leave state-licensed sportsbooks in violation of federal law). But even if these sports bets were swaps contrary to the Ninth Circuit's reasoning, the Act does not preempt state sports-gambling laws anyway. The CFTC enjoys

"exclusive jurisdiction" to regulate swaps compared to other *federal* agencies. That does not displace the States' longstanding police powers to regulate gambling, powers that Congress repeatedly recognized and embraced across decades of reticulated federal gaming laws.

Eight years ago, this Court observed that "Americans have never been of one mind about gambling, and attitudes have swung back and forth." *Murphy*, 584 U.S., at 458. This Court's decision thus confirmed the rights of the States to decide for themselves whether and when to allow sports betting within their borders. Different States have made different choices on that score. But Kalshi insists on a different approach—one where federalism has no place, and where the sports-gambling laws must be the same in New Jersey as in Utah, so long as the company self-certifies its sports bets with the CFTC. As the Ninth Circuit has since observed, neither law nor logic supports the Third Circuit's and Kalshi's unprecedented rule. This Court should grant certiorari.

## OPINIONS BELOW

The Third Circuit opinion is reported at 172 F.4th 220. App.1-41. The district court opinion is unreported but available at 2025 WL 1218313. App.42-60.

## JURISDICTION

The Third Circuit issued its opinion on April 6, 2026. On July 1, 2026, Justice Alito extended the time to file a petition for certiorari until August 4, 2026. On July 24, 2026, Justice Alito further extended the time to file until September 3, 2026. This Court has jurisdiction under 28 U.S.C. §1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The Supremacy Clause, the New Jersey Constitution, Article IV, §7, ¶2(D), and relevant provisions of the Commodity Exchange Act and New Jersey Sports Wagering Act are reproduced at App.61-260.

## STATEMENT OF THE CASE

### A. Legal & Historical Background.

#### 1. State Gambling Laws.

As federal laws have long clarified, "States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. §3001(a); see *Murphy*, 584 U.S., at 484 (noting federal laws concerning gambling "implement a coherent federal policy: They respect the policy choices of the people of each State on the controversial issue of gambling."). Consistent with that framework, States have long made different choices on this sensitive and consequential policy issue.

For over 150 years, New Jersey has regulated gambling. Gambling in New Jersey "is governed directly by the Constitution itself," as state law has long maintained that "[g]ambling is an activity rife with evil" and "mischief" affecting "the public welfare and morality." *Knight v. City of Margate*, 431 A.2d 833, 842 (N.J. 1981). The People of New Jersey have repeatedly adjusted their constitutional limits on gambling in the State. See N.J. Const. 1844, art. IV, §7, ¶2; *ibid.* (1897 amendment); *ibid.* (1939 amendment). In adopting its current constitution in 1947, New Jersey made clear gaming could only be allowed via ballot measure. *Ibid.* (1947 amendment). In 1976, residents voted to amend the New Jersey Constitution

to allow gambling within Atlantic City. *Murphy*, 584 U.S., at 459; N.J. Const. art. IV, §7, ¶2(D). The following year, the New Jersey Legislature implemented that amendment by enacting the Casino Control Act, N.J. Stat. Ann. §§5:12-1 to -233, which regulates Atlantic City's casinos. That law established the Division of Gaming Enforcement, *id.*, §5:12-55, and charged it with enforcing the Act and its implementing regulations, *id.*, §5:12-76(a).

In 2011, New Jerseyans voted to amend their Constitution to permit sports wagering, with a caveat intended to protect student athletes from its potentially harmful effects—that "wagering shall not be permitted on a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place." N.J. Const. art. IV, §7, ¶2(D). Although that amendment was enjoined as violating PASPA's prohibition on the state authorization of sports wagering, this Court held in 2018 that PASPA violated the anticommandeering doctrine. *Murphy*, 584 U.S., at 486. This Court noted that Congress had not itself regulated sports wagering, leaving each State "free to act on its own." *Ibid.*

Swiftly thereafter, New Jersey enacted the Sports Wagering Act, N.J. Stat. Ann. §§5:12A-10 to -19, to regulate sports gambling within its borders. Casinos and racetracks can obtain licenses to "operate a sports pool." *Id.*, §5:12A-11(a). A "sports pool" is "the business of accepting wagers on any sports event by any system or method of wagering," including by peer-to-peer "exchange wagering." *Id.*, §5:12A-10. A licensee "may authorize an internet sports pool operator" to "operate an online sports pool" too. *Id.*, §5:12A-11(a); *id.*, §5:12-

104(a)(12), (13). Operators must establish the financial resources "sufficient to demonstrate that it has the financial stability, integrity, and responsibility to operate a sports pool or online sports pool." *Id.*, §5:12A-13(a); see *id.*, §5:12-92. No other entity may offer sports wagers within the State's borders. *Id.*, §5:12A-11(c).

Other requirements address the issues associated with gaming, including by protecting minors, mitigating compulsive gambling, or preventing insider trading. State law requires persons placing sports wagers to be at least 21. *Id.*, §5:12A-11(e). It facilitates a self-exclusion program where individuals may put themselves on a voluntary exclusion list, so operators cannot accept their wagers. *Id.*, §5:12A-11(f)(3). Operators must notify individuals of a hotline to deal with compulsive gambling. *Id.*, §5:12A-13(a)(11). A portion of the state fee "provide[s] funds for evidence-based prevention, education, and treatment programs for compulsive gambling." *Id.*, §5:12A-16. The Sports Wagering Act bars persons with insider information—including athletes, coaches, referees, directors, or owners—from placing any sports bets. *Id.*, §5:12A-11(f)(1). And operators cannot offer bets on any college sports events in New Jersey or in which any New Jersey college team participates. *Id.*, §5:12A-10. The Division conducts investigations, audits, and enforcements to ensure operators follow the law. *Id.*, §5:12-76.

### 2. Federal Commodities Regulation.

Separately, Congress began regulating commodity futures in 1936 with the Commodity Exchange Act, which delegated certain regulatory responsibilities for commodities trading to the Attorney General and the Secretaries of Agriculture and Commerce. See Pub. L. No. 74-675, 49 Stat. 1491 (1936) (codified at 7 U.S.C.

§§1-27f). The Act aimed to prohibit "cheating or fraudulent practices" by those who sought near term financial gains through speculative investments in agricultural commodities. 80 Cong. Rec. 6162 (Apr. 27, 1936) (Sen. Pope). To that end, the Act established a framework for commodities contracts to "manag[e] and assum[e] price risk," 7 U.S.C. §5(a), "deter and prevent price manipulation," "ensure the financial integrity of all transactions," and protect "all market participants from fraudulent or other abusive sales practices" via "a system of effective self-regulation," *id.*, §5(b).

In 1974, Congress amended the Act to create the CFTC. CFTC Act of 1974, Pub. L. 93-463, §101(a)(3), 88 Stat. 1389, 1389. In doing so, the Act consolidated "all existing authority under the [Act] presently delegated to the Secretary of Agriculture and the Commodity Exchange Commission" into a single federal agency. 120 Cong. Rec. 10,625 (Apr. 10, 1974) (Rep. Pepper). It gave the CFTC "exclusive jurisdiction with respect to accounts, agreements …, and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated … or any other board of trade, exchange, or market." §201(b), 88 Stat. 1389, 1395.

This provision included two savings clauses, which both remain in place today. The first provides: "Except as [provided in the exclusive-jurisdiction provision], nothing contained in this section" shall "(I) supersede or limit the jurisdiction at any time conferred on the [SEC] or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the [SEC] and such other authorities from carrying out their duties and responsibilities in accordance with such laws." *Ibid.* The other provides: "Nothing in this section shall supersede or limit the jurisdiction

conferred on courts of the United States or any State." *Ibid.* Describing the two clauses, Senator Humphrey emphasized the "jurisdiction conferred on regulatory authorities under the laws of ... any State are retained." 120 Cong. Rec. 35,000 (Oct. 10, 1974).

Congress amended the CFTC's powers in 2010. In response to the 2008 financial crisis, Congress passed the Dodd-Frank Act in 2010, which gave the SEC regulatory authority over security-based swaps but gave the CFTC regulatory authority over other swaps. Pub. L. 111-203, §722, 124 Stat. 1376, 1672 (2010) (codified at 7 U.S.C. §2(a)(1)). In doing so, Congress sought to end the "swaps loophole," which had allowed large entities to evade prior CFTC-imposed investment limits. *Hrg. to Rev. Legis. Amending the CEA*, 110th Cong. 57 (2008) (Rep. Hill). This reflected a widespread concern that speculative investments outpaced those by "physical hedgers" who sought price predictability, *id.*, at 30 (Rep. Larson). That flood of speculative money was facilitated by the fact large investors could use swaps to "circumvent" CFTC oversight. *Id.*, at 12 (Rep. Van Hollen). To "tak[e] speculators out of the dark markets," *id.*, at 27 (Rep. Larson), Congress decided to enable the CFTC to regulate swap transactions.

As amended in 2010, the Commodity Exchange Act defines "swaps" to include "any agreement, contract, or transaction" that, among other things, "provides for any purchase, sale, payment, or delivery" that "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A)(ii). As a result, the Act gives the CFTC "exclusive jurisdiction" regarding "accounts, agreements," and "transactions

involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated pursuant to section 7 of this title." *Id.*, §2(a)(1)(A). Dodd-Frank further amended the Act to make it "unlawful for any person" to "enter into a swap unless the swap is entered into on" such a designated contract market. *Id.*, §2(e).

Dodd-Frank also amended the Act to enact a "special rule for review and approval of event contracts." Pub. L. 111-203, §745, 124 Stat. 1376, 1736-37 (codified at 7 U.S.C. §7a-2(c)(5)(C)). Under the special rule, the CFTC "may determine" "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency" by "a designated contract market" are "contrary to the public interest" and therefore prohibited. 7 U.S.C. §7a-2(c)(5)(C)(i). The transactions may be contrary to the public interest if they involve "terrorism," "assassination," "war," "gaming," or "activity that is unlawful under any Federal or State law." *Ibid.* If the CFTC determines that a contract is "contrary to the public interest," it is prohibited from being listed for trading. *Id.*, §7a-2(c)(5)(C)(ii). The Act's special rule sought to prevent "gambling through supposed 'event contracts,'" including "gaming contract[s]," which are "used predominantly by speculators or participants not having a commercial or hedging interest." See 156 Cong. Rec. S5902, S5906-07 (daily ed. July 15, 2010) (Sens. Lincoln and Feinstein). To that end, the CFTC issued a rule in 2011, titled "Prohibition," that "[a] registered entity shall not list for trading" a "swap based upon an excluded commodity" that "involves, relates to, or references," *inter alia,* "gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. §40.11(a)(1).

Last, through Dodd-Frank, Congress amended the Act to add a self-certification process for CFTC-registered markets to offer a new contract. 7 U.S.C. §7a-2(c). A company may list contracts on its exchanges by submitting "a written certification that the new contract" complies with the Act. *Id.*, §7a-2(c)(1). The contract can be listed, unless the CFTC responds within ten business days that it is staying the certification to review the submission. *Id.*, §7a-2(c)(2). If the CFTC subsequently decides to review, it must take final action within 90 days. *Id.*, §7a-2(c)(5)(C)(iv).

**B. Factual & Procedural History.**

1. Kalshi operates a market where users place bets by buying and selling "event contracts," which identify a future event and allow the user to bet money on whether the event will occur. App.2. Specifically, a Kalshi user may purchase the "yes" or "no" position of the event occurring. *Ibid.* If a purchaser chooses a "yes" position, and the event occurs, the purchaser is paid out. *Ibid.*

In January 2025, Kalshi began offering sports bets on its exchange. *Ibid.* It allows users to bet on sports games, *ibid.*, such as which teams will advance in certain rounds of NCAA March Madness or which player will win the U.S. Open, App.274-75. Kalshi also offers "prop" bets, like how many goals a team will score in a match or how many runs a specific player will score in a particular inning. See, *e.g.*, Sports Props, Kalshi, https://tinyurl.com/4efc68k3 (last visited Sept. 2, 2026). The company even offered bets on what song Bad Bunny would sing first during the Super Bowl half-time show, and whether an announcer will say "tush push" during the game. Terry Oldreal, *5 of the*

*strangest 'Big Game' markets on Kalshi*, KalshiNews (Feb. 7, 2026), https://tinyurl.com/3pcmnmt3.

Kalshi thus marketed itself as the "first app for legal sports betting in all 50 states," Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (Apr. 3, 2025), https://tinyurl.com/tb6yvp79, and the "First Nationwide Legal Sports Betting Platform," David Purdum, *How Kalshi and Predictions Markets Are Disrupting Sports Betting*, ESPN (June 2, 2025), https://tinyurl.com/28yxeay9. In 2025, 90% of Kalshi's trades were tied to sports, accounting for 95% of its revenue. See *Assad*, 2026 WL 2543846, at *4.

The Division issued Kalshi a cease-and-desist letter in 2025. CA3 Dkt. 15-2, at JA37-38. The Division warned that these bets violated the Sports Wagering Act, N.J. Stat. Ann. §5:12A-11, "which only permits licensed entities to offer sports wagering to patrons located in New Jersey." CA3 Dkt. 15-2, at JA37. The Division informed Kalshi that it was also offering sports bets to New Jersey residents on collegiate sporting events in New Jersey in violation of the New Jersey Constitution. *Ibid.* The State called on Kalshi to cease and desist from offering unauthorized sports wagers within New Jersey. *Id.*, at JA38.

Kalshi sued to enjoin enforcement of New Jersey's Sports Wagering Act and Constitution. App.261-62. It argued the Commodity Exchange Act as amended by Dodd-Frank preempts state sports-wagering laws, because the Act occupies the field of trading on CFTC-registered markets, and because state laws frustrate the CFTC's exclusive authority to regulate registered exchanges. App.279-80.

2. The district court granted a preliminary injunction, holding that the Act likely preempts the State's

sports-wagering laws because Kalshi's sports-related offerings are "swaps" under the Act's exclusive-jurisdiction provision, which "reflects an intent to occupy the field." App.52, 55. The court relied on a District of Nevada decision that had granted Kalshi preliminary relief. See App.53-57; *Kalshi v. Hendrick*, No. 25-00575, 2025 WL 1073495 (D. Nev. Apr. 9, 2025). But that Nevada court later reversed course and dissolved its injunction. 817 F.Supp.3d 1014 (D. Nev. 2025).

3. A divided Third Circuit panel affirmed. App.4. The majority agreed Kalshi's sports bets are "swaps" under the Act's exclusive-jurisdiction provision, giving the CFTC exclusive authority over them. App.8. It then held the Act preempts New Jersey's sports-wagering laws as applied to sports bets. App.9-10. First, looking to field preemption, the majority held that the CFTC's jurisdiction entirely displaces all state sports-gambling authorities as applied to conduct on CFTC-registered exchanges. App.10-12. Second, looking to conflict preemption, the majority announced that applying States' sports-wagering laws would obstruct Congress' intent to only have a single body of federal regulations governing these contracts. App.12-13.

Judge Roth dissented, reasoning that New Jersey's sports-wagering laws are not preempted by the Act. App.21. Although the dissent did not formally decide whether Kalshi's sports bets are "swaps," it observed that treating these bets as swaps under Dodd-Frank would "take the definition of swaps to its logical extreme." App.22. The dissent explained that, *inter alia*, because "trading of swaps outside [CFTC-registered markets] is illegal," Kalshi's view would raise serious issues for legal sportsbooks like casinos,

which have offered sports bets off CFTC-registered markets since this Court decided *Murphy*. App.21-23.

But regardless of whether these bets are "swaps," Judge Roth found that Kalshi still should not prevail. First, she explained, New Jersey's laws are not field preempted because Kalshi and the majority identified no "comprehensive field where the federal interest is so dominant that Congress intended for the 'complete ouster of state power'"—especially if sports gambling was involved. App.28-32. Second, she would have held that neither obstacle nor impossibility preemption applies, because "Kalshi can comply with both New Jersey and federal law," and state sports-gambling laws "do not frustrate the congressional objectives behind the Act." App.33. State sports-gambling laws cannot undermine Congress's objectives, the dissent continued, because Congress's special rule and the CFTC's regulation themselves already ban all event contracts involving "gaming." App.35-36.

## REASONS FOR GRANTING THE PETITION

This petition presents an ideal vehicle for resolving the important question whether States are prevented from regulating sports gambling merely because that gambling happens on a CFTC-registered market. This issue has led to an explosion of litigation in the lower courts and spawned immediate disagreement on this major question, including a direct, acknowledged, and irreconcilable split between the Third and Ninth Circuits. The issue is one of tremendous practical and legal consequence: Kalshi seeks to federalize the multi-billion-dollar sports betting industry at the expense of every state sports gaming law. And the decision below is badly mistaken. Certiorari is urgently needed.

## I. The Question Presented Has Generated A Direct And Acknowledged Split.

Kalshi has promoted itself as "the first app for legal sports betting in all 50 states," and 95% of its revenue in 2025 came from sports-related betting. *Supra* at 12. Since its business model depends on noncompliance with state gambling laws, Kalshi, similar companies, and the CFTC have launched suits—or refused to comply with state laws and required States to sue—generating at least 39 lawsuits across 20 States.[1] That has caused a direct, acknowledged, and irreconcilable

[1] See, *e.g.*, *Kalshi v. Johnson*, No. 26-01715 (D. Ariz.); *Kalshi v. Cafferelli*, No. 25-2016 (D. Conn.); *Coinbase v. Tong*, No. 25-02121 (D. Conn.); *Coinbase v. Raoul*, No. 25-15406 (N.D. Ill.); *US v. Ill.*, No. 26-3659 (N.D. Ill.); *Kalshi v. Raoul*, No. 26-7363 (N.D. Ill.); *Kalshi v. Bird*, No. 26-109 (S.D. Iowa); *Ky. v. Kalshi*, No. 26-689 (Ky. Circuit Ct.); *Ky. v. Kalshi*, No. 26-48 (E.D. Ky.); *Ky. v. Polymarket*, No. 26-696 (Ky. Circuit Ct.); *Ky. v. Polymarket*, No. 26-47 (E.D. Ky.); *US v. Ky.*, No. 26-49 (E.D. Ky.); *Kalshi v. Martin*, No. 25-1283 (D. Md.); *Mass. v. Kalshi*, No. 2584CV02525 (Mass. Super.); *Coinbase v. Nessel*, No. 25-14092 (E.D. Mich.); *QCX v. Nessel*, No. 26-710 (W.D. Mich.); *Robinhood v. Nessel*, No. 26-730 (W.D. Mich.); *US v. Minn.*, No. 26-2661 (D. Minn.); *Kalshi v. Knudsen*, No. 26-28 (D. Mont.); *Robinhood v. Dreitzer*, No. 25-1541 (D. Nev.); *Kalshi v. Hendrick*, No. 25-575 (D. Nev.); *NADEX v. Nev.*, No. 25-978 (D. Nev.); *State v. Polymarket*, No. 260C000121B (Nev. Dist. Ct.); *State v. Kalshi*, No. 260C000501B (Nev. Dist. Ct.); *State v. Coinbase*, No. 260C000301B (Nev. Dist. Ct.); *Kalshi v. Flaherty*, No. 25-2152 (D.N.J.); *N.M. v. Kalshi*, No. D-101-CV-2026-1567 (1st Jud. Dist. Ct. N.M.); *N.M. v. Kalshi*, No. 26-1857 (D.N.M.); *US v. N.M.*, No. 26-1912 (D.N.M.); *QCX v. Torrez*, No. 26-2100 (D.N.M.); *Ludlow Exch. v. Torrez*, No. 26-2576 (D.N.M.); *Kalshi v. Williams,* No. 25-8846 (S.D.N.Y.); *Kalshi v. Schuler*, No. 25-1165 (S.D. Ohio); *Kalshi v. Furcolo*, No. 26-327 (D.R.I.); *R.I. v. Kalshi*, No. PC-2026-2753 (R.I. Super. Ct.); *Kalshi v. Orgel*, No. 26-34 (M.D. Tenn.); *Kalshi v. Cox*, No. 26-151 (D. Utah Aug. 4, 2026); *Wash. v. Kalshi*, No. 26-2-10264-3 (Wash. Super. Ct.); *US v. Wisc.*, No. 26-C-749 (E.D. Wisc.).

split between the Third and Ninth Circuits on a pure legal question, and caused deep disagreement among other lower courts too. Certiorari is needed to provide lower courts, States, prediction markets, the CFTC, Tribes, and casinos with a definitive answer.

The Third and Ninth Circuits are irrevocably split on this legal question. Below, the Third Circuit majority held that Kalshi could offer sports bets in New Jersey because the Commodities Exchange Act amended by Dodd-Frank preempts state sports-gambling laws. App.8-13. The Ninth Circuit, by contrast, held that Kalshi cannot offer its bets in violation of state gambling laws because Dodd-Frank does not preempt such laws. See *Assad*, 2026 WL 2543846, at *7-17; *e.g.*, *id.*, at *14 ("The Dodd-Frank Wall Street Reform Act cannot be read as a direct (or indirect) regulation of sports gambling"). That split is acknowledged and irreconcilable: the Ninth Circuit mentioned the Third Circuit's opinion over 20 times while disputing its conclusion, interpretation, and methodology. See *id.*, at *17 (recognizing and "disagree[ing]" with the Third Circuit's "conclusion that the CEA has preempted the field of all state gaming regulations"); *id.*, at *8, 11, 13, 17. Judge Lee, in his concurrence, likewise disagreed with the Third Circuit. See *id.*, at *18 (agreeing the panel "rightfully avoids the Third Circuit's … approach … and instead interprets the text under its ordinary meaning and within the statutory context").

That acknowledged split is driven by a conflict over the interpretation of the word swap in Dodd-Frank. See *id.*, at *17 (majority) (noting the Third Circuit's holding "depended on its determination that 'Kalshi's sports-related event contracts are swaps" and specifically "disagree[ing] on that point"). The decision below

and the Ninth Circuit asked whether bets on the outcome of particular sports games or the number of goals a specific player will score involve "an event … associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A)(ii). The Third Circuit held that they do, finding that the "outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence," and thus that the interpretive "analysis need not go further." App.8 (finding this "plain reading" to be dispositive). The Ninth Circuit, on the other hand, rejected the notion that "whether the Dodgers win the World Series, or how many touchdowns Fernando Mendoza might throw in a game, or how many points BYU Football will win by [i]s an 'event'" such that the Dodd-Frank Act's definition of "swap" applies, or that the outcomes are themselves "associated with" financial consequences as the Act uses the phrase. See *Assad*, 2026 WL 2543846, at *9. Instead, that court went on, "Kalshi has a gambling problem": it "markets its sports event contracts … as 'legal sports betting,'" and what it offers "are sports bets under a reasonable person's understanding." *Id.*, at *10. That is, Kalshi's offerings are "sports gambling, regardless of whether Kalshi calls them swaps." *Ibid.*

The split, the Ninth Circuit explained, is driven by a conflict in methodology too. The Third Circuit majority, the Ninth Circuit noted, took a view that arguably fits the "cursory plain-language" approach to the word swap, based on "isolated dictionary definitions." *Id.*, at *8. But the Ninth Circuit rejected the idea that textualism allows a court to ignore the Act's "language, structure, subject matter, context, and history." *Id.*, at *9. Instead, the statutory context is telling: "Congress has spoken on gambling repeatedly, deliberately, and specifically," from PASPA to the Indian Gaming

Regulatory Act to the Wire Act. *Ibid.* It was thus difficult "to conclude that Congress intended to upend its decades of careful regulation of gambling based on broad definitions of the words used in a Wall Street Reform Bill." *Id.*, at *10. And it was especially difficult where Kalshi's and the Third Circuit's view means "every person placing a sports bet at Caesar's Sportsbook (or anywhere else for that matter) is violating the" Commodity Exchange Act. *Id.*, at *11. This is a quintessential situation, the Ninth Circuit held, in which Congress would not "hid[e] an elephant in a mousehole." *Id.*, at *10. In short, as Judge Lee explained in his concurrence, the courts' split in outcome is driven by "the Third Circuit's more literalist approach to textualism" instead of the Ninth Circuit's interpretation of "the text under its ordinary meaning and within the statutory context." *Id.*, at *18.

The direct and express disagreement extends beyond the Third and Ninth Circuits. The Sixth Circuit, too, has doubted the Third Circuit's reasoning. In rejecting Kalshi's motion for a stay pending appeal, the Sixth Circuit noted "judges from around the country have fractured" on this issue, and that there is a "split of authorities." *Kalshi v. Schuler*, 2026 WL 1295806, *3 (CA6 Apr. 24, 2026). And while the panel did not definitively resolve the issue, the Sixth Circuit nevertheless emphasized that it was "unconvinced—at least on the current preliminary briefing on these questions"—that preemption applies. *Ibid.*

Federal district courts and state courts are also intractably divided. Given the explosion of litigation, the courts have issued over 20 decisions and divided by an 18-4 ratio—with the vast majority rejecting the Third Circuit's approach. While four district judges

sided with the companies and CFTC,[2] nearly all other judges have sided with the States, the Ninth Circuit, and the panel dissent below.[3]

This case is an ideal vehicle to resolve the split over whether States can regulate sports wagers on CFTC-registered markets. For one, the question is a purely legal dispute that the parties have thoroughly briefed and is the subject of majority and dissenting opinions. For another, even though this case (like many of the above-listed cases) arises on a preliminary-injunction posture, the courts below resolved it on the merits, rather than turning their decisions on irreparable injury or on other equitable factors. See App.8-15 (majority); App.21-39 (dissent). Still more, this lawsuit does not turn on any disputed factual questions. And given the volume of litigation cascading through the

---

[2] *U.S. v. Minn.*, 2026 WL 2150211 (D. Minn. July 27, 2026); *Kalshi v. Johnson*, 2026 WL 1223373 (D. Ariz. May 5, 2026); *Kalshi v. Orgel*, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026).

[3] *Wash. v. Kalshi*, No. 26-2-10264-3 (Wash. Super. Ct. Aug. 12, 2026); *Kalshi v. Cafferelli*, 2026 WL 2294589 (D. Conn. Aug. 10, 2026); *Coinbase v. Tong*, 2026 WL 2294602 (D. Conn. Aug. 10, 2026); *Coinbase v. Nessel*, 2026 WL 2295184 (E.D. Mich. Aug. 7, 2026); *Kalshi v. Cox*, 2026 WL 2241564 (D. Utah Aug. 4, 2026); *US v. Wisc.*, No. 26-C-749 (E.D. Wisc. July 29, 2026); *Kalshi v. Williams,* 2026 WL 1961872 (S.D.N.Y. July 7, 2026); *QCX v. Nessel*, 2026 WL 1895958 (W.D. Mich. June 17, 2026); *Robinhood v. Nessel*, No. 26-730 (W.D. Mich. June 17, 2026); *State v. Polymarket*, No. 260C000121B (Nev. Dist. Ct. June 3, 2026); *State v. Kalshi*, No. 260C000501B (Nev. Dist. Ct. Apr. 28, 2026); *State v. Coinbase*, No. 260C000301B (Nev. Dist. Ct. Mar. 26, 2026); *Kalshi v. Schuler*, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026); *Mass. v. Kalshi*, 2026 WL 188019 (Mass. Super. Jan. 20, 2026); *Robinhood v. Dreitzer*, 2025 WL 3283308 (D. Nev. Nov. 25, 2025); *Kalshi v. Hendrick*, 817 F.Supp.3d 1014 (D. Nev. 2025); *NADEX v. Nev.*, 815 F.Supp.3d 1169 (D. Nev. 2025); *Kalshi v. Martin*, 793 F.Supp.3d 667 (D. Md. 2025).

federal and state courts on this issue, and the Ninth Circuit's explicit disagreement with the Third Circuit, there is no prospect that this disagreement will resolve itself absent intervention by this Court. So especially given the importance of the issue, and the fact that multiple state laws are currently enjoined by federal courts, resolution of the split this Term benefits all, including the States, prediction markets, the CFTC, Tribes, casinos, and the lower courts themselves.

## II. The Question Presented Is Exceptionally Important.

Not only are the circuits divided on whether States can regulate sports bets occurring on CFTC-registered markets, but the practical and jurisprudential stakes could hardly be higher. The issue is whether Congress federalized the multi-billion-dollar sports-gaming industry at the expense of every state sports-gambling law in a 2010 wall-street reform bill. It implicates an explosion of litigation impacting States, as companies such as Kalshi offer sports bets nationwide based on a business model of noncompliance with state statutes. It has serious implications for Tribes and casinos too, which have long offered sports bets off of CFTC-registered markets via state-sanctioned sportsbooks. And it has major consequences for other federal laws that regulate gambling. It is thus no surprise that a federal agency, 44 States, Tribes, casinos, and public officials have already weighed in and stressed the stakes.

The practical importance of this dispute goes to the heart of the States' police power, posing a fundamental threat to the over 150-year-long tradition of state gaming regulation. For over a century, this Court has recognized that regulation of gaming lies "within the police powers of a state." *Ah v. Wittman*, 198 U.S. 500,

505-06 (1905). As recently as *Murphy*, this Court has reaffirmed that States are "free to act" on the "controversial subject" of "sports gambling." 584 U.S., at 486. Because "Americans have never been of one mind about gambling," our federalist system allows States to make different choices on this matter. *Id.*, at 458. So this Court and Congress both "respect the policy choices of the people of each State on the controversial issue of gambling." *Id.*, at 484; see *Assad*, 2026 WL 2543846, at *15 (noting importance to the States of this "longstanding regulatory authority, given the significant impact gambling has on society").

The decision below upends state police powers and policy choices regarding sports gambling and imposes a one-size-fits-all rule for sports gambling across the Nation. Eleven States prohibit sports betting in their borders, while 39 permit some betting subject to their own laws. See Am. Gaming Ass'n, *State of the States 2025*, at 12-13 (May 13, 2025), https://tinyurl.com/bdhvcvf9. Those state laws are diverse, reflecting different sovereign choices for minimum ages; addressing compulsive gambling; and preventing insider trading. *Supra* at 7 (discussing state laws to prevent insider trading, including involving New Jersey's college teams). But in Kalshi's view, sports bets offered on CFTC-registered markets—even if advertised as sports bets and functionally indistinguishable from sports bets—are immune from state laws and subject only to CFTC oversight, which has "no expertise in crafting" betting policy. See *King v. Burwell*, 576 U.S. 473, 486 (2015); see also 89 Fed. Reg. 48,968, 48,982-48,983 (Jun. 10, 2024) (CFTC admitting it "is not a gaming regulator" and "does not believe that it has the statutory mandate nor specialized experience appropriate to oversee [gambling]").

Not only is this an issue of great policy importance, but the practical economic impacts are overwhelming. Whether States or Kalshi are correct about this legal issue will decide who oversees a multi-billion-dollar industry. In 2025, sports wagering generated $16.89 billion in revenue for States nationwide, not even including sportsbooks in tribal casinos. See *State of the States 2026*, Am. Gaming Ass'n (May 12, 2026), https://tinyurl.com/mptz3m32. During the first two weeks of the 2026 FIFA World Cup, Kalshi "processed more than $17 billion in trading volume," with fees topping $10 million per day. See *Kalshi volume passes $17B in first two weeks of World Cup, fees top $10M daily*, PredictionNews (June 25, 2026), https://tinyurl.com/489nd4yk. Whether Kalshi is correct that States all lost their authority over such a major economic industry requires an answer from this Court.

There are severe implications for traditional casinos and sportsbooks too. Kalshi and the decision below rest on the idea that these sports events contracts (placing bets on the outcome of the game, or the "prop bets" discussed above) are "swaps" for purposes of the Act. See App.8 (citing 7 U.S.C. §1a(47)(A)(ii)). But that raises a practical problem: the statute generally bars "any person" from "enter[ing] into a swap unless the swap is entered into" on a designated contract market. 7 U.S.C. §2(e). So on Kalshi's theory, if sports bets are swaps subject to the CFTC's "exclusive jurisdiction," sports bets off registered exchanges—whether at casinos or online via casino apps—must be illegal. See *Assad*, 2026 WL 2543846, at *11 (explaining Kalshi's effort to distinguish its bets from bets by state-sanctioned sportsbooks does not work, which means "every person placing a sports bet at Caesar's Sportsbook … is violating the CEA" on Kalshi's view of federal law); *Cafferelli*, 2026 WL 2294589, at *9

(same).[4] Before federal courts suddenly render all classic sportsbooks unlawful, this Court should address the issue.

Moreover, the case is important not just practically but jurisprudentially, as the opinion below raises serious issues for the operation of other laws. The Indian Gaming Regulatory Act, for example, gives Tribes the "exclusive right to regulate gaming activity on Indian lands" so long as the State where those lands sit permits gaming. 25 U.S.C. §2701(5). And the Wire Act makes it a crime to use interstate wire communication facilities, including the internet, to facilitate bets on "any sporting event," except if the wagers are legal in the sending and receiving States. 18 U.S.C. §1084(a). But Kalshi—with the Third Circuit's endorsement—created a workaround, where prediction markets can offer sports gambling in tribal lands, via interstate wires, and in all States that prohibit it. See *Assad*, 2026 WL 2543846, at *10 (noting Kalshi's claim "upend[s] … decades of careful regulation of gambling"). And companies could evade other federal gambling statutes, so long as the bets occur on CFTC-registered markets. See, *e.g.*, Illegal Gambling Business Act, 18 U.S.C. §1955(b)(1)(i). That all confirms the statutory importance, no less the practical force, of this case.

---

[4] The Third Circuit acknowledged this argument but did not resolve it, simply noting that "Kalshi does not argue that the Act preempts all state gambling regulation" when the gambling occurs off CFTC-registered markets. App.10 n.2. But the majority misunderstood the issue: the issue is not that Kalshi specifically asks for casinos' sports wagering to be found unlawful, but that this is the logical conclusion of its argument. That the Third Circuit has no answer underscores the consequences here.

It is thus no surprise that so many affected parties have emphasized the importance of this dispute. The CFTC, for its part, has filed nine suits against States and participated as amicus in others, stressing the importance of this issue to federal law. See Amicus Br. of CFTC at 28-29, *NADEX v. Nev.*, No. 25-7187 (CA9). Forty-four States have taken the other view, emphasizing the critical nature of their police power to regulate sports gaming. See Amicus Br. of Nevada, et al. at 22, *Kalshi v. Schuler*, No. 26-3196 (CA6) (noting, *e.g.*, "Kalshi's position would effectively lower the gambling age in many States"); 44 States, *Comment Ltr. on Proposed Rule Regarding Prediction Mkts.* (July 27, 2026), https://tinyurl.com/2v4uauxb. Hundreds of Tribes, too, have emphasized that Kalshi's and the Third Circuit's reading "override[s] the entire purpose and function of IGRA" and allows Kalshi "to enter Indian lands and siphon gaming revenues away from tribes." Amicus Br. of Indian Gaming Ass'n, et al. at 4, 11, *Kalshi v. Schuler*, No. 26-3196 (CA6). And casinos and officials likewise stress the issue's importance. This Court should now weigh in and resolve the split on whether Congress sanctioned the business model of offering sports gambling across all 50 States while disregarding state gaming laws.

## III. The Decision Below Is Wrong.

Not only is this case a good vehicle for resolving an important split, but the panel below is mistaken. This Court should grant certiorari and reverse because (1) sports bets are not swaps, and (2) federal law does not preempt state sports-gambling laws regardless. The Third Circuit thus erred twice over.

1. As the Ninth Circuit rightly observed, the Third Circuit's conclusion that sports bets are "swaps" cannot be squared with the Commodity Exchange

Act's text, context, and structure. Congress did not federalize sports-gambling regulation, and assign all oversight to the CFTC, via the inclusion of a single word and definition in the 2010 Dodd-Frank Act.

As both the Ninth Circuit panel and Judge Lee explained, context matters. "Trading in swaps exploded in the early 2000s leading up to the 2008 financial crisis," and "many saw the previous lack of regulation in swaps as a contributing cause." *United States v. Phillips*, 155 F.4th 102, 113 (CA2 2025). Congress passed Dodd-Frank to "improv[e] accountability and transparency in the financial system," and bring "the swaps market within the CFTC's purview for the first time." *Ibid.* (quoting Pub. L. 111-203, 124 Stat. 1376 (2010)). But sports betting played no role in the 2008 financial crisis. Instead, when Congress enacted Dodd-Frank, PASPA made sports betting unlawful in every State except a few grandfathered States. *Murphy*, 584 U.S., at 462. It is thus unlikely that these financial reforms had anything to do with sports gambling.

All the more so given that myriad federal laws recognize States' principal role in regulating gambling. Congress has confirmed the States "have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. §3001(a)(1). And Congress has repeatedly enshrined this principle across numerous federal laws by incorporating state gambling laws. See *supra* at 23 (citing Indian Gaming Regulatory Act and Wire Act). So, as this Court observed eight years ago, "legalization of sports gambling requires an important policy choice" for the States. *Murphy*, 584 U.S., at 486. It is thus additionally unlikely that "Congress intended to upend its decades of careful regulation of gambling based on broad definitions of the words used

in a Wall Street Reform Bill." *Assad*, 2026 WL 2543846, at *10.

The text and structure of the statute Congress enacted confirm Congress did not in fact federalize this multi-billion-dollar industry. Dodd-Frank gave the CFTC new powers over swaps, with a six-part definition, including the contracts for which "payment" is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event … associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A)(ii). Ordinary speakers of the English language would not describe the *outcome* of a match, or the number of goals a player scores, as an "event" at all. *Assad*, 2026 WL 2543846, at *9 (noting the interpretation of "'event' as a synonym for 'outcome' is an archaic or rare usage"). That is especially so where Congress also included the separate term "occurrence" in the statute, meaning an "event" must be more than anything that occurs. *Ibid.* (noting Kalshi's approach creates surplusage); see also *id.*, at *18 (Lee, J., concurring) ("Few people would describe [the] Mets' latest loss of a game as an 'event.'").

Nor are sports-related outcomes on which Kalshi allows bets "associated with" potential financial consequences as Dodd-Frank uses the term. Courts avoid taking terms like "associate" "to the furthest stretch of its indeterminacy" such that they have no limiting effect. See *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (same, discussing "relate to"). That is especially true here, where anything could have *some* financial consequence. But the term "associate" could also mean a stronger connection—where items are "join[ed] or connect[ed] together." Associate, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); see

also *Assad*, 2026 WL 2543846, at *12 (collecting dictionaries). And that is the meaning used by Dodd-Frank: a swap refers to an event or contingency "inherently associated with a potential financial [or economic] consequence, not just that the event or contingency have some potential downstream financial consequence." *Assad*, 2026 WL 2543846, at *12. That is why "the other subparts of the definition of 'swap' refer 'almost exclusively to financial measures, indices, or instruments.'" *Ibid.*; see 7 U.S.C. §1a(47)(A)(i), (iii). Yet the outcome of a sports game—the Phillies beating the Braves—is not "joined or connected" with a financial instrument. And how many touchdowns Saquon Barkley will score in a particular game is not financial in nature either. So while Dodd-Frank covers events that allow traders to hedge or transfer financial risk, sports bets "do not help institutions or investors hedge against risk; they *create* risk, largely for ordinary consumers." *Assad*, 2026 WL 2543846, at *10; Appellee's Br. at 45, *Kalshi v. CFTC*, No. 24-5205, 2024 WL 4802698 (CADC Nov. 15, 2024) (Kalshi admitting that "in general, contracts relating to *games*" are "unlikely to serve any 'commercial or hedging interest'").

The Third Circuit's contrary holding would expand the CFTC's jurisdiction to an absurd degree. The majority's cursory holding that "[t]he outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence" simply waves away the reality that, on this view, "anything" could "fall under the CFTC's jurisdiction." App.8. The Third Circuit merely responded that such scenarios—where "bingo games to ping-pong matches" fall under the CFTC's authority—are fanciful or could be fixed by the CFTC's power to "'further define' swaps." See App.8-9 (majority) (quoting 15 U.S.C.

§8302(d)(1)); App.22 (Roth, J., dissenting). But this is not fanciful, as the Ninth Circuit observed: "Kalshi offers trading on the outcome of table tennis games," yet can identify no distinction on its own interpretation between those table tennis games and a regional ping-pong match. *Assad*, 2026 WL 2543846, at *11. And on the latter, federal courts "decide all relevant questions of law," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 411, 413 (2024); they cannot adopt interpretations of statutes with absurd consequences with only a hope that an agency will later walk them back.

The consequences of the Third Circuit's construction are absurd not only for what swaps it allows, but for conduct it inexorably prohibits. Congress in 2010 not only added "swaps" to the exclusive jurisdiction of the CFTC, 7 U.S.C. §2(a)(1)(A), but funneled swaps to CFTC-registered markets by making it generally "unlawful for any person" to "enter into a swap unless the swap is entered into on" a designated contract market, *id.*, §2(e). In other words, if "swaps" actually include sports bets, CFTC-registered markets become the *only* place that they can be offered, suggesting casinos across the Nation have been flouting federal law since 2010. The Third Circuit responded only by noting that Kalshi is not itself seeking such a holding, see App.10 n.2, but that is no answer to the logical and structural implications of its statutory interpretation.

2. As Judge Roth correctly concluded, even if sports bets are "swaps," the Dodd-Frank Act still would not preempt state sports-gambling laws.

a. The Third Circuit wrongly applied field preemption here. Field preemption applies in the "rare" case in which "Congress legislated so comprehensively in a particular field that it left no room for supplementary

state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). It "must be grounded in the text and structure of the statute at issue." *Ibid.* But all Kalshi cites is a single phrase giving the CFTC "exclusive jurisdiction" over "swaps" traded on registered markets. 7 U.S.C. §2(a)(1)(A). That provision just "separate[s] the functions of the [CFTC] from those of the [SEC] and other [federal] regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982). That is, it means the CFTC's authority is exclusive as to other federal agencies, not exclusive as to the States' longstanding gaming authority. And field preemption cannot be "based on nothing more than a statute granting regulatory authority over that subject matter to a federal agency." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 638 (2012) (Kagan, J., concurring); *id.*, at 640-41 (Sotomayor, J., concurring in part) (same). "Congress must do much more to oust all of state law." *Id.*, at 638 (Kagan, J., concurring).

It has not done so. To the contrary, federal law recognizes States' principal role in regulating gambling. Four years after establishing the CFTC, Congress in another law confirmed the States "have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. §3001(a). And Congress has repeatedly enshrined this principle across numerous federal laws by incorporating state gambling laws. See *supra* at 23 (citing Indian Gaming Regulatory Act and Wire Act). So "legalization of sports gambling requires an important policy choice" by States. *Murphy*, 584 U.S., at 486. That "Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts" makes clear that field preemption is inapplicable. *Wyeth v. Levine*, 555 U.S. 555, 575 (2009). Indeed, were

the decision below correct, *Murphy* is missing a key caveat: States can make their own choices regarding sports gambling, except if companies evade them by simply self-certifying sports bets with the CFTC.

Other language in the Act further undermines any inference that Congress intended to preempt the field of sports betting with this exclusive-jurisdiction provision. The Act has two distinct preemption clauses. The first "supersede[s] and preempt[s] the application of any" state law "that prohibits or regulates gaming or the operation of bucket shops" in certain inapplicable situations. 7 U.S.C. §16(e)(2). The other preempts state insurance laws as applied to swaps. *Id.*, §16(h). That latter "would be pure surplusage if Congress had intended to occupy the entire field" of derivatives trading, including swaps, to the exclusion of state law. See *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 613 (1991). "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted," *Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992), a far cry from classic field preemption. Plus, Congress also included two savings clauses for a range of state laws, sharply undermining the idea that Congress wished to displace States from the entire field. *Supra* at 8-9.

b. Nor does conflict preemption aid Kalshi. Conflict preemption exists only "where it is impossible for a private party to comply with both state and federal law," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000), or where state law poses an obstacle to the federal law's "text and structure," *Garcia*, 589 U.S., at 208. Neither applies here. Kalshi is not prohibited from offering sports bets in New Jersey as long as it obtains a sports-wagering license. See N.J. Stat. Ann. §5:12A-11(c). And Congress

authorized the CFTC to ban any transactions involving "gaming" and "activity that is unlawful under any Federal or State law"—and it has done so. 7 U.S.C. §7a-2(c)(5)(C)(i). So by Congress's own choice, there is no conflict between the Act and the States' sports-wagering laws.

To the contrary, a holding that the inclusion of one word in Dodd-Frank displaced the entire body of state sports-gambling laws for bets offered on a CFTC-registered market is the quintessential elephant in a mousehole. Finding that the Act impliedly displaces state sports-gambling laws is an "astonishing" conclusion that has grave "economic and political consequences"—and is thus a decision one expects Congress to make clearly. *Learning Res. v. Trump*, 607 U.S. 229, 246 (2026); *W. Virginia v. EPA*, 597 U.S. 697, 721 (2022). That is especially so because this would represent a "significant change in the sensitive relation between federal and state" jurisdiction in an area of "traditional state authority." *Bond v. United States*, 572 U.S. 844, 858-59 (2014); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999) (emphasizing that federal law historically "reflect[ed] a decision to defer to, and even promote, differing gambling policies in different States"). That no one noticed Congress's decision in 2010 to displace state gambling laws in favor of CFTC regulation, least of which this Court in *Murphy*, is telling.

The majority and Kalshi confront another problem too: Congress took pains to make clear swaps should not extend to gambling, which makes it difficult to say Congress was preempting state gambling laws. Congress clarified the CFTC "may determine" that "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the

occurrence, extent of an occurrence, or contingency" by "a designated contract market" are "contrary to the public interest" and therefore prohibited if "the agreements, contracts, or transactions involve," among other things, "gaming" or "activity that is unlawful under any Federal or State law." 7 U.S.C. §7a-2(c)(5)(C)(i). It is thus passing strange to say Dodd-Frank impliedly preempts state gambling laws, especially given the other federal laws that leave a place for such state statutes.

In reaching the opposite conclusion, the Third Circuit wrongly feared "state regulation" of sports gambling would create "the patchwork that Congress replaced wholecloth by creating the CFTC." App.13. The panel missed the point: companies are subject to state and federal laws all the time, from antitrust to securities to consumer protection. So there must be something in *this* statutory scheme to prove that Congress ousted States from regulating sports gambling. But there is no evidence of Congress's decision "to supersede states' 'historic police powers' over gambling regulation." App.29 (Roth, J., dissenting). States have always maintained the primary police powers for health and safety matters, including for gambling. See *supra* at 20-21. Nothing in the Act gives the CFTC unprecedented authority to become the sole regulator of sports gambling in this country, much less gives companies a get-out-of-50-state-laws-free pass by self-certifying their bets on a CFTC-registered market.

## CONCLUSION

The Court should grant the petition.

Respectfully submitted,

JENNIFER DAVENPORT
*Attorney General of New Jersey*
JEREMY M. FEIGENBAUM*
*Solicitor General*
STEPHEN EHRLICH
*Deputy Solicitor General*
LIZA B. FLEMING
EMILY M. BISNAUTH
PATRICK JHOO
VIVEK N. MEHTA
*Deputy Attorneys General*
OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY
25 Market Street, Box 080
Trenton, NJ 08625
(862) 350-5800
jeremy.feigenbaum@njoag.gov
* *Counsel of Record*

*Counsel for Petitioner*

September 2, 2026

# APPENDIX

APPENDIX TABLE OF CONTENTS

Page

**APPENDIX A**

Opinion & Judgment, United States Court of Appeals for the Third Circuit, *KalshiEX, LLC v. Flaherty*, No. 25-1922 (Apr. 6, 2026). 1a

**APPENDIX B**

Opinion, United States District Court for the District of New Jersey, *KalshiEX, LLC v. Flaherty*, No. 25-cv-02152 (Apr. 28, 2025)..... 42a

**APPENDIX C**

Relevant Constitutional, Statutory, and Regulatory Provisions:

U.S. Const. Article VI, Clause 2 .................... 61a

N.J. Const. Article IV, § 7, ¶2 ........................ 62a

7 U.S.C.A. § 1a .............................................. 66a

7 U.S.C.A. § 2 ................................................ 110a

7 U.S.C.A. § 5 ................................................ 176a

7 U.S.C.A. § 7a-2 .......................................... 177a

7 U.S.C.A. § 13a-2 ........................................ 184a

7 U.S.C.A. § 16 .............................................. 187a

N.J. Stat. Ann. § 5:12-1 ................................ 192a

N.J. Stat. Ann. § 5:12-55 .............................. 199a

N.J. Stat. Ann. § 5:12-76 .............................. 201a

N.J. Stat. Ann. § 5:12-92 .............................. 205a

N.J. Stat. Ann. § 5:12-104 ............................ 211a

N.J. Stat. Ann. § 5:12A-10 ............................ 219a

APPENDIX TABLE OF CONTENTS—Continued

| | Page |
|---|---|
| N.J. Stat. Ann. § 5:12A-11 | 223a |
| N.J. Stat. Ann. § 5:12A-13 | 235a |
| N.J. Stat. Ann. § 5:12A-16 | 239a |
| 17 C.F.R. § 40.11 | 243a |
| N.J. Admin. Code § 13:69N-1.2 | 245a |
| N.J. Admin. Code § 13:69O-1.2 | 248a |
| **APPENDIX D** | |
| Complaint, United States District Court for the District of New Jersey, *KalshiEX, LLC v. Flaherty*, No. 25-cv-02152 (March 29, 2025). | 261a |

**APPENDIX A**

U.S. COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 25-1922

KALSHIEX, LLC

v.

MARY JO FLAHERTY; DIVISION OF GAMING ENFORCEMENT; JAMES T. PLOUSIS; ALISA COOPER; CASINO CONTROL COMMISSION; MATTHEW J. PLATKIN; JOYCE MOLLINEAUX

MARY JO FLAHERTY; MATTHEW J. PLATKIN,
*Appellants*

Appeal from the U.S. District Court, D.N.J. Judge Edward S. Kiel, No. 1:25-cv-02152

Before: CHAGARES, *Chief Judge*, PORTER, and ROTH, *Circuit Judges*

Argued Sep. 10, 2025; Decided Apr. 6, 2026

OPINION OF THE COURT PORTER, *Circuit Judge*.

KalshiEX LLC ("Kalshi") moved preliminarily to enjoin the New Jersey Division of Gaming Enforcement from enforcing state law against Kalshi's sports-related event contracts. The District Court granted Kalshi's motion. Because Kalshi has demonstrated a reasonable chance of success on its argument that the Commodity Exchange Act ("the Act") preempts otherwise applicable state law, we will affirm.

I

Kalshi is a financial services company that operates a designated contract market ("DCM") licensed by the Commodity Futures Trading Commission ("CFTC"), on which it offers event contracts, a type of derivative. Derivatives are financial tools that mitigate risk and derive their value from some underlying asset. Kalshi's event contracts "identify an event with multiple possible outcomes, a payment schedule for those outcomes, and an expiration date. The contract's value is determined by market forces, which means its price fluctuates from the time of its creation to its expiration based on perceptions about the event's likelihood." Appellee's Brief at 9. Kalshi customers can buy and trade on predictions about all sorts of events: political elections, movie box office numbers, and even the weather. For example, an event contract could ask whether an earthquake will take place in a certain city on a certain date. A purchaser may then trade on either "yes" or "no." If the earthquake does occur in the city on the date, the "yes" positions would be paid out.

In December 2024, one of Kalshi's competitors started offering event contracts on the outcome of sports events. A month later, Kalshi began offering the same type of event contract. Two months later, New Jersey sent Kalshi a cease-and-desist letter stating that Kalshi's listing of sports-related event contracts violates New Jersey's constitution and gambling laws that prohibit betting on collegiate sports. It threatened to seek "any measures available under New Jersey law" if Kalshi did not promptly end its sports betting activities in New Jersey and void any existing wagers. Joint Appendix ("J.A.") at 38. Violations of the applicable law are punishable as

"crime[s] of the fourth degree" subject to fines up to $100,000. N.J. Stat. Ann. §§ 5:12A-11(c), 2C:43-2.

Kalshi immediately commenced this action in the United States District Court for the District of New Jersey, seeking preliminarily to enjoin New Jersey from enforcing its law. The District Court granted the injunction, finding that Kalshi had a reasonable likelihood of success, faced irreparable harm, and that the public interest is not served by enforcing an unconstitutional law. New Jersey appealed.

II

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

We review the District Court's "findings of fact for clear error, its conclusions of law de novo, and the ultimate decision granting the preliminary injunction for an abuse of discretion." *Mallet and Co. Inc. v. Lacayo*, 16 F.4th 364, 379 n.17 (3d Cir. 2021) (quoting *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010)). Preliminary injunctions are governed by a well-established four-part test. The first two are the most important threshold factors: "likelihood of success on the merits" and whether the party seeking the injunction "is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Id.* at 380 (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). If those two factors are met, the court balances them along with two others: the balance of equities and the public interest. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024). Factors three and four "merge when

the Government is the opposing party." *Id.* at 205 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

III

Kalshi has met its burden for preliminary injunctive relief. The parties contest whether the CFTC's exclusive jurisdiction over DCMs as conferred by the Act preempts New Jersey gambling laws and the state constitution's prohibition on collegiate sports betting. New Jersey frames the issue broadly (regulating all sports gambling) rather than narrowly (regulating trading on federally designated contract markets). The text of the Act suggests that the narrow framing is the better reading. The Act preempts state laws that directly interfere with swaps traded on DCMs. Kalshi's sports-related event contracts are swaps traded on a CFTC-licensed DCM, so the CFTC has exclusive jurisdiction. The District Court did not abuse its discretion by finding that Kalshi would more likely than not suffer irreparable harm absent the preliminary injunction and that the remaining preliminary injunction factors also weigh in favor of Kalshi.

A

The parties' arguments focus on the first factor: likelihood of success on the merits. For that factor, the moving party must show that "there is a reasonable chance, or probability, of winning." *Mallet*, 16 F.4th at 380 (citation modified). "Reasonable" does not mean "more likely than not," but it does mean "significantly better than negligible." *Id.* The District Court concluded that Kalshi demonstrated a likelihood of success on its argument that the Act preempts New Jersey law from reaching into CFTC-licensed DCMs. We agree.

1

The Act, first passed in 1936, regulates derivatives markets. At first, the law did not preempt state regulation in the area. But that resulted in a patchwork of state regulations, so Congress amended the Act in 1974 and created the CFTC to oversee trading on federally designated "contract market[s]." 7 U.S.C. § 2(a)(1)(A). The CFTC has an array of powers to investigate and prohibit contracts. Initially, there is a long and involved process before the CFTC will officially "designate" a prospective contract market. *See generally* 7 U.S.C. § 7. Once designated, a DCM does not need pre-approval before listing contracts, although it must self-certify compliance with the applicable laws and regulations. 7 U.S.C. § 7a-2(c)(1).

The 1974 amendments also expanded the Act's reach from just agricultural products to all "goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). And in 2000, Congress expanded the Act to qualifying events, defined as an "occurrence" or "contingency" that is "beyond the control of the parties to the . . . transaction; and associated with a financial, commercial, or economic consequence." 7 U.S.C. §§ 1a(19)(iv), (iv)(I)–(II).

The Dodd-Frank Act of 2010 amended the Act again, this time adding a new class of futures known as "swaps" and expanding the CFTC's exclusive jurisdiction "with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a [DCM.]" 7 U.S.C. § 2(a)(1)(A). The Act defines "swap" to include "any agreement, contract, or transaction . . . that provides for any . . . payment[

] or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §§ 1a(47)(A), (A)(ii). In other words, "swap" includes event contracts.[1]

The Dodd-Frank Act also implemented a "[s]pecial rule" for event contracts, giving the CFTC discretionary power to review and prohibit six categories of contracts if it concludes they are "contrary to the public interest." 7 U.S.C. §§ 7a-2(c)(5)(C), (C)(i). Relevant here, those categories include contracts that involve "gaming" or "other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest." 7 U.S.C. §§ 7a-2(c)(5)(C)(i)(V)–(VI). The CFTC has codified this power in a regulation, 17 C.F.R. § 40.11, but it has not yet acted to review or prohibit any sports-related event contracts. *Cf.* Prediction Markets, 91 Fed. Reg. 12516, 12521 (proposed March 16, 2026) (inviting comment on the scope and public interest implications of "gaming," and "sports competition").

Although the Act grants the CFTC exclusive regulatory jurisdiction over event contracts, there are two savings clause carveouts that permit state regulation in certain areas not covered by the Act. The first says: "*Except as hereinabove provided*, nothing contained in this section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the

[1] The CFTC recently published an advance notice of proposed rulemaking regarding "event contract derivatives traded on markets commonly referred to as 'prediction markets,'" which include sporting events contracts. Prediction Markets, 91 Fed. Reg. 12516, 12516–17 & n.9 (proposed March 16, 2026).

United States or of any State." 7 U.S.C. § 2(a)(1)(A) (emphasis added). And the second follows: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.*

2

a

In 2020, the CFTC certified Kalshi's online exchange as a DCM after a nine-month review period. *See KalshiEX LLC v. CFTC*, No. 23-cv-3257, 2024 WL 4164694, at *4 (D.D.C. Sept. 12, 2024) ("In 2020, the CFTC authorized Kalshi . . . to list event contracts for public trading as a DCM."). About five years later, Kalshi began offering sports-related event contracts on its DCM exchange. Kalshi self-certified compliance with the applicable laws and regulations, so those event contracts were presumptively approved under federal law. *See* 7 U.S.C. § 7a-2(c)(1). To date, the CFTC has not determined that Kalshi's sports-related event contracts are contrary to the public interest. *See* 7 U.S.C. § 7a-2(c)(5)(C)(ii); 17 C.F.R. § 40.11.

And though the dissent labels Kalshi's event contracts "gaming contracts" and argues that they fall under the "special rule," Dissent at 17–18, the CFTC has chosen not to enforce its regulation against the type of sports-related event contracts at issue here. In fact, it has already certified many "sporting events" contracts for listing. 91 Fed. Reg. at 12517 n.9 (citing *Designated Contract Market Products*, CFTC, https://perma.cc/93Y2-K6ZT (last visited Mar. 17, 2026)).

New Jersey argues that Kalshi's event contracts are not "swaps" covered by the Act "because the

*outcome* of a sports game is not 'joined or connected' with a financial, economic, or commercial instrument or measure." Appellant's Brief at 23–24. But its proposed "joined or connected" requirement raises the bar beyond what the Act requires.

As always with statutory interpretation, "we begin with the text." *United States v. Johnson*, 114 F.4th 148, 153 (3d Cir. 2024). The Act provides that the relevant event or occurrence need only be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii). As the dissent concedes, "[a] plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition." Dissent at 2. That is correct. The outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence. The District Court did not clearly err when it identified numerous affected stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities. The analysis need not go further. Because Kalshi's sports-related event contracts are traded on a CFTC-licensed DCM and depend on event outcomes associated with economic consequences, they fit within the Act's definition of "swaps" subject to the CFTC's jurisdiction. *See* 7 U.S.C. §§ 2(a)(1)(A), 1a(47)(A)(ii).

New Jersey and the dissent "pile inference upon inference" and postulate that anything from bingo games to ping-pong matches will fall under the CFTC's jurisdiction. *See United States v. Lopez*, 514 U.S. 549, 567 (1995); *see also* Transcript of Oral Argument at 18 (lines 12–22), *KalshiEX, LLC v. Flaherty, et al.*, No. 25-1922 (Sept. 24, 2025). But Kalshi makes no such claim, and the District Court

does not so broadly hold. In such far-fetched scenarios, Congress's express delegation to the CTFC and the Securities and Exchange Commission to "further define" swaps would prove useful. 15 U.S.C. § 8302(d)(1); *see, e.g.*, *Further Definition of "Swap,"* 77 Fed. Reg. 48208, 48246 (Aug. 13, 2012) (excluding certain "consumer transactions" from the statutory definition).

b

New Jersey contends that the contracts can be regulated by the states and are not preempted by the Act. Under the Supremacy Clause, "federal law is supreme in case of a conflict with state law." *Murphy v. Natl. Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018); U.S. Const. art. VI, cl. 2. It can preempt state law either expressly or impliedly. *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 463 (3d Cir. 2021). Implied preemption falls into two categories, field or conflict preemption, although the Supreme Court has recognized that "the categories of preemption are not rigidly distinct" and that "field preemption may be understood as a species of conflict preemption." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (citation modified). We hold that both field and conflict preemption apply.

i

The District Court considered whether the Act impliedly preempted state regulation of DCMs and concluded that "at the very least field preemption applies." J.A. 11–14. We agree. Kalshi has demonstrated a reasonable chance of success in showing that the text of the Act preempts otherwise app-

licable state laws that purport to regulate sports-related event contracts on CFTC-licensed DCMs.[2]

As we have recognized, "all preemption arguments [ ] must be grounded in the text and structure of the [federal] statute at issue." *Klotz*, 991 F.3d at 463 (quoting *Kansas v. Garcia*, 589 U.S. 191, 208 (2020)). Field preemption sounds a lot like express preemption—"it concerns a clash between a constitutional exercise of Congress's legislative power and conflicting state law." *Murphy*, 584 U.S. at 479. That conflicting state law is field preempted when "federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.' " *Id.* (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty,* 479 U.S. 130, 140 (1986); *see also Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016).

Here, the Act grants the CFTC exclusive jurisdiction over "swaps . . . traded or executed on a [DCM]," which include Kalshi's sports-related event contracts. 7 U.S.C. § 2(a)(1)(A); *see supra* § III.A.2.a. The Act does have a limiting principle: it "shall [not] supersede or preempt . . . the application of any Federal or State statute . . . to any transaction . . . *that is not conducted on or subject to the rules of a registered entity*." 7 U.S.C. § 16(e)(1)(B)(i) (emphasis added). But here, registered entities include DCMs, so that limiting principle does not apply. 7 U.S.C. § 1a(40)(A).

---

[2] We need not address the parties' extra-textual arguments related to whether the Act preempts all state gambling regulation, because Kalshi does not argue that the Act preempts all state gambling regulation.

The dissent contends that DCM trading is a subfield of futures trading, and that the Act is not "sufficiently comprehensive . . . to preclude enforcement of state laws on the same subject." Dissent at 9. But as our sister circuits have held, the Act preempts state law purporting to regulate futures trading. *See, e.g.*, *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 591–92 (D.C. Cir. 2001); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1157 (7th Cir. 1992); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). This is consistent with Congress's longtime regulation of futures trading dating back to the early twentieth century. *See Bd. of Trade of Chi. v. Olsen*, 262 U.S. 1, 43 (1923). Because Kalshi's sports-related event contracts are swaps under the Act, the District Court properly defined the scope of field preemption as the regulation of trading on a DCM (a form of futures trading) rather than as gambling (a broader and traditionally state-regulated field).[3] *See Schaffner v. Monsanto Corp.*, 113 F.4th 364, 392 (3d Cir. 2024) ("[O]ur understanding of the scope of a preemption statute . . . must rest primarily on a fair understanding of *congressional purpose* . . . [drawn] primarily from the text of the statute and from its surrounding framework.") (citation modified); *Sikkelee*, 822 F.3d at 689 (cautioning that, when assessing preemption, courts should avoid "interpreting the scope of the preempted field too broadly").

---

[3] While there are two savings clauses in the Act, those do not mean that "Congress decided to allow room for state law" on futures trading. Dissent at 13. Unlike other statutes that allow for states to impose stricter standards or other coterminous regulation, the Act has no such allowance and preserves jurisdiction only for state common-law actions. *See infra* § III.A.2.c.

Thus, the District Court did not err in holding that New Jersey law is field preempted by the Act.

ii

Though the District Court limited its analysis to field preemption, conflict preemption also prohibits New Jersey from regulating sports-related event contracts on CFTC-licensed DCMs. *See TD Bank N.A. v. Hill*, 928 F.3d 259, 276 (3d Cir. 2019) ("[W]e may affirm on any ground supported by the record . . . .").

Conflict preemption "occurs when a state law conflicts with federal law such that compliance with both state and federal regulations is impossible, or when a challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law." *Sikkelee*, 822 F.3d at 688 (citation modified); *see also Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).

To determine whether New Jersey's laws and constitution stand as an obstacle to the Act, we first determine Congress's "full purposes and objectives" of the Act as evidenced by "the text and structure of the [federal] statute at issue." *Klotz*, 991 F.3d at 463 (citation omitted). Here, there's little doubt that the Act is "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted). As detailed above, Congress created the CFTC and amended the Act to do away with the patchwork of state regulations and bring futures trading on DCMs under the exclusive jurisdiction of the CFTC. *Supra* § III.A.1.

Second, we ask whether the state law "stands as an obstacle" to those objectives. *Sikkelee*, 822 F.3d at 688

(citation modified). It does. Allowing New Jersey to enforce its gambling laws and state constitution would create an obstacle to executing the Act because such state enforcement would prohibit Kalshi, which operates a licensed DCM under the exclusive jurisdiction of the CFTC, from offering its sports-related event contracts in New Jersey. This state regulation is exactly the patchwork that Congress replaced wholecloth by creating the CFTC. Because that prohibition directly conflicts with the full purposes and objectives of the Act, we need not determine whether it would be impossible for Kalshi to comply with both state and federal regulations. *See Am. Agric. Movement, Inc.*, 977 F.2d at 1156 (holding that state laws "directly affect[ing] trading on or the operation of a futures market" are conflict preempted by the Act).

iii

Our dissenting colleague emphasizes the "strong presumption against preemption in areas of the law that States have traditionally occupied." *Sikkelee*, 822 F.3d at 687. But neither "[b]asic abductive reasoning" nor construing "silence" one way or the other can overcome the Act's text. Dissent at 7, 21. Even accepting the dissent's premise that states have long regulated gambling,[4] the text preempts state

---

[4] States have long regulated intrastate gambling, but not interstate gambling. *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025) ("[S]ince the regulation of *interstate* gambling isn't a traditional area of state regulation, the presumption against preemption doesn't apply.") (emphasis in original); *see also* Wire Act of 1961, 18 U.S.C. § 1084 (federal gambling law prohibiting the interstate wire transmission of bets or wagers on any sporting event or contest).

gambling laws that seek to regulate futures trading, i.e., Kalshi's sports-related event contracts traded on a DCM under the exclusive jurisdiction of the CFTC. 7 U.S.C. § 16(e)(1)(B)(i). Again, the federal government has regulated the derivatives market for over a century. *See Olsen*, 262 U.S. at 43 (upholding the constitutionality of the Grain Futures Act, predecessor to the Act). And it delegated that regulation to the CFTC, which has expertise in swaps like event contracts. *See* 7 U.S.C. §§ 1a(47)(A), (A)(ii); 2(a)(1)(A); 91 Fed. Reg. at 12517 (noting that the CFTC has regulated event contracts since at least 2008); Michael S. Selig, Chairman, Commodity Futures Trading Comm'n, Remarks: *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026) ("[T]he [CFTC] has the expertise and responsibility to defend its exclusive jurisdiction over commodity derivatives").

c

New Jersey argues that the Act's savings clause carve-outs preserve state jurisdiction over sports-related event contracts on CFTC-licensed DCMs. But the clear text of the Act says otherwise. Both carveouts follow the Act's grant of CFTC exclusive jurisdiction over swaps. The first preserves state jurisdiction "*except* as hereinabove provided." 7 U.S.C. § 2(a)(1)(A) (emphasis added). That prefatory clause indicates that swaps fall under the CFTC's exclusive jurisdiction. And as the District Court recognized, the second carveout preserves jurisdiction for state courts in common-law actions but does not

contravene the grant of CFTC's exclusive jurisdiction.[5] *Id.*

Congress gave the CFTC exclusive jurisdiction over trades on DCMs, provided for continued state regulation of trades conducted off DCMs, and recognized that while event contracts could involve gaming, the CFTC has discretionary power to review and prohibit those contracts. Thus, it was reasonable for the District Court to conclude that Kalshi was likely to succeed in showing that the Act preempts New Jersey law from reaching into Kalshi's CFTC-licensed DCM to ban sports-related event contracts.[6]

---

[5] We agree with other circuits that carveouts for state actions like negligence and fraud do not undermine the Act's preemptive regulation of commodity futures. *See, e.g.*, *Kerr v. First Commodity Corp. of Boston*, 735 F.2d 281, 288 (8th Cir. 1984) ("[T]he continued existence of common law fraud actions permitting punitive damage awards does not conflict with the regulatory scheme established by the Act. Congress recognized this by including [the] savings clause . . . ."); *Kotz v. Bache Halsey Stuart, Inc.*, 685 F.2d 1204, 1207 (9th Cir. 1982) ("Congress clearly intended to create a single agency to regulate the field [of futures trading] . . . It does not follow, however, that creation of a central regulatory authority [the CFTC] means abolition of common law rights, unless their retention would render the regulatory scheme ineffective."); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("While courts have held that the CFTA preempts state regulation of commodities futures, it has also been held that the CFTA does not preempt state general antifraud statutes.") (citation omitted).

[6] Other courts considering this question have also determined that Kalshi's sports-related event contracts on its DCM are subject to the exclusive jurisdiction of the CFTC. *Kalshiex LLC v. Orgel*, No. 3:26-CV-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("The court finds that Kalshi is likely to succeed on the merits because sports event contracts are "swaps" and conflict preemption applies."); *Blue Lake Rancheria v. Kalshi Inc.*, No. 3:25-cv-6162, 2025 WL 3141202, at *7 (N.D. Cal. Nov.

B

The remaining preliminary-injunction factors, on balance, tip the scale in favor of Kalshi. As for irreparable harm, the moving party must demonstrate "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 262 (3d Cir. 2020) (quotation omitted). New Jersey threatened Kalshi with civil and criminal penalties. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law."). The District Court did not abuse its discretion when it held that, absent injunctive relief, Kalshi would suffer economic and reputational harm, including loss of business and goodwill. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will."). The District Court pointed to a concrete example of lost business: a trading partner refused to list Kalshi event contracts in New Jersey because of a similar cease-and-desist letter.

The District Court also did not abuse its discretion by balancing the equities and public interest factors in favor of Kalshi. If the Act preempts New Jersey law, then the public interest is best served by en-

---

10, 2025) ("Plaintiffs have not shown the Court has jurisdiction to decide whether Kalshi's event contracts violate the [Act]. That decision belongs to the [CFTC], which has 'exclusive jurisdiction' over its contract markets."); *see also KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) ("I am persuaded that Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction . . . .").

forcing the Act. *See N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 389 (3d Cir. 2012) ("[T]he public interest [is] not served by the enforcement of an unconstitutional law."). Because we agree with the District Court that Kalshi has shown likelihood of success on its argument that the CFTC's exclusive jurisdiction over DCMs preempts New Jersey gambling laws and the state constitution, we conclude that the public interest factors tip toward Kalshi.

* * *

Because the likelihood-of-success and irreparable-harm factors favor Kalshi, and the last factors largely turn on a determination of the merits, the District Court did not abuse its discretion by granting the preliminary injunction. We will affirm.

Matthew J. Platkin
Liza B. Fleming
Stephen Ehrlich [ARGUED]
Emily M. Bisnauth
Vivek N. Mehta
Office of the New Jersey Attorney General
*Counsel for Appellants*

Andrew L. Schlafly
*Counsel for Amicus Appellants Stop Predatory Gambling, Texans Against Gambling, and Association of American Physicians and Surgeons*

Elizabeth A. Bower
Joseph H. Webster
Hobbs Straus Dean & Walker LLP

Scott D. Crowell
Crowell Law Offices

Michael C. Hoenig
Yuhaaviatam of San Manuel Nation
*Counsel for Amicus Appellant Indian Gaming Association, et al.*

Kevin F. King
Eli Nachmany
Covington & Burling LLP
*Counsel for Amicus Appellant American Gaming Association*

Zachery P. Keller
Office of Attorney General of Ohio
Office of the Solicitor General

Heidi P. Stern
Jessica E. Whelan
Office of Attorney General of Nevada
*Counsel for Amicus Appellants 34 States, District of Columbia, and Northern Mariana Islands*

Alexander H. Loomis
Derek Shaffer
Quinn Emanuel Urquhart & Sullivan, LLP
*Counsel for Amicus Appellant Casino Association of New Jersey Inc.*

Neal K. Katyal
William E. Havemann [ARGUED]
Samantha K. Ilagan
Gurbir S. Grewal
Milbank LLP
*Counsel for Appellee*

Tyler R. Green
Consovoy McCarthy PLLC
*Counsel for Amicus Appellee Paradigm Operations LP*

Michael M. Rosensaft
Katten Muchin Rosenman LLP
*Counsel for Amicus Appellee Bitnomial Exchange LLC*

Megan Barbero
Kyle Keraga
Carlos H. Salguero, Jr.
Venable LLP
*Counsel for Amicus Appellees Max Baucus, Blanche L. Lincoln, Saxby Chambliss, K. Michael Conaway, Collin Peterson, Cheri Bustos, and Cindy Axne*

Scott D. Brenner
Parlatore Law Group, LLP
*Counsel for Amicus Curiae New Finance Institute*

ROTH, *Circuit Judge*, dissenting.

When I went on the Kalshi page for the Carolina Panthers vs. Tampa Bay Buccaneers football game scheduled for January 3, 2026, I could have bet on the winner (game outcome).[1] I could have also bet on whether I believed Tampa Bay would win by more than 2.5 points (point spread), whether the two teams would collectively score 45 or more points (game props), or whether former Tampa Bay wide receiver Mike Evans would score a touchdown (player props).[2] These offerings are virtually indistinguishable from the betting products available on online sportsbooks, such as DraftKings and FanDuel. While online sportsbooks are regulated by states such as New Jersey, Kalshi asserts that it is outside the bounds of state regulation because it does not offer gambling products. Instead, Kalshi contends its offered sports-event contracts are swaps, subject to the exclusive jurisdiction of the CFTC. The Majority agrees, holding that Kalshi's registration as a DCM and branding of its wagers as sports-event contracts are acts of alchemy that transmute its products from sports gambling to futures trading. I see Kalshi's actions as a performative sleight meant to obscure the reality that Kalshi's products are sports gambling. Because Kalshi is facilitating gambling, it can be subjected to state regulation.

The Majority's preemption analysis fails to adequately consider the presumption against preemption,

---

[1] *Carolina at Tampa Bay*, KALSHI, https://kalshi.com/markets/kxnflgame/professional-football-game/kxnflgame-26jan04cartb[https://perma.cc/ZG4E-RPAH?type=image] (last visited Jan. 2, 2026).

[2] *Id.*

which applies with special force here because gambling has traditionally been regulated by the states.[3] I believe that when taking into account the presumption against preemption, the application of New Jersey's gambling laws to Kalshi's sports-event contracts is not field preempted. I would also hold that conflict preemption does not apply because Kalshi is not precluded from complying with both New Jersey and federal law, and because New Jersey's regulations do not undermine the congressional objectives behind the Act. Accordingly, because Kalshi cannot demonstrate a likelihood of success on the merits and show that New Jersey's gambling laws are federally preempted, I respectfully dissent.

## I.

Before I delve into the preemption analysis, I would like to briefly address the Majority's holding that Kalshi's sports-event contracts fall within the Act's definition of swaps. Both parties make compelling arguments in support of their respective positions. On the one hand, Kalshi is correct that the statutory definition of swaps is broad, with the Act defining swaps as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."[4] A plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition.

---

[3] *See infra* Section II.

[4] 7 U.S.C. § 1a(47)(A).

On the other hand, we should not read statutes literally "if reliance on that language would defeat the plain purpose of the statute,"[5] or would "def[y] rationality."[6] As New Jersey argues, Kalshi's proffered definition would likely encompass virtually every kind of wager that could exist, including classic casino games and charity raffles. After all, even a bet over the outcome of a friendly neighborhood ping pong match may have a "*potential* financial . . . consequence" because one of the bettors would reap a financial reward based on the match's outcome.[7] Moreover, because the trading of swaps outside DCMs is illegal under 7 U.S.C. § 2(e), any individual who engages in gambling outside of a DCM would commit a felony were we to take the definition of swaps to its logical extreme. Congress could not have intended for such a rationality-defying outcome.

The Majority contends that my concerns with the potential consequences of Kalshi's proffered swaps definition are based on a pile of "inference upon inference,"[8] but I rely on no inferences whatsoever. I simply apply the definition to the real world and articulate the ramifications as I see them. In any event, because I would rule against Kalshi on the basis of preemption,[9] I need not—and will not—decide whether Kalshi's sports-event contracts fall within the statutory definition of swaps. That said, as I have laid out above, the question of whether sports-

---

[5] *Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983).

[6] *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 588 (3d Cir. 2020) (internal citation and quotation marks omitted).

[7] 7 U.S.C. § 1a(47)(A) (emphasis added).

[8] Maj. Op. 8.

[9] *See infra* Sections III and IV.

event contracts are swaps is a thorny issue with the potential to radically upend the legal landscape governing the gambling industry, and I am not convinced the Majority's analysis does this issue justice.

II.

Turning to preemption, I believe it is first important to provide a brief overview of the presumption against preemption, a bedrock principle of preemption law that the Majority incorrectly believes to be inapplicable. Courts cannot find preemption unless Congress's "clear and manifest purpose" was for the federal law to supersede "the historic police powers of the States." [10] Preemption principles counsel that a close call weighs against a finding of preemption. The presumption against preemption applies with special force when Congress has legislated in a field traditionally occupied by the states.[11]

Throughout U.S. history, gambling regulation has been largely left to the state legislatures.[12] Courts have noted that gambling is a potentially harmful

---

[10] *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

[11] *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (citing *Medtronic, Inc. v. Lohr*, 518 U.S 470, 485 (1996)).

[12] *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a state."); *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009) ("It is well recognized that regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme."); *Flynt v. Bonta*, 131 F.4th 918, 932 (9th Cir. 2025) ("Gambling does not involve an inherently national system of regulation, given the states' long-understood authority in this area.").

"vice activity,"[13] which states may regulate under their police powers to promote the "welfare, safety, and morals" of their citizens.[14] While federal gambling laws exist, they generally supplement state laws by targeting areas outside state jurisdiction, such as U.S. territorial waters,[15] Native American lands,[16] and the channels and instrumentalities of interstate commerce.[17] These federal laws also contain non-preemption provisions allowing for state gaming regulations.[18] Congress in 1978 summarized the federal-state balance in gambling laws as follows:

> [T]he States should have the *primary responsibility* for determining what forms of gambling may legally take place within their borders; the Federal Government should prevent interference by one State with the gambling policies of another, and should act to protect identifiable national interests; and in the *limited* area of interstate off-track wagering on horseraces, there is a need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers.[19]

---

[13] *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 185 (1999).

[14] *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003).

[15] 18 U.S.C. §§ 1081–83 (Gambling Ship Act).

[16] 15 U.S.C. § 1175 (Johnson Act).

[17] 18 U.S.C. § 1084 (Wire Act).

[18] *See e.g.*, 18 U.S.C. §§ 1082(a), 1083(a) (Gambling Ships Act); 15 U.S.C. § 1172(a) (Johnson Act); 18 U.S.C. § 1084(b) (Wire Act).

[19] 15 U.S.C. § 3001(a) (emphasis added).

Several states allowed certain forms of sports betting until Congress in 1992 passed the Professional and Amateur Sports Protection Act (PASPA), which barred states from authorizing sports betting.[20] This federal prohibition on sports betting continued until 2018, when the Supreme Court in *Murphy v. NCAA* held that PASPA's preemption provision was unconstitutional and without effect.[21] The Court explained that "Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own."[22] Congress did not, so states did. As of July 2025, nearly 40 states have legalized sports gaming in some form or another. Many of these states use gaming taxes to fund public programs, and have adopted comprehensive regulatory schemes to protect the public from gambling addiction.

Of course, if Kalshi is correct that its products are not gambling, then discussion about the states' preeminent role in regulating gambling is moot. It is difficult, however, to take Kalshi's argument at face value when its marketing materials, such as the Instagram posts below, routinely refer to its products as "sports betting:"[23]

---

[20] *See* 28 U.S.C. §§ 3701–04.

[21] *Murphy v. NCAA*, 584 U.S. 453, 479–80 (2018).

[22] *Id.* at 486.

[23] Casino Ass'n of New Jersey Br. at 24 (citing Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (Apr. 3, 2025), https://tinyurl.com/5a6x8kan.




Marketing materials such as these, coupled with the fact that Kalshi's sports related offerings are a dead ringer for the products offered by state-regulated online sportsbooks, make it difficult for me to accept the proposition that Kalshi is not facilitating gambling. Basic abductive reasoning tells us that if it looks like gambling, talks like gambling, and calls itself gambling, it's gambling.

The Majority believes the presumption against preemption does not apply because federal law governs interstate gambling. That fact is inapposite, however, because New Jersey does not seek to regulate interstate gambling—it only claims jurisdiction over Kalshi's sports betting activity occurring within the state. The historical tradition of states having the dominant interest in intrastate gambling regulations means that our court must "start with the assumption that the historic police powers of the States

were not to be superseded by the Federal Act"[24] when applying the preemption analysis to New Jersey's gambling laws. As the party asserting preemption, Kalshi bears the burden of overcoming this presumption.

III.

The Majority holds that New Jersey's gambling laws as applied to Kalshi are field preempted because the Act grants the CFTC exclusive jurisdiction over trading on DCMs. The Majority believes the CFTC's occupation of the field of DCM trading gives it the sole authority to regulate Kalshi because it is a DCM. There are two issues with the Majority's holding. *First*, the Majority assumes that the relevant field is trading on DCMs when DCM trading is in fact better thought of as a subfield of futures trading. Because the federal occupation of a subfield cannot overcome the presumption against preemption, the CFTC's occupation of the subfield of DCM trading is insufficient to preempt state gambling laws. *Second*, the Majority inadequately addresses the fact that the Act contains savings clauses, which are incompatible with field preemption.

A.

Although I agree with the Majority that the Act's text indicates that federal law occupies the field of DCM trading, I disagree with the Majority's holding that DCM trading is the relevant field for our preemption analysis. In fact, the Majority does not bother with methodically determining the proper field for preemption purposes and instead assumes

[24] *Medtronic, Inc.*, 518 U.S. at 485 (internal quotation mark omitted).

that the pertinent field is trading on DCMs because "Kalshi's sports-related event contracts are swaps under the Act."[25]

The Majority is mistaken in doing so because identifying the appropriate field is fundamental for this analysis.[26] Not all fields are created equal. For field preemption to apply, the field must be "sufficiently comprehensive" or "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."[27] Subjects where field preemption have been found to apply include broad areas of law such as foreign affairs, international relations, and immigration.[28] DCM trading is not the sort of comprehensive field where the federal interest is so dominant that Congress intended for the "complete ouster of state power."[29] Rather, DCM trading is a subfield of futures trading, which the Supreme Court has noted is "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex."[30]

---

[25] Maj. Op. 11.

[26] *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) ("In order to determine whether Congress has implicitly ousted the States from regulating in a particular field, we must first identify the field in which this is said to have occurred.").

[27] *Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cir. 2010) (citations omitted).

[28] A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 290, 291 (2013) ("Field preemption is much more likely to be found when the federal statute deals with an area that the federal government has traditionally controlled, such as foreign affairs, international relations, and immigration.").

[29] *DeCanas v. Bica*, 424 U.S. 351, 357 (1976).

[30] *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982).

The CFTC's occupation of the subfield of DCM trading is insufficient to preempt state gambling laws because of the presumption against preemption. When Congress gave the CFTC jurisdiction over swaps, there was no "clear and manifest purpose" for federal law to supersede states' "historic police powers" over gambling regulation.[31] After all, the CFTC has no expertise in the sports gaming industry.[32] If Congress wanted the CFTC to serve as a kind of national sports gaming commission, it would not have stated its intention "in so cryptic a fashion."[33]

Both Kalshi and the Majority argue that the presumption against preemption is inapplicable because "the federal government has regulated the derivatives market for over a century."[34] Yet, the presence of federal regulation, however longstanding, "does not by itself defeat the application of the presumption."[35] The only federal law in this area that touches on gaming is the Dodd-Frank Act's "special rule" for event contracts (Special Rule), which gives the CFTC the authority to prohibit event contracts involving gaming.[36] The Special Rule, however, has only

---

[31] *Rice*, 331 U.S. at 230.

[32] *See West Virginia v. EPA*, 597 U.S. 697, 729 (2022) ("When [an] agency has no comparative expertise in making certain policy judgments, we have said, Congress presumably would not task it with doing so.") (internal quotation marks omitted).

[33] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 123 (2000).

[34] Maj. Op. 14.

[35] *Farina*, 625 F.3d at 116. *See also Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009) (applying presumption despite federal regulations existing "for more than a century").

[36] 7 U.S.C. § 7a-2(c)(5)(C)(i).

existed since the passage of Dodd-Frank in 2010, and can hardly be considered longstanding. In addition, Dodd-Frank's legislative history has only a brief discussion of "gaming,"[37] further highlighting the lack of federal regulation in this field.

The question of whether the federal occupation of a subfield can preempt state law, especially when the federal law overlaps with an area traditionally dominated by the states, cannot be answered by field preemption principles. Federal law may fully occupy a discrete subfield while leaving adjacent or overlapping fields to be governed under the conflict preemption framework.[38] Ultimately, the Majority errs because it fails to recognize that DCM trading is a subfield and disregards the presumption against preemption.

B.

The Majority also fails to reconcile its finding of field preemption with the existence of two savings clauses in the Act that preserve certain state law causes of action. 7 U.S.C. § 2(a)(1)(A) provides that (1) "[n]othing in this section shall . . . supersede or

---

[37] 156 Cong. Rec. S5906–07 (2010).

[38] *See Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) ("If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." (internal citations omitted)); *see also Farina*, 625 F.3d at 121 (rejecting field preemption claim upon concluding that Federal Communications Commission's regulation of radiofrequency emissions occupied the limited subfield of "areas of technical standards and competitive market structure for cellular service").

limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws of the United States or of any State" (state law carveout), and that (2) "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State" (state court carveout).[39] Such clauses are "fundamentally incompatible with complete field preemption" because they indicate that Congress envisioned a role for state law in the field.[40] A Swiss cheese-like field that allows for enclaves of state authority cannot preempt state law because field preemption requires *complete* occupation on the part of the federal government.

The Majority waves away the presence of these savings clauses by noting that the state law carveout applies "*except* as hereinabove provided" by the grant of exclusive jurisdiction to the CFTC.[41] In the Majority's view, that prefatory clause means that Congress intended to occupy the field of DCM trading regulation because the state law carveout does not apply to matters within the CFTC's exclusive jurisdiction. The Majority misses the point, however. It does not matter if § 2's preservation of state law causes of action is not meant to infringe on the CFTC's exclusive jurisdiction. The very fact that Congress decided to allow room for state law means that Congress chose to not completely occupy the field.

The Majority's position is even weaker with regard to the state court carveout. While true that the state

---

[39] 7 U.S.C. § 2(a)(1)(A).

[40] *Farina*, 625 F.3d at 121.

[41] Maj. Op. 15 (citing 7 U.S.C. § 2(a)(1)(A)) (emphasis in original).

law carveout is restricted by the "except as hereinabove provided" language, the state court carveout is in a completely different sentence.[42] The text of the Act therefore places no limits on the carveout for state court jurisdiction—it is absolute and completely unaffected by the grant of exclusive jurisdiction to the CFTC. For that reason, I disagree with the Majority's holding that the state court carveout "does not contravene the grant of CFTC's exclusive jurisdiction."[43]

Consequently, I would hold that the presence of such clauses is evidence of Congress's intent to allow a certain amount of complementary state regulation in this field. Accordingly, field preemption does not apply.

IV.

Conflict preemption can occur if it is impossible to comply with both state and federal law[44] (impossibility), or if state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (obstacle).[45] Kalshi claims both forms of conflict preemption, arguing that it is impossible to comply with both New Jersey's gambling laws and CFTC requirements, and that the application of New Jersey's gambling laws to Kalshi's sports-event contracts "subverts Congress's aim of

---

[42] 7 U.S.C. § 2(a)(1)(A).

[43] Maj. Op. 15.

[44] *See MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 495 (3d Cir. 2013).

[45] *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985).

bringing futures markets 'under a uniform set of regulations.'"[46]

While the Majority does not address impossibility preemption, it does agree with Kalshi that obstacle preemption prevents New Jersey from regulating Kalshi's sports-event contracts. I would instead hold that neither form of conflict preemption applies here. Kalshi can comply with both New Jersey and federal law, and New Jersey's gambling laws as applied to Kalshi do not frustrate the congressional objectives behind the Act.

A.

Kalshi contends that impossibility preemption applies because New Jersey requires that the gaming it regulates "shall only occur within the State"[47] and because New Jersey bans wagering on college sports events involving New Jersey college teams or taking place in the state.[48] In order to comply with these requirements, Kalshi argues that it would have to exclude New Jersey from contracts it offers in other states, which would violate the CFTC requirement that a DCM provide "impartial access to its markets and services."[49] I disagree. The impartial access requirement does not mandate that a particular market exist for event contracts.[50] Congress simply

---

[46] Appellee Br. 30 (quoting *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992).

[47] N.J. Admin. Code § 13:69O-1.2(e)(2).

[48] N.J. Const. art. IV, § 7, ¶ 2(D).

[49] 17 C.F.R. § 38.151(b).

[50] *See Just Puppies, Inc. v. Brown*, 123 F.4th 652, 664 (4th Cir. 2024).

wanted the CFTC to regulate access to a market to the extent it exists.[51]

In fact, the purpose behind the impartial access requirement was to prevent DCMs from using discriminatory access requirements, like the creation of exclusive membership standards that focus on high net worth.[52] It has nothing to do with ensuring that event contracts are available in all states. Kalshi can still establish different categories of market participants, such as a separate market for New Jersey residents, as long as it does not "discriminate within [that] particular category."[53] Kalshi has therefore not shown that it is impossible to comply with both federal and state laws.

B.

The Majority states "that "[a]llowing New Jersey to enforce its gambling laws and state constitution would create an obstacle to executing the Act" because it would subvert Congress's aim of ensuring that futures markets operate under a uniform set of regulations.[54] While uniformity is an important goal of the Act, "no legislation pursues its purposes at all costs," and it "frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the

---

[51] *Id.*

[52] *See* Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 n.51 (Dec. 22, 2010).

[53] *Id.* at 80579. During oral argument, counsel for New Jersey noted that Sporttrade is a company that offers event contracts in the state and has been able to comply with both New Jersey and federal regulations.

[54] Maj. Op. 13.

law."[55] Such broad purposes arguments "ignor[e] the complexity of the problems Congress is called upon to address."[56] Courts cannot use the Supremacy Clause "to elevate abstract and unenacted legislative desires above state law."[57]

The analysis of this issue should be grounded in the text of the statute and relevant regulations. The Special Rule, which was added to the Act following the passage of Dodd-Frank,[58] is the only provision in the statute that addresses gaming contracts. Therefore, I must analyze this provision to discern whether New Jersey's gambling laws undermine congressional objectives. The Special Rule states that the CFTC "may determine that . . . [event] contracts . . . are contrary to the public interest" if they involve "gaming."[59] Kalshi is correct that this statutory provision alone does not prohibit the trading of gaming contracts in DCMs, as it merely gives the CFTC the authority to prohibit them. The CFTC did use that authority, however, enacting Rule 40.11(a)(1), which prohibits DCMs from trading, or accepting for clearing, event contracts that involve, relate to, or reference gaming.[60] Under the plain text of this regulation, Kalshi's sports-event contracts are being offered in violation of federal law. If gaming

---

[55] *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (emphasis in original).

[56] *Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp,* 4 74 U.S. 361, 373–74 (1986) (internal quotation marks omitted).

[57] *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019).

[58] Pub. L. No. 111-203, 124 Stat. 1737 (2010).

[59] 7 U.S.C. § 7a-2(c)(5)(C)(i).

[60] 17 C.F.R. § 40.11(a)(1).

contracts, such as sports-event contracts, violate federal law, state gambling laws as applied to such contracts cannot be conflict preempted. Far from undermining congressional objectives, New Jersey's gambling laws arguably complement them.

The legislative history of Dodd-Frank also indicates Congress's general disdain for gaming contracts. While it is important to be mindful "that the authoritative statement is the statutory text," and that "legislative history can be murky, ambiguous, and contradictory,"[61] I believe that the legislative history can be useful in providing important context in this case because of the paucity of references to gaming contracts in both the Act and Dodd-Frank.

The congressional record for Dodd-Frank includes a colloquy from then Senator Blanche Lincoln of Arkansas, who said that the Special Rule's purposes are "to prevent the creation of futures and swaps markets that would allow citizens to profit from devastating events," "prevent gambling through futures markets," and "strengthen the government's ability to protect the public interest against gaming contracts and other event contracts."[62] She continued:

> The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament.

---

[61] *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 697 (3d Cir. 2016) (internal quotation marks and citation omitted).

[62] 156 Cong. Rec. S5906 (2010).

These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.[63]

In short, Dodd-Frank's history undermines Kalshi's obstacle preemption claim. Congress intended to prohibit gambling on DCMs, and the CFTC effectuated that intention through its enactment of Rule 40.11(a)(1). Kalshi asserts that its sports-event contracts comply with this regulation because the CFTC has not taken any action against its contracts. The Majority similarly notes that "the CFTC has chosen not to enforce its regulation against the type of sports-related event contracts at issue here."[64] Kalshi and the Majority overlook that agency inaction alone cannot preempt state law,[65] especially not when that inaction constitutes a failure to "adhere to its own rules and regulations."[66] While the CFTC has recently issued an Advance Notice of Proposed Rulemaking on regulating prediction markets,[67] Rule 40.11(a)(1)'s prohibition of gaming contracts continues to be in place. Accordingly, neither the CFTC's failure to enforce its own regulation nor nonexistent rules governing event contracts are sufficient to coat Kalshi's self-certified gaming contracts with a sheen of legality. They cannot be a basis to argue conflict preemption.

---

[63] *Id.* at S5906–07.

[64] Maj. Op. 7.

[65] *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 247 (3d Cir. 2008) (citing *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988); *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65–70 (2002)).

[66] *Reuters Ltd. v. FCC,* 781 F.2d 946, 950 (D.C. Cir. 1986).

[67] *See* Prediction Markets, 91 Fed. 12516 (Mar. 16, 2026).

Further, a federal law does not preempt state laws where the activity regulated by the state is merely a peripheral concern of the federal law.[68] The lack of references to gaming contracts in Dodd-Frank indicates that such contracts were a peripheral concern when the Special Rule was enacted. This is in contrast to New Jersey's laws, which have the explicit purpose of governing the gaming industry and are not intended to intrude on federal regulation of the futures markets.[69]

Finally, Kalshi's argument that New Jersey's gambling laws pose an obstacle to the accomplishment of Congress's goals behind the Act is undercut by the lack of a clear congressional statement that the Special Rule was intended to have preemptive effect. The Act contains both a preemption and non-preemption provision, neither of which cover trading on DCMs. 7 U.S.C. § 16(e)(2) specifies that the Act preempts the application of state gaming laws to certain enumerated transactions that are exempted or excluded from the Act.[70] Transactions "conducted on or subject to the rules of a registered entity," like a DCM, are not on the list of enumerated trans-

---

[68] *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007); *see also Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981).

[69] *Ford Motor Co. v. Ins. Comm'r of Pa.*, 874 F.2d 926, 939 (3d Cir. 1989) (finding no implied preemption because "the intent of the federal scheme was to regulate the *operation* of federally insured thrifts," and thus federal law "did not preclude supplemental state regulations which . . . imposed a restriction upon the *affiliations* that the thrift could have and were designed more to regulate the insurance industry rather than to control the operation of the savings and loan industry" (alteration in original)).

[70] 7 U.S.C. § 16(e)(2).

actions.[71] 7 U.S.C. § 16(e)(1) expressly states that the Act does not preempt the application of state laws to any futures contract conducted *outside* regulated exchanges like DCMs.[72] Since Congress's silence can be construed in more than one way, I would apply the presumption against preemption and interpret the lack of reference to DCM trading as weighing against conflict preemption.

* * *

For these reasons, I would hold that Kalshi cannot demonstrate a reasonable likelihood of success on the merits on its preemption claims. I therefore respectfully dissent.

---

[71] *See id.*

[72] 7 U.S.C. § 16(e)(1).

U.S. COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 25-1922

---

KALSHIEX, LLC

v.

MARY JO FLAHERTY; DIVISION OF GAMING ENFORCEMENT; JAMES T. PLOUSIS; ALISA COOPER; CASINO CONTROL COMMISSION; MATTHEW J. PLATKIN; JOYCE MOLLINEAUX

MARY JO FLAHERTY; MATTHEW J. PLATKIN,

*Appellants*

---

Appeal from the U.S. District Court, D.N.J.
Judge Edward S. Kiel, No. 1:25-cv-02152

Before: CHAGARES, *Chief Judge*, PORTER, and ROTH, *Circuit Judges*
Argued Sep. 10, 2025; Decided Apr. 6, 2026

---

JUDGMENT

This cause came to be considered on appeal from the United States District Court for the District of New Jersey and was argued on September 10, 2025.

On consideration whereof, it is now ORDERED and ADJUDGED by this Court that the District Court's order dated April 28, 2025, is hereby AFFIRMED. All of the above in accordance with the Opinion of this Court. Costs shall be taxed against the appellants.

ATTEST:

s/ Patricia S. Dodszuweit
Clerk

Dated: April 6, 2026

**APPENDIX B**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

Case No. 25–cv–02152–ESK–MJS

---

KALSHIEX LLC,

*Plaintiff,*

v.

MARY JO FLAHERTY, *et al.*,

*Defendants.*

---

OPINION

KIEL, U.S.D.J.

THIS MATTER is before the Court on plaintiff KalshiEX LLC's (Kalshi) motion for a temporary restraining order and preliminary injunction. (ECF No. 2 (Kalshi Mot.).)[1] For the following reasons, the motion will be GRANTED.

---

[1] Kalshi stated in its moving brief that if I am able to resolve its motion for a preliminary injunction prior to the then-applicable compliance deadline of April 7, 2025, a temporary restraining order would be unnecessary. (Kalshi Mot. p. 4.) The parties thereafter agreed to extend the compliance deadline to April 30, 2025. (ECF No. 6 (Apr. 1, 2025 Letter).) Because I am filing this decision while the status quo remains in effect, I do not consider whether a temporary restraining order is warranted.

I. BACKGROUND

Kalshi is a financial services company principally located in New York that operates a derivatives exchange and prediction market. (ECF No. 1 (Compl.) p. 4.) Defendant New Jersey Division of Gaming Enforcement (the Division) is an independent state agency within the New Jersey Attorney General's office that promulgates rules and regulations for the licensing and operating of gaming in New Jersey, enforces state gaming laws and regulations, and monitors casino operations for compliance and conducts related investigations. (*Id.* pp. 4, 5.) Defendant Mary Jo Flaherty is sued in her official capacity as interim director of the Division. (*Id.* p. 4.) Defendant New Jersey Casino Control Commission (the Commission) is an independent state agency that licenses casinos and related key employees. (*Id.* p. 5.) Defendants James T. Plousis, Alisa Cooper, and Joyce Mollineux are sued in their official capacities as chairman, vice chair, and commissioner of the Commission, respectively. (*Id.*) Defendant Matthew J. Platkin is sued in his official capacity as Attorney General of New Jersey. (*Id.*)

A. Event Contracts

A derivative is a financial instrument or contract with a price that is directly dependent on the value of one or more underlying assets. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, Case No. 23–03257, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024), *stay denied*, 119 F.4th 58 (D.C. Cir. 2024). An event contract is a specific type of derivative with a payoff based on a specified event, occurrence, or value. *Id.* at *2. These contracts are generally binary, the buyer may take a "yes" position that the specified event will take place whereby the seller implicitly

takes the "no" position. *Id.* The contract specifies the value to be paid and may be purchased or sold at any time prior to its expiration date. *Id.* When the contract expires, the seller must pay the buyer if the event occurs and the buyer is not paid if the event does not occur. *Id.*

The Commodity Exchange Act (CEA) was enacted in 1936 to regulate transactions on commodity futures exchanges. Derek Fischer, Note, *Dodd-Frank's Failure to Address CFTC Oversight of Self-Regulatory Organization Rulemaking*, 115 Colum. L. Rev. 69, 69 (2015). In 1974, Congress established the Commodity Futures Trading Commission (CFTC), which has since maintained authority over futures trading. *Id.* at 70. The 1974 amendments to the CEA were prompted, at least in part, by concerns that states might regulate futures markets—resulting in conflicting regulatory requirements—in light of increased commodities trading and other exigencies of the time. *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992); *see also Fed. Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583, 590–91 (D.C. Cir. 2001) ("[T]he statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets.*'") (quoting S. Rep. No. 93– 1131, at 23 (1974))).

In 2010, Congress amended the CEA through the Dodd-Frank Act and provided the CFTC oversight over swaps. *DTCC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 12 (D.D.C. 2014). Under the CEA, a "swap" includes an agreement, contract, or transaction "that provides for any purchase, sale, pay-

ment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(a)(ii). An "excluded commodity" includes an occurrence, extent of an occurrence, or contingency that is beyond the control of the parties and is associated with a financial, commercial, or economic consequence. *Id.* at § 1a(19)(iv).

An entity seeking to be designated as a contract market must submit an application and relevant materials to the CFTC. 7 U.S.C. § 7(a); 17 C.F.R. § 38.3(a). The application must include information sufficient to demonstrate compliance with various core principles. 17 C.F.R. § 38.3(a)(2). It is unlawful for any person, other than an eligible contract participant, to enter into a swap if it is not entered on, or subject to the rules of, a board of trade designated as a contract market. 7 U.S.C. § 2(e). Absent limited exceptions, the CFTC possesses exclusive jurisdiction over futures, options, and swaps traded on designated contract markets. Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV Gaming L.J. 53, 63 (2021) (citing 7 U.S.C. § 2(a)(1)(A)).

A designated contract market may seek CFTC approval for any new contract. 7 U.S.C. § 7a–2(c)(4). Alternatively, a designated contract market may list a new contract and submit a certification that the contract complies with the CEA. *Id.* § 7a–2(c)(1); Saule T. Omarova, *License to Deal: Mandatory Approval of Complex Financial Products*, 90 Wash. U. L. Rev. 63, 109 (2012) (same). The CEA contains a "[s]pecial rule" pertaining to event contracts, mean-

ing "the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency . . . by a designated contract market or swap execution facility . . . ." 7 U.S.C. § 7a–2(c)(5)(C)(i). Under the special rule, the CFTC may determine that an agreement, contract, or transaction is contrary to the public interest if it involves an activity that is unlawful under federal or state law, terrorism, assassination, war, gaming, or a similar activity. *Id.*; *see also* Michael P. Vandenbergh, Kaitlin Toner Raimi & Jonathan M. Gilligan, *Energy and Climate Change: A Climate Prediction Market*, 61 UCLA L. Rev. 1962, 1994 (2014) (noting the CFTC's jurisdiction over event contracts and authority to determine whether they are contrary to the public interest). In such cases, the CFTC must take final action within 90 days absent an extension. 7 U.S.C. § 7a–2(c)(5)(C)(iv).

B. Kalshi and the Cease-and-Desist Letter

The CFTC certified Kalshi as a designated contract market in 2020. (Compl. p. 10.) On January 24, 2025, Kalshi self-certified and began listing sports-related contracts such as those buying or selling positions on which team will advance in a given round of a college basketball tournament. (*Id.* p. 11.) The CFTC has not reviewed or prohibited Kalshi's sports-related contracts despite possessing the authority to do so. (*Id.*)

On March 27, 2025, the Division sent a cease-and-desist letter to Kalshi's chief executive officer, Tarek Mansour. (ECF No. 1–1 (Mar. 27, 2025 Letter).) The Division asserted that Kalshi was listing unauthorized sports wagers in violation of both the New Jersey Sports Wagering Act (Sports Wagering Act) and New Jersey Constitution. (*Id.* p. 2.) The Sports

Wagering Act prohibits entities other than sports wagering licensees—or an applicant or internet sports pool operator acting on behalf of a licensee—from offering sports wagering. N.J. Stat. Ann. § 5:12A–11(c). A violation constitutes a crime of the fourth degree subject to a fine of up to $100,000. *Id.* The New Jersey Constitution further permits wagering on professional, college, and amateur sport and athletic events, but not "on a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place." N.J. Const. art. iv, § 7, ¶ 2(D).

The Division demanded Kalshi to immediately cease and desist the offering of any sports wagering to New Jersey residents and to void any existing wagers. (Mar. 27, 2025 Letter p. 2.) The Division provided Kalshi until 11:59 p.m. on March 28, 2025 to confirm that it had ceased sports wagering activities in New Jersey and voided existing wagers subject to enforcement for failure to comply. (*Id.* p. 3.) Kalshi and the Division were unable to reach an agreement. (Compl. pp. 12, 13.) Kalshi then filed the instant complaint alleging that the threat of enforcement under the New Jersey Constitution and Sports Wagering Act encroaches upon the CFTC's exclusive jurisdiction and is preempted under the Supremacy Clause. (*Id.* pp. 14, 15.) Kalshi seeks declaratory and injunctive relief. (*Id.* pp. 15, 16.)

The pending motion followed, wherein Kalshi advised that the parties had agreed to maintain the status quo until April 7, 2025. (Kalshi Mot. p. 4.) I scheduled a hearing. (ECF No. 4.) The parties submitted a joint letter on April 1, 2025 stating that the Division had further extended the compliance

deadline to April 30, 2025, seeking adjournment of the motion hearing, and setting forth a proposed briefing schedule. (Apr. 1, 2025 Letter.) I granted the parties' requests (ECF No. 9) and the parties completed motion practice, (ECF No. 15 (Defs.' Opp'n Br.), ECF No. 17 (Kalshi Reply Br.)).

## II. PRELIMINARY INJUNCTION MOTIONS

To obtain a preliminary injunction, the movant must demonstrate both a likelihood of success on the merits and that it will more likely than not suffer irreparable harm without relief. *Mallet and Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021). If the two threshold factors are met, the court moves on to the two remaining factors—whether granting the requested relief will result in an even greater harm to the nonmovant or other interested party and whether the public interest favors relief—and balances the four factors together. *Id.* When the nonmovant is the government, the third and fourth factors merge. *Shelley v. Metzger*, 832 F. App'x 102, 104 (3d Cir. 2020).

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "While, the posting of a bond is rarely discretionary, '[t]he amount of the bond is left to the discretion of court.'" *Marine Elec. Sys., Inc. v. MES Fin., LLC*, 644 F. Supp. 3d 84, 96 (D.N.J. 2022) (alteration in original) (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210 (3d Cir. 1990)); *see also Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 604, 611 (3d Cir. 2024) ("We have held that posting a bond is 'almost mandatory'; any exceptions are 'rare.'"

(quoting *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988))).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

To establish a likelihood of success on the merits, the movant "must show that 'there is "a reasonable chance, or probability, of winning,"'" which does not require a "more-likely-than-not showing of success on the merits." *Mallet and Co. Inc.*, 16 F.4th at 380 (quoting *In re Revel AC*, 802 F.3d 558, 568 (3d Cir. 2015) and *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 n. 3 (3d Cir. 2017)). The parties' arguments related to Kalshi's likelihood of success on the merits turn on whether the CEA and CFTC's jurisdiction over designated contract markets preempt the New Jersey Constitution and Sports Wagering Act to the extent that the Division threatens enforcement.

#### 1. Preemption and Party Arguments

Under the Supremacy Clause, the constitution and laws of the United States "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The three general classes of preemption are express preemption, field preemption, and conflict preemption. *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 287 (3d Cir. 2020). Express preemption, as the name implies, takes place when Congress expressly preempts state law within the statute's language. *Id.* Field preemption applies "when Congress does not expressly preempt state law but where '"federal law leaves no room for state regulation and that Congress had a clear and manifest intent to supersede state law" in that field.'" *Id.* (quoting *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016)). Lastly, conflict preemption occurs "when a state law

conflicts with federal law such that compliance with both state and federal regulations is impossible, or when a challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law.'" *Id.* (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).

Kalshi asserts that field preemption applies because the text of the CEA makes clear that the CFTC has exclusive jurisdiction over accounts, agreements, and transactions traded on designated contract markets. (Kalshi Mot. p. 14.) This interpretation is supported by the CEA's purported purpose and drafting history. (*Id.* pp. 15–17.) The CEA's comprehensive regulatory scheme further demonstrates an intent to foreclose concurrent state jurisdiction, according to Kalshi. (*Id.* pp. 17, 18.)

Kalshi also contends that conflict preemption applies. (*Id.* pp. 18–22.) Congress's amendments to the CEA in 1974 were intended to bring futures markets under a uniform set of regulations and the Division's actions conflict with that goal. (*Id.* p. 19.) The CFTC had authority to review and determine whether Kalshi's sports-related contracts are contrary to the public interest but did not act. (*Id.* pp. 20, 21.) Kalshi claims that subjecting it to New Jersey law would undermine congressional calibration of force and conflict with the CFTC's evaluation of the public interest. (*Id.*) Abruptly closing its sports-related contracts could further place Kalshi in tension with CFTC core principles requiring impartial access to trading privileges and reduction of risk of price distortion and market disruption. (*Id.* pp. 21, 22.)

Defendants counter that the CEA's exclusive-jurisdiction provision does not cover the sports-

related contracts at issue because they are not associated with a potential financial, economic, or commercial consequence and state law still applies to contracts that do not fall within CFTC's exclusive jurisdiction. (Defs.' Opp'n Br. pp. 25–27.) Even if the exclusive-jurisdiction provision applies, defendants argue that its purpose was to separate CFTC and Securities and Exchange Commission (SEC) functions. (*Id.* pp. 27, 28.) The savings clauses within 7 U.S.C. § 2(a)(1)(A) and reference to state law in the special rule for event contracts evidence intent not to occupy the field. (*Id.* pp. 28–31.) Had Congress sought to preempt state law, it would have done so. (*Id.* p. 32.)

Kalshi's conflict preemption argument stands on shakier ground, according to defendants. (*Id.* pp. 37–44.) The Sports Wagering Act complements the CEA in ensuring financial integrity of transactions and protecting participants from abuse. (*Id.* p. 38.) Absent a small set of contracts related to collegiate athletics, Kalshi may continue to offer its sports-related contracts so long as it obtains New Jersey licensure. (*Id.* pp. 39, 42, 43.) The CEA's special rule for event contracts expressly recognizes the applicability of state law and New Jersey's stronger protections relating to sports wagers do not stand as an obstacle to the CEA's regulation of event contracts, according to defendants. (*Id.* pp. 40–42.)

2. Analysis

Earlier this month, a court in the District of Nevada considered a substantially similar motion for preliminary injunction involving Kalshi. In that case, Kalshi sought to enjoin the Nevada Gaming Commission, Nevada Gaming Control Board, and their members from enforcing Nevada law against its

event contracts, particularly those involving sports and election results. *KalshiEX, LLC v. Hendrick*, Case No. 25–00575, 2025 WL 1073495, at *1–2 (D. Nev. Apr. 9, 2025). Faced with similar preemption arguments as those presented here, the court first concluded that the plain language of 7 U.S.C. § 2(a)(1)(A) grants the CFTC exclusive jurisdiction over accounts, agreements, and transactions involving swaps or contracts of sale of a commodity for future delivery traded or executed on designated exchanges. *Id.* at *5. Though the paragraph's second sentence provides that state regulatory authority is not superseded, that sentence must be read in the context of the first, which supersedes SEC and state authority over contracts on designated exchanges. *Id.* The second sentence therefore merely preserves SEC and state authority over contracts that are not subject to the CFTC's exclusive jurisdiction. *Id.*

Even if express preemption did not apply, the exclusive-jurisdiction language reflects an intent to occupy the field and the defendants cited no authority to the contrary. *Id.* at *6. As field preemption applied and the CFTC had not disapproved of the sports-related contracts, the defendants were unable to impose civil or criminal penalties against Kalshi. *Id.* Even if the sports-related contracts constituted gaming, it would not have subjected Kalshi to state gaming law, according to the court, but rather the CFTC's public-interest review. *Id.*

Defendants acknowledge the District of Nevada result but argue that the court failed to consider various CEA provisions in depth. (Defs.' Opp'n Br. p. 36.) Defendants specifically reference the threshold applicability of the exclusive-jurisdiction provision, the savings clauses, the special rule's reference to

state law, and the CEA's narrow express-preemption provisions. *Id.*

To begin, that 7 U.S.C. § 16 contains express preemption provisions does not foreclose implied preemption elsewhere within the CEA. "[I]mplied preemption may exist even in the face of an express preemption clause." *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 239 (3d Cir. 2009); *see also* Aron & Jones, *supra*, at 59 ("[E]ven though [7 U.S.C. § 16(e)(2)] is an express preemption provision, that alone does not end the preemption analysis of the CEA versus states sports betting."). My task is to look deeper.

Second, and to the partial contrary, the District of Nevada expressly considered the first savings clause of 7 U.S.C. § 2(a)(1)(A). It concluded that the clause "does not give states regulatory authority over CFTC-designated exchanges because that language is limited by the phrase '[e]xcept as hereinabove provided.' [7 U.S.C. § 2(a)(1)(A)'s] first sentence supersedes the SEC and state regulatory authorities' jurisdiction for contracts on a CFTC-designated exchange." *Hendrick*, 2025 WL 1073495, at *5. I agree with that construction. The second savings clause's reference to state courts' jurisdiction says little about preemption of state regulation of designated contract markets. Of course state courts may retain jurisdiction over claims such as private fraud actions. *See* Kenneth B. Sills, 12A Tex. Jur. 3d Commodity Exchanges § 8 (2025) ("In a private action for damages based on misrepresentation and deceptive trade practices in connection with futures contracts, the [CFTC] has neither exclusive nor primary jurisdiction with respect to such claims, and the jurisdiction of the [CFTC] is not exclusive of the jurisdiction of state courts to adjudicate such claims; thus, a claimant is

not required to exhaust his or her administrative remedies prior to the commencement of suit."); Stacy L. Davis, John Kimpflen, J.D., & Karl Oakes, 7 Fed. Proc., L. Ed. § 13:68 (2025) ("[T]he availability of the reparations forum at the CFTC does not bar state court jurisdiction of commodities fraud actions based on state law.")

As for the special rule for event contract's reference to state law, the District for the District of Columbia persuasively addressed this issue in an illustration last year. Addressing the CFTC's position that Kalshi's contracts concerning control of Congress involved unlawful activity because it is illegal in many states to stake money on an elections' outcome, the court noted that many states also define unlawful gambling as staking money on an contingent outcome. *KalshiEX LLC*, 2024 WL 4164694, at *12. Event contracts are, by definition, staking money on the outcome of a contingent event and under the CFTC's logic the special rule would apply to any event contract. *Id.* Thus the only workable interpretation of the special rule is that "unlawful under any Federal or State law" refers to the underlying event rather than the act of staking money on that event. *Id.* This logic is sound to me at this stage. Furthermore, even if "unlawful" refers to state gambling laws or "gaming" refers to the contracts at issue here, that would subject Kalshi to the review of the CFTC—not state regulators. *See Hendrick*, 2025 WL 1073495, at *6 ("[E]ven if Kalshi's sports contracts involve 'gaming,' that would not subject Kalshi to state gaming laws. Rather, it would subject Kalshi to the special rule that allows the CFTC to conduct a public interest review.").

Finally, I am persuaded that Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction and am unconvinced by defendants' arguments to the contrary. Defendants argue that sporting events are without potential financial, economic, or commercial consequence. On the record before me, I disagree. *See* Aron & Jones, *supra*, at 79–80 (noting the use of similar language in defining a swap and event contract under the CEA and stating that sports bets may meet the requirement of a potential financial, commercial, or economic consequence). Kalshi references a few recent examples of the economic impact of sporting events in television, advertising, and local communities. (Kalshi Reply Br. pp. 8, 9.)

The special rule for event contracts states that no agreement, contract, or transaction determined by the CFTC to be contrary to the public interest may be made available on a registered market. *See* 7 U.S.C. § 7a–2(c)(5)(C)(ii). Therefore, at this stage, Kalshi's sports-related event contracts evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them. *See* Vandenbergh, *et al.*, *supra*, at 1994 (noting that the CFTC has jurisdiction over event contracts and that the Dodd-Frank Act provided it with the authority to determine whether an event contract may be approved for trading via the special rule). "[T]o the extent that swaps, futures, or options are traded on [designated contract markets], state law would appear to be preempted by the CFTC's exclusive jurisdiction." Aron & Jones, *supra*, at 64.

Because I conclude that Kalshi has demonstrated a reasonable chance of prevailing—which in this case means proving that at the very least field preemption

applies—I do not consider whether conflict preemption may also apply. I move on then to the irreparable harm prong.

B. Irreparable Harm

"[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 262 (3d Cir. 2020) (alteration in original) (quoting *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994)). Such harm must be likely absent injunctive relief. *Id.*

Kalshi submits that the Division's threatened enforcement is likely to cause it irreparable harm if its motion is not granted. (Kalshi Mot. pp. 22–24.) If Kalshi does not comply with the Division, it faces credible threat of civil and criminal liability. (*Id.* p. 22.) One of Kalshi's partners has already chosen not to move forward with listing Kalshi event contracts in New Jersey due to a similar cease-and-desist letter it received from New Jersey authorities. (ECF No. 2–1 (Sottile Decl.) p. 14.) If it chooses to comply with the Division, Kalshi would forego business within New Jersey without the potential of recouping financial losses if it prevails. (Kalshi Mot. p. 22.) Kalshi does not currently have the need or means to geolocate users and doing so would cost Kalshi an estimated tens of millions of dollars annually, again with no guarantee of recoupment. (*Id.* pp. 22, 23; Sottile Decl. pp. 6, 7.) No matter what it does, Kalshi claims that it will face reputational harms associated with either being perceived as violating New Jersey law or ending its business in New Jersey and undermining user confidence. (Kalshi Mot. pp. 23, 24.)

Defendants respond that potential liability does not constitute irreparable harm because Kalshi's claims may be raised as affirmative defenses. (Defs.' Opp'n Br. p. 45.) Further, economic injuries are insufficient and Kalshi can continue with all but a small portion of its sports-related event contracts so long as it obtains New Jersey licensure and complies with the Sports Wagering Act. (*Id.* pp. 45–47.)

Absent from defendants' argument is reference to Kalshi's asserted reputational harms. The loss of business and goodwill may constitute irreparable injury. *Marine Elec. Sys., Inc.*, 644 F. Supp. 3d at 95; *see also Guardian Life Ins. Co. of Am. v. Estate of Cerniglia*, 446 F. App'x 453, 456 (3d Cir. 2011) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." (quoting *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004))). The declaration of Kalshi's head of markets states that the prospect of facing civil or criminal enforcement or complying and compromising the integrity of its contracts imperils the reputation Kalshi has cultivated over several years. (Sottile Decl. pp. 14, 15.) This is virtually the same "Hobson's choice" discussed in *Hendrick*. *See* 2025 WL 1073495, at *7. I am particularly persuaded by the representation that a similar cease-and-desist letter has already led one partner to decline to list Kalshi event contracts in New Jersey. (Sottile Decl. p. 14.) Therefore, I find that—at minimum— Kalshi has identified harms to its reputation and goodwill that are both likely without injunctive relief and not able to be remedied following trial.

C. Balance of Interests

The parties' arguments as to the public and defendants' combined interests unsurprisingly boil down

to their positions on the merits. Kalshi submits that because New Jersey law is preempted here, there is no public interest in enforcement. (Kalshi Mot. pp. 24, 25.) Defendants respond that states are harmed when they are enjoined from enforcing their laws and that New Jersey has an especially strong interest in regulating gambling. (Defs.' Opp'n Br. pp. 48, 49.) Revenues collected from gambling help support senior citizens and treatment for gambling addiction and a finding for Kalshi will encourage copycats to similarly evade state law. (*Id.* pp. 49, 50.)

Because I found above that Kalshi has established a likelihood of success in demonstrating that New Jersey law is preempted as applied to its sports-related contracts, I also conclude that the interests favor injunction. "[T]he public interest [is] not served by the enforcement of an unconstitutional law." *N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 389 (3d Cir. 2012) (second alteration in original) (quoting *Am. Civ. Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)). Defendants' fear over copycats is also at least somewhat mitigated by the CEA's application process and related requirements. *See* 7 U.S.C. § 7(a); 17 C.F.R. § 38.3(a).

As far as any lost state revenue, such arguments are at least partially the product of the obvious tension between event contracts and sports wagering. Limited to Kalshi's alleged continuing violations of New Jersey law, Kalshi—as noted in *Hendrick*—proceeds at its own peril. *See* 2025 WL 1073495, at *8. Aside from any action the CFTC may take, a finding of likelihood of success on the merits here does not prejudge a finding for defendants through dispositive motion practice or trial. *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 n. 11 (3d Cir. 2016)

(noting the "entirely different" standards governing motions for preliminary injunction and summary judgment). If defendants are proven correct, they may proceed with enforcement actions—thereby recouping at least some deprived revenues and vindicating any police power restrained by this decision in the process.

To find that the interests disfavor Kalshi—especially after determining that it has met its burden on the merits—would mean leaving it subject to state enforcement or obligating it to shift its business practices, consequences that are not cleanly undone. The balancing of the factors here caution me to keep the toothpaste in the tube. Kalshi's motion will therefore be granted.

D. Bond

Finally, Kalshi argues that defendants will not suffer any nonspeculative harm by not proceeding with enforcement efforts against it and thus no security is necessary. (Kalshi Mot. p. 25.) Alternatively, if I determine that security is needed, Kalshi asks that it be de minimis. (*Id.*) Defendants' opposition brief does not reference security.

Though I have discretion in setting the amount of bond, I do not find that my discretion extends to not setting one at all in this instance. *See Marine Elec. Sys., Inc.*, 644 F. Supp. 3d at 96; *see also Tilden Recreational Vehicles, Inc. v. Belair*, 786 F. App'x 335, 343 (3d Cir. 2019) (noting that district courts must set bond even when the parties do not raise the issue and that waiver of the bond requirement applies to narrow circumstances in which compliance with the preliminary injunction poses no risk of monetary loss for the opponent).

The court in *Hendrick* determined that a de minimis security was warranted and set the bond at $10,000 with the parties having an opportunity to advocate for the sum to be increased or decreased. 2025 WL 1073495, at *8. I find that that amount is in insufficient under the instant circumstances and instead determine that a bond of $100,000 is appropriate. This sum is intended to mirror that of the maximum fine of a violation under the Sports Wagering Act. *See* N.J. Stat. Ann. § 5:12A–11(c). If either party seeks an adjustment to this sum, they may do so by filing a letter of no more than three double-spaced pages on the docket.

IV. CONCLUSION

For the foregoing reasons, Kalshi's motion for a preliminary injunction will be GRANTED. An appropriate order accompanies this opinion.

*/s/ Edward S. Kiel*
EDWARD S. KIEL
UNITED STATES DISTRICT JUDGE

Dated: April 28, 2025

# APPENDIX C

United States Code Annotated
Constitution of the United States
Article VI. Debts Validated–
Supreme Law of Land–Oath of Office
Clause 2. Supreme Law of Land

Currentness

**U.S.C.A. Const. Art. VI cl. 2**

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

New Jersey Statutes Annotated
The New Jersey Constitution of 1947
Article IV. Legislative
Section VII
2. Gambling
Effective: January 1, 2022

Currentness

**N.J.S.A. Const. Art. 4, § 7, ¶ 2**

2. No gambling of any kind shall be authorized by the Legislature unless the specific kind, restrictions and control thereof have been heretofore submitted to, and authorized by a majority of the votes cast by, the people at a special election or shall hereafter be submitted to, and authorized by a majority of the votes cast thereon by, the legally qualified voters of the State voting at a general election, except that, without any such submission or authorization:

A. It shall be lawful for bona fide veterans, charitable, educational, religious or fraternal organizations, civic and service clubs, senior citizen associations or clubs, volunteer fire companies and first-aid or rescue squads to conduct, under such restrictions and control as shall from time to time be prescribed by the Legislature by law, games of chance of, and restricted to, the selling of rights to participate, the awarding of prizes, in the specific kind of game of chance sometimes known as bingo or lotto, played with cards bearing numbers or other designations, 5 or more in one line, the holder covering numbers as objects, similarly numbered, are drawn from a receptacle and the game being won by the person who first covers a previously designated arrangement of numbers on such a card, when the entire net proceeds of such games of chance are to be devoted to

educational, charitable, patriotic, religious or public-spirited uses, or to the support of such organizations, in any municipality, in which a majority of the qualified voters, voting thereon, at a general or special election as the submission thereof shall be prescribed by the Legislature by law, shall authorize the conduct of such games of chance therein;

B. It shall be lawful for the Legislature to authorize, by law, bona fide veterans, charitable, educational, religious or fraternal organizations, civic and service clubs, senior citizen associations or clubs, volunteer fire companies and first-aid or rescue squads to conduct games of chance of, and restricted to, the selling of rights to participate, and the awarding of prizes, in the specific kinds of games of chance sometimes known as raffles, conducted by the drawing for prizes or by the allotment of prizes by chance, when the entire net proceeds of such games of chance are to be devoted to educational, charitable, patriotic, religious or public-spirited uses, or to the support of such organizations, in any municipality, in which such law shall be adopted by a majority of the qualified voters, voting thereon, at a general or special election as the submission thereof shall be prescribed by law and for the Legislature, from time to time, to restrict and control, by law, the conduct of such games of chance;

C. It shall be lawful for the Legislature to authorize the conduct of State lotteries restricted to the selling of rights to participate therein and the awarding of prizes by drawings when the entire net proceeds of any such lottery shall be for State institutions and State aid for education; provided, however, that it shall not be competent for the Legislature to borrow, appropriate or use, under any

pretense whatsoever, lottery net proceeds for the confinement, housing, supervision or treatment of, or education programs for, adult criminal offenders or juveniles adjudged delinquent or for the construction, staffing, support, maintenance or operation of an adult or juvenile correctional facility or institution;

D. It shall be lawful for the Legislature to authorize by law the establishment and operation, under regulation and control by the State, of gambling houses or casinos within the boundaries, as heretofore established, of the city of Atlantic City, county of Atlantic, and to license and tax such operations and equipment used in connection therewith. Any law authorizing the establishment and operation of such gambling establishments shall provide for the State revenues derived therefrom to be applied solely for the purpose of providing funding for reductions in property taxes, rental, telephone, gas, electric, and municipal utilities charges of eligible senior citizens and disabled residents of the State, and for additional or expanded health services or benefits or transportation services or benefits to eligible senior citizens and disabled residents, in accordance with such formulae as the Legislature shall by law provide. The type and number of such casinos or gambling houses and of the gambling games which may be conducted in any such establishment shall be determined by or pursuant to the terms of the law authorizing the establishment and operation thereof.

It shall also be lawful for the Legislature to authorize by law wagering at casinos or gambling houses in Atlantic City on the results of any professional, college, or amateur sport or athletic event, except that wagering shall not be permitted on a college sport or athletic

event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place;

E. It shall be lawful for the Legislature to authorize, by law, (1) the simultaneous transmission by picture of running and harness horse races conducted at racetracks located within or outside of this State, or both, to gambling houses or casinos in the city of Atlantic City and (2) the specific kind, restrictions and control of wagering at those gambling establishments on the results of those races. The State's share of revenues derived therefrom shall be applied for services to benefit eligible senior citizens as shall be provided by law; and

F. It shall be lawful for the Legislature to authorize, by law, the specific kind, restrictions and control of wagering on the results of live or simulcast running and harness horse races conducted within or outside of this State. The State's share of revenues derived therefrom shall be used for such purposes as shall be provided by law.

It shall also be lawful for the Legislature to authorize by law wagering at current or former running and harness horse racetracks in this State on the results of any professional, college, or amateur sport or athletic event, except that wagering shall not be permitted on a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place.

United States Code Annotated
Title 7. Agriculture
Chapter 1. Commodity Exchanges
§ 1a. Definitions

Currentness

**7 U.S.C.A. § 1a**

As used in this chapter:

(1) Alternative trading system

The term "alternative trading system" means an organization, association, or group of persons that–

(A) is registered as a broker or dealer pursuant to section 15(b) of the Securities Exchange Act of 1934 (except paragraph (11) thereof);

(B) performs the functions commonly performed by an exchange (as defined in section 3(a)(1) of the Securities Exchange Act of 1934);

(C) does not–

(i) set rules governing the conduct of subscribers other than the conduct of such subscribers' trading on the alternative trading system; or

(ii) discipline subscribers other than by exclusion from trading; and

(D) is exempt from the definition of the term "exchange" under such section 3(a)(1) by rule or regulation of the Securities and Exchange Commission on terms that require compliance with regulations of its trading functions.

(2) Appropriate Federal banking agency

The term "appropriate Federal banking agency"–

(A) has the meaning given the term in section 1813 of Title 12;

(B) means the Board in the case of a noninsured State bank; and

(C) is the Farm Credit Administration for farm credit system institutions.

(3) Associated person of a security-based swap dealer or major security-based swap participant

The term "associated person of a security-based swap dealer or major security-based swap participant" has the meaning given the term in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)).

(4) Associated person of a swap dealer or major swap participant

(A) In general

The term "associated person of a swap dealer or major swap participant" means a person who is associated with a swap dealer or major swap participant as a partner, officer, employee, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves–

(i) the solicitation or acceptance of swaps; or

(ii) the supervision of any person or persons so engaged.

(B) Exclusion

Other than for purposes of section 6s(b)(6) of this title, the term "associated person of a swap dealer or major swap participant" does not include any person associated with a swap dealer or major swap participant the functions of which are solely clerical or ministerial.

(5) Board

The term "Board" means the Board of Governors of the Federal Reserve System.

(6) Board of trade

The term "board of trade" means any organized exchange or other trading facility.

(7) Cleared swap

The term "cleared swap" means any swap that is, directly or indirectly, submitted to and cleared by a derivatives clearing organization registered with the Commission.

(8) Commission

The term "Commission" means the Commodity Futures Trading Commission established under section 2(a)(2) of this title.

(9) Commodity

The term "commodity" means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13-1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

(10) Commodity pool

(A) In general

The term "commodity pool" means any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any–

(i) commodity for future delivery, security futures product, or swap;

(ii) agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

(iii) commodity option authorized under section 6c of this title; or

(iv) leverage transaction authorized under section 23 of this title.

(B) Further definition

The Commission, by rule or regulation, may include within, or exclude from, the term "commodity pool" any investment trust, syndicate, or similar form of enterprise if the Commission determines that the rule or regulation will effectuate the purposes of this chapter.

(11) Commodity pool operator

(A) In general

The term "commodity pool operator" means any person–

(i) engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly

or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any–

(I) commodity for future delivery, security futures product, or swap;

(II) agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

(III) commodity option authorized under section 6c of this title; or

(IV) leverage transaction authorized under section 23 of this title; or

(ii) who is registered with the Commission as a commodity pool operator.

(B) Further definition

The Commission, by rule or regulation, may include within, or exclude from, the term "commodity pool operator" any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise if the Commission determines that the rule or regulation will effectuate the purposes of this chapter.

(12) Commodity trading advisor

(A) In general

Except as otherwise provided in this paragraph, the term "commodity trading advisor" means any person who–

(i) for compensation or profit, engages in the business of advising others, either directly or through

publications, writings, or electronic media, as to the value of or the advisability of trading in–

(I) any contract of sale of a commodity for future delivery, security futures product, or swap;

(II) any agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title1[1]

(III) any commodity option authorized under section 6c of this title; or

(IV) any leverage transaction authorized under section 23 of this title;

(ii) for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i);

(iii) is registered with the Commission as a commodity trading advisor; or

(iv) the Commission, by rule or regulation, may include if the Commission determines that the rule or regulation will effectuate the purposes of this chapter.

(B) Exclusions

Subject to subparagraph (C), the term "commodity trading advisor" does not include–

(i) any bank or trust company or any person acting as an employee thereof;

(ii) any news reporter, news columnist, or news editor of the print or electronic media, or any lawyer, accountant, or teacher;

---

[1] So in original. Probably should be followed by a semicolon.

(iii) any floor broker or futures commission merchant;

(iv) the publisher or producer of any print or electronic data of general and regular dissemination, including its employees;

(v) the fiduciary of any defined benefit plan that is subject to the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1001 et seq.);

(vi) any contract market or derivatives transaction execution facility; and

(vii) such other persons not within the intent of this paragraph as the Commission may specify by rule, regulation, or order.

(C) Incidental services

Subparagraph (B) shall apply only if the furnishing of such services by persons referred to in subparagraph (B) is solely incidental to the conduct of their business or profession.

(D) Advisors

The Commission, by rule or regulation, may include within the term "commodity trading advisor", any person advising as to the value of commodities or issuing reports or analyses concerning commodities if the Commission determines that the rule or regulation will effectuate the purposes of this paragraph.

(13) Contract of sale

The term "contract of sale" includes sales, agreements of sale, and agreements to sell.

(14) Cooperative association of producers

The term "cooperative association of producers" means any cooperative association, corporate, or otherwise,

not less than 75 percent in good faith owned or controlled, directly or indirectly, by producers of agricultural products and otherwise complying with sections 291 and 292 of this title, including any organization acting for a group of such associations and owned or controlled by such associations, except that business done for or with the United States, or any agency thereof, shall not be considered either member or nonmember business in determining the compliance of any such association with this chapter.

(15) Derivatives clearing organization

(A) In general

The term "derivatives clearing organization" means a clearinghouse, clearing association, clearing corporation, or similar entity, facility, system, or organization that, with respect to an agreement, contract, or transaction–

(i) enables each party to the agreement, contract, or transaction to substitute, through novation or otherwise, the credit of the derivatives clearing organization for the credit of the parties;

(ii) arranges or provides, on a multilateral basis, for the settlement or netting of obligations resulting from such agreements, contracts, or transactions executed by participants in the derivatives clearing organization; or

(iii) otherwise provides clearing services or arrangements that mutualize or transfer among participants in the derivatives clearing organization the credit risk arising from such agreements, contracts, or transactions executed by the participants.

(B) Exclusions

The term "derivatives clearing organization" does not include an entity, facility, system, or organization solely because it arranges or provides for–

(i) settlement, netting, or novation of obligations resulting from agreements, contracts, or transactions, on a bilateral basis and without a central counterparty;

(ii) settlement or netting of cash payments through an interbank payment system; or

(iii) settlement, netting, or novation of obligations resulting from a sale of a commodity in a transaction in the spot market for the commodity.

(16) Electronic trading facility

The term "electronic trading facility" means a trading facility that–

(A) operates by means of an electronic or telecommunications network; and

(B) maintains an automated audit trail of bids, offers, and the matching of orders or the execution of transactions on the facility.

(17) Eligible commercial entity

The term "eligible commercial entity" means, with respect to an agreement, contract or transaction in a commodity–

(A) an eligible contract participant described in clause (i), (ii), (v), (vii), (viii), or (ix) of paragraph (18)(A) that, in connection with its business–

(i) has a demonstrable ability, directly or through separate contractual arrangements, to make or take delivery of the underlying commodity;

(ii) incurs risks, in addition to price risk, related to the commodity; or

(iii) is a dealer that regularly provides risk management or hedging services to, or engages in market-making activities with, the foregoing entities involving transactions to purchase or sell the commodity or derivative agreements, contracts, or transactions in the commodity;

(B) an eligible contract participant, other than a natural person or an instrumentality, department, or agency of a State or local governmental entity, that–

(i) regularly enters into transactions to purchase or sell the commodity or derivative agreements, contracts, or transactions in the commodity; and

(ii) either–

(I) in the case of a collective investment vehicle whose participants include persons other than –

(aa) qualified eligible persons, as defined in Commission rule 4.7(a) (17 CFR 4.7(a));

(bb) accredited investors, as defined in Regulation D of the Securities and Exchange Commission under the Securities Act of 1933 (17 CFR 230.501(a)), with total assets of $2,000,000; or

(cc) qualified purchasers, as defined in section 2(a)(51)(A) of the Investment Company Act of 1940;

in each case as in effect on December 21, 2000, has, or is one of a group of vehicles under common control or management

having in the aggregate, $1,000,000,000 in total assets; or

(II) in the case of other persons, has, or is one of a group of persons under common control or management having in the aggregate, $100,000,000 in total assets; or

(C) such other persons as the Commission shall determine appropriate and shall designate by rule, regulation, or order.

(18) Eligible contract participant

The term "eligible contract participant" means–

(A) acting for its own account–

(i) a financial institution;

(ii) an insurance company that is regulated by a State, or that is regulated by a foreign government and is subject to comparable regulation as determined by the Commission, including a regulated subsidiary or affiliate of such an insurance company;

(iii) an investment company subject to regulation under the Investment Company Act of 1940 (15 U.S.C. 80a-1 et seq.) or a foreign person performing a similar role or function subject as such to foreign regulation (regardless of whether each investor in the investment company or the foreign person is itself an eligible contract participant);

(iv) a commodity pool that–

(I) has total assets exceeding $5,000,000; and

(II) is formed and operated by a person subject to regulation under this chapter or a foreign person performing a similar role or function

subject as such to foreign regulation (regardless of whether each investor in the commodity pool or the foreign person is itself an eligible contract participant) provided, however, that for purposes of section 2(c)(2)(B)(vi) of this title and section 2(c)(2)(C)(vii) of this title, the term "eligible contract participant" shall not include a commodity pool in which any participant is not otherwise an eligible contract participant;

(v) a corporation, partnership, proprietorship, organization, trust, or other entity–

(I) that has total assets exceeding $10,000,000;

(II) the obligations of which under an agreement, contract, or transaction are guaranteed or otherwise supported by a letter of credit or keepwell, support, or other agreement by an entity described in subclause (I), in clause (i), (ii), (iii), (iv), or (vii), or in subparagraph (C); or

(III) that–

(aa) has a net worth exceeding $1,000,000; and

(bb) enters into an agreement, contract, or transaction in connection with the conduct of the entity's business or to manage the risk associated with an asset or liability owned or incurred or reasonably likely to be owned or incurred by the entity in the conduct of the entity's business;

(vi) an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1001 et seq.), a governmental employee benefit plan, or a foreign person performing a

similar role or function subject as such to foreign regulation–

(I) that has total assets exceeding $5,000,000; or

(II) the investment decisions of which are made by–

(aa) an investment adviser or commodity trading advisor subject to regulation under the Investment Advisers Act of 1940 (15 U.S.C. 80b-1 et seq.) or this chapter;

(bb) a foreign person performing a similar role or function subject as such to foreign regulation;

(cc) a financial institution; or

(dd) an insurance company described in clause (ii), or a regulated subsidiary or affiliate of such an insurance company;

(vii)(I) a governmental entity (including the United States, a State, or a foreign government) or political subdivision of a governmental entity;

(II) a multinational or supranational government entity; or

(III) an instrumentality, agency, or department of an entity described in subclause (I) or (II);

except that such term does not include an entity, instrumentality, agency, or department referred to in subclause (I) or (III) of this clause unless (aa) the entity, instrumentality, agency, or department is a person described in clause (i), (ii), or (iii) of paragraph (17)(A); (bb) the entity, instrumentality, agency, or department owns and invests on a discretionary basis $50,000,000 or more in investments; or (cc) the

agreement, contract, or transaction is offered by, and entered into with, an entity that is listed in any of subclauses (I) through (VI) of section 2(c)(2)(B)(ii) of this title;

(viii)(I) a broker or dealer subject to regulation under the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) or a foreign person performing a similar role or function subject as such to foreign regulation, except that, if the broker or dealer or foreign person is a natural person or proprietorship, the broker or dealer or foreign person shall not be considered to be an eligible contract participant unless the broker or dealer or foreign person also meets the requirements of clause (v) or (xi);

(II) an associated person of a registered broker or dealer concerning the financial or securities activities of which the registered person makes and keeps records under section 15C(b) or 17(h) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*-5(b), 78q(h));

(III) an investment bank holding company (as defined in section 17(i)[2] of the Securities Exchange Act of 1934 (15 U.S.C. 78q(i));[3]

(ix) a futures commission merchant subject to regulation under this chapter or a foreign person performing a similar role or function subject as such to foreign regulation, except that, if the futures commission merchant or foreign person is a

---

[2] So in original. Subsec. (i) of section 17 of the Act, was repealed by Pub.L. 111-203, Title VI, § 617(a). See References in Text note set out under this section.

[3] So in original. The semicolon probably should be preceded by an additional closing parenthesis.

natural person or proprietorship, the futures commission merchant or foreign person shall not be considered to be an eligible contract participant unless the futures commission merchant or foreign person also meets the requirements of clause (v) or (xi);

(x) a floor broker or floor trader subject to regulation under this chapter in connection with any transaction that takes place on or through the facilities of a registered entity (other than an electronic trading facility with respect to a significant price discovery contract) or an exempt board of trade, or any affiliate thereof, on which such person regularly trades; or

(xi) an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of–

(I) $10,000,000; or

(II) $5,000,000 and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual;

(B)(i) a person described in clause (i), (ii), (iv), (v), (viii), (ix), or (x) of subparagraph (A) or in subparagraph (C), acting as broker or performing an equivalent agency function on behalf of another person described in subparagraph (A) or (C); or

(ii) an investment adviser subject to regulation under the Investment Advisers Act of 1940, a commodity trading advisor subject to regulation under this chapter, a foreign person performing a similar role or function subject as such to foreign

regulation, or a person described in clause (i), (ii), (iv), (v), (viii), (ix), or (x) of subparagraph (A) or in subparagraph (C), in any such case acting as investment manager or fiduciary (but excluding a person acting as broker or performing an equivalent agency function) for another person described in subparagraph (A) or (C) and who is authorized by such person to commit such person to the transaction; or

(C) any other person that the Commission determines to be eligible in light of the financial or other qualifications of the person.

(19) Excluded commodity

The term "excluded commodity" means–

(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is–

(I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

(II) based solely on one or more commodities that have no cash market;

(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

(iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate,

value, or level of a commodity not described in clause (i)) that is–

(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and

(II) associated with a financial, commercial, or economic consequence.

(20) Exempt commodity

The term "exempt commodity" means a commodity that is not an excluded commodity or an agricultural commodity.

(21) Financial institution

The term "financial institution" means–

(A) a corporation operating under the fifth undesignated paragraph of section 25 of the Federal Reserve Act (12 U.S.C. 603), commonly known as "an agreement corporation";

(B) a corporation organized under section 25A of the Federal Reserve Act (12 U.S.C. 611 et seq.), commonly known as an "Edge Act corporation";

(C) an institution that is regulated by the Farm Credit Administration;

(D) a Federal credit union or State credit union (as defined in section 1752 of Title 12);

(E) a depository institution (as defined in section 1813 of Title 12);

(F) a foreign bank or a branch or agency of a foreign bank (each as defined in section 3101 of Title 12);

(G) any financial holding company (as defined in section 1841 of Title 12);

(H) a trust company; or

(I) a similarly regulated subsidiary or affiliate of an entity described in any of subparagraphs (A) through (H).

(22) Floor broker

(A) In general

The term "floor broker" means any person–

(i) who, in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged, shall purchase or sell for any other person–

(I) any commodity for future delivery, security futures product, or swap; or

(II) any commodity option authorized under section 6c of this title; or

(ii) who is registered with the Commission as a floor broker.

(B) Further definition

The Commission, by rule or regulation, may include within, or exclude from, the term "floor broker" any person in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged who trades for any other person if the Commission determines that the rule or regulation will effectuate the purposes of this chapter.

(23) Floor trader

(A) In general

The term "floor trader" means any person–

(i) who, in or surrounding any pit, ring, post, or other place provided by a contract market for the

meeting of persons similarly engaged, purchases, or sells solely for such person's own account–

(I) any commodity for future delivery, security futures product, or swap; or

(II) any commodity option authorized under section 6c of this title; or

(ii) who is registered with the Commission as a floor trader.

(B) Further definition

The Commission, by rule or regulation, may include within, or exclude from, the term "floor trader" any person in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged who trades solely for such person's own account if the Commission determines that the rule or regulation will effectuate the purposes of this chapter.

(24) Foreign exchange forward

The term "foreign exchange forward" means a transaction that solely involves the exchange of 2 different currencies on a specific future date at a fixed rate agreed upon on the inception of the contract covering the exchange.

(25) Foreign exchange swap

The term "foreign exchange swap" means a transaction that solely involves–

(A) an exchange of 2 different currencies on a specific date at a fixed rate that is agreed upon on the inception of the contract covering the exchange; and

(B) a reverse exchange of the 2 currencies described in subparagraph (A) at a later date and at a fixed

rate that is agreed upon on the inception of the contract covering the exchange.

(26) Foreign futures authority

The term "foreign futures authority" means any foreign government, or any department, agency, governmental body, or regulatory organization empowered by a foreign government to administer or enforce a law, rule, or regulation as it relates to a futures or options matter, or any department or agency of a political subdivision of a foreign government empowered to administer or enforce a law, rule, or regulation as it relates to a futures or options matter.

(27) Future delivery

The term "future delivery" does not include any sale of any cash commodity for deferred shipment or delivery.

(28) Futures commission merchant

(A) In general

The term "futures commission merchant" means an individual, association, partnership, corporation, or trust–

(i) that–

(I) is–

(aa) engaged in soliciting or in accepting orders for–

(AA) the purchase or sale of a commodity for future delivery;

(BB) a security futures product;

(CC) a swap;

(DD) any agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

(EE) any commodity option authorized under section 6c of this title; or

(FF) any leverage transaction authorized under section 23 of this title; or

(bb) acting as a counterparty in any agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title; and

(II) in or in connection with the activities described in items (aa) or (bb) of subclause (I), accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom; or

(ii) that is registered with the Commission as a futures commission merchant.

(B) Further definition

The Commission, by rule or regulation, may include within, or exclude from, the term "futures commission merchant" any person who engages in soliciting or accepting orders for, or acting as a counterparty in, any agreement, contract, or transaction subject to this chapter, and who accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom, if the Commission determines that the rule or regulation will effectuate the purposes of this chapter.

(29) Hybrid instrument

The term "hybrid instrument" means a security having one or more payments indexed to the value, level, or rate of, or providing for the delivery of, one or more commodities.

(30) Interstate commerce

The term "interstate commerce" means commerce–

(A) between any State, territory, or possession, or the District of Columbia, and any place outside thereof; or

(B) between points within the same State, territory, or possession, or the District of Columbia, but through any place outside thereof, or within any territory or possession, or the District of Columbia.

(31) Introducing broker

(A) In general

The term "introducing broker" means any person (except an individual who elects to be and is registered as an associated person of a futures commission merchant)–

(i) who–

(I) is engaged in soliciting or in accepting orders for–

(aa) the purchase or sale of any commodity for future delivery, security futures product, or swap;

(bb) any agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

(cc) any commodity option authorized under section 6c of this title; or

(dd) any leverage transaction authorized under section 23 of this title; and

(II) does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom; or

(ii) who is registered with the Commission as an introducing broker.

(B) Further definition

The Commission, by rule or regulation, may include within, or exclude from, the term "introducing broker" any person who engages in soliciting or accepting orders for any agreement, contract, or transaction subject to this chapter, and who does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom, if the Commission determines that the rule or regulation will effectuate the purposes of this chapter.

(32) Major security-based swap participant

The term "major security-based swap participant" has the meaning given the term in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)).

(33) Major swap participant

(A) In general

The term "major swap participant" means any person who is not a swap dealer, and–

(i) maintains a substantial position in swaps for any of the major swap categories as determined by the Commission, excluding–

(I) positions held for hedging or mitigating commercial risk; and

(II) positions maintained by any employee benefit plan (or any contract held by such a plan) as defined in paragraphs (3) and (32) of section 3 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1002) for the primary purpose of hedging or mitigating any risk directly associated with the operation of the plan;

(ii) whose outstanding swaps create substantial counterparty exposure that could have serious adverse effects on the financial stability of the United States banking system or financial markets; or

(iii)(I) is a financial entity that is highly leveraged relative to the amount of capital it holds and that is not subject to capital requirements established by an appropriate Federal banking agency; and

(II) maintains a substantial position in outstanding swaps in any major swap category as determined by the Commission.

(B) Definition of substantial position

For purposes of subparagraph (A), the Commission shall define by rule or regulation the term "substantial position" at the threshold that the Commission determines to be prudent for the effective monitoring, management, and oversight of entities that are systemically important or can significantly impact the financial system of the United States. In setting the definition under this subparagraph, the Commission shall consider the person's relative position in uncleared as opposed to cleared swaps and may

take into consideration the value and quality of collateral held against counterparty exposures.

(C) Scope of designation

For purposes of subparagraph (A), a person may be designated as a major swap participant for 1 or more categories of swaps without being classified as a major swap participant for all classes of swaps.

(D) Exclusions

The definition under this paragraph shall not include an entity whose primary business is providing financing, and uses derivatives for the purpose of hedging underlying commercial risks related to interest rate and foreign currency exposures, 90 percent or more of which arise from financing that facilitates the purchase or lease of products, 90 percent or more of which are manufactured by the parent company or another subsidiary of the parent company.

(34) Member of a registered entity; member of a derivatives transaction execution facility

The term "member" means, with respect to a registered entity or derivatives transaction execution facility, an individual, association, partnership, corporation, or trust–

(A) owning or holding membership in, or admitted to membership representation on, the registered entity or derivatives transaction execution facility; or

(B) having trading privileges on the registered entity or derivatives transaction execution facility.

A participant in an alternative trading system that is designated as a contract market pursuant to section 7b-1 of this title is deemed a member of the

contract market for purposes of transactions in security futures products through the contract market.

(35) Narrow-based security index

(A) The term "narrow-based security index" means an index–

(i) that has 9 or fewer component securities;

(ii) in which a component security comprises more than 30 percent of the index's weighting;

(iii) in which the five highest weighted component securities in the aggregate comprise more than 60 percent of the index's weighting; or

(iv) in which the lowest weighted component securities comprising, in the aggregate, 25 percent of the index's weighting have an aggregate dollar value of average daily trading volume of less than $50,000,000 (or in the case of an index with 15 or more component securities, $30,000,000), except that if there are two or more securities with equal weighting that could be included in the calculation of the lowest weighted component securities comprising, in the aggregate, 25 percent of the index's weighting, such securities shall be ranked from lowest to highest dollar value of average daily trading volume and shall be included in the calculation based on their ranking starting with the lowest ranked security.

(B) Notwithstanding subparagraph (A), an index is not a narrow-based security index if–

(i)(I) it has at least 9 component securities;

(II) no component security comprises more than 30 percent of the index's weighting; and

(III) each component security is–

(aa) registered pursuant to section 12 of the Securities Exchange Act of 1934;

(bb) one of 750 securities with the largest market capitalization; and

(cc) one of 675 securities with the largest dollar value of average daily trading volume;

(ii) a board of trade was designated as a contract market by the Commodity Futures Trading Commission with respect to a contract of sale for future delivery on the index, before December 21, 2000;

(iii)(I) a contract of sale for future delivery on the index traded on a designated contract market or registered derivatives transaction execution facility for at least 30 days as a contract of sale for future delivery on an index that was not a narrow-based security index; and

(II) it has been a narrow-based security index for no more than 45 business days over 3 consecutive calendar months;

(iv) a contract of sale for future delivery on the index is traded on or subject to the rules of a foreign board of trade and meets such requirements as are jointly established by rule or regulation by the Commission and the Securities and Exchange Commission;

(v) no more than 18 months have passed since December 21, 2000, and–

(I) it is traded on or subject to the rules of a foreign board of trade;

(II) the offer and sale in the United States of a contract of sale for future delivery on the index was authorized before December 21, 2000; and

(III) the conditions of such authorization continue to be met; or

(vi) a contract of sale for future delivery on the index is traded on or subject to the rules of a board of trade and meets such requirements as are jointly established by rule, regulation, or order by the Commission and the Securities and Exchange Commission.

(C) Within 1 year after December 21, 2000, the Commission and the Securities and Exchange Commission jointly shall adopt rules or regulations that set forth the requirements under subparagraph (B)(iv).

(D) An index that is a narrow-based security index solely because it was a narrow-based security index for more than 45 business days over 3 consecutive calendar months pursuant to clause (iii) of subparagraph (B) shall not be a narrow-based security index for the 3 following calendar months.

(E) For purposes of subparagraphs (A) and (B)–

(i) the dollar value of average daily trading volume and the market capitalization shall be calculated as of the preceding 6 full calendar months; and

(ii) the Commission and the Securities and Exchange Commission shall, by rule or regulation, jointly specify the method to be used to determine market capitalization and dollar value of average daily trading volume.

(36) Option

The term "option" means an agreement, contract, or transaction that is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty".

(37) Organized exchange

The term "organized exchange" means a trading facility that–

(A) permits trading–

(i) by or on behalf of a person that is not an eligible contract participant; or

(ii) by persons other than on a principal- to-principal basis; or

(B) has adopted (directly or through another nongovernmental entity) rules that–

(i) govern the conduct of participants, other than rules that govern the submission of orders or execution of transactions on the trading facility; and

(ii) include disciplinary sanctions other than the exclusion of participants from trading.

(38) Person

The term "person" imports the plural or singular, and includes individuals, associations, partnerships, corporations, and trusts.

(39) Prudential regulator

The term "prudential regulator" means–

(A) the Board in the case of a swap dealer, major swap participant, security-based swap dealer, or major security-based swap participant that is–

(i) a State-chartered bank that is a member of the Federal Reserve System;

(ii) a State-chartered branch or agency of a foreign bank;

(iii) any foreign bank which does not operate an insured branch;

(iv) any organization operating under section 25A of the Federal Reserve Act or having an agreement with the Board under section 225 of the Federal Reserve Act4[4];

(v) any bank holding company (as defined in section 2 of the Bank Holding Company Act of 1965 (12 U.S.C. 1841)), any foreign bank (as defined in section 3101(7) of Title 12) that is treated as a bank holding company under section 3106(a) of Title 12, and any subsidiary of such a company or foreign bank (other than a subsidiary that is described in subparagraph (A) or (B) or that is required to be registered with the Commission as a swap dealer or major swap participant under this chapter or with the Securities and Exchange Commission as a security-based swap dealer or major security -based swap participant);

(vi) after the transfer date (as defined in section 311 of the Dodd-Frank Wall Street Reform and Consumer Protection Act), any savings and loan holding company (as defined in section 1467a of Title 12) and any subsidiary of such company (other than a subsidiary that is described in subparagraph (A) or (B) or that is required to be registered as a swap dealer or major swap participant

[4] So in original. Probably should read "section 25 of the Federal Reserve Act" which is classified to 12 U.S.C.A. § 601 et seq.

with the Commission under this chapter or with the Securities and Exchange Commission as a security-based swap dealer or major security-based swap participant); or

(vii) any organization operating under section 25A of the Federal Reserve Act (12 U.S.C. 611 et seq.) or having an agreement with the Board under section 25 of the Federal Reserve Act (12 U.S.C. 601 et seq.);

(B) the Office of the Comptroller of the Currency in the case of a swap dealer, major swap participant, security-based swap dealer, or major security - based swap participant that is–

(i) a national bank;

(ii) a federally chartered branch or agency of a foreign bank; or

(iii) any Federal savings association;

(C) the Federal Deposit Insurance Corporation in the case of a swap dealer, major swap participant, security-based swap dealer, or major security - based swap participant that is–

(i) a State-chartered bank that is not a member of the Federal Reserve System; or

(ii) any State savings association;

(D) the Farm Credit Administration, in the case of a swap dealer, major swap participant, security - based swap dealer, or major security-based swap participant that is an institution chartered under the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.); and

(E) the Federal Housing Finance Agency in the case of a swap dealer, major swap participant, security-

based swap dealer, or major security -based swap participant that is a regulated entity (as such term is defined in section 4502 of Title 12).

(40) Registered entity

The term "registered entity" means–

(A) a board of trade designated as a contract market under section 7 of this title;

(B) a derivatives clearing organization registered under section 7a-1 of this title;

(C) a board of trade designated as a contract market under section 7b-1 of this title;

(D) a swap execution facility registered under section 7b-3 of this title;

(E) a swap data repository registered under section 24a of this title; and

(F) with respect to a contract that the Commission determines is a significant price discovery contract, any electronic trading facility on which the contract is executed or traded.

(41) Security

The term "security" means a security as defined in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) or section 3(a)(10) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(10)).

(42) Security-based swap

The term "security-based swap" has the meaning given the term in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)).

(43) Security-based swap dealer

The term "security-based swap dealer" has the meaning given the term in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)).

(44) Security future

The term "security future" means a contract of sale for future delivery of a single security or of a narrow-based security index, including any interest therein or based on the value thereof, except an exempted security under section 3(a)(12) of the Securities Exchange Act of 1934 as in effect on January 11, 1983 (other than any municipal security as defined in section 3(a)(29) of the Securities Exchange Act of 1934 as in effect on January 11, 1983). The term "security future" does not include any agreement, contract, or transaction excluded from this chapter under section 2(c), 2(d), 2(f), or 2(g) of this title (as in effect on December 21, 2000) or sections 27 to 27f of this title.

(45) Security futures product

The term "security futures product" means a security future or any put, call, straddle, option, or privilege on any security future.

(46) Significant price discovery contract

The term "significant price discovery contract" means an agreement, contract, or transaction subject to section 2(h)(5) of this title.

(47) Swap

(A) In general

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction–

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale,

or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as–

(I) an interest rate swap;

(II) a rate floor;

(III) a rate cap;

(IV) a rate collar;

(V) a cross-currency rate swap;

(VI) a basis swap;

(VII) a currency swap;

(VIII) a foreign exchange swap;

(IX) a total return swap;

(X) an equity index swap;

(XI) an equity swap;

(XII) a debt index swap;

(XIII) a debt swap;

(XIV) a credit spread;

(XV) a credit default swap;

(XVI) a credit swap;

(XVII) a weather swap;

(XVIII) an energy swap;

(XIX) a metal swap;

(XX) an agricultural swap;

(XXI) an emissions swap; and

(XXII) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

(B) Exclusions

The term "swap" does not include–

(i) any contract of sale of a commodity for future delivery (or option on such a contract), leverage contract authorized under section 23 of this title, security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

(ii) any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled;

(iii) any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof, that is subject to–

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(iv) any put, call, straddle, option, or privilege relating to a foreign currency entered into on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a));

(v) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a fixed basis that is subject to–

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(vi) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a contingent basis that is subject to the Securities Act of 1933 (15 U.S.C. 77a et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), unless the agreement, contract, or transaction predicates the purchase or sale on the occurrence of a bona fide contingency that might reasonably be expected to affect or be affected by the creditworthiness of a party other than a party to the agreement, contract, or transaction;

(vii) any note, bond, or evidence of indebtedness that is a security, as defined in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1));

(viii) any agreement, contract, or transaction that is–

(I) based on a security; and

(II) entered into directly or through an underwriter (as defined in section 2(a)(11) of the Securities Act of 1933 (15 U.S.C. 77b(a)(11))[5] by the issuer of such security for the purposes of raising capital, unless the agreement, contract, or transaction is entered into to manage a risk associated with capital raising;

(ix) any agreement, contract, or transaction a counterparty of which is a Federal Reserve bank,

---

[5] So in original. A third closing parenthesis probably should appear.

the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States; and

(x) any security-based swap, other than a security-based swap as described in subparagraph (D).

(C) Rule of construction regarding master agreements

(i) In general

Except as provided in clause (ii), the term "swap" includes a master agreement that provides for an agreement, contract, or transaction that is a swap under subparagraph (A), together with each supplement to any master agreement, without regard to whether the master agreement contains an agreement, contract, or transaction that is not a swap pursuant to subparagraph (A).

(ii) Exception

For purposes of clause (i), the master agreement shall be considered to be a swap only with respect to each agreement, contract, or transaction covered by the master agreement that is a swap pursuant to subparagraph (A).

(D) Mixed swap

The term "security-based swap" includes any agreement, contract, or transaction that is as described in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)) and also is based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the

extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence (other than an event described in subparagraph (A)(iii)).

(E) Treatment of foreign exchange swaps and forwards

(i) In general

Foreign exchange swaps and foreign exchange forwards shall be considered swaps under this paragraph unless the Secretary makes a written determination under section 1b of this title that either foreign exchange swaps or foreign exchange forwards or both–

(I) should be not be regulated as swaps under this chapter; and

(II) are not structured to evade the Dodd-Frank Wall Street Reform and Consumer Protection Act in violation of any rule promulgated by the Commission pursuant to section 721(c) of that Act.

(ii) Congressional notice; effectiveness

The Secretary shall submit any written determination under clause (i) to the appropriate committees of Congress, including the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives. Any such written determination by the Secretary shall not be effective until it is submitted to the appropriate committees of Congress.

(iii) Reporting

Notwithstanding a written determination by the Secretary under clause (i), all foreign exchange swaps and foreign exchange forwards shall be reported to either a swap data repository, or, if there is no swap data repository that would accept such swaps or forwards, to the Commission pursuant to section 6r of this title within such time period as the Commission may by rule or regulation prescribe.

(iv) Business standards

Notwithstanding a written determination by the Secretary pursuant to clause (i), any party to a foreign exchange swap or forward that is a swap dealer or major swap participant shall conform to the business conduct standards contained in section 6s(h) of this title.

(v) Secretary

For purposes of this subparagraph, the term "Secretary" means the Secretary of the Treasury.

(F) Exception for certain foreign exchange swaps and forwards

(i) Registered entities

Any foreign exchange swap and any foreign exchange forward that is listed and traded on or subject to the rules of a designated contract market or a swap execution facility, or that is cleared by a derivatives clearing organization, shall not be exempt from any provision of this chapter or amendments made by the Wall Street Transparency and Accountability Act of 2010 prohibiting fraud or manipulation.

(ii) Retail transactions

Nothing in subparagraph (E) shall affect, or be construed to affect, the applicability of this chapter or the jurisdiction of the Commission with respect to agreements, contracts, or transactions in foreign currency pursuant to section 2(c)(2) of this title.

(48) Swap data repository

The term "swap data repository" means any person that collects and maintains information or records with respect to transactions or positions in, or the terms and conditions of, swaps entered into by third parties for the purpose of providing a centralized recordkeeping facility for swaps.

(49) Swap dealer

(A) In general

The term "swap dealer" means any person who–

(i) holds itself out as a dealer in swaps;

(ii) makes a market in swaps;

(iii) regularly enters into swaps with counterparties as an ordinary course of business for its own account; or

(iv) engages in any activity causing the person to be commonly known in the trade as a dealer or market maker in swaps,

provided however, in no event shall an insured depository institution be considered to be a swap dealer to the extent it offers to enter into a swap with a customer in connection with originating a loan with that customer.

(B) Inclusion

A person may be designated as a swap dealer for a single type or single class or category of swap or activities and considered not to be a swap dealer for other types, classes, or categories of swaps or activities.

(C) Exception

The term "swap dealer" does not include a person that enters into swaps for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business.

(D) De minimis exception

The Commission shall exempt from designation as a swap dealer an entity that engages in a de minimis quantity of swap dealing in connection with transactions with or on behalf of its customers. The Commission shall promulgate regulations to establish factors with respect to the making of this determination to exempt.

(50) Swap execution facility

The term "swap execution facility" means a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants in the facility or system, through any means of interstate commerce, including any trading facility, that–

(A) facilitates the execution of swaps between persons; and

(B) is not a designated contract market.

(51) Trading facility

(A) In general

The term "trading facility" means a person or group of persons that constitutes, maintains, or provides a physical or electronic facility or system in which multiple participants have the ability to execute or trade agreements, contracts, or transactions–

(i) by accepting bids or offers made by other participants that are open to multiple participants in the facility or system; or

(ii) through the interaction of multiple bids or multiple offers within a system with a pre-determined non-discretionary automated trade matching and execution algorithm.

(B) Exclusions

The term "trading facility" does not include–

(i) a person or group of persons solely because the person or group of persons constitutes, maintains, or provides an electronic facility or system that enables participants to negotiate the terms of and enter into bilateral transactions as a result of communications exchanged by the parties and not from interaction of multiple bids and multiple offers within a predetermined, nondiscretionary automated trade matching and execution algorithm;

(ii) a government securities dealer or government securities broker, to the extent that the dealer or broker executes or trades agreements, contracts, or transactions in government securities, or assists persons in communicating about, negotiating, entering into, executing, or trading an agreement, contract, or transaction in government securities (as the terms "government securities dealer", "government securities broker", and "government securities" are defined in section 3(a) of

the Securities Exchange Act of 1934 (15 U.S.C. 78c(a))); or

(iii) facilities on which bids and offers, and acceptances of bids and offers effected on the facility, are not binding.

Any person, group of persons, dealer, broker, or facility described in clause (i) or (ii) is excluded from the meaning of the term "trading facility" for the purposes of this chapter without any prior specific approval, certification, or other action by the Commission.

(C) Special rule

A person or group of persons that would not otherwise constitute a trading facility shall not be considered to be a trading facility solely as a result of the submission to a derivatives clearing organization of transactions executed on or through the person or group of persons.

United States Code Annotated
Title 7. Agriculture
Chapter 1. Commodity Exchanges
§ 2. Jurisdiction of Commission; liability of principal for act of agent; Commodity Futures Trading Commission; transaction in interstate commerce
Effective: December 27, 2022

Currentness

**7 U.S.C.A. § 2**

(a) Jurisdiction of Commission; Commodity Futures Trading Commission

(1) Jurisdiction of Commission

(A) In general

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove

provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

(B) Liability of principal for act of agent

The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

(C) Designation of boards of trade as contract markets; contracts for future delivery; security futures products; filing with Board of Governors of Federal Reserve System; judicial review

Notwithstanding any other provision of law–

(i)(I) Except as provided in subclause (II), this chapter shall not apply to and the Commission shall have no jurisdiction to designate a board of trade as a contract market for any transaction whereby any party to such transaction acquires any put, call, or other option on one or more securities (as defined in section 77b(1)[1] of

[1] Section 77b(1) was redesignated 15 U.S.C.A. § 77b(a)(1) by Pub.L. 104-290, Title I, § 106(a)(1), Oct. 11, 1996, 110 Stat. 3424.

Title 15 or section 3(a)(10) of the Securities Exchange Act of 1934 on January 11, 1983), including any group or index of such securities, or any interest therein or based on the value thereof.

(II) This chapter shall apply to and the Commission shall have jurisdiction with respect to accounts, agreements, and transactions involving, and may permit the listing for trading pursuant to section 7a-2(c) of this title of, a put, call, or other option on 1 or more securities (as defined in section 77b(a)(1) of Title 15 or section 3(a)(10) of the Securities Exchange Act of 1934 on January 11, 1983), including any group or index of such securities, or any interest therein or based on the value thereof, that is exempted by the Securities and Exchange Commission pursuant to section 36(a)(1) of the Securities Exchange Act of 1934 with the condition that the Commission exercise concurrent jurisdiction over such put, call, or other option; provided, however, that nothing in this paragraph shall be construed to affect the jurisdiction and authority of the Securities and Exchange Commission over such put, call, or other option.

(ii) This chapter shall apply to and the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty") and transactions involving, and may designate a board of trade as a contract market in,

or register a derivatives transaction execution facility that trades or executes, contracts of sale (or options on such contracts) for future delivery of a group or index of securities (or any interest therein or based upon the value thereof): *Provided, however*, That no board of trade shall be designated as a contract market with respect to any such contracts of sale (or options on such contracts) for future delivery, and no derivatives transaction execution facility shall trade or execute such contracts of sale (or options on such contracts) for future delivery, unless the board of trade or the derivatives transaction execution facility, and the applicable contract, meet the following minimum requirements:

(I) Settlement of or delivery on such contract (or option on such contract) shall be effected in cash or by means other than the transfer or receipt of any security, except an exempted security under section 77c of Title 15 or section 3(a)(12) of the Securities Exchange Act of 1934 as in effect on January 11, 1983, (other than any municipal security, as defined in section 3(a)(29) of the Securities Exchange Act of 1934 on January 11, 1983);

(II) Trading in such contract (or option on such contract) shall not be readily susceptible to manipulation of the price of such contract (or option on such contract), nor to causing or being used in the manipulation of the price of any underlying security, option on such security or option on a group or index including such securities; and

(III) Such group or index of securities shall not constitute a narrow-based security index.

(iii) If, in its discretion, the Commission determines that a stock index futures contract, notwithstanding its conformance with the requirements in clause (ii) of this subparagraph, can reasonably be used as a surrogate for trading a security (including a security futures product), it may, by order, require such contract and any option thereon be traded and regulated as security futures products as defined in section 3(a)(56) of the Securities Exchange Act of 1934 and section 1a of this title subject to all rules and regulations applicable to security futures products under this chapter and the securities laws as defined in section 3(a)(47) of the Securities Exchange Act of 1934.

(iv) No person shall offer to enter into, enter into, or confirm the execution of any contract of sale (or option on such contract) for future delivery of any security, or interest therein or based on the value thereof, except an exempted security under or[2] section 3(a)(12) of the Securities Exchange Act of 1934 as in effect on January 11, 1983 (other than any municipal security as defined in section 3(a)(29) of the Securities Exchange Act of 1934 on January 11, 1983), or except as provided in clause (ii) of this subparagraph or subparagraph (D), any group or index of such securities or any interest therein or based on the value thereof.

(v)(I) Notwithstanding any other provision of this chapter, any contract market in a stock index futures contract (or option thereon) other than a security futures product, or any deriv-

[2] So in original. The word "or" probably should not appear.

atives transaction execution facility on which such contract or option is traded, shall file with the Board of Governors of the Federal Reserve System any rule establishing or changing the levels of margin (initial and maintenance) for such stock index futures contract (or option thereon) other than security futures products.

(II) The Board may at any time request any contract market or derivatives transaction execution facility to set the margin for any stock index futures contract (or option thereon), other than for any security futures product, at such levels as the Board in its judgment determines are appropriate to preserve the financial integrity of the contract market or derivatives transaction execution facility, or its clearing system, or to prevent systemic risk. If the contract market or derivatives transaction execution facility fails to do so within the time specified by the Board in its request, the Board may direct the contract market or derivatives transaction execution facility to alter or supplement the rules of the contract market or derivatives transaction execution facility as specified in the request.

(III) Subject to such conditions as the Board may determine, the Board may delegate any or all of its authority, relating to margin for any stock index futures contract (or option thereon), other than security futures products, under this clause to the Commission.

(IV) It shall be unlawful for any futures commission merchant to, directly or indirectly, extend or maintain credit to or for, or collect margin from any customer on any security

futures product unless such activities comply with the regulations prescribed pursuant to section 7(c)(2)(B) of the Securities Exchange Act of 1934.

(V) Nothing in this clause shall supersede or limit the authority granted to the Commission in section 12a(9) of this title to direct a contract market or registered derivatives transaction execution facility, on finding an emergency to exist, to raise temporary margin levels on any futures contract, or option on the contract covered by this clause, or on any security futures product.

(VI) Any action taken by the Board, or by the Commission acting under the delegation of authority under subclause III,[3] under this clause directing a contract market to alter or supplement a contract market rule shall be subject to review only in the Court of Appeals where the party seeking review resides or has its principal place of business, or in the United States Court of Appeals for the District of Columbia Circuit. The review shall be based on the examination of all information before the Board or the Commission, as the case may be, at the time the determination was made. The court reviewing the action of the Board or the Commission shall not enter a stay or order of mandamus unless the court has determined, after notice and a hearing before a panel of the court, that the agency action complained of was arbitrary, capricious,

---

[3] So in original. Probably should be "subclause (III)".

an abuse of discretion, or otherwise not in accordance with law.

(D) Jurisdiction and authority of Securities and Exchange Commission over security futures; requirements for security futures trading; periodic or special examinations by Commission representatives

(i) Notwithstanding any other provision of this chapter, the Securities and Exchange Commission shall have jurisdiction and authority over security futures as defined in section 3(a)(55) of the Securities Exchange Act of 1934, section 77b(a)(16) of Title 15, section 80a-2(a)(52) of Title 15, and section 80b-2(a)(27) of Title 15, options on security futures, and persons effecting transactions in security futures and options thereon, and this chapter shall apply to and the Commission shall have jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), contracts, and transactions involving, and may designate a board of trade as a contract market in, or register a derivatives transaction execution facility that trades or executes, a security futures product as defined in section 1a of this title: *Provided, however,* That, except as provided in clause (vi) of this subparagraph, no board of trade shall be designated as a contract market with respect to, or registered as a derivatives transaction execution facility for, any such contracts of sale for future delivery

unless the board of trade and the applicable contract meet the following criteria:

(I) Except as otherwise provided in a rule, regulation, or order issued pursuant to clause (v) of this subparagraph, any security underlying the security future, including each component security of a narrow-based security index, is registered pursuant to section 12 of the Securities Exchange Act of 1934.

(II) If the security futures product is not cash settled, the board of trade on which the security futures product is traded has arrangements in place with a clearing agency registered pursuant to section 17A of the Securities Exchange Act of 1934 for the payment and delivery of the securities underlying the security futures product.

(III) Except as otherwise provided in a rule, regulation, or order issued pursuant to clause (v) of this subparagraph, the security future is based upon common stock and such other equity securities as the Commission and the Securities and Exchange Commission jointly determine appropriate.

(IV) The security futures product is cleared by a clearing agency that has in place provisions for linked and coordinated clearing with other clearing agencies that clear security futures products, which permits the security futures product to be purchased on a designated contract market, registered derivatives transaction execution facility, national securities exchange registered under section 6(a) of the Securities Exchange Act of 1934, or national

securities association registered pursuant to section 15A(a) of the Securities Exchange Act of 1934 and offset on another designated contract market, registered derivatives transaction execution facility, national securities exchange registered under section 6(a) of the Securities Exchange Act of 1934, or national securities association registered pursuant to section 15A(a) of the Securities Exchange Act of 1934.

(V) Only futures commission merchants, introducing brokers, commodity trading advisors, commodity pool operators or associated persons subject to suitability rules comparable to those of a national securities association registered pursuant to section 15A(a) of the Securities Exchange Act of 1934 solicit, accept any order for, or otherwise deal in any transaction in or in connection with the security futures product.

(VI) The security futures product is subject to a prohibition against dual trading in section 6j of this title and the rules and regulations thereunder or the provisions of section 11(a) of the Securities Exchange Act of 1934 and the rules and regulations thereunder, except to the extent otherwise permitted under the Securities Exchange Act of 1934 and the rules and regulations thereunder.

(VII) Trading in the security futures product is not readily susceptible to manipulation of the price of such security futures product, nor to causing or being used in the manipulation of the price of any underlying security, option

on such security, or option on a group or index including such securities;

(VIII) The board of trade on which the security futures product is traded has procedures in place for coordinated surveillance among such board of trade, any market on which any security underlying the security futures product is traded, and other markets on which any related security is traded to detect manipulation and insider trading, except that, if the board of trade is an alternative trading system, a national securities association registered pursuant to section 15A(a) of the Securities Exchange Act of 1934 or national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 of which such alternative trading system is a member has in place such procedures.

(IX) The board of trade on which the security futures product is traded has in place audit trails necessary or appropriate to facilitate the coordinated surveillance required in subclause (VIII), except that, if the board of trade is an alternative trading system, a national securities association registered pursuant to section 15A(a) of the Securities Exchange Act of 1934 or national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 of which such alternative trading system is a member has rules to require such audit trails.

(X) The board of trade on which the security futures product is traded has in place procedures to coordinate trading halts between such board of trade and markets on which any

security underlying the security futures product is traded and other markets on which any related security is traded, except that, if the board of trade is an alternative trading system, a national securities association registered pursuant to section 15A(a) of the Securities Exchange Act of 1934 or national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 of which such alternative trading system is a member has rules to require such coordinated trading halts.

(XI) The margin requirements for a security futures product comply with the regulations prescribed pursuant to section 7(c)(2)(B) of the Securities Exchange Act of 1934, except that nothing in this subclause shall be construed to prevent a board of trade from requiring higher margin levels for a security futures product when it deems such action to be necessary or appropriate.

(ii) It shall be unlawful for any person to offer, to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States, its territories or possessions, for the purpose of soliciting, or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a security futures product unless–

(I) the transaction is conducted on or subject to the rules of a board of trade that–

(aa) has been designated by the Commission as a contract market in such security futures product; or

(bb) is a registered derivatives transaction execution facility for the security futures product that has provided a certification with respect to the security futures product pursuant to clause (vii);

(II) the contract is executed or consummated by, through, or with a member of the contract market or registered derivatives transaction execution facility; and

(III) the security futures product is evidenced by a record in writing which shows the date, the parties to such security futures product and their addresses, the property covered, and its price, and each contract market member or registered derivatives transaction execution facility member shall keep the record for a period of 3 years from the date of the transaction, or for a longer period if the Commission so directs, which record shall at all times be open to the inspection of any duly authorized representative of the Commission.

(iii)(I) Except as provided in subclause (II) but notwithstanding any other provision of this chapter, no person shall offer to enter into, enter into, or confirm the execution of any option on a security future.

(II) After 3 years after December 21, 2000, the Commission and the Securities and Exchange Commission may by order jointly determine to permit trading of options on any security future authorized to be traded under the provisions of this chapter and the Securities Exchange Act of 1934.

(iv)(I) All relevant records of a futures commission merchant or introducing broker registered pursuant to section 6f(a)(2) of this title, floor broker or floor trader exempt from registration pursuant to section 6f(a)(3) of this title, associated person exempt from registration pursuant to section 6k(6) of this title, or board of trade designated as a contract market in a security futures product pursuant to section 7b-1 of this title shall be subject to such reasonable periodic or special examinations by representatives of the Commission as the Commission deems necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter, and the Commission, before conducting any such examination, shall give notice to the Securities and Exchange Commission of the proposed examination and consult with the Securities and Exchange Commission concerning the feasibility and desirability of coordinating the examination with examinations conducted by the Securities and Exchange Commission in order to avoid unnecessary regulatory duplication or undue regulatory burdens for the registrant or board of trade.

(II) The Commission shall notify the Securities and Exchange Commission of any examination conducted of any futures commission merchant or introducing broker registered pursuant to section 6f(a)(2) of this title, floor broker or floor trader exempt from registration pursuant to section 6f(a)(3) of this title, associated person exempt from registration pursuant to section 6k(6) of this title, or board of trade designated as a contract market in a

security futures product pursuant to section 7b-1 of this title, and, upon request, furnish to the Securities and Exchange Commission any examination report and data supplied to or prepared by the Commission in connection with the examination.

(III) Before conducting an examination under subclause (I), the Commission shall use the reports of examinations, unless the information sought is unavailable in the reports, of any futures commission merchant or introducing broker registered pursuant to section 6f(a)(2) of this title, floor broker or floor trader exempt from registration pursuant to section 6f(a)(3) of this title, associated person exempt from registration pursuant to section 6k(6) of this title, or board of trade designated as a contract market in a security futures product pursuant to section 7b-1 of this title that is made by the Securities and Exchange Commission, a national securities association registered pursuant to section 15A(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*-3(a)), or a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a)).

(IV) Any records required under this subsection for a futures commission merchant or introducing broker registered pursuant to section 6f(a)(2) of this title, floor broker or floor trader exempt from registration pursuant to section 6f(a)(3) of this title, associated person exempt from registration pursuant to section 6k(6) of this title, or board of trade designated as a contract market in a security futures

product pursuant to section 7b-1 of this title, shall be limited to records with respect to accounts, agreements, contracts, and transactions involving security futures products.

(v)(I) The Commission and the Securities and Exchange Commission, by rule, regulation, or order, may jointly modify the criteria specified in subclause (I) or (III) of clause (i), including the trading of security futures based on securities other than equity securities, to the extent such modification fosters the development of fair and orderly markets in security futures products, is necessary or appropriate in the public interest, and is consistent with the protection of investors.

(II) The Commission and the Securities and Exchange Commission, by order, may jointly exempt any person from compliance with the criterion specified in clause (i)(IV) to the extent such exemption fosters the development of fair and orderly markets in security futures products, is necessary or appropriate in the public interest, and is consistent with the protection of investors.

(vi)(I) Notwithstanding clauses (i) and (vii), until the compliance date, a board of trade shall not be required to meet the criterion specified in clause (i)(IV).

(II) The Commission and the Securities and Exchange Commission shall jointly publish in the Federal Register a notice of the compliance date no later than 165 days before the compliance date.

(III) For purposes of this clause, the term "compliance date" means the later of–

(aa) 180 days after the end of the first full calendar month period in which the average aggregate comparable share volume for all security futures products based on single equity securities traded on all designated contract markets and registered derivatives transaction execution facilities equals or exceeds 10 percent of the average aggregate comparable share volume of options on single equity secureties traded on all national securities exchanges registered pursuant to section 6(a) of the Securities Exchange Act of 1934 and any national securities associations registered pursuant to section 15A(a) of such Act; or

(bb) 2 years after the date on which trading in any security futures product commences under this chapter.

(vii) It shall be unlawful for a board of trade to trade or execute a security futures product unless the board of trade has provided the Commission with a certification that the specific security futures product and the board of trade, as applicable, meet the criteria specified in subclauses (I) through (XI) of clause (i), except as otherwise provided in clause (vi).

(E) Obligation to address security futures products traded on foreign exchanges

(i) To the extent necessary or appropriate in the public interest, to promote fair competition, and consistent with promotion of market efficiency, innovation, and expansion of investment

opportunities, the protection of investors, and the maintenance of fair and orderly markets, the Commission and the Securities and Exchange Commission shall jointly issue such rules, regulations, or orders as are necessary and appropriate to permit the offer and sale of a security futures product traded on or subject to the rules of a foreign board of trade to United States persons.

(ii) The rules, regulations, or orders adopted under clause (i) shall take into account, as appropriate, the nature and size of the markets that the securities underlying the security futures product reflects.

(F) Security futures products traded on foreign boards of trade

(i) Nothing in this chapter is intended to prohibit a futures commission merchant from carrying security futures products traded on or subject to the rules of a foreign board of trade in the accounts of persons located outside of the United States.

(ii) Nothing in this chapter is intended to prohibit any eligible contract participant located in the United States from purchasing or carrying securities futures products traded on or subject to the rules of a foreign board of trade, exchange, or market to the same extent such person may be authorized to purchase or carry other securities traded on a foreign board of trade, exchange, or market so long as any underlying security for such security futures products is traded principally on, by, or through any

exchange or market located outside the United States.

(G)(i) Nothing in this paragraph shall limit the jurisdiction conferred on the Securities and Exchange Commission by the Wall Street Transparency and Accountability Act of 2010 with regard to security-based swap agreements as defined pursuant to section 3(a)(78) of the Securities Exchange Act of 1934, and security-based swaps.

(ii) In addition to the authority of the Securities and Exchange Commission described in clause (i), nothing in this subparagraph shall limit or affect any statutory authority of the Commission with respect to an agreement, contract, or transaction described in clause (i).

(H) Notwithstanding any other provision of law, the Wall Street Transparency and Accountability Act of 2010 shall not apply to, and the Commodity Futures Trading Commission shall have no jurisdiction under such Act (or any amendments to this chapter made by such Act) with respect to, any security other than a security-based swap.

(I)(i) Nothing in this chapter shall limit or affect any statutory authority of the Federal Energy Regulatory Commission or a State regulatory authority (as defined in section 796(21) of Title 16) with respect to an agreement, contract, or transaction that is entered into pursuant to a tariff or rate schedule approved by the Federal Energy Regulatory Commission or a State regulatory authority and is–

(I) not executed, traded, or cleared on a registered entity or trading facility; or

(II) executed, traded, or cleared on a registered entity or trading facility owned or operated by a regional transmission organization or independent system operator.

(ii) In addition to the authority of the Federal Energy Regulatory Commission or a State regulatory authority described in clause (i), nothing in this subparagraph shall limit or affect–

(I) any statutory authority of the Commission with respect to an agreement, contract, or transaction described in clause (i); or

(II) the jurisdiction of the Commission under subparagraph (A) with respect to an agreement, contract, or transaction that is executed, traded, or cleared on a registered entity or trading facility that is not owned or operated by a regional transmission organization or independent system operator (as defined by sections[4] 796(27) and (28) of Title 16).

(2) Establishment of Commodity Futures Trading Commission; composition; terms of Commissioners

(A) There is hereby established, as an independent agency of the United States Government, a Commodity Futures Trading Commission. The Commission shall be composed of five Commissioners who shall be appointed by the President, by and with the advice and consent of the Senate. In nominating persons for appointment, the President shall–

(i) select persons who shall each have demonstrated knowledge in futures trading or its

[4] So in original. Probably should be "section".

regulation, or the production, merchandising, processing or distribution of one or more of the commodities or other goods and articles, services, rights, and interests covered by this chapter; and

(ii) seek to ensure that the demonstrated knowledge of the Commissioners is balanced with respect to such areas.

Not more than three of the members of the Commission shall be members of the same political party. Each Commissioner shall hold office for a term of five years and until his successor is appointed and has qualified, except that he shall not so continue to serve beyond the expiration of the next session of Congress subsequent to the expiration of said fixed term of office, and except (i) any Commissioner appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed for the remainder of such term, and (ii) the terms of office of the Commissioners first taking office after the enactment of this paragraph shall expire as designated by the President at the time of nomination, one at the end of one year, one at the end of two years, one at the end of three years, one at the end of four years, and one at the end of five years.

(B) The President shall appoint, by and with the advice and consent of the Senate, a member of the Commission as Chairman, who shall serve as Chairman at the pleasure of the President. An individual may be appointed as Chairman at the same time that person is appointed as a Commissioner. The Chairman shall be the chief administrative officer of the Commission and shall preside

at hearings before the Commission. At any time, the President may appoint, by and with the advice and consent of the Senate, a different Chairman, and the Commissioner previously appointed as Chairman may complete that Commissioner's term as a Commissioner.

(3) Vacancies

A vacancy in the Commission shall not impair the right of the remaining Commissioners to exercise all the powers of the Commission.

(4) General Counsel

The Commission shall have a General Counsel, who shall be appointed by the Commission and serve at the pleasure of the Commission. The General Counsel shall report directly to the Commission and serve as its legal advisor. The Commission shall appoint such other attorneys as may be necessary, in the opinion of the Commission, to assist the General Counsel, represent the Commission in all disciplinary proceedings pending before it, represent the Commission in courts of law whenever appropriate, assist the Department of Justice in handling litigation concerning the Commission in courts of law, and perform such other legal duties and functions as the Commission may direct.

(5) Executive Director

The Commission shall have an Executive Director, who shall be appointed by the Commission and serve at the pleasure of the Commission. The Executive Director shall report directly to the Commission and perform such functions and duties as the Commission may prescribe.

(6) Powers and Functions of Chairman

(A) Except as otherwise provided in this paragraph and in paragraphs (4) and (5) of this subsection, the executive and administrative functions of the Commission, including functions of the Commission with respect to the appointment and supervision of personnel employed under the Commission, the distribution of business among such personnel and among administrative units of the Commission, and the use and expenditure of funds, according to budget categories, plans, programs, and priorities established and approved by the Commission, shall be exercised solely by the Chairman.

(B) In carrying out any of his functions under the provisions of this paragraph, the Chairman shall be governed by general policies, plans, priorities, and budgets approved by the Commission and by such regulatory decisions, findings, and determination as the Commission may by law be authorized to make.

(C) The appointment by the Chairman of the heads of major administrative units under the Commission shall be subject to the approval of the Commission.

(D) Personnel employed regularly and full time in the immediate offices of Commissioners other than the Chairman shall not be affected by the provisions of this paragraph.

(E) There are hereby reserved to the Commission its functions with respect to revising budget estimates and with respect to determining the distribution of appropriated funds according to major programs and purposes.

(F) The Chairman may from time to time make such provisions as he shall deem appropriate authorizing the performance by any officer, employee, or administrative unit under his jurisdiction of any functions of the Chairman under this paragraph.

(7) Appointment and compensation

(A) In general

The Commission may appoint and fix the compensation of such officers, attorneys, economists, examiners, and other employees as may be necessary for carrying out the functions of the Commission under this chapter.

(B) Rates of pay

Rates of basic pay for all employees of the Commission may be set and adjusted by the Commission without regard to chapter 51 or subchapter III of chapter 53 of Title 5.

(C) Comparability

(i) In general

The Commission may provide additional compensation and benefits to employees of the Commission if the same type of compensation or benefits are provided by any agency referred to in section 1833b(a) of Title 12 or could be provided by such an agency under applicable provisions of law (including rules and regulations).

(ii) Consultation

In setting and adjusting the total amount of compensation and benefits for employees, the Commission shall consult with, and seek to

maintain comparability with, the agencies referred to in section 1833b(a) of Title 12.

(8) Conflict of interest

No Commissioner or employee of the Commission shall accept employment or compensation from any person, exchange, or clearinghouse subject to regulation by the Commission under this chapter during his term of office, nor shall he participate, directly or indirectly, in any registered entity operations or transactions of a character subject to regulation by the Commission.

(9) Liaison with Department of Agriculture; communications with Department of the Treasury, Federal Reserve Board, and Securities and Exchange Commission; application by a board of trade for designation as a contract market for future delivery of securities

(A) The Commission shall, in cooperation with the Secretary of Agriculture, maintain a liaison between the Commission and the Department of Agriculture. The Secretary shall take such steps as may be necessary to enable the Commission to obtain information and utilize such services and facilities of the Department of Agriculture as may be necessary in order to maintain effectively such liaison. In addition, the Secretary shall appoint a liaison officer, who shall be an employee of the Office of the Secretary, for the purpose of maintaining a liaison between the Department of Agriculture and the Commission. The Commission shall furnish such liaison officer appropriate office space within the offices of the Commission and shall allow such liaison officer to attend and

observe all deliberations and proceedings of the Commission.

(B)(i) The Commission shall maintain communications with the Department of the Treasury, the Board of Governors of the Federal Reserve System, and the Securities and Exchange Commission for the purpose of keeping such agencies fully informed of Commission activities that relate to the responsibilities of those agencies, for the purpose of seeking the views of those agencies on such activities, and for considering the relationships between the volume and nature of investment and trading in contracts of sale of a commodity for future delivery and in securities and financial instruments under the jurisdiction of such agencies.

(ii) When a board of trade applies for designation or registration as a contract market or derivatives transaction execution facility involving transactions for future delivery of any security issued or guaranteed by the United States or any agency thereof, the Commission shall promptly deliver a copy of such application to the Department of the Treasury and the Board of Governors of the Federal Reserve System. The Commission may not designate or register a board of trade as a contract market or derivatives transaction execution facility based on such application until forty-five days after the date the Commission delivers the application to such agencies or until the Commission receives comments from each of such agencies on the application, whichever period is shorter. Any comments received by the Commission from such agencies shall be included as part of the public record of the Commission's designation

proceeding. In designating, registering, or refusing, suspending, or revoking the designation or registration of, a board of trade as a contract market or derivatives transaction execution facility involving transactions for future delivery referred to in this clause or in considering any possible action under this chapter (including without limitation emergency action under section 12a(9) of this title) with respect to such transactions, the Commission shall take into consideration all comments it receives from the Department of the Treasury and the Board of Governors of the Federal Reserve System and shall consider the effect that any such designation, registration, suspension, revocation, or action may have on the debt financing requirements of the United States Government and the continued efficiency and integrity of the underlying market for government securities.

(iii) The provisions of this subparagraph shall not create any rights, liabilities, or obligations upon which actions may be brought against the Commission.

(10) Transmittal of budget requests and legislative recommendations to congressional committees

(A) Whenever the Commission submits any budget estimate or request to the President or the Office of Management and Budget, it shall concurrently transmit copies of that estimate or request to the House and Senate Appropriations Committees and the House Committee on Agriculture and the Senate Committee on Agriculture, Nutrition, and Forestry.

(B) Whenever the Commission transmits any legislative recommendations, or testimony, or comments on legislation to the President or the Office of Management and Budget, it shall concurrently transmit copies thereof to the House Committee on Agriculture and the Senate Committee on Agriculture, Nutrition, and Forestry. No officer or agency of the United States shall have any authority to require the Commission to submit its legislative recommendations, or testimony, or comments on legislation to any officer or agency of the United States for approval, comments, or review, prior to the submission of such recommendations, testimony, or comments to the Congress. In instances in which the Commission voluntarily seeks to obtain the comments or review of any officer or agency of the United States, the Commission shall include a description of such actions in its legislative recommendations, testimony, or comments on legislation which it transmits to the Congress.

(C) Whenever the Commission issues for official publication any opinion, release, rule, order, interpretation, or other determination on a matter, the Commission shall provide that any dissenting, concurring, or separate opinion by any Commissioner on the matter be published in full along with the Commission opinion, release, rule, order, interpretation, or determination.

(11) Seal

The Commission shall have an official seal, which shall be judicially noticed.

(12) Rules and regulations

The Commission is authorized to promulgate such rules and regulations as it deems necessary to govern the operating procedures and conduct of the business of the Commission.

(13) Public availability of swap transaction data

(A) Definition of real-time public reporting

In this paragraph, the term "real-time public reporting" means to report data relating to a swap transaction, including price and volume, as soon as technologically practicable after the time at which the swap transaction has been executed.

(B) Purpose

The purpose of this section is to authorize the Commission to make swap transaction and pricing data available to the public in such form and at such times as the Commission determines appropriate to enhance price discovery.

(C) General rule

The Commission is authorized and required to provide by rule for the public availability of swap transaction and pricing data as follows:

(i) With respect to those swaps that are subject to the mandatory clearing requirement described in subsection (h)(1) (including those swaps that are excepted from the requirement pursuant to subsection (h)(7)), the Commission shall require real-time public reporting for such transactions.

(ii) With respect to those swaps that are not subject to the mandatory clearing requirement described in subsection (h)(1), but are cleared at a registered derivatives clearing organization,

the Commission shall require real-time public reporting for such transactions.

(iii) With respect to swaps that are not cleared at a registered derivatives clearing organization and which are reported to a swap data repository or the Commission under subsection (h)(6), the Commission shall require real-time public reporting for such transactions, in a manner that does not disclose the business transactions and market positions of any person.

(iv) With respect to swaps that are determined to be required to be cleared under subsection (h)(2) but are not cleared, the Commission shall require real-time public reporting for such transactions.

(D) Registered entities and public reporting

The Commission may require registered entities to publicly disseminate the swap transaction and pricing data required to be reported under this paragraph.

(E) Rulemaking required

With respect to the rule providing for the public availability of transaction and pricing data for swaps described in clauses (i) and (ii) of subparagraph (C), the rule promulgated by the Commission shall contain provisions–

(i) to ensure such information does not identify the participants;

(ii) to specify the criteria for determining what constitutes a large notional swap transaction (block trade) for particular markets and contracts;

(iii) to specify the appropriate time delay for reporting large notional swap transactions (block trades) to the public; and

(iv) that take into account whether the public disclosure will materially reduce market liquidity.

(F) Timeliness of reporting

Parties to a swap (including agents of the parties to a swap) shall be responsible for reporting swap transaction information to the appropriate registered entity in a timely manner as may be prescribed by the Commission.

(G) Reporting of swaps to registered swap data repositories

Each swap (whether cleared or uncleared) shall be reported to a registered swap data repository.

(14) Semiannual and annual public reporting of aggregate swap data

(A) In general

In accordance with subparagraph (B), the Commission shall issue a written report on a semiannual and annual basis to make available to the public information relating to–

(i) the trading and clearing in the major swap categories; and

(ii) the market participants and developments in new products.

(B) Use; consultation

In preparing a report under subparagraph (A), the Commission shall–

(i) use information from swap data repositories and derivatives clearing organizations; and

(ii) consult with the Office of the Comptroller of the Currency, the Bank for International Settlements, and such other regulatory bodies as may be necessary.

(C) Authority of the Commission

The Commission may, by rule, regulation, or order, delegate the public reporting responsibilities of the Commission under this paragraph in accordance with such terms and conditions as the Commission determines to be appropriate and in the public interest.

(15) Energy and Environmental Markets Advisory Committee

(A) Establishment

(i) In general

An Energy and Environmental Markets Advisory Committee is hereby established.

(ii) Membership

The Committee shall have 9 members.

(iii) Activities

The Committee's objectives and scope of activities shall be–

(I) to conduct public meetings;

(II) to submit reports and recommendations to the Commission (including dissenting or minority views, if any); and

(III) otherwise to serve as a vehicle for discussion and communication on matters of

concern to exchanges, firms, end users, and regulators regarding energy and environmental markets and their regulation by the Commission.

(B) Requirements

(i) In general

The Committee shall hold public meetings at such intervals as are necessary to carry out the functions of the Committee, but not less frequently than 2 times per year.

(ii) Members

Members shall be appointed to 3-year terms, but may be removed for cause by vote of the Commission.

(C) Appointment

The Commission shall appoint members with a wide diversity of opinion and who represent a broad spectrum of interests, including hedgers and consumers.

(D) Reimbursement

Members shall be entitled to per diem and travel expense reimbursement by the Commission.

(E) Chapter 10 of Title 5

The Committee shall not be subject to chapter 10 of Title 5.

(b) Transaction in interstate commerce

For the purposes of this chapter (but not in any wise limiting the foregoing definition of interstate commerce) a transaction in respect to any article shall be considered to be in interstate commerce if such article

is part of that current of commerce usual in the commodity trade whereby commodities and commodity products and by-products thereof are sent from one State, with the expectation that they will end their transit, after purchase, in another, including in addition to cases within the above general description, all cases where purchase or sale is either for shipment to another State, or for manufacture within the State and the shipment outside the State of the products resulting from such manufacture. Articles normally in such current of commerce shall not be considered out of such commerce through resort being had to any means or device intended to remove transactions in respect thereto from the provisions of this chapter. For the purpose of this paragraph the word "State" includes Territory, the District of Columbia, possession of the United States, and foreign nation.

(c) Agreements, contracts, and transactions in foreign currency, government securities, and certain other commodities

(1) In general

Except as provided in paragraph (2), nothing in this chapter (other than section,[5] 7a-1,5 or 16(e)(2)(B) of this title) governs or applies to an agreement, contract, or transaction in–

(A) foreign currency;

(B) government securities;

(C) security warrants;

(D) security rights;

(E) resales of installment loan contracts;

[5] So in original. The comma probably should not appear.

(F) repurchase transactions in an excluded commodity; or

(G) mortgages or mortgage purchase commitments.

(2) Commission jurisdiction

(A) Agreements, contracts, and transactions traded on an organized exchange

This chapter applies to, and the Commission shall have jurisdiction over, an agreement, contract, or transaction described in paragraph (1) that is–

(i) a contract of sale of a commodity for future delivery (or an option on such a contract), or an option on a commodity (other than foreign currency or a security or a group or index of securities), that is executed or traded on an organized exchange;

(ii) a swap; or

(iii) an option on foreign currency executed or traded on an organized exchange that is not a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934.

(B) Agreements, contracts, and transactions in retail foreign currency

(i) This chapter applies to, and the Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that–

(I) is a contract of sale of a commodity for future delivery (or an option on such a contract) or an option (other than an option executed or traded on a national securities exchange registered pursuant to section 6(a) of the

Securities Exchange Act of 1934 (15 U.S.C. 78f(a))); and

(II) is offered to, or entered into with, a person that is not an eligible contract participant, unless the counterparty, or the person offering to be the counterparty, of the person is–

(aa) a United States financial institution;

(bb)(AA) a broker or dealer registered under section 15(b) (except paragraph (11) thereof) or 15C of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(b), 78*o*-5); or

(BB) an associated person of a broker or dealer registered under section 15(b) (except paragraph (11) thereof) or 15C of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(b), 78*o*-5) concerning the financial or securities activities of which the broker or dealer makes and keeps records under section 15C(b) or 17(h) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*-5(b), 78q(h));

(cc)(AA) a futures commission merchant that is primarily or substantially engaged in the business activities described in section 1a of this title, is registered under this chapter, is not a person described in item (bb) of this subclause, and maintains adjusted net capital equal to or in excess of the dollar amount that applies for purposes of clause (ii) of this subparagraph; or

(BB) an affiliated person of a futures commission merchant that is primarily or substantially engaged in the business

activities described in section 1a of this title, is registered under this chapter, and is not a person described in item (bb) of this subclause, if the affiliated person maintains adjusted net capital equal to or in excess of the dollar amount that applies for purposes of clause (ii) of this subparagraph and is not a person described in such item (bb), and the futures commission merchant makes and keeps records under section 6f(c)(2)(B) of this title concerning the futures and other financial activities of the affiliated person;

(dd) a financial holding company (as defined in section 1841 of Title 12); or

(ff)[6] a retail foreign exchange dealer that maintains adjusted net capital equal to or in excess of the dollar amount that applies for purposes of clause (ii) of this subparagraph and is registered in such capacity with the Commission, subject to such terms and conditions as the Commission shall prescribe, and is a member of a futures association registered under section 21 of this title.

(ii) The dollar amount that applies for purposes of this clause is–

(I) $10,000,000, beginning 120 days after the date of the enactment of this clause;

(II) $15,000,000, beginning 240 days after such date of enactment; and

[6] So in original. No item (ee) has been enacted

(III) $20,000,000, beginning 360 days after such date of enactment.

(iii) Notwithstanding items (cc) and (gg) of clause (i)(II) of this subparagraph, agreements, contracts, or transactions described in clause (i) of this subparagraph, and accounts or pooled investment vehicles described in clause (vi), shall be subject to subsection (a)(1)(B) of this section and sections 6(b), 6b, 6c(b), 6*o*, 9, and 13b of this title (except to the extent that sections 9 and 13b of this title prohibit manipulation of the market price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any market), 13a-1, 13a-2, 12(a), 13c(a), and 13c(b) of this title if the agreements, contracts, or transactions are offered, or entered into, by a person that is registered as a futures commission merchant or retail foreign exchange dealer, or an affiliated person of a futures commission merchant registered under this chapter that is not also a person described in any of item (aa), (bb), (ee), or (ff) of clause (i)(II) of this subparagraph.

(iv)(I) Notwithstanding items (cc) and (gg) of clause (i)(II), a person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 21 of this title, shall not–

(aa) solicit or accept orders from any person that is not an eligible contract participant in connection with agreements, contracts, or transactions described in clause (i) entered into with or to be entered into with a

person who is not described in item (aa), (bb), (ee), or (ff) of clause (i)(II);

(bb) exercise discretionary trading authority or obtain written authorization to exercise discretionary trading authority over any account for or on behalf of any person that is not an eligible contract participant in connection with agreements, contracts, or transactions described in clause (i) entered into with or to be entered into with a person who is not described in item (aa), (bb), (ee), or (ff) of clause (i)(II); or

(cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with agreements, contracts, or transactions described in clause (i) entered into with or to be entered into with a person who is not described in item (aa), (bb), (ee), or (ff) of clause (i)(II).

(II) Subclause (I) of this clause shall not apply to–

(aa) any person described in any of item (aa), (bb), (ee), or (ff) of clause (i)(II);

(bb) any such person's associated persons; or

(cc) any person who would be exempt from registration if engaging in the same activities in connection with transactions conducted on or subject to the rules of a contract market or a derivatives transaction execution facility.

(III) Notwithstanding items (cc) and (gg) of clause (i)(II), the Commission may make, promulgate, and enforce such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions of, or to accomplish any of the purposes of, this chapter in connection with the activities of persons subject to subclause (I).

(IV) Subclause (III) of this clause shall not apply to–

(aa) any person described in any of item (aa) through (ff) of clause (i)(II);

(bb) any such person's associated persons; or

(cc) any person who would be exempt from registration if engaging in the same activities in connection with transactions conducted on or subject to the rules of a contract market or a derivatives transaction execution facility.

(v) Notwithstanding items (cc) and (gg) of clause (i)(II), the Commission may make, promulgate, and enforce such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions of, or to accomplish any of the purposes of, this chapter in connection with agreements, contracts, or transactions described in clause (i) which are offered, or entered into, by a person described in item (cc) or (gg) of clause (i)(II).

(vi) This chapter applies to, and the Commission shall have jurisdiction over, an account or

pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency described in clause (i).

(C)(i)(I) This subparagraph shall apply to any agreement, contract, or transaction in foreign currency that is–

(aa) offered to, or entered into with, a person that is not an eligible contract participant (except that this subparagraph shall not apply if the counterparty, or the person offering to be the counterparty, of the person that is not an eligible contract participant is a person described in any of item (aa), (bb), (ee), or (ff) of subparagraph (B)(i)(II)); and

(bb) offered, or entered into, on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.

(II) Subclause (I) of this clause shall not apply to–

(aa) a security that is not a security futures product; or

(bb) a contract of sale that–

(AA) results in actual delivery within 2 days; or

(BB) creates an enforceable obligation to deliver between a seller and buyer that have the ability to deliver and accept delivery, respectively, in connection with their line of business.

(ii)(I) Agreements, contracts, or transactions described in clause (i) of this subparagraph, and accounts or pooled investment vehicles described in clause (vii), shall be subject to subsection (a)(1)(B) of this section and sections 6(b), 6b, 6c(b), 6*o*, 9, and 13b of this title (except to the extent that sections 9 and 13b of this title prohibit manipulation of the market price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any market), 13a-1, 13a-2, 12(a), 13c(a), and 13c(b) of this title.

(II) Subclause (I) of this clause shall not apply to–

(aa) any person described in any of item (aa), (bb), (ee), or (ff) of subparagraph (B)(i)(II); or

(bb) any such person's associated persons.

(III) The Commission may make, promulgate, and enforce such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions of or to accomplish any of the purposes of this chapter in connection with agreements, contracts, or transactions described in clause (i) of this subparagraph if the agreements, contracts, or transactions are offered, or entered into, by a person that is not described in item (aa) through (ff) of subparagraph (B)(i)(II).

(iii)(I) A person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures

association registered under section 21 of this title, shall not–

(aa) solicit or accept orders from any person that is not an eligible contract participant in connection with agreements, contracts, or transactions described in clause (i) of this subparagraph entered into with or to be entered into with a person who is not described in item (aa), (bb), (ee), or (ff) of subparagraph (B)(i)(II);

(bb) exercise discretionary trading authority or obtain written authorization to exercise written trading authority over any account for or on behalf of any person that is not an eligible contract participant in connection with agreements, contracts, or transactions described in clause (i) of this subparagraph entered into with or to be entered into with a person who is not described in item (aa), (bb), (ee), or (ff) of subparagraph (B)(i)(II); or

(cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with agreements, contracts, or transactions described in clause (i) of this subparagraph entered into with or to be entered into with a person who is not described in item (aa), (bb), (ee), or (ff) of subparagraph (B)(i)(II).

(II) Subclause (I) of this clause shall not apply to–

(aa) any person described in item (aa), (bb), (ee), or (ff) of subparagraph (B)(i)(II);

(bb) any such person's associated persons; or

(cc) any person who would be exempt from registration if engaging in the same activities in connection with transactions conducted on or subject to the rules of a contract market or a derivatives transaction execution facility.

(III) The Commission may make, promulgate, and enforce such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions of, or to accomplish any of the purposes of, this chapter in connection with the activities of persons subject to subclause (I).

(IV) Subclause (III) of this clause shall not apply to–

(aa) any person described in item (aa) through (ff) of subparagraph (B)(i)(II);

(bb) any such person's associated persons; or

(cc) any person who would be exempt from registration if engaging in the same activities in connection with transactions conducted on or subject to the rules of a contract market or a derivatives transaction execution facility.

(iv) Sections 6(b) and 6b of this title shall apply to any agreement, contract, or transaction described in clause (i) of this subparagraph as if the agreement, contract, or transaction were a contract of sale of a commodity for future delivery.

(v) This subparagraph shall not be construed to limit any jurisdiction that the Commission may otherwise have under any other provision of this chapter over an agreement, contract, or transaction that is a contract of sale of a commodity for future delivery.

(vi) This subparagraph shall not be construed to limit any jurisdiction that the Commission or the Securities and Exchange Commission may otherwise have under any other provision of this chapter with respect to security futures products and persons effecting transactions in security futures products.

(vii) This chapter applies to, and the Commission shall have jurisdiction over, an account or pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency described in clause (i).

(D) Retail commodity transactions

(i) Applicability

Except as provided in clause (ii), this subparagraph shall apply to any agreement, contract, or transaction in any commodity that is–

(I) entered into with, or offered to (even if not entered into with), a person that is not an eligible contract participant or eligible commercial entity; and

(II) entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.

(ii) Exceptions

This subparagraph shall not apply to–

(I) an agreement, contract, or transaction described in paragraph (1) or subparagraphs[7] (A), (B), or (C), including any agreement, contract, or transaction specifically excluded from subparagraph (A), (B), or (C);

(II) any security;

(III) a contract of sale that–

(aa) results in actual delivery within 28 days or such other longer period as the Commission may determine by rule or regulation based upon the typical commercial practice in cash or spot markets for the commodity involved; or

(bb) creates an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery, respectively, in connection with the line of business of the seller and buyer; or

(IV) an agreement, contract, or transaction that is listed on a national securities exchange registered under section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a)); or

(V) an identified banking product, as defined in section 27(b) of this title.

(iii) Enforcement

Sections 6(a), 6(b), and 6b of this title apply to any agreement, contract, or transaction des-

[7] So in original. Probably should be "subparagraph".

cribed in clause (i), as if the agreement, contract, or transaction was a contract of sale of a commodity for future delivery.

(iv) Eligible commercial entity

For purposes of this subparagraph, an agricultural producer, packer, or handler shall be considered to be an eligible commercial entity for any agreement, contract, or transaction for a commodity in connection with the line of business of the agricultural producer, packer, or handler.

(E) Prohibition

(i) Definition of Federal regulatory agency

In this subparagraph, the term "Federal regulatory agency" means–

(I) the Commission;

(II) the Securities and Exchange Commission;

(III) an appropriate Federal banking agency;

(IV) the National Credit Union Association; and

(V) the Farm Credit Administration.

(ii) Prohibition

(I) In general

Except as provided in subclause (II), a person described in subparagraph (B)(i)(II) for which there is a Federal regulatory agency shall not offer to, or enter into with, a person that is not an eligible contract participant, any agreement, contract, or transaction in foreign currency described in subparagraph (B)(i)(I)

except pursuant to a rule or regulation of a Federal regulatory agency allowing the agreement, contract, or transaction under such terms and conditions as the Federal regulatory agency shall prescribe.

(II) Effective date

With regard to persons described in subparagraph (B)(i)(II) for which a Federal regulatory agency has issued a proposed rule concerning agreements, contracts, or transactions in foreign currency described in subparagraph (B)(i)(I) prior to July 21, 2010, subclause (I) shall take effect 90 days after July 21, 2010.

(iii) Requirements of rules and regulations

(I) In general

The rules and regulations described in clause (ii) shall prescribe appropriate requirements with respect to–

(aa) disclosure;

(bb) recordkeeping;

(cc) capital and margin;

(dd) reporting;

(ee) business conduct;

(ff) documentation; and

(gg) such other standards or requirements as the Federal regulatory agency shall determine to be necessary.

(II) Treatment

The rules or regulations described in clause (ii) shall treat all agreements, contracts, and

transactions in foreign currency described in subparagraph (B)(i)(I), and all agreements, contracts, and transactions in foreign currency that are functionally or economically similar to agreements, contracts, or transactions described in subparagraph (B)(i)(I), similarly.

(d) Swaps

Nothing in this chapter (other than subparagraphs (A), (B), (C), (D), (G), and (H) of subsection (a)(1), subsections (f) and (g), sections 1a, 2(a)(13), 2(c)(2)(A)(ii), 2(e), 2(h), 6(c), 6a, 6b, and 6b-1 of this title, subsections (a), (b), and (g) of section 6c of this title, sections 6d, 6e, 6f, 6g, 6h, 6i, 6j, 6k, 6*l*, 6m, 6n, 6*o*, 6p, 6r, 6s, 6t, 7, 7a-1, 7a-2, 7b, and 7b-3 of this title, sections 9 and 13b of this title, sections 13a-1, 13a-2, 12, 12a, and 13 of this title, subsections (e)(2), (f), and (h) of section 16 of this title, subsections (a) and (b) of section 13c of this title, sections 21, 24, 24a, and 25(a)(4) of this title, and any other provision of this chapter that is applicable to registered entities or Commission registrants) governs or applies to a swap.

(e) Limitation on participation

It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.

(f) Exclusion for qualifying hybrid instruments

(1) In general

Nothing in this chapter (other than section 16(e)(2)(B) of this title) governs or is applicable to a hybrid instrument that is predominantly a security.

(2) Predominance

A hybrid instrument shall be considered to be predominantly a security if–

(A) the issuer of the hybrid instrument receives payment in full of the purchase price of the hybrid instrument, substantially contemporaneously with delivery of the hybrid instrument;

(B) the purchaser or holder of the hybrid instrument is not required to make any payment to the issuer in addition to the purchase price paid under subparagraph (A), whether as margin, settlement payment, or otherwise, during the life of the hybrid instrument or at maturity;

(C) the issuer of the hybrid instrument is not subject by the terms of the instrument to mark-to-market margining requirements; and

(D) the hybrid instrument is not marketed as a contract of sale of a commodity for future delivery (or option on such a contract) subject to this chapter.

(3) Mark-to-market margining requirements

For the purposes of paragraph (2)(C), mark- to-market margining requirements do not include the obligation of an issuer of a secured debt instrument to increase the amount of collateral held in pledge for the benefit of the purchaser of the secured debt instrument to secure the repayment obligations of the issuer under the secured debt instrument.

(g) Application of commodity futures laws

(1) No provision of this chapter shall be construed as implying or creating any presumption that–

(A) any agreement, contract, or transaction that is excluded from this chapter under subsection (c), (d), (e), (f), or (g) of this section or title IV of the Commodity Futures Modernization Act of 2000, or exempted under subsection (h) of this section or section 6(c) of this title; or

(B) any agreement, contract, or transaction, not otherwise subject to this chapter, that is not so excluded or exempted,

is or would otherwise be subject to this chapter.

(2) No provision of, or amendment made by, the Commodity Futures Modernization Act of 2000 shall be construed as conferring jurisdiction on the Commission with respect to any such agreement, contract, or transaction, except as expressly provided in section 7a-1 of this title.

(h) Clearing requirement

(1) In general

(A) Standard for clearing

It shall be unlawful for any person to engage in a swap unless that person submits such swap for clearing to a derivatives clearing organization that is registered under this chapter or a derivatives clearing organization that is exempt from registration under this chapter if the swap is required to be cleared.

(B) Open access

The rules of a derivatives clearing organization described in subparagraph (A) shall–

(i) prescribe that all swaps (but not contracts of sale of a commodity for future delivery or options on such contracts) submitted to the deriv-

atives clearing organization with the same terms and conditions are economically equivalent within the derivatives clearing organization and may be offset with each other within the derivatives clearing organization; and

(ii) provide for non-discriminatory clearing of a swap (but not a contract of sale of a commodity for future delivery or option on such contract) executed bilaterally or on or through the rules of an unaffiliated designated contract market or swap execution facility.

(2) Commission review

(A) Commission-initiated review

(i) The Commission on an ongoing basis shall review each swap, or any group, category, type, or class of swaps to make a determination as to whether the swap or group, category, type, or class of swaps should be required to be cleared.

(ii) The Commission shall provide at least a 30-day public comment period regarding any determination made under clause (i).

(B) Swap submissions

(i) A derivatives clearing organization shall submit to the Commission each swap, or any group, category, type, or class of swaps that it plans to accept for clearing, and provide notice to its members (in a manner to be determined by the Commission) of the submission.

(ii) Any swap or group, category, type, or class of swaps listed for clearing by a derivative clearing organization as of July 21, 2010, shall be considered submitted to the Commission.

(iii) The Commission shall–

(I) make available to the public submissions received under clauses (i) and (ii);

(II) review each submission made under clauses (i) and (ii), and determine whether the swap, or group, category, type, or class of swaps described in the submission is required to be cleared; and

(III) provide at least a 30-day public comment period regarding its determination as to whether the clearing requirement under paragraph (1)(A) shall apply to the submission.

(C) Deadline

The Commission shall make its determination under subparagraph (B)(iii) not later than 90 days after receiving a submission made under subparagraphs (B)(i) and (B)(ii), unless the submitting derivatives clearing organization agrees to an extension for the time limitation established under this subparagraph.

(D) Determination

(i) In reviewing a submission made under subparagraph (B), the Commission shall review whether the submission is consistent with section 7a-1(c)(2) of this title.

(ii) In reviewing a swap, group of swaps, or class of swaps pursuant to subparagraph (A) or a submission made under subparagraph (B), the Commission shall take into account the following factors:

(I) The existence of significant outstanding notional exposures, trading liquidity, and adequate pricing data.

(II) The availability of rule framework, capacity, operational expertise and resources, and credit support infrastructure to clear the contract on terms that are consistent with the material terms and trading conventions on which the contract is then traded.

(III) The effect on the mitigation of systemic risk, taking into account the size of the market for such contract and the resources of the derivatives clearing organization available to clear the contract.

(IV) The effect on competition, including appropriate fees and charges applied to clearing.

(V) The existence of reasonable legal certainty in the event of the insolvency of the relevant derivatives clearing organization or 1 or more of its clearing members with regard to the treatment of customer and swap counterparty positions, funds, and property.

(iii) In making a determination under subparagraph (A) or (B)(iii) that the clearing requirement shall apply, the Commission may require such terms and conditions to the requirement as the Commission determines to be appropriate.

(E) Rules

Not later than 1 year after July 21, 2010, the Commission shall adopt rules for a derivatives clearing organization's submission for review, pursuant to this paragraph, of a swap, or a group, category,

type, or class of swaps, that it seeks to accept for clearing. Nothing in this subparagraph limits the Commission from making a determination under subparagraph (B)(iii) for swaps described in subparagraph (B)(ii).

(3) Stay of clearing requirement

(A) In general

After making a determination pursuant to paragraph (2)(B), the Commission, on application of a counterparty to a swap or on its own initiative, may stay the clearing requirement of paragraph (1) until the Commission completes a review of the terms of the swap (or the group, category, type, or class of swaps) and the clearing arrangement.

(B) Deadline

The Commission shall complete a review undertaken pursuant to subparagraph (A) not later than 90 days after issuance of the stay, unless the derivatives clearing organization that clears the swap, or group, category, type, or class of swaps agrees to an extension of the time limitation established under this subparagraph.

(C) Determination

Upon completion of the review undertaken pursuant to subparagraph (A), the Commission may–

(i) determine, unconditionally or subject to such terms and conditions as the Commission determines to be appropriate, that the swap, or group, category, type, or class of swaps must be cleared pursuant to this subsection if it finds that such clearing is consistent with paragraph (2)(D); or

(ii) determine that the clearing requirement of paragraph (1) shall not apply to the swap, or group, category, type, or class of swaps.

(D) Rules

Not later than 1 year after July 21, 2010, the Commission shall adopt rules for reviewing, pursuant to this paragraph, a derivatives clearing organization's clearing of a swap, or a group, category, type, or class of swaps, that it has accepted for clearing.

(4) Prevention of evasion

(A) In general

The Commission shall prescribe rules under this subsection (and issue interpretations of rules prescribed under this subsection) as determined by the Commission to be necessary to prevent evasions of the mandatory clearing requirements under this chapter.

(B) Duty of Commission to investigate and take certain actions

To the extent the Commission finds that a particular swap, group, category, type, or class of swaps would otherwise be subject to mandatory clearing but no derivatives clearing organization has listed the swap, group, category, type, or class of swaps for clearing, the Commission shall–

(i) investigate the relevant facts and circumstances;

(ii) within 30 days issue a public report containing the results of the investigation; and

(iii) take such actions as the Commission determines to be necessary and in the public interest, which may include requiring the retaining of

adequate margin or capital by parties to the swap, group, category, type, or class of swaps.

(C) Effect on authority

Nothing in this paragraph–

(i) authorizes the Commission to adopt rules requiring a derivatives clearing organization to list for clearing a swap, group, category, type, or class of swaps if the clearing of the swap, group, category, type, or class of swaps would threaten the financial integrity of the derivatives clearing organization; and

(ii) affects the authority of the Commission to enforce the open access provisions of paragraph (1)(B) with respect to a swap, group, category, type, or class of swaps that is listed for clearing by a derivatives clearing organization.

(5) Reporting transition rules

Rules adopted by the Commission under this section shall provide for the reporting of data, as follows:

(A) Swaps entered into before July 21, 2010, shall be reported to a registered swap data repository or the Commission no later than 180 days after the effective date of this subsection.

(B) Swaps entered into on or after July 21, 2010, shall be reported to a registered swap data repository or the Commission no later than the later of–

(i) 90 days after such effective date; or

(ii) such other time after entering into the swap as the Commission may prescribe by rule or regulation.

(6) Clearing transition rules

(A) Swaps entered into before July 21, 2010, are exempt from the clearing requirements of this subsection if reported pursuant to paragraph (5)(A).

(B) Swaps entered into before application of the clearing requirement pursuant to this subsection are exempt from the clearing requirements of this subsection if reported pursuant to paragraph (5)(B).

(7) Exceptions

(A) In general

The requirements of paragraph (1)(A) shall not apply to a swap if 1 of the counterparties to the swap–

(i) is not a financial entity;

(ii) is using swaps to hedge or mitigate commercial risk; and

(iii) notifies the Commission, in a manner set forth by the Commission, how it generally meets its financial obligations associated with entering into non-cleared swaps.

(B) Option to clear

The application of the clearing exception in subparagraph (A) is solely at the discretion of the counterparty to the swap that meets the conditions of clauses (i) through (iii) of subparagraph (A).

(C) Financial entity definition

(i) In general

For the purposes of this paragraph, the term "financial entity" means–

(I) a swap dealer;

(II) a security-based swap dealer;

(III) a major swap participant;

(IV) a major security-based swap participant;

(V) a commodity pool;

(VI) a private fund as defined in section 80b-2(a) of Title 15;

(VII) an employee benefit plan as defined in paragraphs (3) and (32) of section 1002 of Title 29;

(VIII) a person predominantly engaged in activities that are in the business of banking, or in activities that are financial in nature, as defined in section 1843(k) of Title 12.

(ii) Exclusion

The Commission shall consider whether to exempt small banks, savings associations, farm credit system institutions, and credit unions, including–

(I) depository institutions with total assets of $10,000,000,000 or less;

(II) farm credit system institutions with total assets of $10,000,000,000 or less; or

(III) credit unions with total assets of $10,000,000,000 or less.

(iii) Limitation

Such definition shall not include an entity whose primary business is providing financing, and uses derivatives for the purpose of hedging underlying commercial risks related to interest

rate and foreign currency exposures, 90 percent or more of which arise from financing that facilitates the purchase or lease of products, 90 percent or more of which are manufactured by the parent company or another subsidiary of the parent company.

(D) Treatment of affiliates

(i) In general

An affiliate of a person that qualifies for an exception under subparagraph (A) (including affiliate entities predominantly engaged in providing financing for the purchase of the merchandise or manufactured goods of the person) may qualify for the exception only if the affiliate–

(I) enters into the swap to hedge or mitigate the commercial risk of the person or other affiliate of the person that is not a financial entity, and the commercial risk that the affiliate is hedging or mitigating has been transferred to the affiliate;

(II) is directly and wholly-owned by another affiliate qualified for the exception under this subparagraph or an entity that is not a financial entity;

(III) is not indirectly majority-owned by a financial entity;

(IV) is not ultimately owned by a parent company that is a financial entity; and

(V) does not provide any services, financial or otherwise, to any affiliate that is a nonbank financial company supervised by the Board of Governors (as defined under section 5311 of Title 12).

(ii) Limitation on qualifying affiliates

The exception in clause (i) shall not apply if the affiliate is–

(I) a swap dealer;

(II) a security-based swap dealer;

(III) a major swap participant;

(IV) a major security-based swap participant;

(V) a commodity pool;

(VI) a bank holding company;

(VII) a private fund, as defined in section 80b-2(a) of Title 15;

(VIII) an employee benefit plan or government[8] plan, as defined in paragraphs (3) and (32) of section 1002 of Title 29;

(IX) an insured depository institution;

(X) a farm credit system institution;

(XI) a credit union;

(XII) a nonbank financial company supervised by the Board of Governors (as defined under section 5311 of Title 12); or

(XIII) an entity engaged in the business of insurance and subject to capital requirements established by an insurance governmental authority of a State, a territory of the United States, the District of Columbia, a country other than the United States, or a political subdivision of a country other than the United States that is engaged in the super-

---

[8] So in original. Probably should be "governmental".

vision of insurance companies under insurance law.

(iii) Limitation on affiliates' affiliates

Unless the Commission determines, by order, rule, or regulation, that it is in the public interest, the exception in clause (i) shall not apply with respect to an affiliate if the affiliate is itself affiliated with–

(I) a major security-based swap participant;

(II) a security-based swap dealer;

(III) a major swap participant; or

(IV) a swap dealer.

(iv) Conditions on transactions

With respect to an affiliate that qualifies for the exception in clause (i)–

(I) the affiliate may not enter into any swap other than for the purpose of hedging or mitigating commercial risk; and

(II) neither the affiliate nor any person affiliated with the affiliate that is not a financial entity may enter into a swap with or on behalf of any affiliate that is a financial entity or otherwise assume, net, combine, or consolidate the risk of swaps entered into by any such financial entity, except one that is an affiliate that qualifies for the exception under clause (i).

(v) Transition rule for affiliates

An affiliate, subsidiary, or a wholly owned entity of a person that qualifies for an exception under subparagraph (A) and is predominantly enga-

ged in providing financing for the purchase or lease of merchandise or manufactured goods of the person shall be exempt from the margin requirement described in section 6s(e) of this title and the clearing requirement described in paragraph (1) with regard to swaps entered into to mitigate the risk of the financing activities for not less than a 2-year period beginning on July 21, 2010.

(vi) Risk management program

Any swap entered into by an affiliate that qualifies for the exception in clause (i) shall be subject to a centralized risk management program of the affiliate, which is reasonably designed both to monitor and manage the risks associated with the swap and to identify each of the affiliates on whose behalf a swap was entered into.

(E) Election of counterparty

(i) Swaps required to be cleared

With respect to any swap that is subject to the mandatory clearing requirement under this subsection and entered into by a swap dealer or a major swap participant with a counterparty that is not a swap dealer, major swap participant, security-based swap dealer, or major security-based swap participant, the counterparty shall have the sole right to select the derivatives clearing organization at which the swap will be cleared.

(ii) Swaps not required to be cleared

With respect to any swap that is not subject to the mandatory clearing requirement under this

subsection and entered into by a swap dealer or a major swap participant with a counterparty that is not a swap dealer, major swap participant, security-based swap dealer, or major security-based swap participant, the counterparty–

(I) may elect to require clearing of the swap; and

(II) shall have the sole right to select the derivatives clearing organization at which the swap will be cleared.

(F) Abuse of exception

The Commission may prescribe such rules or issue interpretations of the rules as the Commission determines to be necessary to prevent abuse of the exceptions described in this paragraph. The Commission may also request information from those persons claiming the clearing exception as necessary to prevent abuse of the exceptions described in this paragraph.

(8) Trade execution

(A) In general

With respect to transactions involving swaps subject to the clearing requirement of paragraph (1), counterparties shall–

(i) execute the transaction on a board of trade designated as a contract market under section 7 of this title; or

(ii) execute the transaction on a swap execution facility registered under 7b-3[9] of this title or a

---

[9] So in original. Probably should be preceded by "section".

swap execution facility that is exempt from registration under section 7b-3(f) of this title.

(B) Exception

The requirements of clauses (i) and (ii) of subparagraph (A) shall not apply if no board of trade or swap execution facility makes the swap available to trade or for swap transactions subject to the clearing exception under paragraph (7).

(i) Applicability

The provisions of this chapter relating to swaps that were enacted by the Wall Street Transparency and Accountability Act of 2010 (including any rule prescribed or regulation promulgated under that Act), shall not apply to activities outside the United States unless those activities–

(1) have a direct and significant connection with activities in, or effect on, commerce of the United States; or

(2) contravene such rules or regulations as the Commission may prescribe or promulgate as are necessary or appropriate to prevent the evasion of any provision of this chapter that was enacted by the Wall Street Transparency and Accountability Act of 2010.

(j) Committee approval by Board

Exemptions from the requirements of subsection (h)(1) to clear a swap and subsection (h)(8) to execute a swap through a board of trade or swap execution facility shall be available to a counterparty that is an issuer of securities that are registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports pursuant to section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*[d])

only if an appropriate committee of the issuer's board or governing body has reviewed and approved its decision to enter into swaps that are subject to such exemptions.

United States Code Annotated
Title 7. Agriculture
Chapter 1. Commodity Exchanges

§ 5. Findings and purpose
Effective: December 21, 2000

Currentness

**7 U.S.C.A. § 5**

(a) Findings

The transactions subject to this chapter are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities.

(b) Purpose

It is the purpose of this chapter to serve the public interests described in subsection (a) through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission. To foster these public interests, it is further the purpose of this chapter to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants.

United States Code Annotated
Title 7. Agriculture
Chapter 1. Commodity Exchanges
§ 7a-2. Common provisions applicable to registered entities

Currentness

**7 U.S.C.A. § 7a-2**

(a) Acceptable business practices under core principles

(1) In general

Consistent with the purposes of this chapter, the Commission may issue interpretations, or approve interpretations submitted to the Commission, of sections 7(d) and 7a-1(c)(2) of this title, to describe what would constitute an acceptable business practice under such sections.

(2) Effect of interpretation

An interpretation issued under paragraph (1) may provide the exclusive means for complying with each section described in paragraph (1).

(b) Delegation of functions under core principles

(1) In general

A contract market, derivatives transaction execution facility, or electronic trading facility with respect to a significant price discovery contract may comply with any applicable core principle through delegation of any relevant function to a registered futures association or a registered entity that is not an electronic trading facility.

(2) Responsibility

A contract market, derivatives transaction execution facility, or electronic trading facility that

delegates a function under paragraph (1) shall remain responsible for carrying out the function.

(3) Noncompliance

If a contract market, derivatives transaction execution facility, or electronic trading facility that delegates a function under paragraph (1) becomes aware that a delegated function is not being performed as required under this chapter, the contract market, derivatives transaction execution facility, or electronic trading facility shall promptly take steps to address the noncompliance.

(c) New contracts, new rules, and rule amendments

(1) In general

A registered entity may elect to list for trading or accept for clearing any new contract, or other instrument, or may elect to approve and implement any new rule or rule amendment, by providing to the Commission (and the Secretary of the Treasury, in the case of a contract of sale of a government security for future delivery (or option on such a contract) or a rule or rule amendment specifically related to such a contract) a written certification that the new contract or instrument or clearing of the new contract or instrument, new rule, or rule amendment complies with this chapter (including regulations under this chapter).

(2) Rule review

The new rule or rule amendment described in paragraph (1) shall become effective, pursuant to the certification of the registered entity and notice of such certification to its members (in a manner to be determined by the Commission), on the date that is 10 business days after the date on which the

Commission receives the certification (or such shorter period as determined by the Commission by rule or regulation) unless the Commission notifies the registered entity within such time that it is staying the certification because there exist novel or complex issues that require additional time to analyze, an inadequate explanation by the submitting registered entity, or a potential inconsistency with this chapter (including regulations under this chapter).

(3) Stay of certification for rules

(A) A notification by the Commission pursuant to paragraph (2) shall stay the certification of the new rule or rule amendment for up to an additional 90 days from the date of the notification.

(B) A rule or rule amendment subject to a stay pursuant to subparagraph (A) shall become effective, pursuant to the certification of the registered entity, at the expiration of the period described in subparagraph (A) unless the Commission–

(i) withdraws the stay prior to that time; or

(ii) notifies the registered entity during such period that it objects to the proposed certification on the grounds that it is inconsistent with this chapter (including regulations under this chapter).

(C) The Commission shall provide a not less than 30-day public comment period, within the 90-day period in which the stay is in effect as described in subparagraph (A), whenever the Commission reviews a rule or rule amendment pursuant to a notification by the Commission under this paragraph.

(4) Prior approval

(A) In general

A registered entity may request that the Commission grant prior approval to any new contract or other instrument, new rule, or rule amendment.

(B) Prior approval required

Notwithstanding any other provision of this section, a designated contract market shall submit to the Commission for prior approval each rule amendment that materially changes the terms and conditions, as determined by the Commission, in any contract of sale for future delivery of a commodity specifically enumerated in section 1a(10)[1] of this title (or any option thereon) traded through its facilities if the rule amendment applies to contracts and delivery months which have already been listed for trading and have open interest.

(C) Deadline

If prior approval is requested under subparagraph (A), the Commission shall take final action on the request not later than 90 days after submission of the request, unless the person submitting the request agrees to an extension of the time limitation established under this subparagraph.

(5) Approval

(A) Rules

The Commission shall approve a new rule, or rule amendment, of a registered entity unless the Commission finds that the new rule, or rule

---

[1] So in original. Probably should be "section 1a(9)".

amendment, is inconsistent with this chapter (including regulations).

(B) Contracts and instruments

The Commission shall approve a new contract or other instrument unless the Commission finds that the new contract or other instrument would violate this chapter (including regulations).

(C) Special rule for review and approval of event contracts and swaps contracts

(i) Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i)[2] of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve–

(I) activity that is unlawful under any Federal or State law;

(II) terrorism;

(III) assassination;

(IV) war;

(V) gaming; or

---

[2] So in original. There is no section "1a(2)(i)" in this title.

(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

(ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

(iii) Swaps contracts

(I) In general

In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

(II) Requirements

Any such criteria, conditions, or rules shall consider–

(aa) the financial integrity of the derivatives clearing organization; and

(bb) any other factors which the Commission determines may be appropriate.

(iv) Deadline

The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the

party seeking to offer the contract or swap agrees to an extension of this time limitation.

(d) Repealed. Pub.L. 111-203, Title VII, § 745(c), July 21, 2010, 124 Stat. 1737

(e) Reservation of emergency authority

Nothing in this section shall limit or in any way affect the emergency powers of the Commission provided in section 12a(9) of this title.

(f) Rules to avoid duplicative regulation of dual registrants

Consistent with this chapter, each designated contract market and registered derivatives transaction execution facility shall issue such rules as are necessary to avoid duplicative or conflicting rules applicable to any futures commission merchant registered with the Commission pursuant to section 6f(a) of this title (except paragraph (2) thereof), that is also registered with the Securities and Exchange Commission pursuant to section 78*o*(b) of Title 15 (except paragraph (11) thereof) with respect to the application of–

(1) rules of such designated contract market or registered derivatives transaction execution facility of the type specified in section 6d(e) of this title involving security futures products; and

(2) similar rules of national securities associations registered pursuant to section 78*o*-3(a) of Title 15 and national securities exchanges registered pursuant to section 78f(g) of Title 15 involving security futures products.

United States Code Annotated
Title 7. Agriculture
Chapter 1. Commodity Exchanges
§ 13a-2. Jurisdiction of States
Effective: December 21, 2000

Currentness

**7 U.S.C.A. § 13a-2**

(1) Whenever it shall appear to the attorney general of any State, the administrator of the securities laws of any State, or such other official as a State may designate, that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader) has engaged in, is engaging or is about to engage in, any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity or an action at law on behalf of its residents to enjoin such act or practice, to enforce compliance with this chapter, or any rule, regulation, or order of the Commission thereunder, to obtain damages on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

(2) The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia, shall have jurisdiction of all suits in equity and actions at law brought under this section to enforce any liability or duty created by this chapter or any rule, regulation, or order of the Commission thereunder, or to obtain damages or other relief with respect thereto. Upon proper application, such courts shall also have

jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder, including the requirement that the defendant take such action as is necessary to remove the danger of violation of this chapter or of any such rule, regulation, or order. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

(3) Immediately upon instituting any such suit or action, the State shall serve written notice thereof upon the Commission and provide the Commission with a copy of its complaint, and the Commission shall have the right to (A) intervene in the suit or action and, upon doing so, shall be heard on all matters arising therein, and (B) file petitions for appeal.

(4) Any suit or action brought under this section in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

(5) For purposes of bringing any suit or action under this section, nothing in this chapter shall prevent the attorney general, the administrator of the State securities laws, or other duly authorized State officials from exercising the powers conferred on them by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

(6) For purposes of this section, “State” means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

(7) Nothing contained in this section shall prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State.

(8)(A) Nothing in this chapter shall prohibit an authorized State official from proceeding in a State court against any person registered under this chapter (other than a floor broker, floor trader, or registered futures association) for an alleged violation of any antifraud provision of this chapter or any antifraud rule, regulation, or order issued pursuant to the chapter.

(B) The State shall give the Commission prior written notice of its intent to proceed before instituting a proceeding in State court as described in this subsection and shall furnish the Commission with a copy of its complaint immediately upon instituting any such proceeding. The Commission shall have the right to (i) intervene in the proceeding and, upon doing so, shall be heard on all matters arising therein, and (ii) file a petition for appeal. The Commission or the defendant may remove such proceeding to the district court of the United States for the proper district by following the procedure for removal otherwise provided by law, except that the petition for removal shall be filed within sixty days after service of the summons and complaint upon the defendant. The Commission shall have the right to appear as amicus curiae in any such proceeding.

United States Code Annotated
Title 7. Agriculture
Chapter 1. Commodity Exchanges
§ 16. Commission operations

Currentness

**7 U.S.C.A. § 16**

(a) Cooperation with other agencies

The Commission may cooperate with any Department or agency of the Government, any State, territory, district, or possession, or department, agency, or political subdivision thereof, any foreign futures authority, any department or agency of a foreign government or political subdivision thereof, or any person.

(b) Employment of investigators, experts, Administrative Law Judges, consultants, clerks, and other personnel; contracts

(1) The Commission shall have the authority to employ such investigators, special experts, Administrative Law Judges, clerks, and other employees as it may from time to time find necessary for the proper performance of its duties and as may be from time to time appropriated for by Congress.

(2) The Commission may employ experts and consultants in accordance with section 3109 of Title 5, and compensate such persons at rates not in excess of the maximum daily rate prescribed for GS-18 under section 5332 of Title 5.

(3) The Commission shall also have authority to make and enter into contracts with respect to all matters which in the judgment of the Commission are necessary and appropriate to effectuate the purposes and provisions of this chapter, including, but

not limited to, the rental of necessary space at the seat of Government and elsewhere.

(4) The Commission may request (in accordance with the procedures set forth in subchapter II of chapter 31 of Title 5) and the Office of Personnel Management shall authorize pursuant to the request, eight positions in the Senior Executive Service in addition to the number of such positions authorized for the Commission on October 28, 1992.

(c) Expenses

All of the expenses of the Commissioners, including all necessary expenses for transportation incurred by them while on official business of the Commission, shall be allowed and paid on the presentation of itemized vouchers therefor approved by the Commission.

(d) Authorization of appropriations

There are authorized to be appropriated such sums as are necessary to carry out this chapter for each of the fiscal years 2008 through 2013.

(e) Relation to other law, departments, or agencies

(1) Nothing in this chapter shall supersede or preempt–

(A) criminal prosecution under any Federal criminal statute;

(B) the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest–

(i) that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

(ii) (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

(iii) that is not subject to regulation by the Commission under section 6c or 23 of this title; or

(C) the application of any Federal or State statute, including any rule or regulation thereunder, to any person required to be registered or designated under this chapter who shall fail or refuse to obtain such registration or designation.

(2) This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of–

(A) an electronic trading facility excluded under section 2(e) of this title; and

(B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

(f) Investigative assistance to foreign futures authorities

(1) On request from a foreign futures authority, the Commission may, in its discretion, provide assistance in accordance with this section if the requesting authority states that the requesting authority is conducting an investigation which it deems necessary to determine whether any person has violated,

is violating, or is about to violate any laws, rules or regulations relating to futures or options matters that the requesting authority administers or enforces. The Commission may conduct such investigation as the Commission deems necessary to collect information and evidence pertinent to the request for assistance. Such assistance may be provided without regard to whether the facts stated in the request would also constitute a violation of the laws of the United States.

(2) In deciding whether to provide assistance under this subsection, the Commission shall consider whether–

(A) the requesting authority has agreed to provide reciprocal assistance to the Commission in futures and options matters; and

(B) compliance with the request would prejudice the public interest of the United States.

(3) Notwithstanding any other provision of law, the Commission may accept payment and reimbursement, in cash or in kind, from a foreign futures authority, or made on behalf of such authority, for necessary expenses incurred by the Commission, its members, and employees in carrying out any investigation, or in providing any other assistance to a foreign futures authority, pursuant to this section. Any payment or reimbursement accepted shall be considered a reimbursement to the appropriated funds of the Commission.

(g) Computerized futures trading

Consistent with its responsibilities under section 22 of this title, the Commission is directed to facilitate the development and operation of computerized trading as

an adjunct to the open outcry auction system. The Commission is further directed to cooperate with the Office of the United States Trade Representative, the Department of the Treasury, the Department of Commerce, and the Department of State in order to remove any trade barriers that may be imposed by a foreign nation on the international use of electronic trading systems.

(h) Regulation of swaps as insurance under State law

A swap–

(1) shall not be considered to be insurance; and

(2) may not be regulated as an insurance contract under the law of any State.

New Jersey Statutes Annotated
Title 5. Amusements, Public Exhibitions and Meetings
Chapter 12. Casino Control Act (Refs & Annos)
Article 1. Introduction and General Provisions
5:12-1. Short title; Casino Control Act; declaration of policy and legislative findings

Effective: February 1, 2011
Currentness

**N.J.S.A. 5:12-1**

a. This act shall be known and may be cited as the "Casino Control Act."

b. The Legislature hereby finds and declares to be the public policy of this State, the following:

(1) The tourist, resort and convention industry of this State constitutes a critical component of its economic structure and, if properly developed, controlled and fostered, is capable of providing a substantial contribution to the general welfare, health and prosperity of the State and its inhabitants.

(2) By reason of its location, natural resources and worldwide prominence and reputation, the city of Atlantic City and its resort, tourist and convention industry represent a critically important and valuable asset in the continued viability and economic strength of the tourist, convention and resort industry of the State of New Jersey.

(3) The rehabilitation and redevelopment of existing tourist and convention facilities in Atlantic City, and the fostering and encouragement of new construction and the replacement of lost convention, tourist, entertainment and cultural centers in Atlantic City will offer a unique opportunity for the inhabitants of

the entire State to make maximum use of the natural resources available in Atlantic City for the expansion and encouragement of New Jersey's hospitality industry, and to that end, the restoration of Atlantic City as the Playground of the World and the major hospitality center of the Eastern United States is found to be a program of critical concern and importance to the inhabitants of the State of New Jersey.

(4) Legalized casino gaming has been approved by the citizens of New Jersey as a unique tool of urban redevelopment for Atlantic City. In this regard, the introduction of a limited number of casino rooms in major hotel convention complexes, permitted as an additional element in the hospitality industry of Atlantic City, will facilitate the redevelopment of existing blighted areas and the refurbishing and expansion of existing hotel, convention, tourist, and entertainment facilities; encourage the replacement of lost hospitality-oriented facilities; provide for judicious use of open space for leisure time and recreational activities; and attract new investment capital to New Jersey in general and to Atlantic City in particular.

(5) Restricting the issuance of casino licenses to major hotel and convention facilities is designed to assure that the existing nature and tone of the hospitality industry in New Jersey and in Atlantic City is preserved, and that the casino rooms licensed pursuant to the provisions of this act are always offered and maintained as an integral element of such hospitality facilities, rather than as the industry unto themselves that they have become in other jurisdictions.

(6) An integral and essential element of the regulation and control of such casino facilities by the State rests in the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations. To further such public confidence and trust, the regulatory provisions of this act are designed to extend strict State regulation to all persons, locations, practices and associations related to the operation of licensed casino enterprises and all related service industries as herein provided. In addition, licensure of a limited number of casino establishments, with the comprehensive law enforcement supervision attendant thereto, is further designed to contribute to the public confidence and trust in the efficacy and integrity of the regulatory process.

(7) Legalized casino gaming in New Jersey can attain, maintain and retain integrity, public confidence and trust, and remain compatible with the general public interest only under such a system of control and regulation as insures, so far as practicable, the exclusion from participation therein of persons with known criminal records, habits or associations, and the exclusion or removal from any positions of authority or responsibility within casino gaming operations and establishments of any persons known to be so deficient in business probity, either generally or with specific reference to gaming, as to create or enhance the dangers of unsound, unfair or illegal practices, methods and activities in the conduct of gaming or the carrying on of the business and financial arrangements incident thereto.

(8) Since the public has a vital interest in casino operations in Atlantic City and has established an exception to the general policy of the State concerning gaming for private gain, participation in casino

operations as a licensee or registrant under this act shall be deemed a revocable privilege conditioned upon the proper and continued qualification of the individual licensee or registrant and upon the discharge of the affirmative responsibility of each such licensee or registrant to provide to the regulatory and investigatory authorities established by this act any assistance and information necessary to assure that the policies declared by this act are achieved. Consistent with this policy, it is the intent of this act to preclude the creation of any property right in any license, registration, certificate or reservation permitted by this act, the accrual of any value to the privilege of participation in gaming operations, or the transfer of any license, registration, certificate, or reservation, and to require that participation in gaming be solely conditioned upon the individual qualifications of the person seeking such privilege.

(9) Since casino operations are especially sensitive and in need of public control and supervision, and since it is vital to the interests of the State to prevent entry, directly or indirectly, into such operations or the ancillary industries regulated by this act of persons who have pursued economic gains in an occupational manner or context which are in violation of the criminal or civil public policies of this State, the regulatory and investigatory powers and duties shall be exercised to the fullest extent consistent with law to avoid entry of such persons into the casino operations or the ancillary industries regulated by this act.

(10) (Deleted by amendment, P.L.1995, c. 18.)

(11) The facilities in which licensed casinos are to be located are of vital law enforcement interest to the State, and it is in the public interest that the

regulatory and investigatory powers and duties conferred by this act include the power and duty to review architectural and site plans to assure that the proposal is suitable by law enforcement standards.

(12) Since the economic stability of casino operations is in the public interest and competition in the casino operations in Atlantic City is desirable and necessary to assure the residents of Atlantic City and of this State and other visitors to Atlantic City varied attractions and exceptional facilities, the regulatory and investigatory powers and duties conferred by this act shall include the power and duty to regulate, control and prevent economic concentration in the casino operations and the ancillary industries regulated by this act, and to encourage and preserve competition.

(13) It is in the public interest that the institution of licensed casino establishments in New Jersey be strictly regulated and controlled pursuant to the above findings and pursuant to the provisions of this act, which provisions are designed to engender and maintain public confidence and trust in the regulation of the licensed enterprises, to provide an effective method of rebuilding and redeveloping existing facilities and of encouraging new capital investment in Atlantic City, and to provide a meaningful and permanent contribution to the economic viability of the resort, convention, and tourist industry of New Jersey.

(14) Confidence in casino gaming operations is eroded to the extent the State of New Jersey does not provide a regulatory framework for casino gaming that permits and promotes stability and continuity in casino gaming operations.

(15) Continuity and stability in casino gaming operations cannot be achieved at the risk of permitting persons with unacceptable backgrounds and records of behavior to control casino gaming operations contrary to the vital law enforcement interest of the State.

(16) The aims of continuity and stability and of law enforcement will best be served by a system in which continuous casino operation can be assured under certain circumstances wherein there has been a transfer of property or another interest relating to an operating casino and the transferee has not been fully licensed or qualified, as long as control of the operation under such circumstances may be placed in the possession of a person or persons in whom the public may feel a confidence and a trust.

(17) A system whereby the suspension or revocation of casino operations under certain appropriate circumstances causes the imposition of a conservatorship upon the suspended or revoked casino operation serves both the economic and law enforcement interests involved in casino gaming operations.

(18) As recognized in the July 2010 Report of the Governor's Advisory Commission on New Jersey Gaming, Sports, and Entertainment, and as confirmed in subsequent legislative hearings held throughout the State, legalized casino gaming in New Jersey presently stands at a crossroads, facing critical challenges that jeopardize its important role in the State economy, and it is in the public interest to modernize and streamline the current outdated casino regulatory structure in order to achieve efficiencies and cost savings that are more appropriately directed to marketing and infrastructure improvement efforts

while, at the same time, maintaining strict integrity in the regulation of casino operations.

(19) The ability of the legalized casino gaming industry in New Jersey to compete in an ever-expanding national gaming market requires a regulatory system that is sufficiently flexible to encourage persons and entities holding casino gaming licenses outside of New Jersey to participate in casino gaming in Atlantic City, to allow licensees to take full and timely advantage of advancements in technology, particularly in information technology, and business management, and to encourage the efficient utilization of resources between and among affiliated New Jersey licensees operating casinos located in Atlantic City and between and among a New Jersey affiliate and its licensed affiliates in other jurisdictions.

New Jersey Statutes Annotated
Title 5. Amusements, Public Exhibitions and Meetings
Chapter 12. Casino Control Act (Refs & Annos)
Article 2. Casino Control Commission and Division of Gaming Enforcement: Establishment and Organization
5:12-55. Division of gaming enforcement
Effective: August 7, 2012

Currentness

**N.J.S.A. 5:12-55**

There is hereby established in the Department of Law and Public Safety the Division of Gaming Enforcement. The division shall be under the immediate supervision of a director who shall also be sworn as an Assistant Attorney General and who shall administer the work of the division under the direction and supervision of the Attorney General. The director shall be appointed by the Governor, with the advice and consent of the Senate, and shall serve during the term of office of the Governor, except that the first director shall be appointed for a term of 2 years. The director may be removed from office by the Attorney General for cause upon notice and opportunity to be heard.

The director and any employee or agent of the division shall be subject to the duty to appear and testify and to removal from his office, position or employment in accordance with the provisions of P.L.1970, c. 72 (C.2A:81-17.2a et seq.). The Attorney General shall be responsible for the exercise of the duties and powers assigned to the division.

The division shall be located in Atlantic City, except that the division may maintain a secondary satellite office in Trenton, which shall not be the primary office,

if deemed necessary for the effective performance of its duties and responsibilities.

If, as a result of the transfer of duties and responsibilities from the Casino Control Commission to the division in accordance with P.L.2011, c. 19 (C.5:12-6.1 et al.), the division needs to employ an individual to fill a position, former employees of the commission who performed the duties of the position to be filled shall be given a one-time right of first refusal offer of employment with the division, and such employees may be removed by the division for cause or if deemed unqualified to hold the position, notwithstanding any other provision of law to the contrary. An individual formerly employed by the commission who becomes employed by the division shall retain as an employee of the division the seniority, and all rights related to seniority, that the employee had with the commission as of the last day of employment with the commission; provided, however, that such seniority and seniority rights shall be retained only by an employee who was transferred from employment with the commission to employment with the division, and shall not be retained by an employee who was removed from employment with the commission due to layoff procedures or who resigned from a position with the commission prior to being hired by the division.

New Jersey Statutes Annotated
Title 5. Amusements, Public Exhibitions and Meetings
Chapter 12. Casino Control Act
Article 5. Division of Gaming Enforcement–Powers and Duties
5:12-76. General duties and powers
Effective: November 21, 2013

Currentness

**N.J.S.A. 5:12-76**

The Division of Gaming Enforcement shall have the general responsibility for the implementation of P.L.1977, c. 110 (C.5:12-1 et seq.), and to issue any approvals necessary as hereinafter provided, including without limitation, the responsibility to:

a. Enforce the provisions of this act and any regulations promulgated hereunder;

b. Promptly and in reasonable order investigate all applications for licensure and all registrations under this act;

c. Issue reports and recommendations to the commission with respect to all entities and natural persons required to qualify for a casino license, an application for interim casino authorization or a petition for a statement of compliance;

d. Promptly and in reasonable order review and approve or deny all casino service industry enterprise license applications;

e. Accept and maintain registrations for all casino employee and vendor registrants;

f. Revoke any registration or casino service industry enterprise license upon findings pursuant to the

disqualification criteria in section 86 of P.L. 1977, c. 110 (C.5:12-86);

g. Promulgate such regulations as may be necessary to fulfill the policies of this act;

h. Initiate and decide any actions against licensees or registrants for violation of this act or regulations promulgated hereunder, and impose sanctions and levy and collect penalties upon finding violations;

i. Provide the commission with all information that the director deems necessary for any action to be taken by the commission under Article 6 of P.L.1977, c. 110 (C.5:12-80 through 95);

j. Initiate, prosecute and defend appeals, as the director may deem appropriate;

k. Conduct continuing reviews of casino operations through on-site observation and other reasonable means to assure compliance with this act and regulations promulgated hereunder, subject to subsection h. of section 63 of P.L.1977, c. 110 (C.5:12-63);

l. Receive and take appropriate action on any referral from the commission relating to any evidence of a violation of P.L.1977, c. 110 (C.5:12-1 et seq.) or the regulations promulgated thereunder;

m. Exchange fingerprint data with, and receive criminal history record information from, the Federal Bureau of Investigation for use in considering applicants for any license or registration issued pursuant to the provisions of P.L.1977, c. 110 (C.5:12-1 et seq.);

n. Conduct audits of casino operations at such times, under such circumstances, and to such extent as the director shall determine, including reviews of accounting, administrative and financial records, and

management control systems, procedures and records utilized by a casino licensee;

o. Request and receive information, materials and any other data from any licensee or registrant, or applicant for a license or registration under this act; and

p. Report to the Attorney General recommendations that promote more efficient operations of the division.

q. Receive complaints from the public relating to the conduct of gaming and simulcasting operations, examine records and procedures, and conduct periodic reviews of operations and facilities for the purpose of evaluating current or suggested provisions of P.L.1977, c. 110 (C.5:12-1 et seq.) and the regulations promulgated thereunder, as the director deems appropriate;

r. Certify the revenue of any casino or simulcasting facility in such manner as the director deems appropriate;

s. Create and maintain a list of all excluded patrons;

t. Initiate and decide all actions for involuntary exclusion of patrons pursuant to section 71 of P.L.1977, c. 110 (C.5:12-71);

u. Issue an operation certificate upon the commission's grant of an application for a casino license;

v. Recommend that the commission issue or revoke statements of compliance pursuant to section 81 of P.L.1977, c. 110 (C.5:12-81) and the regulations promulgated thereunder;

w. Accept impact statements submitted by an applicant for a casino license pursuant to section 84 of P.L.1977, c. 110 (C.5:12-84);

x. Utilize, in its discretion, the services of a private entity for the purpose of expediting criminal history record background checks required to be performed by the division pursuant to the provisions of P.L.1977, c. 110 (C.5:12-1 et seq.), provided that the private entity has been awarded a contract in accordance with the public contracting laws of this State; and

y. License, regulate, investigate and take any other action regarding all aspects of authorized games conducted through the Internet.

New Jersey Statutes Annotated
Title 5. Amusements, Public Exhibitions and Meetings
Chapter 12. Casino Control Act
Article 6. Licensing

5:12-92. Licensing of casino service industry enterprises

Effective: November 8, 2021
Currentness

**N.J.S.A. 5:12-92**

a. (1) Any business to be conducted with a casino applicant, racetrack, or licensee by a vendor offering goods or services which directly relate to casino, racetrack, sports wagering, or gaming activity, or Internet gaming activity, including gaming equipment and simulcast wagering equipment manufacturers, suppliers, repairers, and independent testing laboratories, and companies that supply sports wagering equipment or services, shall require licensure as a casino service industry enterprise in accordance with the provisions of this act prior to conducting any business whatsoever with a casino applicant, racetrack, or licensee, its employees or agents; provided, however, that upon a showing of good cause by a casino applicant, racetrack, or licensee, the director may permit an applicant for a casino service industry enterprise license to conduct business transactions with such casino applicant, racetrack, or licensee prior to the licensure of that casino service industry enterprise applicant under this subsection for such periods as the division may establish by regulation. Companies providing services to casino licensees regarding Internet gaming shall, notwithstanding any other provision of P.L.1977, c. 110 (C.5:12-1 et seq.), be responsible for

the full cost of their licensure, including any investigative costs.

In the case of conducting an online sports pool, as that term is defined in section 1 of P.L.2018, c. 33 (C.5:12A-10), a vendor that holds an existing casino service industry enterprise license shall, upon the approval of the division, expand on any initial license granted by the division prior to offering goods or services directly related to sports wagering or online sports wagering activities or operations. The approval shall be in accordance with the terms and conditions set forth by the division.

(2) In addition to the requirements of paragraph (1) of this subsection, any casino service industry enterprise intending to manufacture, sell, distribute, test or repair slot machines within New Jersey, other than antique slot machines as defined in N.J.S.2C:37-7, shall be licensed in accordance with the provisions of this act prior to engaging in any such activities; provided, however, that upon a showing of good cause by a casino applicant or licensee, the director may permit an applicant for a casino service industry enterprise license to conduct business transactions with the casino applicant or licensee prior to the licensure of that casino service industry enterprise applicant under this subsection for such periods as the division may establish by regulation; and provided further, however, that upon a showing of good cause by an applicant required to be licensed as a casino service industry enterprise pursuant to this paragraph, the director may permit the casino service industry enterprise applicant to initiate the manufacture of slot machines or engage in the sale, distribution, testing or repair of slot machines with any person other than a casino applicant

or licensee, its employees or agents, prior to the licensure of that casino service industry enterprise applicant under this subsection.

(3) Vendors providing goods and services to casino licensees or applicants ancillary to gaming, including, without limitation, junket enterprises and junket representatives, and any person employed by a junket enterprise or junket representative in a managerial or supervisory position, non-casino applicants or licensees required to hold a casino hotel alcoholic beverage license pursuant to section 103 of P.L.1977, c. 110 (C.5:12-103), lessors of casino property not required to hold a casino license pursuant to section 82 of P.L.1977, c. 110 (C.5:12-82), and licensors of authorized games shall be required to be licensed as an ancillary casino service industry enterprise and shall comply with the standards set forth in paragraph (4) of subsection c. of this section.

b. Each casino service industry enterprise required to be licensed pursuant to paragraph (1) of subsection a. of this section, as well as its owners; management and supervisory personnel; and employees if such employees have responsibility for services to a casino applicant or licensee, must qualify under the standards, except residency, established for qualification of a casino key employee under this act, P.L.1977, c. 110 (C.5:12-1 et seq.).

c. (1) Any vendor that offers goods or services to a casino applicant or licensee that is not included in subsection a. of this section including, but not limited to casino site contractors and subcontractors, shopkeepers located within the approved hotels, gaming schools that possess slot machines for the purpose of instruction, and any non-supervisory employee of a junket enterprise licensed under paragraph (3) of subsection a.

of this section, shall be required to register with the division in accordance with the regulations promulgated under this act, P.L.1977, c. 110 (C.5:12-1 et seq.).

(2) Notwithstanding the provisions of paragraph (1) of this subsection, the director may, consistent with the public interest and the policies of this act, direct that individual vendors registered pursuant to paragraph (1) of this subsection be required to apply for either a casino service industry enterprise license pursuant to paragraph (1) of subsection a. of this section, or an ancillary casino service industry enterprise license pursuant to paragraph (3) of subsection a. of this section, as directed by the division, including, without limitation, in-State and out-of-State sending tracks as defined in section 2 of the "Casino Simulcasting Act," P.L.1992, c. 19 (C.5:12-192); shopkeepers located within the approved hotels; and gaming schools that possess slot machines for the purpose of instruction. The director may also order that any enterprise licensed as or required to be licensed as an ancillary casino service industry enterprise pursuant to paragraph (3) of subsection a. of this section be required to apply for a casino service industry enterprise license pursuant to paragraph (1) of subsection a. of this section. The director may also, in his discretion, order that an independent software contractor not otherwise required to be registered be either registered as a vendor pursuant to subsection c. of this section or be licensed pursuant to either paragraph (1) or (3) of subsection a. of this section.

(3) (Deleted by amendment, P.L.2011, c. 19)

(4) Each ancillary casino service industry enterprise required to be licensed pursuant to paragraph (3) of subsection a. of this section, as well as its owners,

management and supervisory personnel, and employees if such employees have responsibility for services to a casino applicant or licensee, shall establish their good character, honesty and integrity by clear and convincing evidence and shall provide such financial information as may be required by the division. Any enterprise required to be licensed as an ancillary casino service industry enterprise pursuant to this section shall be permitted to transact business with a casino licensee upon filing of the appropriate vendor registration form and application for such licensure.

d. Any applicant, licensee or qualifier of a casino service industry enterprise license or of an ancillary casino service industry enterprise license under subsection a. of this section, and any vendor registrant under subsection c. of this section shall be disqualified in accordance with the criteria contained in section 86 of P.L.1977, c. 110 (C.5:12-86), except that no such ancillary casino service industry enterprise license under paragraph (3) of subsection a. of this section or vendor registration under subsection c. of this section shall be denied or revoked if such vendor registrant can affirmatively demonstrate rehabilitation as provided in subsection d. of section 91 of P.L.1977, c. 110 (C.5:12-91).

e. No casino service industry enterprise license or ancillary casino service industry enterprise license shall be issued pursuant to subsection a. of this section to any person unless that person shall provide proof of valid business registration with the Division of Revenue in the Department of the Treasury.

f. (Deleted by amendment, P.L.2011, c. 19)

g. For the purposes of this section, each applicant shall submit to the division the name, address, fingerprints

and a written consent for a criminal history record background check to be performed, for each person required to qualify as part of the application. The division is hereby authorized to exchange fingerprint data with and receive criminal history record information from the State Bureau of Identification in the Division of State Police and the Federal Bureau of Investigation consistent with applicable State and federal laws, rules and regulations. The applicant shall bear the cost for the criminal history record background check, including all costs of administering and processing the check. The Division of State Police shall promptly notify the division in the event a current or prospective qualifier, who was the subject of a criminal history record background check pursuant to this section, is arrested for a crime or offense in this State after the date the background check was performed.

h. (1) Subsequent to the licensure of any entity pursuant to subsection a. of this section, including any finding of qualification as may be required as a condition of licensure, or the registration of any vendor pursuant to subsection c. of this section, the director may revoke, suspend, limit, or otherwise restrict the license, registration or qualification status upon a finding that the licensee, registrant or qualifier is disqualified on the basis of the criteria set forth in section 86 of P.L.1977, c. 110 (C.5:12-86).

(2) A hearing prior to the suspension of any license, registration or qualification issued pursuant to this section shall be a limited proceeding at which the division shall have the affirmative obligation to demonstrate that there is a reasonable possibility that the licensee, registrant or qualifier is disqualified on the basis of the criteria set forth in section 86 of P.L.1977, c. 110 (C.5:12-86).

New Jersey Statutes Annotated
Title 5. Amusements, Public Exhibitions and Meetings
Chapter 12. Casino Control Act (Refs & Annos)
Article 7. Conditions of Operation
5:12-104. Casino licensee; leases and contracts
Effective: June 11, 2018

Currentness

**N.J.S.A. 5:12-104**

a. Unless otherwise provided in this subsection, no agreement shall be lawful which provides for the payment, however defined, of any direct or indirect interest, percentage or share of: any money or property gambled at a casino or simulcasting facility; any money or property derived from casino gaming activity or wagering at a simulcasting facility; or any revenues, profits or earnings of a casino or simulcasting facility. Notwithstanding the foregoing:

(1) Agreements which provide only for the payment of a fixed sum which is in no way affected by the amount of any such money, property, revenues, profits or earnings shall not be subject to the provisions of this subsection; and receipts, rentals or charges for real property, personal property or services shall not lose their character as payments of a fixed sum because of contract, lease, or license provisions for adjustments in charges, rentals or fees on account of changes in taxes or assessments, cost-of-living index escalations, expansion or improvement of facilities, or changes in services supplied.

(2) Agreements between a casino licensee and a junket enterprise or junket representative licensed, qualified or registered in accordance with the provisions of P.L.1977, c. 110 (C.5:12-1 et seq.) and the

regulations of the division which provide for the compensation of the junket enterprise or junket representative by the casino licensee based upon the actual casino gaming or simulcast wagering activities of a patron procured or referred by the junket enterprise or junket representative shall be lawful if filed with the division prior to the conduct of any junket that is governed by the agreement.

(3) Agreements between a casino licensee and its employees which provide for casino employee or casino key employee profit sharing shall be lawful if the agreement is in writing and filed with the division prior to its effective date. Such agreements may be reviewed by the division under any relevant provision of P.L.1977, c. 110 (C.5:12-1 et seq.).

(4) Agreements to lease an approved casino hotel or the land thereunder and agreements for the complete management of all casino gaming operations in a casino hotel shall not be subject to the provisions of this subsection but shall rather be subject to the provisions of subsections b. and c. of section 82 of this act.1

(5) Agreements which provide for percentage charges between the casino licensee and a holding company or intermediary company of the casino licensee shall be in writing and filed with the division but shall not be subject to the provisions of this subsection.

(6) Agreements relating to simulcast racing and wagering between a casino licensee and an in-State or out-of-State sending track licensed or exempt from licensure in accordance with section 92 of P.L.1977,

[1] N.J.S.A. § 5:12-82.

c. 110 (C.5:12-92) shall be in writing, be filed with the division, and be lawful and effective only if expressly approved as to their terms by the division and the New Jersey Racing Commission, except that any such agreements which provide for a percentage of the parimutuel pool wagered at a simulcasting facility to be paid to the sending track shall not be subject to the provisions of this subsection.

(7) Agreements relating to simulcast racing and wagering between a casino licensee and a casino service industry enterprise licensed pursuant to the provisions of subsection a. of section 92 of P.L.1977, c. 110 (C.5:12-92) as a hub facility, as defined in joint regulations of the Division of Gaming Enforcement and the New Jersey Racing Commission, shall be in writing, be filed with the commission, and be lawful and effective only if expressly approved as to their terms by the commission and the New Jersey Racing Commission, except that any such agreements which provide for a percentage of the casino licensee's share of the parimutuel pool wagered at a simulcasting facility to be paid to the hub facility shall not be subject to the provisions of this subsection.

(8) Agreements relating to simulcast racing and wagering between a casino licensee and a casino service industry enterprise licensed pursuant to the provisions of subsection a. of section 92 of P.L.1977, c. 110 (C.5:12-92) to conduct casino simulcasting in a simulcasting facility shall be in writing, be filed with the commission, and be lawful and effective only if expressly approved as to their terms by the commission, except that any such agreements which provide for a percentage of the casino licensee's share of the parimutuel pool wagered at a simulcasting facility to be paid to the casino service industry

enterprise shall not be subject to the provisions of this subsection.

(9) Written agreements relating to the operation of multi-casino or multi-state progressive slot machine systems between one or more casino licensees and a casino service industry enterprise licensed pursuant to the provisions of subsection a. of section 92 of P.L.1977, c. 110 (C.5:12-92), or an eligible applicant for such license, which provide for an interest, percentage or share of the casino licensee's revenues, profits or earnings from the operation of such multi-casino or multi-state progressive slot machines to be paid to the casino service industry enterprise licensee or applicant shall not be subject to the provisions of this subsection if the agreements are filed with and approved by the division.

(10) A written agreement between a casino licensee and a casino service industry enterprise licensed pursuant to subsection a. of section 92 of P.L.1977, c. 110 (C.5:12-92), or an eligible applicant for such license, relating to the construction, renovation or operation of qualifying sleeping units, as defined in section 27 of P.L.1977, c. 110 (C.5:12-27), or of non-gaming amenities, as defined by the division, within the limits of the city of Atlantic City, regardless of whether such qualifying sleeping units or non-gaming amenities are connected to a casino hotel facility, which provides for an interest, percentage or share of the casino licensee's revenues, profits or earnings, not to exceed 5% of the casino licensee's revenues, to be paid to the casino service industry enterprise licensee or applicant in return for the construction, renovation or operation of such qualifying sleeping units or non-gaming amenities shall not be subject to the provisions of this subsection provided that: (i)

the agreement requires a capital investment, at least 10% of which shall be made by the casino service industry enterprise licensee or applicant over the term of the agreement, of not less than $30 million, which minimum amount shall be adjusted periodically by the division for inflation; (ii) the division finds that the total amount of casino revenues, profits or earnings that can be paid to the casino service industry enterprise licensee or applicant pursuant to this agreement is commercially reasonable under the circumstances; and (iii) the agreement is filed with and approved by the division.

(11) A written agreement between a casino licensee holding an Internet gaming permit and a casino service industry enterprise licensed pursuant to subsection a. of section 92 of P.L.1977, c. 110 (C.5:12-92), or an eligible applicant for such a license, in connection with the conduct of Internet gaming under P.L.2013, c. 27 (C.5:12-95.17 et al.), which provides for a percentage of the casino licensee's Internet gaming gross revenue to be paid to the casino service industry enterprise licensee shall not be subject to the provisions of this subsection, provided that the agreement shall be in writing, filed with the division, and shall be lawful and effective only if the terms thereof are expressly approved by the division.

(12) A written agreement between a casino licensee and a casino service industry enterprise licensed pursuant to subsection a. of section 92 of P.L.1977, c. 110 (C.5:12-92), or an eligible applicant for such a license, in connection with the conduct of mobile gaming under section 100 of P.L.1977, c. 110 (C.5:12-100), or mobile sports pool operations within a casino hotel facility in areas in which mobile

gaming under section 100 of P.L.1977, c. 110 (C.5:12-100) is authorized, which provides for a percentage of the casino licensee's gross revenue from mobile gaming to be paid to the casino service industry enterprise licensee shall not be subject to the provisions of this subsection, provided that the agreement shall be in writing, filed with the division, and shall be lawful and effective only if the terms thereof are expressly approved by the division.

(13) A written agreement between a casino licensee and a casino service industry enterprise licensed pursuant to subsection a. of section 92 of P.L.1977, c. 110 (C.5:12-92), or an eligible applicant for such a license, in connection with the conduct of a sports pool, including an online sports pool, mobile sports pool operations within a casino hotel facility in areas in which mobile gaming under section 100 of P.L.1977, c. 110 (C.5:12-100) is authorized, or both, which provides for a percentage of the casino licensee's gross revenue from the operations of a sports pool, including online sports pool and mobile operations, to be paid to the casino service industry enterprise licensee shall not be subject to the provisions of this subsection, provided that the agreement shall be in writing, filed with the division, and shall be lawful and effective only if the terms thereof are expressly approved by the division.

b. Each casino applicant or licensee shall maintain, in accordance with the rules of the division, a record of each written or unwritten agreement regarding the realty, construction, maintenance, or business of a proposed or existing casino hotel or related facility. The foregoing obligation shall apply regardless of whether the casino applicant or licensee is a party to the

agreement. Any such agreement may be reviewed by the division on the basis of the reasonableness of its terms, including the terms of compensation, and of the qualifications of the owners, officers, employees, and directors of any enterprise involved in the agreement, which qualifications shall be reviewed according to the standards enumerated in section 86 of P.L.1977, c. 110 (C.5:12-86). If the division disapproves such an agreement or the owners, officers, employees, or directors of any enterprise involved therein, the division may require its termination.

Every agreement required to be maintained, and every related agreement the performance of which is dependent upon the performance of any such agreement, shall be deemed to include a provision to the effect that, if the commission shall require termination of an agreement pursuant to its authority under P.L.1977, c. 110 (C.5:12-1 et seq.), such termination shall occur without liability on the part of the casino applicant or licensee or any qualified party to the agreement or any related agreement. Failure expressly to include such a provision in the agreement shall not constitute a defense in any action brought to terminate the agreement. If the agreement is not maintained or presented to the commission in accordance with division regulations, or the disapproved agreement is not terminated, the division may pursue any remedy or combination of remedies provided in this act.

For the purposes of this subsection, “casino applicant” includes any person required to hold a casino license pursuant to section 82 of P.L.1977, c. 110 (C.5:12-82) who has applied to the division for a casino license or any approval required under P.L.1977, c. 110 (C.5:12-1 et seq.).

c. Nothing in this act shall be deemed to permit the transfer of any license, or any interest in any license, or any certificate of compliance or any commitment or reservation.

New Jersey Statutes Annotated
Title 5. Amusements, Public Exhibitions and Meetings
Chapter 12A. Sports Wagering
5:12A-10. Definitions
Effective: November 8, 2021

Currentness

**N.J.S.A. 5:12A-10**

As used in this act:

"Casino" means a licensed casino or gambling house located in Atlantic City at which casino gambling is conducted pursuant to the provisions of P.L.1977, c. 110 (C.5:12-1 et seq.).

"Commission" means the Casino Control Commission established pursuant to section 50 of P.L.1977, c. 110 (C.5:12-50).

"Collegiate sport or athletic event" means a sport or athletic event offered or sponsored by or played in connection with a public or private institution that offers educational services beyond the secondary level.

"Division" means the Division of Gaming Enforcement established pursuant to section 55 of P.L.1977, c. 110 (C.5:12-55).

"Former racetrack" means any former racetrack where a horse race meeting was conducted within 15 years prior to the effective date of P.L.2014, c. 62 (C.5:12A-7 et seq.), excluding premises other than the land contained within the racecourse oval.

"Internet sports pool operator" means an entity that is licensed as a casino service industry enterprise pursuant to section 92 of P.L.1977, c. 110 (C.5:12-92)

"Online sports pool" means a sports wagering operation in which wagers on sports events are made through computers or mobile or interactive devices and accepted at a sports wagering lounge through an online gaming system which is operating pursuant to a sports wagering license issued by the division or racing commission pursuant to P.L.2018, c. 33 (C.5:12A-10 et al.).

"Operator" means a casino or a racetrack which has elected to operate a sports pool, either independently or jointly, and any entity with whom a casino or racetrack licensed to operate a sports pool contracts to operate a sports pool or online sports pool, including an Internet sports pool operator, on its behalf.

"Professional sport or athletic event" means an event at which two or more persons participate in sports or athletic events and receive compensation in excess of actual expenses for their participation in such event.

"Prohibited sports event" means any collegiate sport or athletic event that takes place in New Jersey or a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place. A "prohibited sports event" does not include the other games of a collegiate sport or athletic tournament in which a New Jersey college team participates, nor does it include any games of a collegiate tournament that occurs outside New Jersey even though some of the individual games or events are held in New Jersey. A "prohibited sports event" includes all high school sports events. A "prohibited sports event" includes electronic sports and competitive video games that are sponsored by or affiliated with a high school or electronic sports and competitive video games and tournaments in which a majority of the competitors

are under 18 years of age. A "prohibited sports event" does not include sports, electronic sports, or competitive video game events in which persons under age 18 make up a minority of the participants.

"Racetrack" means the physical facility and the land, as of the effective date of P.L.2018, c. 33 (C.5:12A-10 et al.), where a permit holder conducts a horse race meeting with wagering under a license issued by the racing commission pursuant to P.L.1940, c. 17 (C.5:5-22 et seq.), and includes any former racetrack.

"Racing Commission" means the New Jersey Racing Commission established by section 1 of P.L.1940, c. 17 (C.5:5-22).

"Sports event" means any professional sport or athletic event, any Olympic or international sports competition event and any collegiate sport or athletic event, or any portion thereof, including, but not limited to, the individual performance statistics of athletes in a sports event or combination of sports events, except "sports event" shall not include a prohibited sports event or a fantasy sports activity, as defined in section 2 of P.L.2017, c. 231 (C.5:20-2). A "sports event" shall include any live competition or talent contest, including awards competitions and competitive eating contests.

"Sports pool" means the business of accepting wagers on any sports event by any system or method of wagering, including but not limited to single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange wagering, in-game wagering, in-play bets, proposition bets, and straight bets.

"Sports wagering lounge" means an area wherein a licensed sports pool is operated located in a casino hotel or racetrack.

New Jersey Statutes Annotated
Title 5. Amusements, Public Exhibitions and Meetings
Chapter 12A. Sports Wagering
5:12A-11. Issuance of sports wagering licenses and renewals; operation of sports pools; duties; report on impact of sports wagering
Effective: January 10, 2022

Currentness

**N.J.S.A. 5:12A-11**

a. The division shall issue all sports wagering licenses and renewals thereof to casinos. The racing commission shall issue all initial sports wagering licenses to racetracks but the division shall have responsibility for the renewal thereof. In addition to casino games permitted pursuant to the provisions of P.L.1977, c. 110 (C.5:12-1 et seq.), a casino which holds a sports wagering license issued by the division may operate a sports pool in accordance with the provisions of this act and applicable regulations promulgated pursuant to this act. A racetrack which holds an initial sports wagering license issued by the racing commission or a sports wagering license that has been renewed by the division may operate a sports pool in accordance with the provisions of this act and applicable regulations promulgated pursuant to this act.

The division may issue a transactional waiver to allow the continued operation of an established sports wagering lounge and authorization to conduct up to three online sports wagering operations when a racetrack that holds a license issued by the racing commission pursuant to P.L.1940, c. 17 (C.5:5-22 et seq.) undergoes a material change in ownership to a degree such that it would be required to file a new application

with the racing commission in order to continue to operate pursuant to P.L.1940, c. 17 (C.5:5-22 et seq.). A transactional waiver issued pursuant to this section shall be for an initial period of up to six months and may be renewed during the pendency of the racing commission's consideration of a new application for up to three one-year periods, but the division shall have the right to reexamine and rescind the grant of the waiver at any time.

A racetrack at which a permit holder has scheduled a standardbred horse race meeting within one year preceding the effective date of P.L.2018, c. 33 (C.5:12A-10 et al.) and that met the definition of a racetrack under P.L.2018, c. 33 (C.5:12A-10 et al.) on the effective date thereof:

> shall not be permitted to hold a sports wagering license as a former racetrack on or after the effective date of P.L.2021, c. 350, and
>
> shall, as a condition of holding a sports wagering license after the effective date of P.L.2021, c. 350, schedule annually no fewer than 151 standardbred race dates, except that the annual number of scheduled standardbred race dates may be decreased to no fewer than 75 standardbred race dates upon written consent from the Standardbred Breeders' and Owners' Association of New Jersey.

A casino which holds a sports wagering license and a racetrack which holds a sports wagering license may enter into an agreement to jointly operate a sports pool at the racetrack, in accordance with the provisions of this act and applicable regulations promulgated pursuant to this act. A casino or racetrack that holds a sports wagering license may conduct an online sports pool or may authorize an internet sports pool operator

licensed as a casino service industry enterprise pursuant to section 92 of P.L.1977, c. 110 (C.5:12-92), or an applicant for such license, to operate an online sports pool on its behalf provided the terms of the agreement are approved by the division; provided, however, that each sports wagering licensee may provide no more than three individually branded websites, each of which may have an accompanying mobile application bearing the same brand as the website for an online sports pool, those websites and mobile applications, in the case of a casino being in addition to or, in the discretion of the casino, in conjunction with, any websites and mobile applications that also offer other types of Internet gaming pursuant to P.L.2013, c. 27 (C.5:12-95.17 et seq.). No online sports pool shall be opened to the public, and no sports wagering, except for test purposes, may be conducted therein, until an Internet sports pool operator receives approval from the division to conduct an online sports pool on behalf of a casino or racetrack that holds a sports wagering license. Sports wagering licensees and operators may provide promotional credits, incentives, bonuses, complimentaries, or similar benefits designed to induce sports betters to wager. The division, in consultation with the commission, shall establish by rule standards governing the provision of these measures. The server or other equipment used by a racetrack to accept wagers at a sports pool or online sports pool shall be located in that racetrack or in any location in Atlantic City which conforms to the requirements of section 20 of P.L.2013, c. 27 (C.5:12-95.22) and any additional requirements which the division may impose by regulation. The server or other equipment used by a casino to accept wagers at a sports pool or online sports pool shall conform to the requirements of section 20 of P.L.2013, c.

27 (C.5:12-95.22) and any additional requirements which the division may impose by regulation.

With regard to this act, P.L.2018, c. 33 (C.5:12A-10 et al.), the duties specified in section 63 of P.L.1977, c. 110 (C.5:12-63) of the Casino Control Commission shall apply to the extent not inconsistent with the provisions of this act. In addition to the duties specified in section 76 of P.L.1977, c. 110 (C.5:12-76), the division or racing commission, as required pursuant to this act, shall hear and decide promptly and in reasonable order all applications for a license to operate a sports pool. In addition to the duties specified in section 76 of P.L.1977, c. 110 (C.5:12-76), the division shall have the general responsibility for the implementation of this act, except with respect to the authority to issue sports wagering licenses to a racetrack as provided by this act, and shall have all other duties specified in that section with regard to the operation of a sports pool.

The license to operate a sports pool shall be in addition to any other license required to be issued pursuant to P.L.1977, c. 110 (C.5:12-1 et seq.) to operate a casino or pursuant to P.L.1940, c. 17 (C.5:5-22 et seq.) to conduct horse racing. The division and the racing commission shall each have the authority to charge a casino or a racetrack a fee for the issuance or, in the case of the division renewal, of a sports wagering license in an amount of $100,000 for initial issuance and in the case of a renewal a reasonable fee that is based upon the expense associated with renewal, enforcement, and gambling addiction programs. No sports wagering license shall be issued by the division or racing commission to any entity unless it has established its financial stability, integrity and responsibility and its good character, honesty and integrity. No casino or racetrack shall be permitted to operate a sports pool or

accept wagers via an online sports pool unless a sports wagering lounge is established and has commenced operation in its facility; provided, however, that an applicant for a sports wagering license may petition the agency issuing the sports wagering license pursuant to this act to commence operation of the sports pool at a temporary facility and/or an online sports pool during the pendency of construction of a sports wagering lounge in its facility. Such temporary facility may include, at the discretion of the agency issuing the sports wagering license pursuant to this act, the utilization of designated windows at the current casino cage or racetrack betting window for purposes of placing sports betting wagers and self-service wagering machines located at the racetrack or casino hotel complex. No license to operate a sports pool shall be issued to any entity which is disqualified under the criteria of section 86 of P.L.1977, c. 110 (C.5:12-86).

No later than five years after the date of the issuance of a license and every five years thereafter or within such lesser periods as the agency issuing the sports wagering license pursuant to this act may direct, a licensee shall submit to the said agency such documentation or information as the division or racing commission may by regulation require, to demonstrate to the satisfaction of the agency that the licensee continues to meet the requirements of the law and regulations.

The division and the racing commission following consultation with the sports wagering licensees shall annually cause a report to be prepared and distributed to the Governor on the impact of sports wagering, including Internet wagering on sports events, on problem gamblers and gambling addiction in New Jersey. The report shall be prepared by a private organization

or entity with expertise in serving the needs of persons with gambling addictions, which organization or entity shall be selected jointly by the division and the racing commission. The report shall be prepared and distributed under the supervision of, and in coordination with, the division and the racing commission. Any costs associated with the preparation and distribution of the report shall be borne by casino and racetrack licensees who have been authorized by the division or the racing commission to conduct Internet gaming and the division and the racing commission shall be authorized to assess a fee against such licensees for these purposes. The division and the racing commission may also report periodically to the Governor on the effectiveness of the statutory and regulatory controls in place to ensure the integrity of gaming operations through the Internet.

b. A sports pool shall be operated in a sports wagering lounge located at a casino or racetrack. A sports wagering lounge may be located at a casino simulcasting facility. The lounge shall conform to all requirements concerning square footage, design, equipment, security measures and related matters which the division shall by regulation prescribe. The space required for the establishment of a lounge shall not reduce the space authorized for casino gaming activities as specified in section 83 of P.L.1977, c. 110 (C.5:12-83).

c. No sports pool or online sports pool shall be offered or made available for wagering to the public by any entity other than a sports wagering licensee, pursuant to P.L.2018, c. 33 (C.5:12A-10 et al.), an applicant for such license, operating such pool on behalf of a licensee, or an Internet sports pool operator, on behalf of a sports wagering licensee. Any person who offers a sports pool or an online sports pool without approval

of the division or racing commission to do so is guilty of a crime of the fourth degree and notwithstanding the provisions of N.J.S.2C:43-3, shall be subject to a fine of not more than $25,000 and in the case of a person other than a natural person, to a fine of not more than $100,000 and any other appropriate disposition authorized by subsection b. of N.J.S.2C:43-2.

d. The operator shall establish or display the odds at which wagers may be placed on sports events.

e. An operator shall accept wagers on sports events only from persons physically present in the sports wagering lounge; through self-service wagering machines located in its facility as authorized by the agency issuing the sports wagering license; or through an online sports pool. A person placing a wager on a sports event shall be at least 21 years of age.

f. (1) Any person who is:

an athlete, coach, referee, or director of a sports governing body or any of its member teams;

a sports governing body or any of its member teams;

a player or a referee personnel member, in or on any sports event overseen by that person's sports governing body based on publicly available information;

a person who holds a position of authority or influence sufficient to exert influence over the participants in a sporting contest, including but not limited to coaches, managers, handlers, athletic trainers, or horse trainers;

a person with access to certain types of exclusive information on any sports event overseen by that person's sports governing body based on publicly available information; or

a person identified by any lists provided by the sports governing body to the division and the racing commission,

shall not be permitted to have any ownership interest in, control of, or otherwise be employed by an operator, a sports wagering licensee, or a facility in which a sports wagering lounge is located or place a wager on a sports event that is overseen by that person's sports governing body based on publicly available information.

Any employee of a sports governing body or its member teams who is not prohibited from wagering on a sports event shall, nevertheless, provide notice to the division prior to placing a wager on a sports event. The direct or indirect legal or beneficial owner of 10 percent or more of a sports governing body shall not place or accept any wager on a sports event in which any member team of that sports governing body participates. The direct or indirect legal or beneficial owner of 10 percent or more of a member team of a sports governing body shall not place or accept any wager on a sports event in which that member team participates. Any person who violates this paragraph shall be guilty of a disorderly persons offense and shall be fined not less than $500 and not more than $1,000.

(2) The prohibition set forth in paragraph (1) of this subsection shall not apply to any person who is a direct or indirect owner of a specific sports governing body member team and (i) has less than 10 percent direct or indirect ownership interest in a casino or racetrack or (ii) the shares of such person are registered pursuant to section 12 of the Securities Exchange Act of 1934, as amended (15 U.S.C. s.78*l*), and the value of the ownership of such team

represents less than one percent of the person's total enterprise value.

(3) An operator shall adopt procedures to prevent persons from wagering on sports events who are prohibited from placing sports wagers. An operator shall not accept wagers from any person whose identity is known to the operator and:

whose name appears on the exclusion list maintained by the division pursuant to section 71 of P.L.1977, c. 110 (C.5:12-71);

whose name appears on any self-exclusion list maintained by the division pursuant to sections 1 and 2 of P.L.2001, c. 39 (C.5:12-71.2 and C.5:12-71.3, respectively);

who is the operator, director, officer, owner, or employee of the operator or any relative thereof living in the same household as the operator;

who has access to nonpublic confidential information held by the operator; or

who is an agent or proxy for any other person.

(4) An operator shall adopt procedures to obtain personally identifiable information from any individual who places any single wager in an amount of $10,000 or greater on a sports event while physically present in a racetrack facility or a casino.

Sections 1 and 2 of P.L.2002, c. 89 (C.5:5-65.1 and C.5:5-65.2, respectively) shall apply to the conduct of sports wagering under this act.

g. The holder of a sports wagering license may contract with an entity to conduct that operation, in accordance with the regulations of and approval by the division. That entity shall obtain a license as a casino service

industry enterprise prior to the execution of any such contract, and such license shall be issued pursuant to the provisions of P.L.1977, c. 110 (C.5:12-1 et seq.) and in accordance with the regulations promulgated by the division in consultation with the commission. That entity shall, upon approval of the division, expand on any initial license granted by the division prior to entering into any such contract. The approval shall be in accordance with the terms and conditions set forth by the division.

h. If any provision of this act, P.L.2018, c. 33 (C.5:12A-10 et al.), or its application to any person or circumstance, is held invalid, the invalidity shall not affect other provisions or applications of this act which can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.

i. An operator shall promptly report to the division:

any criminal or disciplinary proceedings commenced against the operator or its employees in connection with the operations of the sports pool or online sports pool;

any abnormal betting activity or patterns that may indicate a concern about the integrity of a sports event or events;

any other conduct with the potential to corrupt a betting outcome of a sports event for purposes of financial gain, including but not limited to match fixing; and

suspicious or illegal wagering activities, includeing the use of funds derived from illegal activity, wagers to conceal or launder funds derived from

illegal activity, use of agents to place wagers, or use of false identification.

The division is authorized to share any information under this section with any law enforcement entity, team, sports governing body, or regulatory agency the division deems appropriate.

j. An operator shall maintain records of sports wagering operations in accordance with regulations promulgated by the division.

k. A sports wagering licensee may, in addition to having a sports wagering lounge, conduct wagering on authorized sports events through one or more kiosks or self-service wagering stations located within its facility. Such self-service wagering stations located at a casino may offer any game authorized under rules established by the division. Such self-service wagering stations located at a racetrack may offer wagering only on authorized sports events and horse races.

l. All wagers on sports events authorized under this provision shall be initiated, received and otherwise made within this State unless otherwise determined by the division in accordance with applicable federal and State laws. Consistent with the intent of the United States Congress as articulated in the Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. s.5361 et seq.), the intermediate routing of electronic data relating to a lawful intrastate wager authorized under this provision shall not determine the location or locations in which such wager is initiated, received or otherwise made.

m. A sports wagering licensee shall not accept any wager on any sports event unless the sports event has been approved for wagering by the director. Except as otherwise provided in this subsection, no sports event

shall be approved for wagering unless the director has certified that the sports event has appropriate policies and procedures to monitor the integrity of the athletes or competitors. In the absence of such certification, the director shall impose a wager limit of not more than $100 or a win limit of $500, whichever is greater, on the amount permitted to be wagered or won on such competitions or contests by any individual.

New Jersey Statutes Annotated
Title 5. Amusements, Public Exhibitions and Meetings
Chapter 12A. Sports Wagering
5:12A-13. Division authority to regulate sports pools, online sports pools, and the conduct of sports wagering; financial stability requirements
Effective: June 11, 2018

Currentness

**N.J.S.A. 5:12A-13**

a. Except as otherwise provided by this act, the division shall have the authority to regulate sports pools, online sports pools, and the conduct of sports wagering under this act to the same extent that the division regulates casino games. No casino or racetrack shall be authorized to operate a sports pool or online sports pool unless it has produced, to the satisfaction of the agency issuing the sports wagering license, information, documentation, and assurances concerning its financial background and resources, including cash reserves, that are sufficient to demonstrate that it has the financial stability, integrity, and responsibility to operate a sports pool or online sports pool. In developing rules and regulations applicable to sports wagering, the division may examine the regulations implemented in other states where sports wagering is conducted and may, as far as practicable, adopt a similar regulatory framework. The division, in consultation with the commission, shall promulgate regulations necessary to carry out the provisions of this act, including, but not limited to, regulations governing the:

(1) amount of cash reserves to be maintained by operators to cover winning wagers;

(2) acceptance of wagers on a series of sports events;

(3) maximum wagers which may be accepted by an operator from any one patron on any one sports event;

(4) type of wagering tickets which may be used;

(5) method of issuing tickets;

(6) method of accounting to be used by operators;

(7) types of records which shall be kept;

(8) use of credit and checks by patrons;

(9) type of system for wagering;

(10) protections for a person placing a wager; and

(11) display of the words, "If you or someone you know has a gambling problem and wants help, call 1-800 GAMBLER," or some comparable language approved by the division, which language shall include the words "gambling problem" and "call 1-800 GAMBLER," in all print, billboard, sign, online, or broadcast advertisements of a sports pool and online sports pool and in every sports wagering lounge.

b. Notwithstanding any other provision of P.L.2018 c. 33 (C.5:12A-10 et al.) or of the "Administrative Procedure Act," P.L.1968, c. 410 (C.52:14B-1 et seq.), to the contrary, during the 90-day period following the effective date of this act, the division and the racing commission may, after notice provided in accordance with this subsection, summarily adopt, amend, or repeal any order, rule, or regulation for a period not to exceed 270 days for the purpose of ensuring the expeditious and effective implementation of sports wagering at casinos or racetracks in accordance with this act. Any summary rulemaking authorized by this subsection shall be subject to such terms and conditions as the division and the racing commission may deem

appropriate. Such rules shall be effective when published by the division and the racing commission on their respective websites and shall allow for the immediate application of any racetrack licensed by the racing commission, or casino licensed by the division, to the respective agency by which they are licensed or permitted, for a transactional waiver to immediately commence sports wagering. Upon the filing of such application, these rules shall further provide that, upon a showing therein that the applicant is licensed or permitted by the appropriate agency, a sports wagering license shall immediately be issued to the respective applicant allowing for its immediate commencement of sports wagering subject to the condition that it conform to the entity and individual or other licensing, facility and any other requirements set forth in the respective rules of each within 270 days. In the event such rules are not complied with within such time period, the non-complying racetrack or casino will not thereafter be eligible to conduct sports wagering until such compliance is achieved. Notice of any emergency rulemaking action taken by the division or the racing commission pursuant to this subsection shall be published in the New Jersey Register, and provided to the newspapers designated by the division and racing commission pursuant to subsection d. of section 3 of P.L.1975, c. 231 (C.10:4-8), not later than 30 days subsequent to the implementation of the emergency rules. The text of any emergency rule adopted by the division and the racing commission pursuant to this section shall be available in each racetrack, casino, sports wagering lounge, and simulcasting facility implementing the provisions of emergency rulemaking.

c. Any person employed on the effective date of this act, P.L.2018, c. 33 (C.5:12A-10 et al.), by a permitholder in the admissions department or parimutuel clerk

department of a racetrack operated by the permitholder shall be given a one-time right of first refusal offer of employment at the sports pool, including an online sports pool, that opens at that racetrack, for the then available positions of similar employment in that sports pool, or with any vendor contracting with the licensee to operate the sports pool.

New Jersey Statutes Annotated
Title 5. Amusements, Public Exhibitions and Meetings (Refs & Annos)
Chapter 12A. Sports Wagering (Refs & Annos)

5:12A-16. Taxation of sums received from sports wagering operations; amounts

Effective: July 1, 2025

Currentness

**N.J.S.A. 5:12A-16**

The sums received by the casino from sports wagering or from a joint sports wagering operation, less only the total of all sums actually paid out as winnings to patrons, shall not be taxed as gross revenue as specified under section 24 of P.L.1977, c. 110 (C.5:12-24) but shall be subject to an 8.5 percent tax, except that sums received from Internet wagering on sports events, less only the total of all sums actually paid out as winnings to patrons, shall be subject to a 19.75 percent tax, which shall be paid to the Casino Revenue Fund, and to an additional tax of 1.25 percent which shall be remitted by the State Treasurer to the Casino Reinvestment Development Authority for marketing and promotion of the City of Atlantic City, provided, however, that the cash equivalent value of any merchandise or thing of value included in a jackpot or payout shall not be included in the total of all sums paid out as winnings to patrons for purposes of determining revenue under this paragraph.

The net revenues actually received by the horse racing permit holder from any sports wagering operation at the Meadowlands Racetrack, including Internet wagering on sports events, either jointly established with a casino or established independently or with non-

casino partners, less the total of all sums actually paid out for any operating expenses and as winnings to patrons, shall be paid by the Meadowlands Racetrack to the Standardbred Breeders and Owners' Association of New Jersey and the New Jersey Thoroughbred Horsemen's Association pursuant to the terms of a written agreement between the Meadowlands Racetrack and each association. A written agreement shall be in effect for as long as a sports wagering operation is conducted at the Meadowlands Racetrack.

The net revenues actually received by the horse racing permit holder from any sports wagering operation at the Monmouth Park Racetrack, including Internet wagering on sports events, either jointly established with a casino or established independently or with non-casino partners, less the total of all sums actually paid out for any operating expenses and as winnings to patrons, shall be paid by Monmouth Park Racetrack to the New Jersey Thoroughbred Horsemen's Association pursuant to the terms of a written agreement between Monmouth Park Racetrack and that association. A written agreement shall be in effect for as long as a sports wagering operation is conducted at Monmouth Park Racetrack.

The net revenues actually received by the horse racing permit holder from any sports wagering operation at the Freehold Raceway, including Internet wagering on sports events, either jointly established with a casino or established independently or with non-casino partners, less the total of all sums actually paid out for any operating expenses and as winnings to patrons, shall be paid by Freehold Raceway to the Standardbred Breeders and Owners' Association of New Jersey pursuant to the terms of a written agreement between Freehold Raceway and that association. A written

agreement shall be in effect for as long as a sports wagering operation is conducted at Freehold Raceway.

The sums actually received by the horse racing permit holder from any sports wagering operation, either jointly established with a casino or established independently or with non-casino partners, less only the total of all sums actually paid out as winnings to patrons, shall be subject to an 8.5 percent tax, except that sums received from Internet wagering on sports events, less only the total of all sums actually paid out as winnings to patrons, shall be subject to a 19.75 percent tax, to be collected by the division and paid to the State General Fund and to an additional tax of 1.25 percent on amounts actually received from a sports wagering operation, less only the total of all sums actually paid out as winnings to patrons, to be paid, except as provided below with respect to amounts generated by the Meadowlands racetrack, to the Department of the Treasury for distribution, upon application by a municipality or county, to the municipality in which the majority of the racetrack is located and to the county in which the racetrack is located or to an economic development authority of that municipality and county with those amounts used for economic development purposes, which shall include, but not be limited to, improvements to: transportation and infrastructure, tourism, public safety, and properties located on or near the racetrack, provided, however, that the cash equivalent value of any merchandise or thing of value included in a jackpot or payout shall not be included in the total of all sums paid out as winnings to patrons for purposes of determining revenue under this paragraph. The Department of the Treasury shall establish an account for each eligible municipality and county and shall ensure that the amounts generated from the racetrack shall only be distributed to the

municipality in which the majority of the racetrack is located and county in which the racetrack is located with 0.75 percent paid to the municipality and 0.5 percent paid to the county, except that amounts generated from the Meadowlands racetrack shall be paid into the intermunicipal account, established pursuant to section 53 of P.L.2015, c. 19 (C.5:10A-53), and used to pay Meadowlands adjustment payments to municipalities in the Meadowlands district.

A percentage of the fee paid for a license to operate a sports pool shall be deposited into the State General Fund for appropriation by the Legislature to the Department of Health to provide funds for evidence-based prevention, education, and treatment programs for compulsive gambling that meet the criteria developed pursuant to section 2 of P.L.1993, c. 229 (C.26:2-169), such as those provided by the Council on Compulsive Gambling of New Jersey, and including the development and implementation of programs that identify and assist problem gamblers. The percentage shall be determined by the division.

Code of Federal Regulations
Title 17. Commodity and Securities Exchanges
Chapter I. Commodity Futures Trading Commission
Part 40. Provisions Common to Registered Entities
§ 40.11 Review of event contracts based upon certain excluded commodities.
Effective: September 26, 2011

Currentness

**17 C.F.R. § 40.11**

(a) Prohibition. A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

(1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

(2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b) [Reserved]

(c) 90–day review and approval of certain event contracts. The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in

§ 40.11(a)(1) or § 40.11(a)(2), be subject to a 90–day review. The 90–day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

(1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90–day review period. The Commission shall post on the Web site a notification of the intent to carry out a 90–day review.

(2) Final determination. The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90–day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at the conclusion of such extended period agreed to or requested by the registered entity.

New Jersey Administrative Code
Title 13. Law and Public Safety
Chapter 69N. Sports Pool and Online Sports Pool Wagering at Casinos and Racetracks
Subchapter 1. Casino Sports Wagering Licenses; Casino and Race Track Sports Wagering Operations
13:69N-1.2 General requirements for sports pools and online sports pools
Effective: July 1, 2024

Currentness

**N.J.A.C. 13:69N-1.2**

(a) A racetrack authorized to conduct a sports pool or online sports pool shall comply with all applicable requirements of:

1. N.J.A.C. 13:69D-1.1, 1.8, 1.10, 1.11, 1.14, 1.15, 2.1, 2.2, 2.3, 2.4, 2.5, and 3.1;

2. N.J.A.C. 13:69E-1.28O and 1.28R;

3. N.J.A.C. 13:69J-1.1, 1.2, 1.2B, 1.3B, 1.14, and 1.14B;

4. N.J.A.C. 13:69L-1.1 and 1.4 through 1.8; and

5. N.J.A.C. 13:69O-1.2, 1.3, 1.4, 1.7, and 1.9.

(b) No casino or racetrack licensee shall operate or accept wagers from either a sports pool or online sports pool, unless the licensee has commenced operation in a sports wagering lounge, except that:

1. Online sports wagering may commence for a period not to exceed nine months upon the approval of the Director if the lounge is under construction; and

2. Casino and racetrack sports wagering may commence upon the approval of the Director in a temporary sports pool facility for a period not to exceed

nine months if the lounge is under construction. The Director may extend the use of the temporary facility for good cause.

(c) An internet gaming affiliate may commence online sports wagering if an associated casino has commenced operation in a sports wagering lounge, except that online sports wagering may commence in a temporary sports pool facility for a period not to exceed nine months upon the approval of the Director if the lounge is under construction.

(d) A casino licensee, racetrack, or online sports wagering operator offering a sports pool or online sports pool shall maintain a cash reserve of an amount necessary to ensure the ability to cover both the outstanding unpaid winning sport pool wagers and the outstanding sport pool wagers where the outcome has not been determined. On a monthly basis, an attestation with an accounting of the required cash reserve shall be submitted to the Division.

(e) Each sports pool operator shall, prior to commencing operations, and annually thereafter, perform a system integrity and security assessment conducted by an independent professional selected by the licensee. The party performing the assessment and the scope of the assessment shall be approved by the Division. The independent professional's report on the assessment shall be submitted to the Division and shall include:

1. Scope of review;

2. Name and company affiliation of the individual(s) who conducted the assessment;

3. Date of the assessment;

4. Findings;

5. Recommended corrective action, if applicable; and

6. The operator's response to the findings and recommended corrective action.

(f) A sports pool operator shall investigate each patron complaint and provide a response to the patron within five calendar days. For complaints that cannot be resolved to the satisfaction of the patron and which are related to patron accounts, settlement of wagers, and/or illegal activity, a copy of the complaint and licensee's response, including all relevant documentation, shall be provided to the Division or New Jersey Racing Commission, as applicable.

(g) An online sports pool operator shall only accept wagers from patrons that have been affirmatively located as being physically present in the State of New Jersey at the time of their wager.

New Jersey Administrative Code
Title 13. Law and Public Safety
Chapter 69O. Internet and Mobile Gaming
Subchapter 1. General Provisions
13:69O–1.2 General requirements for Internet and mobile gaming
Effective: January 16, 2018

Currentness

**N.J.A.C. 13:69O–1.2**

(a) Internet or mobile gaming shall only be engaged in by patrons who have established an Internet or mobile gaming account.

(b) The message "If you or someone you know has a gambling problem and wants help, call 1-800-Gambler" shall be displayed prominently within the Internet or mobile gaming log on screen and a command to display this message on the log off screen shall be transmitted whenever the system detects a log off.

(c) When a patron logs on to an Internet or mobile gaming system, the system shall display the date and time of the patron's previous log on.

(d) If a patron has suspended his or her account, a casino licensee shall not send gaming-related electronic mail to such patron while the account is suspended.

(e) The Internet or mobile gaming system shall employ a mechanism to detect the physical location of a patron upon logging into the gaming system and as frequently as specified in the Internet gaming permit holder's approved submission. If the system detects that the physical location of the patron is in an area unauthorized for Internet or mobile gaming, the system shall

not accept wagers until such time that the patron is in an authorized location as follows:

1. Mobile gaming shall only occur within the property boundaries of an approved casino hotel facility. For purposes of this chapter, the approved casino hotel facility shall include any area located within the property boundaries of the casino hotel facility, including any recreation area or swimming pool, where mobile gaming devices may be used by patrons, but excluding parking garages or parking areas. A mobile gaming system shall disable all gaming activity on a client terminal whenever it is removed from the property boundaries; and

2. Internet gaming shall only occur within the State of New Jersey, unless the conduct of such gaming is not inconsistent with Federal law, law of the jurisdiction, including any foreign nation, in which the participating patron is located, or such gaming activity is conducted pursuant to a reciprocal agreement to which this State is a party that is not inconsistent with Federal law.

(f) A client terminal used for Internet or mobile gaming shall not contain patron account information or game logic that determines the outcome of any game.

(g) Client terminal software used for Internet or mobile gaming shall not contain unauthorized data collection, file extraction, malware, or any other feature that compromises the integrity of the client terminal or the data contained therein.

(h) Software utilized for Internet or mobile gaming shall either:

1. Continuously display the current time in the time zone where the game server is physically located

and the time elapsed while in the current patron session; or

2. Cause a pop-up notification, at least every half-hour, to be prominently displayed on the client terminal advising the patron of the current time and the amount of time elapsed since his or her log on.

(i) A casino licensee offering Internet wagering shall have an Internet gaming manager responsible for the operation and integrity of Internet gaming and reviewing all reports of suspicious behavior. A casino licensee offering mobile wagering shall have a mobile gaming manager responsible for ensuring the operation and integrity of mobile gaming and reviewing all reports of suspicious behavior. The Internet or mobile gaming manager shall be a key employee, however nothing shall preclude a casino licensee from having one key employee perform the functions of both the Internet and mobile gaming managers. The Internet and mobile gaming manager(s) shall immediately notify the Division upon detecting any person participating in Internet or mobile wagering who is:

1. Engaging in or attempting to engage in, or who is reasonably suspected of cheating, theft, embezzlement, collusion, money laundering, or any other illegal activities, including those activities prohibited in Article 9 of the Act;

2. Required to be excluded pursuant to N.J.S.A. 5:12–71, 5:12–71.2, or any person who is prohibited from entering a casino or a casino simulcasting facility pursuant to N.J.S.A. 5:12–119(a); or

3. Prohibited by the casino licensee from Internet wagering.

(j) A licensee shall file with the Division, internal controls for all aspects of Internet and mobile gaming operations prior to implementation and any time a change is made thereafter. The internal controls shall include detailed procedures for system security, operations, accounting, and reporting of problem gamblers.

(k) A casino licensee offering Internet or mobile gaming shall describe in its internal controls the method for securely issuing, modifying, and resetting a patron's account password, Personal Identification Number (PIN), or other approved security feature, where applicable. Any method shall include notification to the patron following any modification via electronic or regular mail, text message, or other manner approved by the Division. Such method shall include at a minimum:

1. Proof of identity, if in person;

2. The correct response to two or more challenge questions; or

3. Strong authentication.

(l) All terms and conditions for Internet or mobile gaming shall be included as an appendix to the internal controls of the licensee addressing all aspects of the operation, including the following:

1. Name of the party or parties with whom the patron is entering into a contractual relationship, including any licensee;

2. Patron's consent to have the licensee confirm the patron's age and identity;

3. Rules and obligations applicable to the patron other than rules of the game including, but not limited to:

i. Prohibition from allowing any other person to access or use his or her Internet or mobile gaming account;

ii. Prohibition from engaging in Internet or mobile wagering activity, unless they are physically present in New Jersey;

iii. Consent to the monitoring and recording by the operator and/or the Division of any wagering communications and geographic location information;

iv. Consent to the jurisdiction of the State of New Jersey to resolve any disputes arising out of Internet or mobile gaming; and

v. Prohibition against utilizing automated computerized software or other equivalent mechanism, such as a "bot," to engage in play.

4. Full explanation of all fees and charges imposed upon a patron related to gaming transactions;

5. Availability of account statements detailing patron account activity;

6. Privacy policies, including information access;

7. Legal age policy, including a statement that it is a criminal offense to allow a person who is under the age of 21 to participate in Internet or mobile wagering;

8. Full explanation of all rules applicable to dormant Internet gaming accounts;

9. Patron's right to set responsible gaming limits and to self-exclude;

10. Patron's right to suspend his or her account for a period of no less than 72 hours;

11. Actions that will be taken in the event a patron becomes disconnected from the Internet or mobile gaming system during game play;

12. Notice that a malfunction voids all pays;

13. Estimated time period for withdrawal of funds from Internet or mobile account; and

14. Information to be displayed on a patron protection page. The patron protection page shall be accessible to a patron during a patron session. The patron protection page shall contain, at a minimum, the following:

   i. Method for changing or retrieving a password or other approved access security feature and the ability to choose “strong authentication” log in protection;

   ii. Method for filing a complaint with the licensee;

   iii. Method for filing with the Division an unresolved complaint after all reasonable means to resolve the complaint with the licensee have been exhausted utilizing the Internet Dispute Form on the Division’s website;

   iv. Method for obtaining a copy of the terms and conditions agreed to when establishing an Internet or mobile gaming account;

   v. Method for the patron to obtain account and game history from the licensee;

   vi. Notification that underage gambling is a criminal offense and that anyone who facilitates someone under the age of 21 to gamble has committed a criminal offense and shall be prohibited from Internet gaming;

vii. Notification that the patron is responsible to configure his or her client terminal's auto-lock feature to protect the client terminal from unauthorized use;

viii. Notification that a patron is prohibited from allowing any other person to access or use his or her Internet or mobile gaming account;

ix. Notification of Federal prohibitions and restrictions regarding Internet gaming, specifically, any limitations upon Internet gaming as set forth in 18 U.S.C. §§ 1084 et seq. (The Wire Act) and 31 U.S.C. §§ 3163 through 3167 (UIEGA). The notice shall explicitly state that it is a Federal offense for persons physically located outside of New Jersey to engage in Internet wagering through a New Jersey casino, unless explicitly authorized by the Division ; and

x. Notification that for mobile gaming if the mobile device is removed from the property boundaries of the casino hotel facility the connection will be terminated.

(m) Whenever the terms and conditions that apply to Internet or mobile gaming are changed, the licensee shall require a patron to acknowledge acceptance of such change. Unless otherwise authorized by the Division, the patron's acknowledgement shall be date and time stamped by the Internet or mobile gaming system, as applicable.

(n) A casino operator's gaming equipment used to conduct Internet or mobile gaming shall be located, with the prior approval of the Division, as set forth below:

1. Primary gaming equipment shall be located:

i. In a restricted area on the premises of the casino hotel within the territorial limits of Atlantic City, New Jersey; or

ii. In another facility owned or leased by the casino licensee that is secure, inaccessible to the public, and specifically designed to house that equipment, and where the equipment shall be under the complete control of the casino licensee or its Internet gaming affiliate, within the territorial limits of Atlantic City, New Jersey. For the purposes of this subsection, a secure facility within Atlantic City that is owned or leased by the casino licensee to house Internet gaming equipment shall be considered to be part of the casino hotel facility notwithstanding that the facility may not be contiguous with the premises of the casino hotel.

2. Backup gaming equipment used to conduct Internet or mobile gaming may also be located:

i. Subject to Division approval, in a restricted area on the premises of a casino hotel facility within the territorial limits of Atlantic City to conduct Internet gaming for a time period not to exceed 60 days unless otherwise authorized by the Division; or

ii. In another facility owned or leased by the casino licensee that is secure, inaccessible to the public, and specifically designed to house that equipment, and where the equipment shall be under the complete control of the casino licensee or its Internet gaming affiliate, within the territorial limits of Atlantic City, New Jersey. For the purposes of this subsection, a secure facility within Atlantic City that is owned or leased by the casino

licensee to house Internet gaming equipment shall be considered to be part of the casino hotel facility notwithstanding that the facility may not be contiguous with the premises of the casino hotel.

3. Backup gaming equipment that is not used to conduct Internet or mobile gaming but which is used only to restore data to primary Internet gaming equipment may be located within the State of New Jersey.

(o) Internet or mobile gaming systems shall require a patron after 15 minutes of user inactivity, as measured by the Internet or mobile gaming system, to reenter his or her username and password.

(p) A casino licensee offering Internet or mobile gaming shall comply with all Federal requirements including, but not limited to, suspicious activity reporting and W2-G reporting.

(q) Each casino licensee offering Internet gaming shall perform an annual system integrity and security assessment conducted by an independent professional selected by the licensee, subject to the approval of the Division. The independent professional's report on the assessment shall be submitted to the Division annually and shall include:

1. Scope of review;

2. Name and company affiliation of the individual(s) who conducted the assessment;

3. Date of the assessment;

4. Findings;

5. Recommended corrective action, if applicable; and

6. Casino licensee's response to the findings and recommended corrective action.

(r) A casino licensee shall investigate each patron complaint related to Internet gaming and provide a response to the patron within five calendar days. For complaints that cannot be resolved to the satisfaction of the patron, related to patron accounts, game outcomes, and/or illegal activity, a copy of the complaint and licensee's response including all relevant documentation shall be provided to the Division. All other complaints and responses related to Internet gaming (for example, password problems, online chat disputes and technical matters) shall be provided biweekly or with such frequency approved by the Division.

(s) An Internet or mobile gaming system may offer games that do not require a wager or payment from a patron's Internet gaming account to patrons who have not exceeded any daily time-based limit, provided that the games comply with the following requirements:

1. Any game substantially similar to a game approved by the Division shall utilize a payout percentage equal to or less than the lowest payout percentage of the approved game;

2. Any game not substantially similar to a game approved by the Division shall prominently display the following prior to the start of the game and during game play:

i. The game is offered for entertainment purposes only;

ii. The game is not approved by the Division; and

iii. The game outcomes may not be representative of those for a Division-approved game; and

3. Games traditionally played on social networks that may require a payment for certain game features (social games) may be fundable or accessible from a patron's Internet gaming account provided that the operator provides a clear and conspicuous notice on the initial screen of any social game and in its terms and conditions that such social games are not regulated by the Division.

(t) An Internet or mobile gaming system shall not induce a patron to continue placing wagers when play is in session, when the patron attempts to end a session, or when the patron wins or loses a bet.

(u) An Internet or mobile gaming system shall allow patrons to access a player protection page at all times while logged into their Internet or mobile gaming account. The player protection page shall include all features listed in (l)14 above.

(v) Employees of an Internet gaming operator who perform activities such as Internet casino accounting, patron identification and verification, problem gaming detection, anti-money laundering detection, fraud prevention, or other similar functions and that require access to confidential patron account information shall be physically present in New Jersey absent a showing of compelling need by the Internet gaming operator that the employee should be located elsewhere. Such need shall be documented by filing a written notice to the Division detailing the employee's location, job function, and information access rights.

(w) Internet gaming operators and related vendors shall be prohibited from retaining patron account information without the expressed written consent of the Internet gaming permit holder.

(x) All Internet gaming operators with employees who have direct contact with patrons via phone, e-mail, electronic chat, or other means, shall implement training for those employees, at the start of their employment and at regular intervals thereafter, addressing areas set forth in (y)1 through 3 below. If the training requirement under this subsection follows the standards set forth by the Council on Compulsive Gambling of New Jersey it shall be deemed sufficient.

1. Recognizing the nature and symptoms of problem gambling behavior and how to assist players in obtaining information regarding help for a gambling problem and self-exclusion programs;

2. Responding to patrons who may disclose that they have a gambling problem; and

3. Responding to reports from third parties, such as family members, about patrons who may have a gambling problem.

(y) Internet gaming operators shall promptly notify all affected Internet gaming managers of any issues impacting the integrity of Internet gaming operations.

(z) Each Internet gaming site shall display a responsible gaming logo in a manner approved by the Division to direct a patron to the site's responsible gaming page. The responsible gaming page shall be accessible to a patron during a patron session and shall contain, at a minimum, the following:

1. A prominent message, which states "If you or someone you know has a gambling problem and wants help, call 1-800-Gambler";

2. A direct link to the Council on Compulsive Gambling New Jersey, Inc., and one other organization

based in the United States dedicated to helping people with potential gambling problems;

3. A clear statement of the Internet gaming operator's policy and commitment to responsible gaming;

4. Information regarding the subjects in (z)4i through iv below, or a direct link to information regarding the following subjects, if available, from an organization based in the United States dedicated to helping people with potential gambling problems:

i. Practical tips to stay within safe limits;

ii. Myths associated with gambling;

iii. Information regarding the risks associated with gambling; and

iv. The potential signs of a gambling problem; and

5. Rules governing self-imposed responsible gaming limits and the ability for the patron to establish those limits.

(aa) Internet gaming operators shall employ personnel responsible for the duties of an IT department as detailed by N.J.A.C. 13:69D-1.11(b)3 and 2.

**APPENDIX D**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Case No.: 25-cv-2152

KALSHIEX LLC,

*Plaintiff,*

vs.

MARY JO FLAHERTY, in her official capacity as Interim Director of the New Jersey Division of Gaming Enforcement; NEW JERSEY DIVISION OF GAMING ENFORCEMENT; JAMES T. PLOUSIS, in his official capacity as Chairman of the New Jersey Casino Control Commission; ALISA COOPER, in her official capacity as Vice Chair of the New Jersey Casino Control Commission; JOYCE MOLLINEAUX, in her official capacity as Commissioner of the New Jersey Casino Control Commission; NEW JERSEY CASINO CONTROL COMMISSION; and MATTHEW J. PLATKIN, in his official capacity as Attorney General of New Jersey,

*Defendants.*

COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF

INTRODUCTION

1. This action challenges the state of New Jersey's intrusion into the federal government's "exclusive" authority to regulate futures derivatives

trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). The New Jersey Division of Gaming Enforcement is seeking to prevent Plaintiff KalshiEX LLC ("Kalshi") from offering certain event contracts for trading on its federally regulated exchange. New Jersey's attempt to regulate Kalshi intrudes upon the federal regulatory framework that Congress established for regulating futures derivatives on designated exchanges. New Jersey law is both field-preempted and conflict-preempted. This Court should therefore issue both a preliminary and a permanent injunction, as well as declaratory relief to that effect.

2. Commodity futures regulation has long been under the exclusive purview of the federal government. In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives. In 1974, Congress established a federal agency called the CFTC to oversee it.

3. The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of futures derivatives on exchanges overseen by the CFTC. The text of the statute gives the CFTC "exclusive jurisdiction" over federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). During the CEA's drafting process, Congress deleted a provision that would have granted states concurrent jurisdiction over futures derivatives. *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge). One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork of 51 different—and potentially conflicting—state laws. *Commodity Futures Trading*

*Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry,* 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark). And the statute gives the CFTC comprehensive authority over regulated exchanges, including the authority to approve or reject event contracts as against the public interest.

4. For that reason, courts have easily found state laws preempted in similar contexts. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995). The CFTC itself agrees. It informed the U.S. Court of Appeals for the D.C. Circuit just a few months ago that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a [designated contract market]" like Kalshi. CFTC Brief at *27, *KalshiEx LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

5. Two New Jersey agencies—the New Jersey Division of Gaming Enforcement and the New Jersey Casino Control Commission—are threatening to intrude on the comprehensive federal scheme for regulating designated exchanges. Kalshi is a federally-designated and approved derivatives exchange, subject to the CFTC's exclusive jurisdiction. It offers consumers the chance to invest in many types of event contracts, including, as relevant here, sports-outcome contracts. These contracts are subject to extensive oversight by the CFTC, and—critically—they are *lawful* under federal law. Two months ago, the CFTC allowed Kalshi's sports-outcome contracts to take effect without review.

6. Even though Kalshi's contracts are lawful under the federal law that exclusively governs them, Defendants are threatening to shut down these contracts in New Jersey *immediately*. Defendants' actions would subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent and would interfere with the CFTC's exclusive authority to regulate futures derivatives contracts in the exchanges it oversees. For that reason, Defendants' actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has occupied the entire field of regulating futures derivatives on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal policy.

7. Kalshi is entitled to declaratory and injunctive relief to prevent New Jersey authorities from enforcing their preempted state laws against Kalshi.

8. The New Jersey authorities' actions threaten immediate and irreparable harm, not just to Kalshi but to its customers. Shutting down its event contracts in New Jersey would threaten Kalshi's viability and require devising complex technological solutions whose feasibility is entirely untested and unclear. Defendants' acts would also impair Kalshi's existing contracts with consumers, subject Kalshi's users to uncertainty and loss, and undermine confidence in the integrity of Kalshi's platform. For that reason, concurrently with the filing of this complaint, Kalshi seeks an emergency temporary restraining order and preliminary injunction to avoid immediate and irreparable harm that would result from Defendants' unlawful acts.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution. The federal question presented is whether New Jersey gambling laws are preempted by the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

10. The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. The Eleventh Amendment does not bar "suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law." *Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002).

11. Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). The Individual Defendants perform their duties and thus reside in this District. The New Jersey Division of Gaming Enforcement and New Jersey Casino Control Commission are entities subject to this Court's personal jurisdiction and thus reside in this District. A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

12. Plaintiff Kalshi is a financial services company with its principal place of business in New York. Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts. Its exchange market is federally regulated by the

Commodity Futures Trading Commission pursuant to the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq*.

13. Defendant Mary Jo Flaherty is sued in her official capacity as the Interim Director of the New Jersey Division of Gaming Enforcement.

14. Defendant New Jersey Division of Gaming Enforcement is sued as the independent state agency within the Attorney General's office that, among other things, (1) promulgates rules and regulations for the licensing and operation of gaming in the state of New Jersey, (2) enforces state laws and regulations governing gaming in the state, and (3) monitors day-to-day casino operations to ensure regulatory compliance and investigate potential violations.

15. James T. Plousis is sued in his official capacity as Chairman of the New Jersey Casino Control Commission.

16. Alisa Cooper is sued in her official capacity as Vice Chair of the New Jersey Casino Control Commission.

17. Joyce Mollineux is sued in her official capacity as Commissioner of the New Jersey Casino Control Commission.

18. The New Jersey Casino Control Commission is sued as the independent state agency that licenses New Jersey casinos and their key employees. As a quasi-judicial panel, the Commission entertains hearings on contested licensing matters and appeals from decisions of the New Jersey Division of Gaming Enforcement.

19. Defendant Matthew J. Platkin is sued in his official capacity as Attorney General of New Jersey.

## FACTUAL ALLEGATIONS

### A. An Event Contract—Like Other Derivatives—Is A Recognized Financial Tool To Mitigate Risk.

20. Derivatives contracts are financial tools used to mitigate risk. Event contracts are a quintessential example of a derivatives contract—they are a type of option. This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025. A purchaser may trade on either the "yes" or the "no" position on the Los Angeles earthquake contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

21. Event contracts are traded on an exchange. Traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house."

22. The value of an event contract is determined by market forces. An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period, individuals can buy and sell the contract at its fluctuating prices. The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs,

the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

23. Traders price event contracts by reference to available information at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by datapoints the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

24. Event contracts are a valuable means to hedge risk against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure on real-world events in an uncertain market. There is no other financial instrument with the unique capability to capture the risks of an event with economic consequences. A property owner in Los Angeles County might purchase an earthquake event contract because the payoff would offset economic losses in the event an earthquake occurs.

25. Event contracts should not be mistaken for insurance. While insurance covers property losses, event contracts can cover a wider range of possible economic fallout like temporary shelter, a decline in

rental income, or short-term cost increases for basic needs due to shortages generated by an earthquake.

26. Event contracts are also valuable means of communicating information to the general public because contract prices reflect prevailing market opinions and conditions. Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions. The data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event.

B. Congress Delegated The Power To Regulate Event Contracts That Are Offered By A Regulated Exchange To The Commodity Futures Trading Commission.

27. Futures contracts have long been regulated by the federal government. In 1936, Congress passed the CEA which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

28. In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA. Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves" which would lead to the undesired outcome that national futures exchanges might be subject to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156. One Senator remarked that "different State laws would just lead to total chaos." Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen.

Clark). As a solution, the House Committee on Agriculture put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading. *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge).

29. To offer derivatives for public trading, an entity must seek and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). An entity must first submit an application to the CFTC detailing how the entity complies with the core principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. 17 C.F.R. § 38.3(a)(2).

30. Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive

jurisdiction" over the derivatives that are traded on those regulated markets. 7 U.S.C. § 2(a)(1)(A). Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." *Id.* This exclusive jurisdiction extends to "event contracts." *See id.* § 1a(47)(A)(ii), (iv), (vi).

31. Once an exchange is designated as a CEA-compliant contract market, the market is subject to an extensive framework for CFTC oversight. Part 38 of Title 17, Chapter 1 of the U.S. Code comprehensively regulates designated contract markets, ensuring that these markets continue to comply with the CEA. Exchanges must meet detailed requirements to maintain good standing as designated contract markets. 17 C.F.R. pt. 38. Among other things, designated contract markets must abide by recordkeeping requirements that specify the form, manner, and duration of retention. 17 C.F.R. §§ 38.950, 1.31. Designated contract markets must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. 17 C.F.R. § 38.450, pt. 16. Specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more are also detailed in Part 38. A designated contract market must comply with all these requirements to comply with the CEA and remain in good standing before the CFTC. 7 U.S.C. § 7(d); 17 C.F.R. pt. 38.

32. As long as the designated contract market abides by the requirements set forth in the CEA, it may list contracts on its exchange without pre-approval from the CFTC. Instead, the exchange may self-certify that the contract complies with applicable law by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). Within 10 days, the CFTC reviews the reports and may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). If the CFTC does not take action within the ten-day probationary period, the contract automatically becomes "effective." *See* 7 U.S.C. § 7a-2(c)(2).

33. Alternatively, exchanges may submit contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA. 7 U.S.C. § 7a-2(c)(5)(B).

34. The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on designated contract markets. The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for designated contract markets. The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or administrative proceedings. If the Division concludes that there has been a violation of the CEA, it may recommend to the Commission that it seek a wide range of enforcement measures including civil monetary penalties, restitution, disgorgement, the suspension, denial, revocation, or restriction of regis-

tration and trading privileges, and injunctions or cease-and-desist orders. *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3. If the Division suspects that an entity has engaged in criminal violations, the Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution. *Id.*

35. The CFTC regulates derivatives in products like "wheat, cotton, rice, corn, oats," as well as "excluded commodities" like interest rates, certain financial instruments, economic indices, risk metrics, and events. 7 U.S.C. § 1a(9), (19)(i)–(iv). The CFTC regulates event contracts as a type of derivative referencing an "excluded commodity." *See id.* § 1a(47)(A)(ii), (iv), (vi); *see KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-3257 (JMC), 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024). "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i). Events themselves constitute "excluded commodities" under the CEA and are defined as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv).

36. In 2010, Congress amended the CEA to address event contracts specifically. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

C. After An Extensive Regulatory Process, The CFTC Registered Kalshi As A Contract Market That Operates Under Federal Law.

37. Kalshi is a regulated exchange and prediction market where users can buy and sell event contracts. In 2020, the CFTC unanimously certified Kalshi as a designated contract market, affirming that its platform complied with the CEA. Since then, Kalshi has been fully regulated as a financial exchange under federal law alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

38. Kalshi specializes in event contract trading, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

39. Kalshi offers many kinds of events contracts related to an array of substantive areas like climate, technology, health, crypto, popular culture, and economics. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. Kalshi offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

40. Among its menu of event contracts, Kalshi offers sports-outcome contracts.

41. In accordance with 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. §§ 40.2(a), Kalshi self-certified and began listing sports-related contracts on its exchange on January 24, 2025. Kalshi's sports-related contracts allow users to place positions on which teams will

advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship. The CFTC has authority to review and prohibit contracts involving gaming if it concludes that they are "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but the CFTC declined to review Kalshi's sports-related contracts. Unless and until the CFTC takes action on Kalshi's sports-related contracts, they remain authorized under federal law.

42. Several other federally regulated exchanges began listing sports-related event contracts around the same time period. In response, the CFTC exercised its power to commence review of a sports-related event contract offered by NADEX/crypto.com—a designated contract market that the CFTC certified under the name HedgeStreet in 2004. The CFTC initiated its 90-day review period of the sports-related contracts on January 14, 2025. The Commission requested that NADEX/crypto.com suspend its sports-related contracts during the pendency of the review. But the CFTC never made a similar request to Kalshi.

D. The New Jersey Division of Gaming Enforcement Threatened Kalshi With Legal Action With Regard To Its Sports-Related Event Contracts.

43. On the afternoon of March 27, 2025, the New Jersey Division of Gaming Enforcement (the "Division") sent a cease and desist letter to Tarek Mansour, Kalshi's Chief Executive Officer. The Division informed Kalshi that it had "accessed [Kalshi's] mobile application and website . . . and [had] determined that [Kalshi] is listing unauthorized sports wagers for individuals located within the

State of New Jersey." Exhibit 1, at 1. It claimed that Kalshi's conduct "constitutes a violation of the New Jersey Sports Wagering Act." *Id.* (citing N.J.S.A. 5:12A-11). The Division added that the state statute "only permits licensed entities to offer sports wagering to patrons located in New Jersey." *Id.*

44. Additionally, the Division asserted that "Kalshi is currently offering unauthorized sports wagering to New Jersey residents on collegiate sporting events occurring in New Jersey in violation of the New Jersey Constitution." *Id.* (citing N.J. Const. Art. IV, § 7, ¶ 2(D)).

45. The Division declared that its March 27, 2025 letter served "as official notice that Kalshi, by facilitating and/or accepting unauthorized sports wagering from individuals within the State of New Jersey, is engaging in activity that is unlawful under not only New Jersey law, but New Jersey's Constitution." *Id.* The Division further "demand[ed] that [Kalshi] immediately cease and desist from offering any form of sports wagering to New Jersey residents and void any such wagers already placed." *Id.* The Division "reserve[d] the right to pursue any appropriate sanctions if [Kalshi] fail[ed] to take immediate corrective action as demanded[.]" *Id.* at 2.

46. The Division instructed that Kalshi halt its sports event-based contracts operation in New Jersey by 11:59 PM on March 28, 2025, and that failure to do so would "result in the Division taking further enforcement actions, which may include any measures available under New Jersey law." *Id.* at 2.

47. Several hours after receiving the Division's cease and desist letter, Kalshi's counsel and representatives of the Division discussed the Division's

concerns regarding Kalshi's sports-based event contracts in New Jersey, including contracts related to upcoming collegiate basketball games. The Division demanded that Kalshi unwind any existing contracts relating to those games and cease offering them in the state going forward. Kalshi agreed to examine the feasibility of addressing the Division's concerns overnight but stressed that its offerings are federally regulated financial products not subject to state-by-state regulation.

48. Counsel for Kalshi and Division representatives met again on the morning of March 28, 2025. Kalshi relayed to the Division its conclusion that it was infeasible for the platform to unwind existing contracts related to the collegiate basketball games occurring simultaneously with the Division's request. Moreover, Kalshi expressed its concern that if it complied with the Division's demands to deny New Jersey users access to its platform, Kalshi risked losing its registration as a designated contract market with the CFTC. As Kalshi explained, it could not disregard federal law regulating—and possessing exclusive jurisdiction over—the derivatives contracts on its exchange.

49. Still hoping to find a mutually agreeable solution, however, Kalshi's counsel undertook to determine whether Kalshi could accommodate any of the Division's concerns.

50. Kalshi's counsel and the Division representatives met again that afternoon in an attempt to reach a mutually agreeable solution.

51. That evening, however, Kalshi and the New Jersey authorities were unable to reach an agreement regarding the authorities' cease and desist

letter. With the resulting prospect of liability to which Kalshi was subject without relief, Kalshi filed this complaint the next day.

REQUISITES FOR RELIEF

52. As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject Kalshi and its customers to irreparable harm.

53. An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein will result in irreparable injury to Plaintiffs, including but not limited to criminal liability, economic hardship, and impairment of existing contractual relationships.

54. Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Plaintiffs therefore seek declaratory and injunctive relief restraining Defendants from enforcing New Jersey law that interferes with the operation and function of Plaintiff's futures market described herein.

COUNT I

(Supremacy Clause—Preemption By Commodity Exchange Act)

55. Plaintiff incorporates all prior paragraphs by reference.

56. The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in

> Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

57. The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

58. Congress explicitly gave the CFTC the "exclusive jurisdiction" to regulate futures trading on approved exchanges. 7 U.S.C. § 2(a)(1)(A). Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos." Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges. *See, e.g., Am. Agric. Movement*, 977 F.2d at 1156; *Jones v. B.C. Christopher & Co.,* 466 F.Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.,* 459 F.Supp. 733, 737 (N.D. Cal. 1978).

59. In threatening to enforce N.J.S.A. 5:12A-11 and N.J. Const. Art. IV, § 7, ¶ 2(D) against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "against the public interest," 7 U.S.C.

§ 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same subject matter. Because federal law occupies the entire field of regulating futures trading on regulated markets, the threatened actions are field-preempted under the Supremacy Clause.

60. New Jersey authorities likewise threatened to deploy New Jersey law in a manner that conflicts with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized, which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

61. Defendants may therefore not enforce New Jersey's gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 et seq.

PRAYER FOR RELIEF

WHERFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1. Enter a judgment declaring that N.J.S.A. 5:12A-11, N.J. Const. Art. IV, § 7, ¶ 2(D), and any other New Jersey law that is used in a manner to effectively regulate Plaintiff's designated futures market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2. Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents,

servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing that N.J.S.A. 5:12A-11, N.J. Const. Art. IV, § 7, ¶ 2(D), and any other New Jersey law that attempts to effectively regulate Plaintiff's futures market, against Plaintiff;

3. Any other relief within this Court's discretion that it deems just and proper.

Dated this 29th day of March, 2025.

/s/ Gurbir S. Grewal

Gurbir S. Grewal
Milbank LLP
55 Hudson Yards
New York, New York 10001
Telephone: 212-530-5775
Facsimile: 212-530-5775

Neal Kumar Katyal (pro hac vice pending)
Joshua B. Sterling (pro hac vice pending)
William E. Havemann (pro hac vice pending)
Milbank LLP
1850 K Street, Suite 1100
Washington D.C. 20006
Telephone: 202-835-7505
Facsimile: 213-629-5063

Mackenzie Austin (pro hac vice pending)
Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: 424-386-4000
Facsimile: 213-629-5063

ATTORNEYS FOR PLAINTIFF

VERIFICATION

I, Xavier Sottile, Head of Markets at KalshiEx LLC, hereby declare under penalty of perjury that the following statements made by me are true and correct.

1. I am the Head of Markets of Plaintiff, KalshiEx, LLC, in this matter.
2. I have reviewed the Verified Complaint.
3. I know or believe that all the factual allegations of which I have personal knowledge are true.
4. I believe that all the factual allegations of which I do not have personal knowledge are true based on information and belief, documents, or both.

/s/ Xavier Sottile__________
Xavier Sottile

Dated: March 28, 2025

# EXHIBIT D

No. 25-7187

# In The United States Court of Appeals for the Ninth Circuit

---

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D / B / A CRYPTO.COM | DERIVATIVES NORTH AMERICA,

*Plaintiff-Appellant,*

v.

THE STATE OF NEVADA, ET AL.,

*Defendants-Appellees*,

NEVADA RESORT ASSOCIATION,

*Intervenor-Defendant-Appellee.*

---

On Appeal from the United States District Court for the District of Nevada,
Case No. 2:25-cv-00978-APG-BNW

---

**AMICUS BRIEF OF COMMODITY FUTURES TRADING COMMISSION, A FEDERAL GOVERNMENT AGENCY, IN SUPPORT OF APPELLANT AND IN SUPPORT OF REVERSAL**

Tyler S. Badgley, *General Counsel*
Anne Stukes, *Acting Deputy General Counsel*
Carlin Metzger, *Assistant General Counsel*
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5127
*Counsel for Amicus Curiae*
*Commodity Futures Trading Commission*

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE .......... 1

BACKGROUND .......... 3

I. The Commodity Exchange Act Provides the Regulatory Framework for Commodity Derivatives Market in the United States. .......... 3

II. The Development of Federal Regulation of U.S. Futures and Swaps Markets. .......... 5

*A. The Origins of Federal Oversight of Derivatives Regulation.* .......... 5

*B. Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974.* .......... 8

*C. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction after 1974.* .......... 9

*D. Congress Embraced Preemption as to Swaps Transactions in the Dodd Frank Act.* .......... 13

ARGUMENT .......... 14

I. Event Contracts Trading on CFTC-Regulated Markets Is Subject to the CFTC's Exclusive Jurisdiction. .......... 14

*A. Under the Plain Language of CEA Section 1(a)(47), Event Contracts Are "Swaps."* .......... 14

*B. Sports Event Contracts Are Associated with Potential Financial, Economic, and Commercial Consequences.* .......... 19

II. The CEA Preempts Other Federal and State Actors from Exercising Regulatory Authority over Swaps, Including Event Contracts, on CFTC-Regulated Markets. .......... 21

*A. The CEA Was Intended to, and Does, Occupy the Field of Regulating Commodity Derivatives Exchanges.* ....21

*B. The "Savings Clause" in CEA § 2(a)(1)(A) Does Not Nullify Its Field Preemptive Effect; It Preserves Traditional State Powers over State-Regulated Gambling.* ....24

*C. State Gambling Laws Are Conflict Preempted.* ....26

III. Subjecting Derivatives Listed on a CFTC-Registered DCM to State Regulation Would Have Destabilizing Economic Effects. ....28

CONCLUSION ....29

# TABLE OF AUTHORITIES

Cases

*Alabama Power Co. v. Costle*,
636 F.2d 323 (D.C. Cir. 1979)....................19

*Ali v. Federal Bureau of Prisons*,
552 U.S. 214 (2008)....................14

*Altria Group, Inc. v. Good*,
555 U.S. 70 (2008)....................22, 27

*American Agriculture Movement, Inc. v. Board of Trade of Chicago*,
977 F.2d 1147 (7th Cir. 1992)....................22

*Arizona v. United States*,
567 U.S. 387 (2012)....................21

*Board of Trade of Chicago v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905)....................2, 6

*Bostock v. Clayton County, Ga.*,
590 U.S. 644 (2020)....................15

*Chicago Mercantile Exchange v. SEC*,
883 F.2d 537 (7th Cir. 1989)....................23

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888)....................6

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000)....................26

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
622 F.2d 216 (6th Cir. 1980),
*aff'd Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982)....................23

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933)....................7

*Duke Energy Trading & Marketing, LLC v. Davis*,
267 F.3d 1042 (9th Cir. 2001) ....................................................................21

*Effex Capital, LLC v. National Futures Association*,
933 F.3d 882 (7th Cir. 2019) ......................................................................22

*English v. General Electric Co.*,
496 U.S. 72 (1990) ....................................................................................26

*Florida Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963) ..................................................................................26

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) ....................................................................25

*Hillman v. Maretta*,
569 U.S. 483 (2013) ..................................................................................26

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ....................................................................................26

*Hughes v. Talen Energy Marketing, LLC*,
578 U.S. 150 (2016) ..................................................................................21

*Hunter v. FERC*,
711 F.3d 155 (D.C. Cir. 2013) ....................................................................25

*International Trading, Ltd. v. Bell*,
556 S.W.2d 420 (Ark. 1977) ......................................................................23

*Irwin v. Williar*,
110 U.S. 499 (1884) ....................................................................................5

*Leist v. Simplot*.
638 F.2d 283 (2d Cir. 1980) ......................................................................22

*Los Angeles Memorial Coliseum Commission v. NFL*,
726 F.2d 1381 (9th Cir. 1984) ....................................................................19

*Nevada, et al. v. Coinbase Financial Markets, Inc.*,
No. 26-OC-0030-1B (Nev. 1st Judic. Dist. Feb. 5, 2026) ................................ 2-3

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
515 F. Supp. 202 (N.D. Ala. 1981) ....................23

*Pennsylvania v. National Collegiate Athletic Association*,
948 F. Supp. 2d 416 (M.D. Pa. 2013) .................... 19-20

*Point Landing, Inc. v. Omni Capital International, Ltd.*,
795 F.2d 415, 422 (5th Cir. 1986),
*aff'd sub nom. Omni Capital International, Ltd. v. Rudolf Wolff & Co.*,
484 U.S. 97 (1987)....................23

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947)....................27

*Richardson v. Kruchko & Fries*,
966 F.2d 153 (4th Cir. 1992)....................21

*Rumsey v. Berry*,
65 Me. 570 (Me. 1876) ....................6

*Stuber v. Hill*,
170 F. Supp. 2d 1146 (D. Kan. 2001) ....................23

*Texas v. Monex International, Ltd.*,
527 S.W.2d 804 (Tex. Civ. App. 1975),
*writ refused* (Dec. 17, 1975) ....................23

*Time Warner Cable v. Doyle*,
66 F.3d 867 (7th Cir. 1995)....................22

*Transcontinental Gas Pipe Line Co. v. Pennsylvania Environmental Hearing Board*,
108 F.4th 144 (3d Cir. 2024)....................21

<u>Statutes</u>

7 U.S.C. §§ 1-26, CEA §§ 1-23 ....................1

7 U.S.C. § 1a(9), CEA § 1a(9)....................16

7 U.S.C. § 1a(47), CEA § 1a(47)....................14

7 U.S.C. § 1a(47)(A), CEA § 1a(47)(A) ........................................................14

7 U.S.C. § 1a(47)(A)(i), CEA § 1a(47)(A)(i) ................................................14

7 U.S.C. § 1a(47)(A)(ii), CEA § 1a(47)(A)(ii) ..............................................14

7 U.S.C. § 1a(47)(A)(iv), CEA § 1a(47)(A)(iv) ............................................14

7 U.S.C. § 1a(47)(A)(vi), CEA § 1a(47)(A)(vi) ............................................14

7 U.S.C. § 1a(47)(B), CEA § 1a(47)(B) ........................................................16

7 U.S.C. § 2(a)(1), CEA § 2(a)(1)..............................................................1, 19

7 U.S.C. § 2(a)(1)(A), CEA § 2(a)(1)(A)............................................ 1, 4, 13, 21-25

7 U.S.C. § 2(d), CEA § 2(d)..........................................................................13

7 U.S.C. § 5, CEA § 3 .....................................................................................1

7 U.S.C. § 6(a), CEA § 4(a) ............................................................................4

7 U.S.C. § 13a-2, CEA § 6d ..........................................................................10

31 U.S.C. § 5362(1)(E)(ii) ..............................................................................24

Commodity Exchange Act,
Pub. L. No. 74-675, 49 Stat. 1491 (1936).........................................................7

Commodity Futures Trading Commission Act of 1974,
Pub. L. No. 93-463, 88 Stat. 1389 (1974) .........................................................8

Commodity Futures Modernization Act of 2000,
Pub. L. No. 106-554, 114 Stat. 2763A-365 (2000)...........................................12

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. No. 111-203, 124 Stat. 1376 (2010)......................................................13

Future Trading Act of 1921,
Pub. L. No. 67-66, 42 Stat. 187 (1921)...............................................................6

Futures Trading Act of 1978,
Pub. L. No. 95-405, 92 Stat. 865 (1978)............................................................10

Futures Trading Act of 1982,
Pub. L. No. 97-444, 96 Stat. 2294 (1982)........................................................11

Futures Trading Practices Act of 1992,
Pub. L. No. 102-546, 106 Stat. 3590 (1992)....................................................11

Grain Futures Act of 1922,
Pub. L. No. 67-331, 42 Stat. 998 (1922)........................................................ 6-7

Regulations

17 C.F.R. § 1.3 ..............................................................................................16

17 C.F.R. § 32.2(a)..........................................................................................16

17 C.F.R. § 38.151(b).......................................................................................26

17 C.F.R. § 40.2 .............................................................................................28

CFTC Commodity Options,
77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012) ..............................................16

CFTC Further Definition of "Swap", "Security Based-Swap", and "Security-Based Swap Agreement"; Mixed Swaps; Security Based-Swap Agreement Recordkeeping,
77 Fed. Reg. 48208, 48209 (Aug. 13, 2012) ...................................................18

CFTC Concept Release on the Appropriate Regulatory Treatment of Event Contracts,
73 Fed. Reg. 25669, 25671 (May 7, 2008).......................................................18

Legislative Materials

H. Rep. No. 67-1095 (1922) (Conf. Rep.) ..........................................................7

H.R. Rep. No. 93-975 (1974)...............................................................................1

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.),
*as reprinted in* 1974 U.S.C.C.A.N. 5894..........................................................9

H.R. Rep. No. 97-565 (1982), pt 1,
*as reprinted in* 1982 U.S.C.C.A.N. 3871....................................................10, 11

H.R. Rep. No. 102-978 (1992) (Conf. Rep.),
*as reprinted in* 1992 U.S.C.C.A.N. 3179 .......... 12

S. Rep. No. 67-871 (1922) .......... 5

S. Rep. No. 93-1131 (1974),
*as reprinted in* 1974 U.S.C.C.A.N. 5843 .......... 1

S. Rep. No. 95-850 (1978),
*as reprinted in* 1978 U.S.C.C.A.N. 2087 .......... 10

120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974)
(statement of Sen. Curtis) .......... 9

156 Cong. Rec. S5923 (daily ed. July 15, 2010)
(statement of Sen. Lincoln) .......... 18

Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric., 93d Cong., 1st Sess. 121 (1973) ........ 7-8

Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark) .......... 9

Other Authorities

CFTC, Designated Contracts Markets (DCMs),
https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations?Status=Designated&Date_From=&Date_To=&Show_All=1 .......... 5, 20

CFTC, Futures Glossary,
https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm .......... 16

CFTC, History of the CFTC,
https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html .......... 5

*Event*, Merriam-Webster.com,
https://www.merriam-webster.com/dictionary/event .......... 15

*Contingency*, Merriam-Webster.com,
https://www.merriam-webster.com/dictionary/contingency .......... 15

John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977) ....................6

Ryan Grandeau, *Securing the Best Odds: Why Congress Should Regulate Sports Gambling Based on Securities Style Mandatory Disclosure*, 41 Cardozo L. Rev. 1229, 1247 (2000)....................19

William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848 (U.M. Rose ed., 1884)....................6

## INTEREST OF AMICUS CURIAE

The Commodity Futures Trading Commission ("CFTC" or "Commission") is the federal agency charged with administering and enforcing the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §§ 1-26. Congress created the CFTC in 1974 to establish a uniform national system for regulating futures trading after concluding that the existing patchwork of state-by-state regulation had critically impaired the development and functioning of national commodities markets. *See* H.R. Rep. No. 93-975, at 51 (1974); S. Rep. No. 93-1131, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5885. "[T]ransactions subject to [the CEA] are entered into regularly in interstate and international commerce and are affected with a national public interest," including in "liquid, fair, and financially secure trading facilities." 7 U.S.C. § 5.

Congress vested the CFTC with "exclusive jurisdiction" to protect that national interest by overseeing the regulation of futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). The CFTC's jurisdiction "supersedes State as well as Federal agencies" because commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, surveillance, and enforcement of financial instruments traded in these markets to prevent the type of fragmented oversight at risk in this case. *See* S. Rep. No. 93-1131 (1974), *reprinted in* 1974 U.S.C.C.A.N. at 5848.

Appellees' views and the district court's decision, if accepted, present a fundamental threat to Congress's statutory design. As Justice Holmes presciently noted in 1905:

> People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value is well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain.

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 247-48 (1905).

States cannot invade the CFTC's exclusive jurisdiction over CFTC-regulated designated contract markets ("DCMs") by re-characterizing swaps trading on DCMs as illegal gambling. The decision below is inconsistent with the text, structure, and history of the CEA and, if affirmed, would reintroduce precisely the regulatory fragmentation Congress deliberately displaced.

It is Appellees' theory of the case that presents a seismic shift in the longstanding status quo between CFTC and state authority. This court need only look at many of these same parties' temporary restraining order against Coinbase, where they requested, and received, an injunction barring the offering of "event-based contracts relating to sporting *and other events*." Ex Parte Temporary

Restraining Order at 2, 7 *Nevada, et al. v. Coinbase Financial Markets, Inc.*, No. 26-OC-0030-1B (Nev. 1st Judic. Dist. Feb. 5, 2026) (emphasis added) (prohibiting Coinbase "from offering or facilitating the offering of event contract[s] in Nevada"). Unable to articulate any limiting principle to their theory, they have upended decades of well-settled and Congressionally-mandated exclusive jurisdiction across the full spectrum of event contracts.

While subsequent litigation may require resolution of complicated follow-on questions, this case presents two narrow, yet exceptionally important, questions: (1) are Appellant's CFTC exchange-traded event contracts swaps, and (2) may such swaps also be regulated, or prohibited, under state law, thereby displacing the CEA's express preemption of state and other federal laws or rules? The CFTC submits this brief to assist the Court in resolving these fundamental issues.

## BACKGROUND

### I. The Commodity Exchange Act Provides the Regulatory Framework for Commodity Derivatives Markets in the United States.

The CEA is a federal statute that provides the comprehensive federal framework governing transactions in United States commodity derivatives markets. A derivative is a financial instrument, the value of which depends on (*i.e.*, is derived from) the value of some underlying asset, index, or other measure. In general, market participants use derivatives to hedge risks or speculate on commodity price movements. The most common derivatives are "futures

contracts" and "swaps." While derivatives markets are distinct from "cash" or "physical" markets in which the assets themselves are bought and sold, the prices of those assets and derivatives are typically closely linked. If a price disparity arises, arbitrageurs will take advantage of the difference, and the gap disappears. In the ordinary course, these price movements contribute to "price discovery," the mechanism by which supply and demand set the price of a commodity.

A futures contract is a standardized agreement to purchase or sell a "commodity" at a future date for a price determined at the contract's inception. Although the CEA uses the term of art "contract[] of sale of a commodity for future delivery," most contracts are structured for financial settlement and are discharged by executing a contract that reverses the obligation to purchase or sell. *See, e.g.*, 7 U.S.C. § 2(a)(1)(A). Under the CEA, a futures contract must be traded on a DCM, the statutory term for a registered derivatives exchange. 7 U.S.C. § 6(a). A swap includes a broad array of financial instruments, such as "event contracts." Swap transactions are also traded on CFTC-registered DCMs.

Futures markets originated in the United States at transportation hubs for agricultural products like grain, butter, and eggs. Over time, exchanges began to offer contracts for other physical commodities like metals, oil, and gas, and later introduced cash-settled futures linked to less tangible measures like interest rates and price indices. While the range of underlying commodities has expanded (and

continues to do so) over time, the fundamental regulatory structure governing futures markets has remained consistent. Today there are 24 exchanges (DCMs) in the United States, including North American Derivatives Exchange d/b/a Crypto.com.[1]

## II. The Development of Federal Regulation of U.S. Futures and Swaps Markets.

### *A. The Origins of Federal Oversight of Derivatives Regulation.*

By the mid-nineteenth century, exchanges in major commodity trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation.[2] But there was tension between state regulation of gambling and the growth of futures markets. States and courts often failed to distinguish between futures trading and "gambling" or "wagering," with many states even prohibiting futures trading as a

---

[1] *See* CFTC, Designated Contracts Markets (DCMs), https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations?Status=Designated&Date_From=&Date_To=&Show_All=1 (last visited February 8, 2026).

[2] *See* CFTC, History of the CFTC, https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html (last visited February 8, 2026); *see also Regulating Transactions on Grain-Future Exchanges*, S. Rep. No. 67-871, at 3 (1922): "Transactions in grain futures are utilized by the public for speculation and by the grain trade for the purpose of eliminating or reducing, as far as practicable, the hazards in the merchandising of grain and its products and by-products due to price fluctuations. Public speculation helps to carry the risk for the producers, dealers, and millers who wish to hedge their cash grain transactions."

form of gambling. *See, e.g., Irwin v. Williar*, 110 U.S. 499, 508-09 (1884) (describing futures contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain"); *see also Rumsey v. Berry*, 65 Me. 570, 574 (Me. 1876) (finding futures contracts to be void as contrary to public policy). For example, an Arkansas law declared that "[t]he buying or selling or otherwise dealing in what is known as futures . . . with a view to profit, is hereby declared to be gambling" and made dealing in futures illegal. *See* William W. Mansfield, *A Digest of the Statutes of Arkansas* § 1848 (U.M. Rose ed., 1884).

Nevertheless, the Supreme Court and Congress acknowledged that futures markets served a valuable economic function and should be given room to develop. A futures contract's "value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices and providing for periods of want." *Bd. of Trade of Chi.*, 198 U.S. 236 at 247-48.[3] And Congress ultimately centralized the oversight and regulation of futures trading on federally regulated contract markets. The first federal legislation designed to create a comprehensive federal regulatory framework for futures markets was the Future Trading Act of 1921, Pub. L. No.

---

[3] Even after the Supreme Court recognized the legitimacy of futures trading on organized exchanges, states continued to characterize commodity futures markets as illegal gambling. *See* John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977).

67-66, 42 Stat. 187 (1921) ("21 Act"), followed by the Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922) ("22 Act"). In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, despite concerns by some members of Congress who objected to the proposed law because it would interfere with state police powers. H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.).

But the Supreme Court found that this preemptive design was not sufficiently explicit in the statute, which resulted in states continuing to regulate or even prohibit futures trading. *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198-99 (1933) (rejecting "the contention that Congress occupied the field in respect to contracts for future delivery; and that necessarily all state legislation in any way dealing with that subject is superseded.") And when Congress expanded federal oversight of futures markets in 1936 with the Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936), the boundary between federal and state authority remained unsettled as futures markets expanded beyond their agricultural origins. Market participants continued to face the persistent threat of state prosecution through a patchwork of state laws and regulations.

In 1973, futures exchanges recommended that "federal policy . . . be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." Review of Commodity Exch. Act and

Discussion of Possible Change: Hearings Before the H. Comm. on Agric*.*, 93d Cong., 1st Sess. 121 (1973). And the very next year, Congress explicitly spoke on the question in the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 88 Stat. 1389 (1974) ("74 Act").

### *B. Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974.*

The 74 Act amendments to the CEA worked a sea change in the regulation of U.S. derivatives markets in three critical ways. First, Congress established the CFTC, vesting in it the authority to administer the CEA. Second, Congress expanded the scope of the CEA to cover "all commodities." Third, Congress expressly gave the CFTC "exclusive jurisdiction" over U.S. commodity futures and options markets. The 74 Act amended Section 2 of the CEA to provide that "the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' . . ., and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market." 74 Act, Section 201(b), 88 Stat. at 1395 (codified at 7 U.S.C. § 2(a)(1)).

Preemption was an express goal of the 74 Act. Congress recognized the need for uniform nationwide regulation of futures and options markets because

concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos."[4] Potential limiting language was stricken from the statute "to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis). All commodity futures markets were to be under the CFTC's exclusive jurisdiction. The 74 Act "preempt[ed] the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11.

### *C. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction After 1974.*

Amendments to the CEA between 1978 and 2010 repeatedly reinforced and clarified the CFTC's exclusive jurisdiction over futures and options. In the Futures Trading Act of 1978 ("78 Act"), Congress preserved the CFTC's exclusive authority over futures transactions on CFTC-registered DCMs while clarifying the states' ability to pursue certain violations of the CEA against actors other than federally regulated exchanges. The 78 Act added a section to the CEA authorizing

---

[4] See Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

states to bring actions for injunctive or monetary relief for specified violations of the CEA and to enforce their "general civil or criminal antifraud" statutes. *See* 78 Act, Pub. L. 95-405, § 15(7), 92 Stat. 865, 873 (1978).[5] Other than this explicit authorization of state authority, the CEA retained the broad preemption of state laws put in place in 1974. Proposals to carve off pieces of the CFTC's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority." S. Rep. No. 95-850, at 111-12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11. Just because "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC." *Id*. Congress also further added to the list of justifications supporting exclusive jurisdiction citing concerns over "costly duplication and possible conflict of regulation or over-regulation." *Id.*

The Futures Trading Act of 1982 (the "82 Act") further clarified the scope of the CEA's preemption of other federal and state laws and the role of the states in pursuing illegal or fraudulent off-exchange transactions, while still recognizing "the CFTC['s] exclusive jurisdiction to regulate futures trading and enforce the

---

[5] This "Jurisdiction of the States" provision is now found in CEA Section 6d, 7 U.S.C. § 13a-2. The language of subsection (7) remains the same in the current version of the CEA.

provisions of the Act, thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, at 44-45 & 102-03 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3893-94 & 3951-52. First, the 82 Act clarified the procedures for states to pursue violations of the CEA's anti-fraud provisions in state court. Second, the 82 Act clarified the role of states with respect to off-exchange futures transactions. Language was added to permit "criminal prosecution under any federal criminal statute" or the application of federal or state laws to *off-exchange* transactions or *unregistered* market participants. 82 Act, Pub. L. 97-444, § 229, 96 Stat. 2294, 2318 (1982). The broad preemption of other potentially applicable state or federal laws remained as to transactions *on* DCMs and as to market participants registered with the CFTC. *See* H.R. Rep. No. 97-565, at 44-45 & 102-103, 1982 U.S.C.C.A.N. at 3893-94, 3951-52. Adding again to the reasons for exclusive jurisdiction, the Committee report noted it "was done in recognition of the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform enforcement of the Act" before ultimately concluding that "[t]he Committee . . . continues to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures."

In 1992, Congress began grappling with the advent of a new type of derivative financial product, swaps. In the Futures Trading Practices Act of 1992 ("92 Act"), Pub. L. 102-546, 106 Stat. 3590 (1992), Congress gave the CFTC

authority to "exempt" certain off-exchange ("over-the-counter" or "OTC") swap transactions from the CEA's mandatory exchange trading regime for futures and options. The 92 Act added language to CEA Section 12(e) to preempt the application of state gambling and bucket shop laws as applied to OTC derivatives (swaps) transactions that the CFTC exempted pursuant to its new authority in CEA Section 4(c). While the 82 Act allowed the states authority to apply state and local laws to off-exchange transactions, the 92 Act limited this authority at least as to off-exchange swaps that received an exemption from the CFTC. The goal was to provide "legal certainty under both the Act and state gaming and bucket shop laws for transactions covered by the terms of an exemption." H.R. Rep. No. 102-978, at 80 (1992) (Conf. Rep.), *reprinted in* 1992 U.S.C.C.A.N. 3179, 3212.

The next evolution of the scope of the CEA occurred in 2000 with the passage of the Commodity Futures Modernization Act of 2000 ("CFMA"), Pub. L. No. 106-554, Appendix E & § 103, 114 Stat. 2763A-365, 2763A-377 (2000). The CFMA exempted or excluded swap transactions from the CEA's exchange trading requirements. However, in so doing, the CFMA also preempted the application of state and local laws to those "excluded" swap transactions. The preemption of state and local laws as to on-exchange transactions remained as is, and the preemption of state and local laws as to off-exchange transactions (exempt or excluded swaps) was expanded.

### *D. Congress Embraced Preemption as to Swaps Transactions in the Dodd Frank Act.*

In the wake of the 2008 financial crisis, Congress created a framework within the CEA for the on-exchange execution, clearing and reporting of vast portions of the previously "OTC" swaps markets. In the 2010 Dodd-Frank Act, Congress expressly extended the CFTC's "exclusive jurisdiction" to encompass "transactions involving swaps."[6] The Dodd-Frank Act also added a new subsection, 2(d), which specifies that certain CEA provisions do not apply to swaps. Section 2(d) eliminated the concurrent jurisdiction of states as to off-exchange swap transactions. The authority for state regulation of swaps (whether on- or off-exchange) is now based on Section 12(e)(2), which applies to any swap that the CFTC may exempt pursuant to Section 4(c). This new preemption model is consistent with the one originally created in 1974 for commodity futures, *except* this model was even broader. Congress did not carve out a role for states to regulate off-exchange swaps through a grant of concurrent jurisdiction, despite having done so for off-exchange commodity futures in 1982.

* * *

[6] *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A).

## ARGUMENT

### I. Event Contracts Trading on CFTC-Regulated Markets Is Subject to the CFTC's Exclusive Jurisdiction.

#### *A. Under the Plain Language of CEA Section 1(a)(47), Event Contracts Are "Swaps."*

After Dodd-Frank, the statutory definition of "swap" is deliberately broad. As such, it encompasses event contracts within multiple sub-definitions of CEA § 1a(47)(A). CEA § 1a(47)(A)(i) defines the term "swap," in relevant part, to include "any agreement, contract, or transaction . . . that is a[n] . . . option of any kind that is for the purchase or sale, or based on the value, of 1 or more . . . quantitative measures, or other financial or economic interests or property of any kind," and CEA § 1a(47)(A)(ii) defines swap to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."[7]

Congress's use of the word "any" in multiple sub-definitions of § 1a(47) confirms the statute's breadth. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008) (observing that the word "any," read naturally carries an expansive

---

[7] *See also* §§ 1a(47)(A)(iv) (including transactions "commonly known to the trade as swaps") and (vi) ("any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)").

meaning). The word "*any*" in the swap definition reflects a conscious decision to avoid a narrow construction that could limit the purpose of derivatives markets. Thus, as an example, an event contract that is settled based on the outcome of a sporting event is therefore an agreement providing for a payment dependent on a future occurrence, and nothing in the statutory text excludes such instruments.

The plain meaning of the statute includes event contracts even though the terms "event" and "contingency" are undefined. Where a statute does not define a term, courts interpret it according to its ordinary meaning. *Bostock v. Clayton County, Ga.,* 590 U.S. 644, 654-55 (2020). Dictionary definitions confirm the breadth of the relevant terms "event" and "contingency." An event is "something that happens: occurrence,"[8] and a "contingency" is an "event that may but is not certain to occur."[9] The final score of a sporting event is a future occurrence whose outcome is uncertain until the game concludes and falls easily within the broad language of the swap definition as well as the broad definitions of "event" or "contingency." Moreover, Congress did not limit covered swaps to binary outcomes; instead, it expressly encompassed contracts measured by the *extent* of the occurrence of an event. This broad language encompasses contracts based on the margin of victory or any other quantifiable result of a sports event.

---

[8] https://www.merriam-webster.com/dictionary/event.
[9] https://www.merriam-webster.com/dictionary/contingency.

An event contract is also a binary option. See 17 C.F.R. 1.3 (defining commodity option). A binary option is a "type of option whose payoff is either a fixed amount or zero. For example, there could be a binary option that pays $100 if a hurricane makes landfall in Florida before a specified date and zero otherwise." CFTC Futures Glossary, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#B (last visited Feb. 17, 2026). Commodity option transactions must be conducted in compliance with the CEA and the Commission's regulations related to swaps. 17 C.F.R. 32.2(a); *see also* Commodity Options, 77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012) ("the swap definition . . . includes options . . . (whether or not traded on a DCM)").

Importantly, when Congress has limited the Commission's jurisdiction over derivatives it has only done so by expressly embedding narrow exclusions in the statutory commodity definition itself (*i.e.*, onions and movie box office receipts).[10] Here, Congress wrote specific, enumerated exclusions into the definition of swap in § 1a(47)(B), confirming that when it intended to limit the Commission's jurisdiction, it did so expressly, not by inviting courts or states to create additional, atextual carve-outs.[11]

---

[10] *See* 7 U.S.C. § 1a(9).

[11] 7 U.S.C. § 1a(47)(B) (excluding, inter alia, physically settled forward transactions, certain insurance and consumer arrangements, and other ordinary-course commercial agreements).

The CEA's text is designed to account for financial innovation. Futures were novel at one point. But even as financial derivatives markets have developed and grown, Congress has chosen to vest the CFTC with broad jurisdiction. That a derivative is novel or different cannot be an excuse for a Court to re-write existing law. The law should be faithfully applied. And if it needs to be amended, that is the job of Congress, not the Courts.

Excluding event contracts from the definition of swap would leave no principled boundary preventing any other event-based derivatives, including currently listed contracts tied to weather, energy, economic indices, and political outcome contracts, from falling outside the CEA. The consequences of such a ruling would be immediate and substantial. States could characterize any derivative as prohibited gambling, thereby subjecting nationally (and internationally) traded swaps to a patchwork of state restrictions. This concern is not hypothetical. Nevada's cease and desist letter to KalshiEX LLC at issue in a related case orders it to "immediately cease and desist from offering any event-based contracts in Nevada," without limitation to sports. If Nevada's approach were permitted to stand, event contracts referencing agricultural, metal, energy, and financial outcomes could likewise all become subject to state-by-state bans across the country. The resulting market fragmentation would erode the nationally uniform framework Congress established to reduce risk, promote transparency, and

safeguard market integrity within the financial system. *See* Further Definition of "Swap", "Security-Based Swap", and "Security-Based Swap Agreement"; Mixed Swaps; Security Based-Swap Agreement Recordkeeping, 77 Fed. Reg. 48208, 48209 (Aug. 13, 2012).

The CFTC has treated event contracts as measuring the level of the outcome of an event for nearly two decades.[12] Moreover, Congress deliberately adopted an expansive definition of "swap" following the 2008 financial crisis to ensure a comprehensive regulatory oversight of derivatives markets. *See* 156 Cong. Rec. S5923 (daily ed. July 15, 2010) (Statement of Sen. Lincoln) ("Section 721 includes a broad and expansive definition of the term 'swap' that is subject to the new regulatory regime established in Title VII."). Nothing in the statutory text or legislative history suggests that the occurrence of an event, or extent of its occurrence, excludes an event's outcome. The swap definition is written broadly to capture contracts that shift risk based on uncertain future developments. Event contracts do exactly that.

[12] *See* Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669, 25671 (May 7, 2008).

### *B. Sports Event Contracts Are Associated with Potential Financial, Economic, and Commercial Consequences.*

As the statutory definition makes clear, the relevant inquiry is intentionally broad. The statute is framed in expansive terms, requiring only that the contract be "associated with *potential* financial, economic, or commercial consequence." That definitional framework reflects Congress's recognition that derivatives markets serve a wide spectrum of market participants whose economic exposures are not limited to any specific market participant. *See Alabama Power Co. v Costle*, 636 F.2d 323, 353 (D.C. Cir. 1979) (recognizing that "potential . . . will always and inherently exceed actual"). Because the statute does not demand certainty, sports event contracts fall comfortably within the statute's reach.

Broadly speaking, sporting events are economic enterprises that generate billions of dollars in economic activity and materially affect both regional and national markets. *See* Ryan Grandeau, *Securing the Best Odds: Why Congress Should Regulate Sports Gambling Based on Securities-Style Mandatory Disclosure*, 41 Cardozo L. Rev. 1229, 1247 (2020). Stadiums function as regional economic anchors around a network of businesses, including hotels, restaurants, transportation providers, retailers, and event management firms. *See, e.g.*, *Los Angeles Mem'l Coliseum Comm'n v. NFL,* 726 F.2d 1381, 1397 (9th Cir.1984) (discussing claim that a professional sporting team's presence generates local business activity) and *Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp.

2d 416, 433 (M.D. Pa. 2013) (summarizing the Commonwealth's allegations that the sanctions would cause a loss of football-related hospitality revenue for surrounding businesses). For these reasons, hotels likely adjust pricing models, restaurants expand staffing to accommodate increased demand, vendors increase supply orders, and cities allocate resources to accommodate projected crowds. All of these decisions pose economic risk, which is precisely the type of economic exposure that derivatives markets are designed to mitigate.[13]

The issues presented on appeal do not require this Court to resolve the outer limits of the definition of a swap or engage in line drawing between a swap and a wager. That line drawing exercise presents complicated fact questions concerning the exact structure and mechanics of the instruments, who is the price maker, the difference between an open exchange and a bilateral arrangement, and unrelated legal questions, including the applicability of the CEA to purely intrastate transactions, among others. It is sufficient to resolve this case that the transactions conducted on a CFTC-registered DCM qualify as swaps under the CEA.

---

[13] *See, e.g.,* KalshiEx's "February 2026 Sportsbook Hedging Rebate Program" filing with the CFTC, available on the CFTC's website at: https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationRules/59640 (last visited 2/17/2026).

## II. The CEA Preempts Other Federal and State Actors from Exercising Regulatory Authority Over Swaps, Including Event Contracts, on CFTC-Regulated Markets.

CEA § 2(a)(1)(A)'s "exclusive jurisdiction" includes "transactions involving swaps" trading on a CFTC-registered DCM. The "exclusive jurisdiction" provision of 7 U.S.C. § 2(a)(1) preempts application of state gambling laws to event contracts trading on DCMs governed by the CEA, whether the question is evaluated as a matter of field preemption or conflict preemption. Congress intended the CFTC to have exclusive jurisdiction over federally registered DCMs and transactions conducted on those exchanges, displacing state gambling laws that would otherwise apply.

### *A. The CEA Was Intended to, and Does, Occupy the Field of Regulating Commodity Derivatives Exchanges.*

Where Congress has declared federal authority to be exclusive, state laws attempting to regulate the same subject matter must give way. *See Arizona v. United States*, 567 U.S. 387, 399 (2012); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *Duke Energy Trading & Mktg., L.L.C. v. Davis,* 267 F.3d 1042, 1057 (9th Cir. 2001); *see also Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-52 (3d Cir. 2024) (an "explicit statutory conferral of exclusive jurisdiction . . . withdraws any concurrent jurisdiction"), *Richardson v. Kruchko & Fries,* 966 F.2d 153, 158 (4th Cir. 1992) (state-law claims preempted where they fell within federal agency's "exclusive jurisdiction").

The inquiry does not turn on whether Congress anticipated every possible form of state interference; it turns on whether state law intrudes into a field Congress has reserved to federal regulation. While not needed given the explicit statutory language, preemptive intent may be inferred "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Such is the case here. CEA § 2(a)(1)(A) makes plain that Congress intended the CEA to occupy the field of "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market . . . or any other board of trade, exchange, or market." When an instrument is trading on a CFTC-regulated market as a "swap" or "future," state gambling laws do not apply.

CEA § 2(a)(1)(A)'s "exclusive jurisdiction" over futures and swaps traded on a DCM "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). "Precisely, preemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. Nat'l Futures Ass'n,* 933 F.3d 882, 894 (7th Cir. 2019) (quoting *Am. Agric. Movement, Inc v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995)). Offering event contracts on a DCM cannot, in and of itself,

be an activity that is unlawful under any state law. "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001).

This is not a new or novel concept. For decades courts have recognized that the CEA preempts application of other federal or state laws to instruments trading on CFTC-regulated markets.[14] Again, this is part and parcel of Congress's intent

---

[14] *See Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 544, 548 (7th Cir. 1989) (recognizing that the CFTC is "the sole lawful regulator" where "its jurisdiction is exclusive"--i.e., if the at-issue derivative falls within Section 2(a)(1)(A)'s reach); *Point Landing, Inc. v. Omni Cap. Int'l, Ltd.*, 795 F.2d 415, 422 (5th Cir. 1986), *aff'd sub nom. Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987) (finding the CEA preempted private rights of action under securities laws because "[a]ny other result would frustrate the intent of Congress to preempt the field insofar as futures regulation is concerned."); *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982) ("[T]he thrust of the [CEA's exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation."); *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 205-06 (N.D. Ala. 1981) (holding that the CEA preempted private plaintiff's counterclaim under Alabama gambling statute purporting to void all futures transactions in which delivery of the commodity is not intended); *Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (1977) (finding the "vesting of exclusive jurisdiction is a clear indication that Congress intended no regulation in this field except under the authority of the [A]ct"); *Texas v. Monex Int'l, Ltd.*, 527 S.W.2d 804, 806 (Tex. Civ. App. 1975), *writ refused* (Dec. 17, 1975) (holding the CEA preempted Texas securities laws over margined commodity transactions).

for the CEA to occupy the field of commodity derivatives, as the very purpose of the 74 Act was to "assure that Federal preemption is complete." 120 Cong. Rec. S. 30,458, 30,464 (daily ed. Sept. 9, 1974) (statement of Sen. Curtis). That the instruments at issue here involve swaps on sports events does not change the preemption framework.[15]

### *B. The "Savings Clause" in CEA § 2(a)(1)(A) Does Not Nullify its Field Preemptive Effect; It Preserves Traditional State Powers Over State-Regulated Gambling.*

The grant of "exclusive jurisdiction" in § 2(a)(1)(A) does not permit a state to define federally regulated derivatives transactions as illegal under state law. The "savings clause" in § 2(a)(1)(A) does not nullify this conclusion. Specifically, that subsection provides, "[e]xcept as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred . . . on . . . other regulatory authorities under the laws of the United States or of any State," or "(II) restrict . . . such other authorities from carrying out their duties and responsibilities in accordance with such laws," or "supersede or limit the jurisdiction conferred on courts of the United States or any State."

---

[15] Notably, the Unlawful Internet Gambling Enforcement Act of 2006 specifically excludes transactions "conducted on or subject to the rules of a registered entity" under the CEA, reinforcing the field-preemptive effect of the CFTC's exclusive jurisdiction. 31 U.S.C. § 5362(1)(E)(ii).

As a matter of plain language interpretation, this "savings clause" only applies "[e]xcept as hereinabove provided" in CEA § 2(a)(1)(A). That means other laws that would ordinarily apply outside the field of "accounts, agreements . . . and transactions . . . traded or executed on a contract market" still apply, just not to transactions that are trading on CEA-governed markets. *FTC v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001) (observing that other agencies like the FTC "retain their jurisdiction over all matters beyond the confines" of "accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery") (quoting CEA § 2(a)(1)(A)). The "savings clause" preserves traditional, non-conflicting state powers, but does not empower states to use state powers against transactions on CEA-governed markets. *Hunter v. FERC*, 711 F.3d 155, 159 (D.C. Cir. 2013) ("To be clear, there are limits to what comes within CEA section 2(a)(1)(A)'s orbit, but once a scheme crosses the statute's event horizon, the CFTC has exclusive jurisdiction."). Thus the "savings clause" does not allow states to prohibit the very types of contracts that the CFTC is exclusively empowered to regulate.

Properly interpreted, the "savings clause" means that the CEA does not displace traditional state authority to enforce state criminal or civil antifraud laws, nor does it displace state authority to regulate purely intrastate conduct or transactions. But the CEA explicitly displaces state attempts to regulate swaps that

are conducted on a CFTC-registered contract market. To the specific question in this case, the CEA expressly bars state laws from regulating or prohibiting these transactions that are conducted on CFTC-regulated DCM.

***C. State Gambling Laws Are Conflict Preempted.***

Application of gambling laws is also preempted under the concept of conflict preemption. State law is pre-empted "to the extent of any conflict with a federal statute." *Hillman v. Maretta*, 569 U.S. 483, 490 (2013) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)). Conflict preemption occurs when compliance with both federal and state law is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 66-67 (1941). Field preemption can be understood as a type of conflict preemption, because a state law falling within a preempted field conflicts with Congress's intent to exclude state regulation, making the categories not "rigidly distinct." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990).

Here, gambling laws are preempted under both impossibility and obstacle conflict preemption. As for impossibility, a DCM is required by federal law to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). If a state bans the contract, the DCM cannot fulfill its federal

mandate to provide impartial national access. As for obstacle preemption, gambling laws often require local licensing, fees, and specific hardware (like localized servers). Applying state-by-state local requirements to national commodity exchanges would create the very "patchwork" that Congress set out to prevent.

Nor does the presumption against preemption alter this conclusion. Even accepting arguendo that regulation of gambling is a historic police power of the states, the Court should not apply a presumption against preemption. The entire purpose of the exclusive jurisdictional provision in CEA § 2(a)(1)(A) is to provide national uniformity for derivatives trading and to prevent 50 different states from undermining this national regulatory structure by claiming derivatives markets are subject to state gambling laws. Congress's "clear and manifest purpose" was indeed to preempt these historic police powers. *Altria Grp., Inc.*, 555 U.S. at 77 (noting "the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress") (quoting *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947)).

The plain language of the text, underscored by the consistent legislative history to preempt states from applying 50 state requirements on national markets, indicates this "clear and manifest purpose" to preempt state police powers.

## III. Subjecting Derivatives Listed on a CFTC-Registered DCM to State Regulation Would Have Destabilizing Economic Effects.

If this Court holds that sports event contracts listed on CFTC-registered DCMs do not qualify as swaps or are outside the CFTC's exclusive jurisdiction within the meaning of the statute, the consequences would not be confined to a single category of event contracts. The interpretation would redraw the statutory boundary Congress established to ensure a comprehensive federal oversight of derivatives markets, inviting the public to characterize an expanding universe of event contracts as beyond the CEA's reach. At least eight DCMs have collectively self-certified with the CFTC more than 3,000 event based contracts with the CFTC pursuant to CFTC Rule 17 C.F.R. § 40.2, with a notable increase in such filings during the last two years.[16] Importantly, the vast majority of these contracts are tied to non-sport outcomes involving measurable commodity indicators, including cryptocurrency price levels and related indices, GDP releases, benchmark interest-rate decisions, election outcomes, temperature forecasts, electricity usage, and the price movements of precious metals. *Id.* These event contracts rest on objectively measurable outcomes no less than sports event contracts. A finding excluding such

---

[16] *See* CFTC Designated Contact Market Products, *available at* https;//www.cftc.gov/IndustryOversight/Industry Filings/TradingOrganizationProducts?Organization=CM (last visited February 13, 2026).

contracts from the definition of swap would therefore risk destabilizing the settled expectations upon which these markets depend, fostering uncertainty in an area where Congress sought uniformity and regulatory clarity. It could introduce the "chaos" Congress sought to prevent by providing the CFTC with exclusive jurisdiction over futures trading in 1974. Because even modest ambiguity in the scope of the CEA can move rapidly through interconnected financial markets, the CFTC respectfully requests that the Court not adopt a construction that could generate systemic consequences for CEA preemption far removed from the case at hand.

## CONCLUSION

For the foregoing reasons, the CFTC respectfully submits that this Court should reverse and remand the judgment of the district court.

Dated: February 17, 2026

Respectfully Submitted,

/s/ Anne Stukes
D.C. Bar 469446
Tyler S. Badgley, *General Counsel*
Anne Stukes, *Acting Deputy General Counsel*
Carlin Metzger, *Assistant General Counsel*
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5127

**CERTIFICATE OF COMPLIANCE**

I certify that, pursuant to Fed. R. App. 29(a)(5), the foregoing brief complies with the type-volume limitations, in that it has 6,652 words, excluding the parts of the brief, exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in proportionally spaced typeface using Microsoft Word 365 and is set in 14-point sized Times New Roman type style.

/s/ Anne Stukes

## CERTIFICATE OF SERVICE

I certify that on February 17, 2026, I electronically filed this Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

/s/ Anne Stukes

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

HO-CHUNK NATION,

Plaintiff,

v.

KALSHI INC., KALSHIEX LLC,
ROBINHOOD MARKETS, INC. and
ROBINHOOD DERIVATIVES LLC,

Defendants.

OPINION and ORDER

25-cv-698-wmc

---

Plaintiff Ho-Chunk Nation, a federally-recognized Indian tribe, filed this lawsuit to prohibit defendants Kalshi Inc. and KalshiEX LLC (collectively, "Kalshi") and Robinhood Derivatives LLC, and Robinhood Markets, Inc. (collectively, "Robinhood") from offering online sports betting on its tribal land. Specifically, plaintiff claims that: (1) the sports-related "event contracts" that defendants offer on their nationwide prediction markets amount to unlawful gaming in violation of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701-2721 ("IGRA"); (2) Kalshi's advertisements for "legal" sports betting are false or misleading in violation of the Lanham Act, 15 U.S.C. § 1125; and (3) all defendants are engaged in criminal racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c). Early in the case, defendants filed a motion to dismiss, which the court granted as to plaintiff's claims under the Lanham Act and RICO, but denied as to the IGRA claims. (Op. & Order (dkt. #97).) Plaintiff also filed a motion for a preliminary injunction, which the court denied after finding that, although plaintiff had shown a likelihood of success on the merits of its IGRA claim, it had not shown irreparable harm absent preliminary injunctive relief. (*Id.*)

Now before the court is plaintiff's motion to amend its complaint to replead its Lanham Act claims to include allegations that defendants' statements about the legality of sports betting are false under IGRA as well. (Dkt. #99.) That motion will be denied for the reasons set forth below. Also before the court is defendants' motion for a certificate of appealability and to certify for interlocutory appeal the court's order denying in part and granting in part their motion to dismiss. (Dkt. #101.) Because the issue here is novel, as well as percolating up to federal courts of appeals around the country and likely to the Supreme Court, that motion will be granted and this case will be stayed pending the outcome of defendants' interlocutory appeal.

OPINION

**I. Plaintiff's Motion for Leave to File an Amended Complaint**

Plaintiff's original Lanham Act claim was for false advertising based on Kalshi's allegedly false offering of *legal* sports betting in all 50 states. But the court dismissed that claim because under the current state of the law, there is no "clear and unambiguous" authority resolving whether Kalshi's sports event contracts are legal. *See Coastal Abstract Service, Inc. v. First American Title Insurance. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) ("Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons … purport[ing] to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact."); *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484, 489 (D.C. Cir. 1996) (there must be a definitive statement from the relevant governing agency that "the law was unambiguous *at the time [the] alleged misstatements were made*" (emphasis in original)). As this court explained in dismissing plaintiff's Lanham Act claim, courts have so far reached

"mixed opinions" as to the legality of Kalshi's sports event contracts. (Op. & Order (dkt. #97) 27). Since that dismissal, several more courts have weighed in, again with mixed results. *Compare KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *7, 14 (9th Cir. Aug. 28, 2026) (holding that "[t]he CEA likely does not preempt Nevada's gaming regulations as applied to Kalshi's sports event contracts[,]" and "accepting Kalshi's argument that Congress delegated its power to regulate gambling (a power traditionally exercised by the States and Tribes) to the CFTC … would create a major-questions problem"), and *CFTC v. Wisconsin*, *et al.*, No. 26-C-749, 2026 WL 2474512, at *11 (E.D. Wis. July 29, 2026) ("CFTC has not shown that it is likely to prevail on its argument that the CEA's definition of 'swaps' covers the event contracts offered by entities such as Kalshi"), *with United States v. Minnesota*, No. 26-CV-2661 (KMM/DTS), 2026 WL 2150211, at *12 (D. Minn. July 27, 2026) (granting Kalshi's motion for preliminary injunction on grounds that CEA likely preempts state gambling law).

Nonetheless, plaintiff contends that it should be allowed to revive its false advertising claim by pleading that *IGRA*, 25 U.S.C. § 2710(d)(3), as opposed to state or other federal law, provides "definitive guidance that sports betting is not legal in all 50 states on Kalshi." (Plt.'s Br. (dkt. #99) 2.) Specifically, plaintiff argues that IGRA provides clear and unambiguous language prohibiting class III gaming on tribal lands unless expressly authorized by the tribe or conducted in conformance with a tribal-state compact. However, IGRA's statutory language is not as "definitive" or "unambiguous" as plaintiff asserts with respect to the legality of Kalshi's sports event contracts. Not only does that statute *not* expressly address multiple, complex questions at issue here, including whether Congress must authorize federal regulation of gambling before an agency may claim that right, but to date, the only two courts to have considered the specific question regarding IGRA and online sports events contracts have

reached differing conclusions. *Compare* Op. & Order (dkt. #97) 8, *with Blue Lake Rancheria v. Kalshi Inc.*, 2025 WL 3141202, at *6 (N.D. Cal. Nov. 10, 2025) (finding that IGRA does not govern Kalshi's sports event contracts). Moreover, there have been no "definitive" decisions regarding whether the CEA may preempt IGRA on the issue of so-called "sports events contracts" now listed on a derivative exchange. Thus, even though this court concluded that plaintiff had shown a likelihood of success on its IGRA claim, that is not sufficient to revive plaintiff's false advertising claim.

Alternatively, plaintiff argues that Kalshi's original advertisements purporting to offer "sports betting" or "sports gaming" are false or materially misleading to consumers on their face, since Kalshi actually purports to be offering event contracts on a derivative exchange. Thus, plaintiff argues, by using the terms "betting" and "gaming," Kalshi is either in violation of IGRA *or* is misrepresenting the nature of its services in violation of the Lanham Act. However, as this court recognized throughout its earlier opinion, Kalshi *does* offer sports betting. (Op. & Order (dkt. #97) ("the activity at issue here is sports betting"); *see Assad*, No. 25-7516, 2026 WL 2543846, at *11 ("Kalshi's attempts to distinguish its sports event contracts from sportsbooks betting are unpersuasive."). The fact that Kalshi changed its business strategy to emphasize its betting as "sports event contracts" does not make its original advertisements false or misleading unless definitively found to be in violation of the law.

Because plaintiff's proposed amended complaint does not state a claim under the Lanham Act for false advertising, therefore, plaintiff's motion for leave to amend will be denied as futile. *See Indiana Funeral Directors Ins. Tr. v. Trustmark Ins. Corp.*, 347 F.3d 652, 655 (7th Cir. 2003) (courts can deny leave to amend under Fed. R. Civ. P. 15 if amendment would be futile).

## II. Defendants' Motion for Certification of Interlocutory Appeal

That leaves the question whether to certify for interlocutory appeal the following legal questions proposed by defendants:

> (1) whether an alleged violation of a tribal gaming ordinance is actionable as a compact violation under IGRA; and
>
> (2) whether the CEA's grant of exclusive jurisdiction to the CFTC bars Indian tribes such as Plaintiff from regulating derivatives traded on DCMs, as confirmed by UIGEA's express carve-out for transactions on DCMs in the context of internet gaming legislation.

(Dfts.' Br. (dkt. #102) 2.) Before certifying an order for interlocutory appeal, a court must find that "[its] order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Said another way: (1) there must be a question of law, (2) that is controlling, (3) contestable and (4) its resolution must promise to speed up the litigation. *Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 675 (7th Cir. 2000) (citation omitted).

As an initial matter, the court agrees with plaintiff that the questions as phrased by defendants above do not accurately reflect the court's reasoning and conclusions as set forth in the May 11, 2026, opinion and order granting in part and denying in part defendants' motion to dismiss. Instead, the controlling questions in the court's view are more accurately phrased as follows:

> (1) Can the Nation bring a claim under IGRA to enjoin class III gaming, unauthorized by the tribe but offered on tribal land by an entity that is not party to the Tribal-State compact? (This court answered "yes.")
>
> (2) Does the CEA or UIGEA preempt the Nation's authority under IGRA to regulate class III gaming activity that is offered on tribal lands in the form of sports events contracts on a derivative exchange? (This court answered "no.")

Phrased as such, the court agrees with defendants that the four criteria for certifying the court's opinion and order for interlocutory appeal are satisfied. First, even plaintiff concedes that the court's opinion "turns on pure questions of law." (Plt.'s Opp. Br. (dkt. #105) 4.) Second, the questions are controlling. If the Seventh Circuit disagrees with this court's ruling on either question, plaintiff's claims against defendants must be dismissed. Third, the questions are contestable as reflected by mixed decisions from courts around the country as to both questions. *See* discussion, *supra*. Finally, resolution of these questions will unquestionably speed up the litigation. In particular, regardless how this court rules ultimately on the merits, the case will certainly be appealed all the way up to the Supreme Court. Asking the Seventh Circuit to address these questions now creates a possibility that controlling legal issues may be more efficiently resolved without summary judgment or trial. The court recognizes that interlocutory appeals under § 1292(b) are "'not intended merely to provide review of difficult rulings in hard cases.'" *Union County v. Piper Jaffray & Co.*, 525 F.3d 643, 646 (8th Cir. 2008) (quoting *U.S. Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir. 1966) (per curiam)). Given that this case presents novel and complex questions for which there is no controlling precedent in this circuit, the court concludes that permitting an interlocutory appeal is appropriate in this case.

A final remaining question is whether this case should be stayed pending the outcome of an interlocutory appeal. The parties address defendants' entitlement to a stay under under standards mirroring those for granting a preliminary injunction. *See In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014) ("The standard for granting a stay pending appeal mirrors that for granting a preliminary injunction.") In brief, this means courts consider the likelihood of success on the merits, the irreparable harm that each side stands to incur, and the public's

interest in the outcome. (*Id.*) However, "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Tex. Indep. Producers & Royalty Owners Ass'n v. E.P.A.*, 410 F.3d 964, 980 (7th Cir. 2005) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)); *see also Munson v. Butler*, 776 F. App'x 339, 342 (7th Cir. 2019) ("[A] district court has inherent power to exercise its discretion to stay proceedings to avoid unnecessary litigation of the same issues.")

Aside from possible disputes over damages, the outcome of this case is not likely to turn on the resolution of factual disputes, but rather on resolution of legal questions that the Seventh Circuit could consider now if it accepts defendant's interlocutory appeal. If the case were to continue simultaneously in this court, the next stage would likely be summary judgment, during which this court would face the very same legal questions, albeit far less definitively. To avoid duplication of effort and unnecessary resources and expense that would arise from litigating the same claims in two courts, the court will stay this case pending the outcome of defendants' interlocutory appeal.

ORDER

IT IS ORDERED that:

1) Plaintiff Ho-Chunk Nation's motion for leave to amend its complaint (dkt. #99) is DENIED.

2) Defendants' motion for certification of interlocutory appeal (dkt. #101) is GRANTED, and this court CERTIFIES its May 11, 2026, opinion and order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

Case 2:26-cv-04031-TL Document 9-2 Filed 10/30/26 Page 425 of 428

3) Consistent with this order, the court will STAY all proceedings pending resolution of the legal questions certified for interlocutory appeal provided defendants seek leave to appeal from the Seventh Circuit expeditiously.

Entered this 11th day of September, 2026.

BY THE COURT:

/s/

______________________________________
WILLIAM M. CONLEY
District Judge

# EXHIBIT F

(EXCERPT)

STAYED,STAYED - DISCOVERY

# U.S. District Court [LIVE AREA]
# Middle District of Georgia (Columbus)
# CIVIL DOCKET FOR CASE #: 4:25-cv-00310-CDL

GEORGIA GAMBLING RECOVERY LLC v. KALSHI INC et al
Assigned to: US DISTRICT JUDGE CLAY D LAND
Cause: 28:1331 Fed. Question

Date Filed: 10/02/2025
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**GEORGIA GAMBLING RECOVERY LLC**

represented by **DAVID C RAYFIELD**
PO BOX 351
COLUMBUS, GA 31902-0351
(706) 320-0600
Fax: (706) 320-0622
Email: davidrayfield@waldrepmullin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DEREK T HO**
1615 M ST NW
STE 400
WASHINGTON, DC 20036
202-362-7931
Email: dho@kellogghansen.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**DAVID R HELMICK**
PO BOX 351
COLUMBUS, GA 31902
706-320-0600
Email: dhelmick@waldrepmullin.com
*ATTORNEY TO BE NOTICED*

**KYLE GRIGEL**
1615 M ST NW
STE 400
WASHINGTON, DC 20036
202-326-7978
Email: kgrigel@kellogghansen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

| | | |
|---|---|---|
| [illegible]9/2026 | | Notice of Clerk's Granting of Extension Pursuant to Local Rule 6.2 requested by GEORGIA GAMBLING RECOVERY LLC re: 62 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and 63 MOTION to Dismiss Amended Complaint. (esl) (Entered: 04/09/2026) |
| 04/10/2026 | 66 | This is a text only entry; no document issued. **ORDER** granting 65 Motion for Leave to File Excess Pages. Plaintiff's motion for leave to file a single memorandum of law, not to exceed 60 pages, in response to Defendants' motions to dismiss is granted. Ordered by US DISTRICT JUDGE CLAY D LAND on 4/10/2026 (sts) (Entered: 04/10/2026) |
| 04/30/2026 | 67 | UNOPPOSED MOTION for Extension of Time to File RESPONSE as to 63 MOTION to Dismiss Amended Complaint, 62 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by GEORGIA GAMBLING RECOVERY LLC filed by DAVID C RAYFIELD. (RAYFIELD, DAVID) (Entered: 04/30/2026) |
| 05/01/2026 | 68 | This is a text only entry; no document issued. **ORDER** granting 67 Motion for Extension of Time to File RESPONSE re 63 MOTION to Dismiss Amended Complaint, 62 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . Plaintiff shall have until May 19, 2026 to respond to Defendants' motions to dismiss. Ordered by US DISTRICT JUDGE CLAY D LAND on 05/01/2026 (sts) (Entered: 05/01/2026) |
| 05/13/2026 | 69 | MOTION to Stay Case by GEORGIA GAMBLING RECOVERY LLC filed by DAVID C RAYFIELD.(RAYFIELD, DAVID) (Entered: 05/13/2026) |
| 05/14/2026 | 70 | RESPONSE filed by ROBINHOOD DERIVATIVES LLC, ROBINHOOD MARKETS INC re 69 MOTION to Stay Case (SNIPES, ALAN) (Entered: 05/14/2026) |
| 05/15/2026 | 71 | NOTICE of Voluntary Dismissal by GEORGIA GAMBLING RECOVERY LLC as to ROBINHOOD DERIVATIVES LLC, ROBINHOOD MARKETS INC(RAYFIELD, DAVID) (Entered: 05/15/2026) |
| 05/15/2026 | 72 | NOTICE Plaintiff's Supplemental Notice Concerning Motion to Stay by GEORGIA GAMBLING RECOVERY LLC re 69 MOTION to Stay Case (RAYFIELD, DAVID) (Entered: 05/15/2026) |
| 05/18/2026 | 73 | This is a text only entry; no document issued. **ORDER** granting 69 Motion to Stay. The Court grants Plaintiff's unopposed motion to stay all proceedings for six months. If during this period the Supreme Court grants certiorari on the federal preemption issue, the stay will be automatically extended until the Supreme Court's issuance of an opinion. Ordered by US DISTRICT JUDGE CLAY D LAND on 05/18/2026 (sts) (Entered: 05/18/2026) |